1   ANTHONY R. SEGALL (CSB No. 101340)
    asegall@rsglabor.com
2   ROTHNER, SEGALL & GREENSTONE
    510 South Marengo Avenue
3   Pasadena, California 91101-3115
    Telephone: (626) 796-7555
4   Facsimile:  (626) 577-0124

5

    KATHERINE S. CHRISTOVICH (CSB No. 178397)
6   LEILA B. AZARI (CSB No. 262443)
    lazari@wga.org
7   WRITERS GUILD OF AMERICA, WEST, INC.
    7000 West Third Street
8   Los Angeles, CA 90048
    Telephone:  (323) 782-4521
9   Facsimile:  (323) 782-4806

10  Attorneys for Respondent Writers Guild of America, West, Inc. and Real Parties in Interest
    David E. Callaham and Jittery Dog Productions, Inc.
11

12                    UNITED STATES DISTRICT COURT

13                    CENTRAL DISTRICT OF CALIFORNIA

14                          WESTERN DISTRICT

15

16  DOUBLE LIFE PRODUCTIONS, INC., a      CV14-0197 DMG-AJW x
17  California corporation,
                                           CASE NO.
18                        Petitioner,
                                           NOTICE OF REMOVAL OF CIVIL
19          vs.                            ACTION

20  WRITERS GUILD OF AMERICA, WEST,        [Los Angeles Superior Court Case No.
    INC., a California corporation,        BS146511]
21
22                        Respondent;

23  DAVID E. CALLAHAM, an individual; and
    JITTERY DOG PRODUCTIONS, INC., a
24  California corporation,

25              Real Parties in Interest.

26      **PLEASE TAKE NOTICE** that Respondent Writers Guild of America, West, Inc., and Real

27  Parties in Interest David E. Callaham and Jittery Dog Productions, Inc. (collectively "Respondents")

28  hereby remove the above-entitled action from the Superior Court of the State of California for the

                                        1

County of Los Angeles to the United States District Court for the Central District of California pursuant to 28 U.S.C. §§ 1441 and 1446.  This removal is based on the original jurisdiction of the district court pursuant to 29 U.S.C. § 185, and 28 U.S.C. §§ 1331 and 1337.  In support of this Notice of Removal of Civil Action, Respondents allege as follows:

1.      On December 24, 2013, an action was commenced in the Superior Court of the State of California for the County of Los Angeles, entitled *Double Life Productions, Inc., a California corporation, Petitioner, vs. Writers Guild of America, West, Inc., a California corporation, Respondent; David E. Callaham, an individual; and Jittery Dog Productions, Inc., a California corporation, Real Parties in Interest*, Case No. BS146511.  A copy of the entire state court file in Case No. BS146511 is attached as Exhibit "A."

2.      The first date on which Respondents were served a copy of Petitioner's Verified Petition For Writ Of Mandate, For A Writ Of Prohibition And/Or A Writ Of Review Or Certiorari ("Petition") was December 30, 2013.

3.      This case is a civil action of which this Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1337.  It may be removed to this Court by Respondents pursuant to the provisions of 28 U.S.C. § 1441(b), because it arises under 29 U.S.C. § 185(a).  This Court has supplemental jurisdiction over any pendant state law claims under 28 U.S.C. § 1367, and such claims are therefore removed pursuant to the provisions of 28 U.S.C. § 1441(c).  The factual bases for the jurisdictional claims in this paragraph are as follows:

a.      At all relevant times, Respondent Writers Guild of America, West, Inc. ("Guild") was a labor organization which exists for the purpose of representing writers in the motion picture, broadcast, cable, interactive and new media industries, industries affecting commerce within the meaning of § 301(a) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a).

b.     At all relevant times, the Guild has represented writers in the motion picture, broadcast, cable, interactive and new media industries, including Real Party in Interest David Callaham ("Callaham").  Real Party in Interest Jittery Dog Productions, Inc. is Callaham's loan-out corporation.

c.     At all relevant times, the Guild was the exclusive bargaining representative of writers employed by, or who have contracted with, Petitioner Double Life Productions, Inc. ("Company"), an employer in an industry affecting commerce within the meaning of LMRA § 301(a), 29 U.S.C. § 185(a).

d.     At all relevant times, the Company was signatory to an industrywide collective bargaining agreement with the Guild known as the Writers Guild of America Theatrical and Television Basic Agreement ("MBA").

e.     In its Petition, Petitioner seeks writs commanding the Guild to investigate David E. Callaham, a writer employed under the MBA, based on allegations of fraud committed in connection with a determination of writing credits for a motion picture conducted by the Guild in 2009.  The Guild has authority to determine writing credits pursuant to collectively bargained procedures set forth in the MBA. *See Marino v. Writers Guild of America, East, Inc.*, 992 F.2d 1480, 1481-83 (9th Cir. 1993), *cert. denied*, 114 S. Ct. 472 (1993).  This action therefore arises under LMRA § 301(a), 29 U.S.C. § 185(a), and is removable to federal district court. *Id.* at 1483.

f.     The district court has jurisdiction over all the parties and its territorial jurisdiction encompasses the place where the Petition is pending.

4.     No other parties have been named in the Petition, and therefore no joinders are required to be filed herewith.

NOTICE OF REMOVAL OF CIVIL ACTION

1    **WHEREFORE,** Respondents pray that Petitioner's Petition be removed from the Superior

2    Court of the State of California for the County of Los Angeles to the United States District Court for

3    the Central District of California.

4

5    Dated: January 9, 2014                         ANTHONY R. SEGALL
                                                     ROTHNER, SEGALL & GREENSTONE
6
                                                     KATHERINE S. CHRISTOVICH
7                                                    LEILA B. AZARI
                                                     WRITERS GUILD OF AMERICA, WEST, INC.
8

9
                                                     By:
10                                                       LEILA B. AZARI
11                                                   Attorneys for Respondent Writers Guild of America,
                                                     West, Inc. and Real Parties in Interest David E.
12                                                   Callaham and Jittery Dog Productions, Inc.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
Charles M. Coate 140404
Costa Abrams & Coate, LLP
1221 Second St. 3Fl., Santa Monica CA 90401
TELEPHONE NO.: (310) 576-6161    FAX NO.: (310) 576-6161
ATTORNEY FOR (Name): Double Life Productions, Inc.

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 111 N. Hill St.
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Stanley Mosk Courthouse

CASE NAME:
Double Life Productions, Inc. v. Writers Guild of America West, Inc.,

FOR COURT USE ONLY

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

DEC 24 2013

Sherri R. Carter, Executive Officer/Clerk
By: Judi Lara, Deputy

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: BS146511 |
|---|---|---|---|---|
| ☒ Unlimited (Amount demanded exceeds $25,000) | ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter ☐ Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE: | |
| | | | DEPT: | |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)

**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)

**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)

**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)

**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☒ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.603)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition (not specified above) (43)

2. This case ☐ is ☒ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. ☒ monetary b. ☒ nonmonetary; declaratory or injunctive relief c. ☐ punitive
4. Number of causes of action (specify): 3 (Writ of Mandate; Writ of Prohibition; Writ of Reverse Certiorari)
5. This case ☐ is ☒ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: 12/24/13    CHARLES M. COATE ▶ Chas M Coate
(TYPE OR PRINT NAME)    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

0005

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the primary cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
  Damage/Wrongful Death
Uninsured Motorist (46) *(if the
  case involves an uninsured
  motorist claim subject to
  arbitration, check this item
  instead of Auto)*

**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death)
Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/
    Wrongful Death
Product Liability *(not asbestos or
  toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice–
    Physicians & Surgeons
  Other Professional Health Care
    Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip
    and fall)
  Intentional Bodily Injury/PD/WD
    (e.g., assault, vandalism)
  Intentional Infliction of
    Emotional Distress
  Negligent Infliction of
    Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
  Practice (07)
Civil Rights (e.g., discrimination,
  false arrest) *(not civil
  harassment)* (08)
Defamation (e.g., slander, libel)
  (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice
    *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease
    Contract *(not unlawful detainer
      or wrongful eviction)*
  Contract/Warranty Breach–Seller
    Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/
    Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open
  book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections
    Case
Insurance Coverage *(not provisionally
  complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute
**Real Property**
Eminent Domain/Inverse
  Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent
    domain, landlord/tenant, or
    foreclosure)*
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
  drugs, check this item; otherwise,
  report as Commercial or Residential)*
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court
    Case Matter
  Writ–Other Limited Court Case
    Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor
    Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
  *(arising from provisionally complex
  case type listed above)* (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of
    County)
  Confession of Judgment *(non-
    domestic relations)*
  Sister State Judgment
  Administrative Agency Award
    *(not unpaid taxes)*
  Petition/Certification of Entry of
    Judgment on Unpaid Taxes
  Other Enforcement of Judgment
    Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified
  above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-
    harassment)*
  Mechanics Lien
  Other Commercial Complaint
    Case *(non-tort/non-complex)*
  Other Civil Complaint
    *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
Partnership and Corporate
  Governance (21)
Other Petition *(not specified
  above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult
    Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late
    Claim
  Other Civil Petition

CM-010 [Rev. July 1, 2007]                    **CIVIL CASE COVER SHEET**

0006

| SHORT TITLE: Double Life Productions, Inc. v. Writers Guild, etal | CASE NUM. BS146511 |
|---|---|

# CIVIL CASE COVER SHEET ADDENDUM AND
## STATEMENT OF LOCATION
### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

This form is required pursuant to Local Rule 2.0 in all new civil case filings in the Los Angeles Superior Court.

**Item I.** Check the types of hearing and fill in the estimated length of hearing expected for this case:

JURY TRIAL? ☐ YES   CLASS ACTION? ☐ YES  LIMITED CASE? ☐YES  TIME ESTIMATED FOR TRIAL  7  ☐ HOURS/☒ DAYS

**Item II.** Indicate the correct district and courthouse location (4 steps – If you checked "Limited Case", skip to Item III, Pg. 4):

**Step 1:** After first completing the Civil Case Cover Sheet form, find the main Civil Case Cover Sheet heading for your case in the left margin below, and, to the right in Column **A**, the Civil Case Cover Sheet case type you selected.

**Step 2:** Check **one** Superior Court type of action in Column **B** below which best describes the nature of this case.

**Step 3:** In Column **C**, circle the reason for the court location choice that applies to the type of action you have checked. For any exception to the court location, see Local Rule 2.0.

> **Applicable Reasons for Choosing Courthouse Location (see Column C below)**

1. Class actions must be filed in the Stanley Mosk Courthouse, central district.
2. May be filed in central (other county, or no bodily injury/property damage).
3. Location where cause of action arose.
4. Location where bodily injury, death or damage occurred.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office

**Step 4:** Fill in the information requested on page 4 in Item III; complete Item IV: Sign the declaration.

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1., 2., 4. |
| | Uninsured Motorist (46) | ☐ A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1., 2., 4. |
| **Other Personal Injury/ Property Damage/ Wrongful Death Tort** | Asbestos (04) | ☐ A6070  Asbestos Property Damage | 2. |
| | | ☐ A7221  Asbestos - Personal Injury/Wrongful Death | 2. |
| | Product Liability (24) | ☐ A7260  Product Liability (not asbestos or toxic/environmental) | 1., 2., 3., 4., 8. |
| | Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons | 1., 4. |
| | | ☐ A7240  Other Professional Health Care Malpractice | 1., 4. |
| | Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250  Premises Liability (e.g., slip and fall) | 1., 4. |
| | | ☐ A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1., 4. |
| | | ☐ A7270  Intentional Infliction of Emotional Distress | 1., 3. |
| | | ☐ A7220  Other Personal Injury/Property Damage/Wrongful Death | 1., 4. |

LACIV 109 (Rev. 03/11)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM**
**AND STATEMENT OF LOCATION**

Local Rule 2.0
Page 1 of 4

| SHORT TITLE: Double Life, et al. v. Writers Guild, et al. | CASE NUMBER |
|---|---|

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Non-Personal Injury Property Damage Wrongful Death Tort** | Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1., 3. |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1., 2., 3. |
| | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1., 2., 3. |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1., 2., 3. |
| | Professional Negligence (25) | ☐ A6017  Legal Malpractice<br>☐ A6050  Other Professional Malpractice (not medical or legal) | 1., 2., 3.<br>1., 2., 3. |
| | Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 2.,3. |
| **Employment** | Wrongful Termination (36) | ☐ A6037  Wrongful Termination | 1., 2., 3. |
| | Other Employment (15) | ☐ A6024  Other Employment Complaint Case<br>☐ A6109  Labor Commissioner Appeals | 1., 2., 3.<br>10. |
| **Contract** | Breach of Contract/ Warranty<br>(06)<br>(not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction)<br>☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence)<br>☐ A6019  Negligent Breach of Contract/Warranty (no fraud)<br>☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 2., 5.<br>2., 5.<br>1., 2., 5.<br>1., 2., 5. |
| | Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff<br>☐ A6012  Other Promissory Note/Collections Case | 2., 5., 6.<br>2., 5. |
| | Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1., 2., 5., 8. |
| | Other Contract (37) | ☐ A6009  Contractual Fraud<br>☐ A6031  Tortious Interference<br>☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1., 2., 3., 5.<br>1., 2., 3., 5.<br>1., 2., 3., 8. |
| **Real Property** | Eminent Domain/Inverse<br>Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation          Number of parcels_____ | 2. |
| | Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2., 6. |
| | Other Real Property (26) | ☐ A6018  Mortgage Foreclosure<br>☐ A6032  Quiet Title<br>☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2., 6.<br>2., 6.<br>2., 6. |
| **Unlawful Detainer** | Unlawful Detainer-Commercial<br>(31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-Residential<br>(32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 2., 6. |
| | Unlawful Detainer-<br>Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2., 6. |
| | Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2., 6. |

SHORT TITLE: Double Life, et al. v. Writers Guild, et al.          CASE NUMBER:

| | A<br>Civil Case Cover Sheet<br>Category No. | | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|---|
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108 | Asset Forfeiture Case | 2., 6. |
| | Petition re Arbitration (11) | ☐ A6115 | Petition to Compel/Confirm/Vacate Arbitration | 2., 5. |
| | Writ of Mandate (02) | ☒ A6151 | Writ - Administrative Mandamus | 2., 8. |
| | | ☐ A6152 | Writ - Mandamus on Limited Court Case Matter | 2. |
| | | ☐ A6153 | Writ - Other Limited Court Case Review | 2. |
| | Other Judicial Review (39) | ☐ A6150 | Other Writ /Judicial Review | 2., 8. |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003 | Antitrust/Trade Regulation | 1., 2., 8. |
| | Construction Defect (10) | ☐ A6007 | Construction Defect | 1., 2., 3. |
| | Claims Involving Mass Tort (40) | ☐ A6006 | Claims Involving Mass Tort | 1., 2., 8. |
| | Securities Litigation (28) | ☐ A6035 | Securities Litigation Case | 1., 2., 8. |
| | Toxic Tort<br>Environmental (30) | ☐ A6036 | Toxic Tort/Environmental | 1., 2., 3., 8. |
| | Insurance Coverage Claims<br>from Complex Case (41) | ☐ A6014 | Insurance Coverage/Subrogation (complex case only) | 1., 2., 5., 8. |
| **Enforcement of Judgment** | Enforcement<br>of Judgment (20) | ☐ A6141 | Sister State Judgment | 2., 9. |
| | | ☐ A6160 | Abstract of Judgment | 2., 6. |
| | | ☐ A6107 | Confession of Judgment (non-domestic relations) | 2., 9. |
| | | ☐ A6140 | Administrative Agency Award (not unpaid taxes) | 2., 8. |
| | | ☐ A6114 | Petition/Certificate for Entry of Judgment on Unpaid Tax | 2., 8. |
| | | ☐ A6112 | Other Enforcement of Judgment Case | 2., 8., 9. |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033 | Racketeering (RICO) Case | 1., 2., 8. |
| | Other Complaints<br>(Not Specified Above) (42) | ☐ A6030 | Declaratory Relief Only | 1., 2., 8. |
| | | ☐ A6040 | Injunctive Relief Only (not domestic/harassment) | 2., 8. |
| | | ☐ A6011 | Other Commercial Complaint Case (non-tort/non-complex) | 1., 2., 8. |
| | | ☐ A6000 | Other Civil Complaint (non-tort/non-complex) | 1., 2., 8. |
| **Miscellaneous Civil Petitions** | Partnership Corporation<br>Governance (21) | ☐ A6113 | Partnership and Corporate Governance Case | 2., 8. |
| | Other Petitions<br>(Not Specified Above)<br>(43) | ☐ A6121 | Civil Harassment | 2., 3., 9. |
| | | ☐ A6123 | Workplace Harassment | 2., 3., 9. |
| | | ☐ A6124 | Elder/Dependent Adult Abuse Case | 2., 3., 9. |
| | | ☐ A6190 | Election Contest | 2. |
| | | ☐ A6110 | Petition for Change of Name | 2., 7. |
| | | ☐ A6170 | Petition for Relief from Late Claim Law | 2., 3., 4., 8. |
| | | ☐ A6100 | Other Civil Petition | 2., 9. |

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

| SHORT TITLE: Double Life, et al. v. Writers Guild, et al. | CASE NUMBER |
| --- | --- |

**Item III. Statement of Location:** Enter the address of the accident, party's residence or place of business, performance, or other circumstance indicated in Item II., Step 3 on Page 1, as the proper reason for filing in the court location you selected.

| REASON: Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected for this case.<br><br>☐1. ☒2. ☐3. ☐4. ☐5. ☐6. ☐7. ☐8. ☐9. ☐10. | ADDRESS:<br>Writers Guild of America, West, Arbitration Tribunal<br>7000 West Third Street<br>Los Angeles, CA 90048 |
| --- | --- |
| CITY: Los Angeles | STATE: CA | ZIP CODE: 90048 |

**Item IV.** *Declaration of Assignment:* I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that the above-entitled matter is properly filed for assignment to the **Stanley Mosk** courthouse in the **Central** District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., § 392 et seq., and Local Rule 2.0, subds. (b), (c) and (d)].

Dated: **December 24, 2013**

_____
(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet, Judicial Council form CM-010.

4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 03/11).

5. Payment in full of the filing fee, unless fees have been waived.

6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

0010

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

DEPT 18
JAMES C. CHALFANT

Charles M. Coate, Esq. (SBN: 140404)
Darius Anthony Vosylius, Esq. (SBN: 175030)
COSTA, ABRAMS & COATE, LLP
1221 Second Street, Third Floor
Santa Monica, California 90401
(310) 576-6161
fax (310) 576-6160
Attorneys for Petitioner Double Life Productions, Inc.

CONFORMED COPY
ORIGINAL FILED
Superior Court Of California
County Of Los Angeles

DEC 24 2013

Sherri R. Carter, Executive Officer/Clerk
By: Judi Lara, Deputy

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES

BS146511

DOUBLE LIFE PRODUCTIONS, INC., a California corporation,

　　　　Petitioner,

　　vs.

WRITERS GUILD OF AMERICA, WEST, INC., a California corporation,

Respondent;

DAVID E. CALLAHAM, an individual; and JITTERY DOG PRODUCTIONS, INC., a California corporation,

　　　　Real Parties in Interest.

Case No.:

**VERIFIED PETITION FOR WRIT OF MANDATE, FOR A WRIT OF PROHIBITION AND/OR A WRIT OF REVIEW OR CERTIORARI**

**MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION OF TREVOR SHORT**

[Cal. Const., art. VI § 10, Code Civil Procedure §§ 1063, 1064, 1084-1110b]

Date: TBD
Time: TBD
Dept.: TBD

Petitioner Double Life Productions, Inc. hereby petitions and alleges as follows:

## JURISDICTION AND VENUE

1.　　This Court has jurisdiction over the subject matter of this action and venue pursuant to the provisions of California Constitution Article VI § 10 and Code Civil

0011

VERIFIED PETITION FOR MANDAMUS, PROHIBITION OR CERTIORARI

Procedure §§ 1063, 1064, 1084-1110b, *et. seq.*

2.     This Court has personal jurisdiction over the Respondent and Real Parties in Interest named herein because they are based in this forum.   Furthermore, venue is also proper in this forum.

### THE PARTIES

3.     Petitioner Double Life Productions, Inc. was and is now, and at all relevant times mentioned herein, a California corporation with its principal place of business located in Los Angeles, California.

4.     Petitioner is informed and believes that Respondent Writers Guild of America, West, Inc. ("WGA") is a California corporation as well as labor union composed of writers who write content for television shows and motion pictures.

5.     Petitioner is informed and believes that real party in interest David E. Callaham ("Callaham") is an individual residing in Los Angeles County, California.

6.     Petitioner is informed and believes that real party in interest Jittery Dog Productions, Inc. ("Jittery Dog) is a California corporation that functions as Callaham's "loan-out corporation." Petitioner is further informed and believes that Callaham is the president, officer and/or authorized representative of Jittery Dog and at all relevant times has the authority to bind Jittery Dog.

7.     Petitioner is informed and believes that Callaham and Jittery Dog have an interest that is directly affected by this proceeding in that Petitioner is seeking a writ of mandate commanding the WGA to discipline Callaham for his fraudulent conduct committed in a 2009 WGA screen credit arbitration proceeding, as more fully described herein.

**0012**

2

Furthermore, Petitioner is seeking a writ of prohibition commanding the WGA to cease a pending arbitration filed on behalf of Callaham/Jittery Dog against Petitioner and others, as more fully described herein. Finally, Petitioner is seeking a writ of review or certiorari against the WGA and Callaham/Jittery Dog regarding the results of a 2009 WGA screen credit arbitration which Callaham/Jittery Dog largely prevailed on (based on Callaham's fraudulent conduct), as more fully described herein.

## NATURE OF ACTION

8.    The WGA performs and functions as a "quasi-judicial" body and organization. The WGA controls important economic interests and has attained a quasi-public stature in that it is a professional society of motion picture writers in the State of California.

9.    This petition respectfully requests that this Court issue three types of prerogative writs.  First, Petitioner respectfully requests that this Court issue a writ of mandate commanding the WGA to follow its procedures and to investigate its own member (*i.e.* Callaham/Jittery Dog) who apparently committed fraud upon the WGA and the Petitioner with respect to a 2009 WGA screen credit arbitration pertaining to the motion picture *The Expendables*.  Second, Petitioner respectfully requests that this Court issue a writ of prohibition commanding the WGA to cease representing and arbitrating a 2013 pending arbitration on behalf of Callaham/Jittery Dog against Petitioner and others pertaining to the motion picture *Expendables 2*. Third, Petitioner respectfully requests a writ of review (or certiorari) concerning the results of the 2009 WGA screen credit arbitration.

0013

VERIFIED PETITION FOR MANDAMUS, PROHIBITION OR CERTIORARI

10.     Petitioner does not have a plain, speedy, and adequate remedy in the ordinary course of law.

## GENERAL ALLEGATIONS

11.     Petitioner is informed and believes that Callaham is a writer with some experience in the motion picture industry and that he primarily writes comic book and science fiction screenplays. A copy of IMDB Pro's listing of Callaham's experience is attached hereto as **Exhibit "A."** See also Declaration of Trevor Short ("Short Dec.") ¶2).

12.     Petitioner is informed and believes that Callaham and/or Jittery Dog are members of the WGA.

13.     Petitioner is informed and believes that Sylvester Stallone ("Stallone") is also a member of the WGA.  Besides being a world-famous actor, Stallone is also a well-regarded writer. Indeed, Stallone has approximately twenty-seven writing credits on various motion picture projects and has an Oscar nomination for "best writing and screenplay" for the motion picture *Rocky*.

14.     This dispute results from Callaham's wrongful and fraudulent conduct during and after a 2009 WGA arbitration concerning the determination of screen writing credits for the motion picture *The Expendables*. As set forth below, Callaham engaged in fraudulent conduct during that 2009 arbitration and the subterfuge he committed back in 2009 continues to damage Petitioner to this day.

### The WGA Rules & Its Credit Determination Process

15.     Because of the fraud committed by Callaham on the WGA tribunal during the 2009 screen writing credit arbitration as alleged below, the WGA should investigate and

VERIFIED PETITION FOR MANDAMUS, PROHIBITION OR CERTIORARI

discipline Callaham according to its own rules.

16.     WGA working rule ¶1 states, in part that "A VIOLATION [BY A MEMBER] OF ANY WORKING RULE SHALL BE CONSIDERED GROUNDS FOR DISCIPLINARY ACTION." WGA Working Rule ¶2 states that each "member shall comply with these Rules in spirit as well as in letter." WGA Working Rule ¶15 states that no "member shall accept credit which misrepresents the member's contribution to a picture or program." WGA Working Rule ¶16 states, *inter alia*, that "members shall cooperate fully with the Guild Credits Committee in order that all credits shall properly reflect the writer's contribution to the final script." Attached hereto as **Exhibit "B"** and incorporated herein is a copy of the WGA's "Code of Working Rules." (See also Short Dec. ¶3).

17.     According to its website, the WGA's "primary duty is to represent our members in negotiations with film and television producers to ensure the rights of screen, television, and new media writers." Furthermore, according to its website, the WGA is "responsible for determining writing credits for feature films, television, and new media programs — a responsibility with far-reaching impact, financial and artistic. Writers' livelihoods often depend on the careful and objective determination of credits." (See also Short Dec. ¶4).

18.     According to the WGA's website, if an author writes "original material under Guild jurisdiction, the Guild's collective bargaining agreement provides you certain additional rights known as Separated Rights. The rights are quite important . . ." (See also Short Dec. ¶4).

19.     According to the Preface for the WGA's "Screen Credits Manual" attached

VERIFIED PETITION FOR MANDAMUS, PROHIBITION OR CERTIORARI

hereto as **Exhibit "C,"** the "administration of an accurate and equitable system of determining credits is therefore one of the most important services the Guild performs for writers. . ." (See also Short Dec. ¶5).

20.     The Preface to the Screen Credits Manual further explains that the "Guild is asked more than one hundred and fifty times a year to assist in the resolution of controversies between writers over their credits. Arduous and unpleasant as this chore sometimes is, the Guild undertakes it willingly . . . to ensure the validity of credit records on which the professional status of writers depends." (See also Short Dec. ¶5).

21.     The Preface then goes on to state that the "guiding principle of this system of credit determination is that the writing credits should be a true and accurate statement of authorship as determined by the rules of this Manual. . .  The importance of credits demands that writers give the process for determining credits the closest scrutiny." (See also Short Dec. ¶5).

22.     Paragraph 4 of the WGA's Screen Credits Manual states that all "participating writers are obligated to cooperate with the Guild . . . in every way required to render a fair and timely decision." (See also Short Dec. ¶5).

23.     The WGA provides for an appellate mechanism concerning credit determination arbitrations.  However, that mechanism contains very strict time limits and very limited grounds for an appeal.  In this case, the WGA's appellate mechanism does not provide a remedy in a situation such as the present one (*i.e.* where a prevailing writer such as Callaham/Jittery Dog later produces documents years later indicating that the prevailing writer actually committed fraud on the tribunal during the WGA credit determination

0016

VERIFIED PETITION FOR MANDAMUS, PROHIBITION OR CERTIORARI

arbitration). (See also Short Dec. ¶5).

24.     More specifically, ¶7 of the WGA Screen Credits Manual states that within "twenty-four hours of the initial notification of the Arbitration Committee's decision, any of the participating writers may request an internal Guild appeal to a Policy Review Board. . . The function of the Policy Review Board is to determine whether or not, in the course of the credit determination, there has been any serious deviation from the policy of the Guild or the procedure as set forth in this Manual. . . Only the following are grounds for a participant's appeal to a Policy Review Board:

a.     Dereliction of duty on the part of the Arbitration Committee or any of

its members;

b.     The use of undue influence upon the Arbitration Committee or any of

its members;

c.     The misinterpretation, misapplication or **violation of Guild policy**; or

d.     Availability of important literary or source material, for valid reasons not

previously available to the Arbitration Committee. . .

The Policy Review Board hearing must be held and its decision rendered within the 21 business days allowed for the arbitration under the provisions of the Minimum Basic Agreement." (See also Short Dec. ¶5).

25.     In this case, as alleged above, Callaham and/or Jittery Dog violated numerous WGA rules, including the WGA's Working Rule ¶15 which states that no "member shall accept credit which misrepresents the member's contribution to a picture or program." (See also Short Dec. ¶6).

0017

7

VERIFIED PETITION FOR MANDAMUS, PROHIBITION OR CERTIORARI

26.     However, as discussed in greater detail herein, Petitioner only discovered Callaham and/or Jittery Dog's fraudulent conduct years later in early 2013 long after the WGA's stated twenty-one day period to appeal referenced above expired. (See also Short Dec. ¶7).

### The August 2009 WGA Screen Credit Arbitration Re: *The Expendables*

27.     Petitioner was involved in the development and production of the motion picture *The Expendables*, starring Stallone as well as other notable action stars including Jet Li, Jason Statham, Arnold Schwarzenegger and Bruce Willis. (See also Short Dec. ¶8).

28.     Petitioner is informed and believes that Stallone was primarily responsible for writing the script for *The Expendables*. Petitioner is informed and believes that while Stallone was writing the script, he reviewed Callaham's script entitled *Barrow* and based part of the story for *The Expendables* on *Barrow*. Petitioner is informed and believes that while he was writing *The Expendables*, Stallone believed that Callaham might receive a shared "Story By" credit for *The Expendables* along with Stallone, but that Stallone should be credited solely with a "Screenplay By" credit. (See also Short Dec. ¶9).

29.     Petitioner is informed and believes that Callaham was paid $250,000 for writing services concerning *Barrow* pursuant to a "Blind Commitment Agreement" originally signed with Warner Bros. (See also Short Dec. ¶10).

30.     Stallone was not only a writer for *The Expendables* but also a production executive and a director of that motion picture.  Accordingly, because Stallone was also a production executive, the WGA rules provide for an automatic arbitration concerning screen writing credits under these circumstances. This screen writing credit arbitration took place in

VERIFIED PETITION FOR MANDAMUS, PROHIBITION OR CERTIORARI

or about August-September 2009. (See also Short Dec. ¶11).

31.     During that 2009 arbitration, Callaham represented that he was entitled to sole "Written By" credit for *The Expendables*.  In other words, upon information and belief, Callaham contended that he alone wrote the screenplay for *The Expendables*. As set forth below, these representations and Callaham's position were patently false and confirmed by Callaham's own written words and disclosures that came to light years thereafter. (See also Short Dec. ¶12).

32.     Nevertheless, on or about September 22, 2009, the WGA issued its screen writing credit determination. Callaham essentially prevailed and Callaham received a sole "Story By" credit and received the first position in a "Screenplay By" credit that he would share with Stallone with respect to *The Expendables*.  (See also Short Dec. ¶13).

33.     However, long after Callaham "prevailed" with the WGA screen credit arbitration, several August 2009 emails written by Callaham surfaced. These emails (which Petitioner is informed and believes were not shared by Callaham with the 2009 WGA screen writing credit arbitration tribunal) reflect that Callaham in direct violation of WGA Rules accepted credits which misrepresented his contribution to *The Expendables*, and in effect committed fraud on the WGA tribunal. (See also Short Dec. ¶14).

34.     For example, in one August 17, 2009, email, Callaham claims that the script for *The Expendables* "IS FUCKING AWFUL. . . I am ASTOUNDED at how bad this is. I **want you to know that it's nothing like what I wrote."** (emphasis added) Attached hereto as **Exhibit "D"** is a true and correct printout of Callaham's August 17, 2009, email that he wrote to Dave Kalstein and Kyle Harimoto confirming this. (See also Short Dec. ¶15).

VERIFIED PETITION FOR MANDAMUS, PROHIBITION OR CERTIORARI

35.    On August 18, 2009, Callaham wrote another email to Kyle Harimoto and Dave Kalstein, stating the following: "Put it this way: the idea and very loose structure [of *The Expendables*] is mine. Everything else . . . I plead the fifth. Or, to put it another way, if I get sole credit like I am asking for . . . it would be A MIRACLE." Attached hereto as **Exhibit "E"** is a true and correct printout of Callaham's August 18, 2009, email reflecting Callaham's belief about the merits of the position he advanced before the WGA. (See also Short Dec. ¶16).

36.    Petitioner is informed and believes that Callaham intentionally withheld these material emails, and concealed the limited extent of his contributions to *The Expendables* from the WGA screen writing credit arbitration panel in 2009 and instead continued to assert before the arbitral tribunal his patently false assertion that he was entitled to sole "Written By" credit for *The Expendables*. (See also Short Dec. ¶17).

37.    Callaham's false representations (*i.e.* that he wrote most of the shooting script for *The Expendables*) damaged Petitioner who justifiably were forced to rely upon on those false representations and pay Callaham/Jittery Dog a "writing credit bonus" of $102,250 as a result of the 2009 WGA screen credit arbitration based upon Callaham's falsehoods. If Petitioner had been aware of the falsity of the above misrepresentations of material fact, or omissions of material fact, then Petitioner would not have acted in the manner that it acted. (See also Short Dec. ¶18).

38.    Callaham's withholding of material information from the 2009 WGA screen writing credit arbitration panel ultimately unjustly enriched Callaham/Jittery Dog: because Callaham (improperly) received a shared "Screenplay By" credit for *The Expendables*,

VERIFIED PETITION FOR MANDAMUS, PROHIBITION OR CERTIORARI

Furthermore, based on Callaham's false representations and material omissions, Petitioner paid Callaham a credit bonus of over $102,250.   This amount should be returned by Callaham/Jittery Dog to Petitioner. (See also Short Dec. ¶19).

### *The Sequels* & The Pending 2013 WGA Arbitration

39.   *The Expendables* was released in the United States on or about August 13, 2010, and was a popular motion picture with general public.   (See also Short Dec. ¶20).

40.   Petitioner was then involved in developing and producing a sequel called *Expendables 2*, which was released in the United States on or about August 17, 2012.  *The Expendables 2* was also a popular motion picture with general public. (See also Short Dec. ¶21).

41.   Because *Expendables 2* was produced and released, WGA and Callaham/Jittery Dog have now taken the position that they are entitled to receive a "sequel payment" even though Callaham/Jittery Dog did not contribute any writing service for *Expendables 2*. A true and correct copy of the May 2013 "Notice of Claim" filed by the Respondent WGA against the Petitioner and others is attached hereto as **Exhibit "F."** (See also Short Dec. ¶22).

42.   In this 2013 arbitration, the WGA and Callaham/Jittery Dog have taken the position that Callaham/Jittery Dog have "separated rights" in *The Expendables*. Accordingly, based on this theory, the WGA and Callaham/Jittery Dog have taken the position that Petitioner and others owe Callaham/Jittery Dog the principal amount of $175,000 as a "sequel payment" because of *Expendables 2*, along with interest.  As of July 25, 2013, the WGA and Callaham/Jittery Dog contend they are owed in excess of $234,800

VERIFIED PETITION FOR MANDAMUS, PROHIBITION OR CERTIORARI

as a "sequel payment." (See also Short Dec. ¶23).

43.     *Expendables 3* is currently in production and is expected to be released in August 2014. (See also Short Dec. ¶24).

### Petitioner's Damages and Ongoing Injuries

44.     Petitioner has performed all conditions precedent to the filing of this petition. Petitioner has exhausted any and all internal remedies provided by the WGA and the initiation of the 2013 arbitration on behalf of Callaham/Jittery Dog excuses Petitioner from exhausting those remedies further.  Further, Petitioner is informed and believes and on that basis alleges that the 2009 screen credit determination as well as the WGA's refusal to investigate and/or discipline Callaham/Jittery Dog for its fraudulent conduct back in 2009 is final.

45.     Petitioner has been damaged by the conduct of the WGA and Callaham/Jittery Dog in that Petitioner wrongfully paid over $102,250 to Callaham/Jittery Dog with respect to *The Expendables.* Petitioner has been further damaged by being forced to incur attorney fees and costs in defending itself in the 2013 arbitration brought by the WGA on behalf of Callaham/Jittery Dog with respect to the *Expendables 2.* (See also Short Dec. ¶25). Therefore, Petitioner will seek leave to amend this petition to show the true amount and nature of these damages when they are ascertained.

46.     Furthermore, Petitioner's injuries as a proximate result of the wrongful conduct by the WGA and Callaham/Jittery Dog are continuing injuries. Thus, Petitioner would be required to institute successive actions at law for damages, leading to a multiplicity of judicial proceedings.

VERIFIED PETITION FOR MANDAMUS, PROHIBITION OR CERTIORARI

## PETITION FOR WRIT OF MANDATE

47.    A writ of mandate may issue to compel performance of a ministerial act or mandatory duty if there is a legal right in the person seeking relief, a corresponding duty and a lack of any other adequate remedy.  See C.C.P. §§1085(a), 1086.

48.    In this case, as alleged above, WGA working rule ¶1 states, in part that "A VIOLATION [BY A MEMBER] OF ANY WORKING RULE SHALL BE CONSIDERED GROUNDS FOR DISCIPLINARY ACTION." (See also Short Dec. ¶3).

49.    However, despite being informed of Callaham/Jittery Dog's fraudulent conduct with respect to the 2009 screen credit writing arbitration, the WGA has not initiated an investigation or disciplined Callaham. (See Short Dec. ¶26).

50.    The investigation of one of its members for disciplinary action is, upon information and belief, a ministerial act. Accordingly, a writ of mandate should issue from this Court requiring the WGA to investigate Callaham for his fraudulent conduct and for his numerous violations of the WGA rules and procedures.

51.    Petitioner has a beneficial interest in the requested writ of mandate because, *inter alia*, if Callaham/Jittery Dog are investigated and disciplined by the WGA, then the pending arbitration brought by the WGA against Petitioner and other will likely cease.

52.    Petitioner has established the requirements for its requested relief for a writ of mandate, including:

(a)    its beneficial interest. *See California Association for Health Services at Home v. State Department of Health Services* (2007) 148 Cal.App.4th 696, 704-707;

(b)    its performance of all conditions precedent, if any. (*See Igna v. City of Baldwin Park* (1970) 9 Cal.App.3d 909, 914; (See Short Dec. ¶¶ 5, 26).

VERIFIED PETITION FOR MANDAMUS, PROHIBITION OR CERTIORARI

(c)     the making of a demand on WGA for the requested relief.  *See Metropolitan Life Ins. Co. v. Rolph* (1920) 184 Cal. 557, 559. (See Short Dec. ¶26).

(d)     the ability of the Respondent to perform the duty or exercise the discretion when the writ seeks to compel performance of a duty or exercise of discretion. *See Treber v. Superior Court* (1968) 68 Cal.2d 128, 134.  In this case, there can be no doubt that the WGA has the authority to investigate Callaham, yet it refuses to do so.

(e)     the lack of an adequate legal remedy.  *See Phelan v. Superior Court* (1950) 35 Cal.2d 363, 366; and

(f)     damages. *See* C.C.P. §1095.

## PETITION FOR WRIT OF PROHIBITION

53.     A writ of prohibition may issue to prevent an inferior tribunal possessing quasi-judicial powers from exercising its jurisdiction in matters over which it lacks sufficient jurisdiction. See C.C.P. §§1102, 1103(a).

54.     As alleged above, in 2013, the WGA initiated an arbitration on behalf of Callaham/Jittery Dog with respect to the *Expendables 2*. (See Short Dec. ¶22; Exhibit "F").

55.     Because of Callaham/Jittery Dog's underlying fraudulent and wrongful conduct, there is no merit to this arbitration. Nevertheless, the WGA continues to prosecute the 2013 arbitration against the Petitioner and others. Accordingly, this Court should issue a writ of prohibition arresting and/or suspending the pending 2013 arbitration.

56.     Petitioner has established the requirements for its requested relief for a writ of prohibition, including:

(a)     the identity of respondent WGA as an inferior tribunal, corporation, board or person. *See* C.C.P. § 1103(a); *Haldane v. Superior Court (1963)* 221 Cal.App.2d 483, 485-

VERIFIED PETITION FOR MANDAMUS, PROHIBITION OR CERTIORARI

486;

(b)    the fact that respondent WGA is threatening to take judicial action without or in excess of its jurisdiction.  See C.C.P. §1102.  In this case, the WGA has initiated an arbitration and, if successful, will presumably seek to have such an arbitration award confirmed with this Court;

(c)    the fact that Petitioner objected to Respondent WGA's exercise of jurisdiction and/or that such an objection regarding Respondent's lack of jurisdiction would be useless. See *Rescue Army v. Municipal Court* (1946) 28 Cal.2d 460, 465; *Hanrahan v. Superior Court* (1947) 81 Cal.App.2d 432, 434-435.

(d)    the beneficial interest of Petitioner; C.C.P. §1103(a); *Seven Up Bottling Co. v. Superior Court* (1951) 107 Cal.App.2d 75, 76. In this case, the Petitioner has a beneficial interest in having the pending 2013 arbitration suspended and/or terminated in that it is a party to that arbitration.

(e)    the lack of an adequate legal remedy.  See *C.C.P. §1103(a)*; *Peebler v. Superior Court* (1944) 63 Cal.App.2d 651, 653; and

(f)    damages. *See* C.C.P. §§1095, 1105; *McCarthy v. Superior Court* (1944) 65 Cal.App.2d 42, 43.

## PETITION FOR WRIT OF REVIEW OR CERTIORARI

57.    A writ of review or certiorari may issue to review miscellaneous actions of inferior tribunals, boards and officers exercising judicial functions if these bodies have exceeded their jurisdiction and there is neither any appeal nor any plain, speedy and adequate remedy.  See C.C.P. §§1068(a), 1074.

VERIFIED PETITION FOR MANDAMUS, PROHIBITION OR CERTIORARI

58.   A writ of review commands the respondent to certify to this Court the transcript of what has been done and may, in addition, require the respondent to temporarily desist from further proceedings in the matter to be reviewed. C.C.P. §1071.

59.   Accordingly, for the reasons set forth above, Petitioner respectfully requests that this Court issue a writ of review with respect to the 2009 WGA screen credit arbitration and command the WGA to certify to this Court what has been done and to temporarily desist from prosecuting the current 2013 arbitration on behalf of Callaham/Jittery Dog with respect to the *Expendables 2*.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner prays judgment against Respondents and Real Parties in Interest, as follows:

1.   That the Court issue a peremptory writ of mandate in the first instance commanding respondent Writers Guild of America, West, Inc. to investigate David E. Callaham with respect to the alleged fraud committed by him during a 2009 WGA screen credit arbitration pertaining to *The Expendables*.

2.   That in the alternative, this Court first issue an alternative writ commanding respondent Writers Guild of America, West, Inc. to investigate David E. Callaham with respect to the alleged fraud committed by him during a 2009 WGA screen credit arbitration pertaining to *The Expendables* or, in the alternative, show cause why it should not do so and thereafter issue a peremptory writ commanding respondent to conduct this investigation.

3.   That the Court issue a peremptory writ of prohibition in the first instance commanding respondent Writers Guild of America, West, Inc. to immediately cease representing and arbitrating a 2013 pending arbitration on behalf of Callaham/Jittery Dog

16

0026

VERIFIED PETITION FOR MANDAMUS, PROHIBITION OR CERTIORARI

against Petitioner and others pertaining to the motion picture *Expendables 2*.

    4.    That in the alternative, this Court first issue an alternative writ commanding respondent Writers Guild of America, West, Inc. to immediately cease representing and arbitrating a 2013 pending arbitration on behalf of Callaham/Jittery Dog against Petitioner and others pertaining to the motion picture *Expendables 2* or in the alternative, show cause why it should not do so and thereafter issue a peremptory writ commanding respondent to conduct this investigation.

    5.    That the Court issue a peremptory writ of review of certiorari in the first instance commanding respondent Writers Guild of America, West, Inc. concerning the results of the 2009 WGA screen credit arbitration pertaining to *The Expendables*.

    6.    That in the alternative, this Court first issue an alternative writ of review of certiorari concerning the results of the 2009 WGA screen credit arbitration pertaining to *The Expendables* or in the alternative, show cause why such determination is not subject to review and thereafter issue a peremptory writ of review or certiorari pertaining to the 2009 WGA screen credit arbitration.

    7.    For general damages according to proof.

    8.    For costs of suit herein incurred;

    9.    For such other and further relief as the Court may deem proper.

Dated: December **15**, 2013        COSTA, ABRAMS & COATE, LLP

By: _____

Charles M. Coate
Attorneys for Petitioner Double Life Productions, Inc.

VERIFIED PETITION FOR MANDAMUS, PROHIBITION OR CERTIORARI

## VERIFICATION

I, Trevor Short, am an officer and authorized representative of the Petitioner Double Life Productions, Inc. in the above-entitled proceeding. I have read the foregoing petition and know its contents. The same is true of my own knowledge, except as to those matters that are therein alleged on information and belief, and as to those matters, I believe it to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and was executed in Los Angeles, California on December 13, 2013.

Trevor Short

0028

VERIFIED PETITION FOR MANDAMUS, PROHIBITION OR CERTIORARI

## DECLARATION OF TREVOR SHORT

I, TREVOR SHORT, hereby declare as follows:

1.      I am an officer and authorized representative of Petitioner Double Life Productions, Inc. ("Petitioner"). The matters set forth herein are true and correct and of my own personal knowledge, and if called upon to testify to these matters, I could and would do so competently.

2.      I am informed and believe that David E. Callaham ("Callaham") is a writer with some experience in the motion picture industry and that he primarily writes comic book and science fiction screenplays. Attached hereto as **Exhibit "A"** is a printout from IMDB PRO listing Callaham's experience in the motion picture industry.  I am further informed and believe that Callaham's "loan out company" is Jittery Dog Productions, Inc. ("Jittery Dog").

3.      The Writers Guild of America, West, Inc. ("WGA") working rule ¶1 states, in part that "A VIOLATION [BY A MEMBER] OF ANY WORKING RULE SHALL BE CONSIDERED GROUNDS FOR DISCIPLINARY ACTION." WGA Working Rule ¶2 states that each "member shall comply with these Rules in spirit as well as in letter." WGA Working Rule ¶15 states that no "member shall accept credit which misrepresents the member's contribution to a picture or program." WGA Working Rule ¶16 states, *inter alia,* that "members shall cooperate fully with the Guild Credits Committee in order that all credits shall properly reflect the writer's contribution to the final script."  Attached hereto as **Exhibit "B"** and incorporated herein is a copy of the WGA's "Code of Working Rules."

4.      According to its website, the WGA's "primary duty is to represent our members in negotiations with film and television producers to ensure the rights of screen,

VERIFIED PETITION FOR MANDAMUS, PROHIBITION OR CERTIORARI

television, and new media writers." Furthermore, according to its website, the WGA is "responsible for determining writing credits for feature films, television, and new media programs — a responsibility with far-reaching impact, financial and artistic. Writers' livelihoods often depend on the careful and objective determination of credits."

According to the WGA's website, if an author writes "original material under Guild jurisdiction, the Guild's collective bargaining agreement provides you certain additional rights known as Separated Rights. The rights are quite important . . ."

5.      According to the Preface for the WGA's "Screen Credits Manual," the "administration of an accurate and equitable system of determining credits is therefore one of the most important services the Guild performs for writers. . ."  A copy of the WGA's "Screen Credits Manual" is attached hereto as **Exhibit "C."**

The WGA provides for an appellate mechanism concerning credit determination arbitrations.  However, that mechanism contains very strict time limits and very limited grounds for an appeal.  In this case, the WGA's appellate mechanism does not provide a remedy in a situation such as the present one (*i.e.* where a prevailing writer such as Callaham/Jittery Dog later produces documents years later indicating that the prevailing writer actually committed fraud during the WGA credit determination arbitration).

6.      In this case, I am informed and believe that Callaham and/or Jittery Dog violated various WGA rules, including the WGA's Working Rule ¶15 which states that no "member shall accept credit which misrepresents the member's contribution to a picture or program."

7.      However, as discussed in greater detail herein, Petitioner only discovered

**0030**

VERIFIED PETITION FOR MANDAMUS, PROHIBITION OR CERTIORARI

Callaham and/or Jittery Dog's fraudulent conduct years later and long after the WGA's stated twenty-one day period to appeal referenced above expired.

8.    Petitioner was involved in the development and production of the motion picture *The Expendables*, starring Sylvester Stallone ("Stallone") as well as other notable action stars including Jet Li, Jason Statham, Arnold Schwarzenegger and Bruce Willis.

9.    I am informed and believe that Stallone was primarily responsible for writing the script for *The Expendables*. I am further informed and believe that while Stallone was writing the script, he reviewed Callaham's script entitled *Barrow* and based part of the story for *The Expendables* on *Barrow*. I am informed and believe that while he was writing *The Expendables*, Stallone believed that Callaham might receive a shared "Story By" credit for *The Expendables* along with Stallone, but that Stallone should be credited solely with a "Screenplay By" credit.

10.    I am informed and believe that Callaham was paid $250,000 for his writing services concerning *Barrow* pursuant to a November 14, 2002 "Blind Commitment Agreement" originally signed with Warner Bros.

11.    Stallone was not only a writer for *The Expendables* but also a production executive and a director of that motion picture.  Accordingly, because Stallone was also a production executive, I am informed and believe that the WGA rules provide for an automatic arbitration concerning screen writing credits under these circumstances. I am informed that this screen writing credit arbitration took place in 2009.

12.    During that 2009 arbitration, I am informed and believe that Callaham contended that he was entitled to sole "Written By" credit for *The Expendables*.  I am further

0031

VERIFIED PETITION FOR MANDAMUS, PROHIBITION OR CERTIORARI

informed and believe that Callaham contended that he alone wrote the screenplay for *The Expendables*. As set forth below, these allegations and Callaham's position appear to be patently false and confirmed by Callaham's own written words and disclosures that came to light years thereafter.

13.    Nevertheless, on or about September 22, 2009, I am informed and believe that the WGA issued its screen writing credit determination. Callaham essentially prevailed and Callaham received a sole "Story By" credit and received the first position in a "Screenplay By" credit that he would share with Stallone with respect to *The Expendables*.

14.    However, after Callaham "prevailed" with the WGA screen credit arbitration, several August 2009 emails written by Callaham surfaced years later. These emails (which I am informed and believe was not shared by Callaham with the 2009 WGA screen writing credit arbitration tribunal) reflect that Callaham in direct violation of WGA Rules accepted credits which misrepresented his contribution to *The Expendables*, and in effect, committed fraud on the WGA tribunal.

15.    For example, in one August 17, 2009, email, Callaham claims that the script for *The Expendables* "IS FUCKING AWFUL. . . I am ASTOUNDED at how bad this is. I **want you to know that it's nothing like what I wrote.**" (emphasis added) Attached hereto as **Exhibit "D"** is a true and correct printout of Callaham's August 17, 2009, email that he wrote to Dave Kalstein and Kyle Harimoto confirming this.

16.    On August 18, 2009, Callaham wrote another email to Kyle Harimoto and Dave Kalstein, stating the following: "Put it this way: the idea and very loose structure [of *The Expendables*] is mine. Everything else . . . I plead the fifth. Or, to put it another way, if I

22

0032

VERIFIED PETITION FOR MANDAMUS, PROHIBITION OR CERTIORARI

get sole credit like I am asking for . . . it would be A MIRACLE." Attached hereto as **Exhibit "E"** is a true and correct printout of Callaham's August 18, 2009, email reflecting Callaham's belief about the merits of the position he advanced before the WGA.

17.     I am informed and believe that Callaham intentionally withheld these material emails, and concealed the limited extent of his contributions to *The Expendables* from the WGA screen writing credit arbitration panel in 2009 and instead continued to assert before the arbitral tribunal his patently false assertion that he was entitled to sole "Written By" credit for *The Expendables*.

18.     Callaham's false representations (*i.e.* that he wrote most of the shooting script for *The Expendables*) damaged Petitioner who justifiably were forced to rely upon on those false representations and paid Callaham/Jittery Dog a "writing credit bonus" of $102,250 as a result of the 2009 WGA screen credit arbitration based on Callaham's falsehoods. If Petitioner had been aware of the falsity of the above misrepresentations of material fact, or omissions of material fact, then Petitioner would not have acted in the manner that it acted.

19.     Callaham's withholding of material information from the 2009 WGA screen writing credit arbitration panel ultimately unjustly enriched Callaham/Jittery Dog: because Callaham received a shared "Screenplay By" credit for *The Expendables* from a tribunal upon which fraud had been committed. Furthermore, based on Callaham's false representations and material omissions, Petitioner paid Callaham a credit bonus of over $102,250. This amount should be returned by Callaham/Jittery Dog to Petitioner.

20.     *The Expendables* was released in the United States on or about August 13, 2010, and I believe it was a popular motion picture with the general public throughout the

23

**0033**

VERIFIED PETITION FOR MANDAMUS, PROHIBITION OR CERTIORARI

world.

21.    Petitioner was then involved in developing and producing a sequel called *Expendables 2*, which was released in the United States on or about August 17, 2012. *The Expendables 2* was also a popular motion picture with the general public throughout the world.

22.    Because *Expendables 2* was produced and released, the WGA and Callaham/Jittery Dog have now taken the position that they are entitled to receive a "sequel payment" even though Callaham/Jittery Dog did not contribute any writing service for *Expendables 2*. A true and correct copy of the May 2013 "Notice of Claim" filed by the Respondent WGA against the Petitioner and others is attached hereto as **Exhibit "F."**

23.    In this 2013 arbitration, based on the results of the secret 2009 screen credit arbitration, the WGA and Callaham/Jittery Dog have taken the position that Callaham/Jittery Dog have "separated rights" in *The Expendables*. Accordingly, the WGA and Callaham/Jittery Dog now claim that Petitioner and others owe Callaham/Jittery Dog the principal amount of $175,000 as a "sequel payment" because of *Expendables 2*, along with interest and penalties. As of July 25, 2013, the WGA and Callaham/Jittery Dog contend they are owed in excess of $234,800 as a "sequel payment."

24.    *Expendables 3* is currently in production and is expected to be released in August 2014.

25.    Petitioner has been damaged by the conduct of the WGA and Callaham/Jittery Dog in that Petitioner wrongfully paid over $102,250 to Callaham/Jittery Dog with respect to *The Expendables*. Petitioner has been further damaged by being forced to incur attorney fees

VERIFIED PETITION FOR MANDAMUS, PROHIBITION OR CERTIORARI

and costs in defending itself in the 2013 arbitration brought by the WGA on behalf of Callaham/Jittery Dog with respect to the *Expendables 2*.

26.     The WGA has been informed of Callaham/Jittery Dog's fraudulent conduct with respect to the 2009 screen credit writing arbitration; however, I do not believe that the WGA has initiated an investigation or disciplined Callaham.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and was executed on this 13 day of December 2013, at Los Angeles, California.

Trevor Short

0035

# Dave Callaham

Main Details · Filmography · Personal Details · Media · Contact · Clients/Coworkers   & more

**Main Details**
STARmeter
Filmography
Summary
Year
Profession
Title Type
TV Series
Credited Name
Genre
Keyword
Budget
Box Office
Ratings
Votes
**Personal Details**
Biography
Quotes
Trivia
Other Works
Awards
Message Board
**Media**
Photo Gallery
Official Photos
Publicity
News Articles
Trailer
Blog
Web Sites
**Contact**
**Clients/Coworkers**
by STARmeter
by Company
by Relationship

| | |
|---|---|
| **Talent Agent:** | United Talent Agency (UTA) - Jason Burns  more » |
| | Beverly Hills, CA |
| | UTA Plaza |
| | 9336 Civic Center Drive |
| | Beverly Hills, CA 90210 |
| | USA |
| **Profession:** | Writer / Producer |
| **Known for:** | The Expendables / Doom / The Expendables 2 |
| **Also Known As:** | Dave Callaham / David Callaham  more » |
| **Born:** | 24 October 1977, USA (age 36)  more » |
| **Height:** | 6' 7" (2.01 m) |
| **Industry News:** | Godzilla, Ready to Roar at Comic-Con as Legendary Promotes Its Next Creature Feature (From Variety - Film News, 16 July 2013, 12:43 PM, PDT) |
| | Comic-Con 2013 schedule: All the best movie events (From EW.com - Inside Movies, 7 July 2013, 2:03 PM, PDT) |
| **News:** | First Look @ New "Godzilla" (From SneakPeek, 8 October 2013, 11:47 PM, PDT) |
| (425 articles) | 2nd Godzilla Trailer Has Leaked! (From ComicBookMovie, 8 October 2013, 10:20 PM, PDT) |
| | Watch the Godzilla Comic-Con trailer (From Flickeringmyth, 3 October 2013, 11:54 AM, PDT) |
| | See the Godzilla Comic-Con Teaser Trailer While You Can! (From Dread Central, 4 October 2013, 12:00 PM, PDT) |



STARmeter™

Current rank:
**16,733**
Click graph for more detail

Photo
Gallery
- Official
Photos

## Filmography sorted by: Production Status ▼ [Go]

↳ Jump to: Future Films · Past Films & Videos · Add IMDb Resume

**Projects In Development (2 titles)**

| | Year | MOVIE Meter | Status |
|---|---|---|---|
| The Bride - *Writer* | ???? | 445,739 | Unknown |
| Untitled MGM Sci-Fi/Adventure Project - *Writer* (screenplay) | ???? | 427,671 | Script |

**Films In Production (2 titles)**

| | Year | MOVIE Meter | Status | Budget |
|---|---|---|---|---|
| The Expendables 3 - *Writer* (characters) | 2014 | 189 | Filming | |
| Godzilla - *Writer* (screenplay) | 2014 | 74 | Post-production | |

**Past Films & Videos (6 titles)**

| | Year | MOVIE Meter | Budget | Opening Weekend | US Box Office |
|---|---|---|---|---|---|
| The Expendables 2 - *Writer* (characters) (as David Callaham) | 2012 | 491 | $92M | $28.6M | $85M |
| The Expendables - *Writer* (screenplay) (as David Callaham) (story) (as David Callaham) | 2010 | 851 | $80M | $34.8M | $103M |
| Tell-Tale - *Writer* (screenplay) (as David Callaham), *Executive Producer* | 2009 | 11,502 | $12M | | |
| Horsemen - *Writer* (written by) (as David Callaham) | 2009 | 6,106 | $20M | | |
| Doom - *Writer* (screenplay) (as David Callaham) (story) (as David Callaham) | 2005 | 3,174 | $60M | $15.5M | $28M |
| David Callaham: Writer Reel (short) - *Writer* | 2004 | 322,936 | $300 | | |

update   You may report errors and omissions on this page to the IMDb database managers. They will be examined and if approved will be included in a future update. Clicking the 'Edit page' button will take you through a step-by-step process.



EXHIBIT A

**0036**

http://pro.imdb.com/name/nm1700264/                                                10/16/2013

(The following Code of Working Rules applies to Associate, Current and Post-Current members.)

# Code of Working Rules

## OPERATING

1. Under the Constitution, the Guild may, from time to time, adopt Working Rules, as set forth below, governing the working relationship of members with employers, agents and others with whom writers have professional dealings in connection with writing services and literary properties. Any proposed working rule must be approved by the Board of Directors before submission to the membership for approval but shall not be effective or operative if, in the discretion of the Board of Directors, it is contrary to the provisions of the Constitution or causes a breach of any contract entered into by the Guild. A VIOLATION OF ANY WORKING RULE SHALL BE CONSIDERED GROUNDS FOR DISCIPLINARY ACTION.

2. Each member shall comply with these Rules in spirit as well as in letter.

## EMPLOYMENT

3.

(a) All agreements and contracts between writers and producers must be in writing.

(b) Each member must promptly file with the Guild office a copy of his/her contract of employment (whether such agreement provides for leasing of material, participation in profits, residuals or otherwise) in no case later than one week after the receipt of the contract. *In addition to any other disciplinary action which may be deemed proper, an automatic fine shall be levied upon a member who fails to file his/her contract within two weeks after written notice that there is no contract on record.*

4. No member shall do any work, including reviewing stock film before the commencement of a definite assignment under contract.

5. Each member shall comply with the terms of the Minimum Basic Agreements in spirit as well as in letter, and shall not accept any employment, sign any contract or make any agreement for employment which violates such Minimum Basic Agreements.

6. No member shall contract for employment with any producer under terms less favorable than those set forth in the applicable Minimum Basic Agreements.

Violation of this rule shall subject the member to disciplinary action and a fine of up to $2,000, or on flat deals where the amount of money involved exceeds $2,000, a fine of not more than 100% of the amount received for such writing.



NOTE: If you are working at the minimum on any assignment, check with the Guild office for further particulars as to the applicable provisions of the Minimum Basic Agreements.

7. No member shall make or enter into any contract or participate in any venture requiring the writing of any literary material by such writer whereby writer's initial compensation for the writing of such material shall be less than the minimum set forth in the applicable MBAs except with the specific written approval of the Guild, which approval may be granted only under unusual circumstances. In the case of joint ventures or other similar engagements or deals involving participation in profits, a waiver may be granted only where the writer's participation is substantial.

8. No member shall accept employment with, nor option or sell literary material to, any person, firm or corporation who is not signatory to the applicable MBAs.

Violation of this Rule shall automatically subject the member to a fine, the maximum amount of which shall not exceed 100% of the remuneration received from such non-signatory.

9. It shall be the responsibility of every member to report, in confidence to the Guild office, for appropriate action, any violation or abuses of the terms and working standards established by the current Minimum Basic Agreements and Code of Working Rules, including any "offers" of employment which violate the current Minimum Basic Agreements.

10. No member may enter into a contract for the rendition of writing services with any producer whose name is contained in the then current Guild unfair list unless such producer shall have first posted a bond with the Guild guaranteeing the full amount of the writer's proposed compensation pursuant to such contract.

Violation of this Rule shall automatically subject the member to a fine, the maximum amount of which may not exceed 100% of his/her remuneration pursuant to such contract and the minimum amount of which shall be $250 or the applicable minimum, whichever is lower.

11. No member shall participate in any arrangement for ghost writing.

Violation of this Rule shall subject the member to disciplinary action and a fine of up to $2,000.

12. Each member upon being assigned under an employment contract is required to ascertain from the proper authorities in the production company the name or names of any other writers currently assigned to the same material. It will be the obligation of the member to notify the other writer or writers on the property of the fact that he/she has been assigned to it.

13. Each member shall report to the Guild any engagement as a producer, director or executive, or any activities which involve the hiring and firing of writers.

## SPECULATIVE WRITING

14. No member shall work for a producer on speculation or under any arrangement in which

payment is contingent on approval or ability to pay. Members may, however, discuss their thoughts and reactions regarding material owned by the producer; it is recommended, however, that in such cases the writer shall make a written memorandum of any suggestions made by him/her and register this material at the Guild office.

Violation of this Rule shall subject the member to disciplinary action and a fine of up to $2,000.

## CREDITS AND ARBITRATION

15. No member shall accept credit which misrepresents the member's contribution to a picture or program.

16. Members shall accept, abide by and contract for credit only in accordance with the terms and provisions of the applicable Minimum Basic Agreements; and members shall cooperate fully with the Guild Credits Committee in order that all credits shall properly reflect the writer's contribution to the final script.

17. Each member shall promptly report to the Guild all writing credits received on pictures or programs produced by non-signatory producers.

18. If a writer performing duties as a production executive intends to claim collaboration credit, he/she must, at the time he/she starts to work as a writer, signify such intention in writing to the Guild and to any other writer or writers assigned to the script. *Failure to comply will subject the member to disciplinary action.* In order to be entitled to credit, such production executive must be able to furnish the Guild with written material of his/her own, which can be identified as his/her contribution to the finished script.

## PSEUDONYM

19. A writer must use his/her own name in all writing credits unless he/she has already established a pseudonym or registers one at the Guild office *before commencement of employment* on a writing assignment, or *before disposition of any rights* to literary material on which he/she wishes to use such pseudonym.

## ORIGINAL STORIES, SERIES AND PROGRAM IDEAS, ORIGINAL RADIO, SCREEN AND TELEPLAYS

20. For the purposes only of these Rules, original stories, series and program ideas and original radio, screen and teleplays shall be defined as material which is the sole creation of the member or members and which is written by the member or members on his/her or their own time.

21. Each member shall promptly file with the Guild office a copy of his/her original story, series or program idea, and/or original radio, screen or teleplay sales or leasing contract, which filing shall in no event be later than one week after receipt of such contract.

NOTE: Members are strongly urged to register all literary material which they own with the Registration Service maintained at the Guild office prior to offering such material for sale or other exploitation. While such registration is not a substitute for the statutory copyright which must be obtained on publication of the work, it is extremely helpful if suit is brought for any copyright infringement or plagiarism of the material.

## ADVERTISING

22. The Writers Guild of America, West, Inc. has adopted and approved the agreement between the Screen Writers Guild and the consenting trade publications condemning the following practices as unfair:

  1. Slanting reviews on account of advertising, or retaliating against a writer for failure to advertise.

  2. Using pressure from a writer's employer to get advertising.

  3. Engaging in any harassing practices, such as making repeated solicitation, asking for chain advertising, or soliciting an advertisement in connection with a particular picture before the picture has been previewed (or a particular show or series before the program has been broadcast).

The consenting trade publications have instructed their staffs to refrain from engaging in any of the above practices.

Members should immediately notify the Guild of any violation of the Code of Fair Practices.

## AGENTS

23. No writer shall enter into a representation agreement whether oral or written, with any agent who has not entered into an agreement with the Guild covering minimum terms and conditions between agents and their writer clients.

## ADDRESSES

24. Each member shall inform the Guild of his/her residence address and agent and will immediately advise the Guild of any changes thereof.

A member whose address is outside the United States shall inform the Guild immediately upon his entry into the United States.

The Guild must be able to contact a member whenever necessary.

Revised: 5/21/68; 7/24/74; 9/24/86.



# Screen Credits Manual



**WGAW** WRITERS GUILD OF AMERICA WEST



WRITERS GUILD of AMERICA EAST

# Contents

*Effective for Notices of Tentative Writing Credits submitted on or after June 18, 2010.*

PREFACE ................................................................................iv

**I. WORKING PROCEDURES** .................................................. 1
  **A. Writer's Responsibility When Assigned** ...................... 1
    1. Notify Other Writers on the Same Assignment ................1
    2. File Contract at Guild Office ...........................................1
    3. Keep a Copy of All Work Done .......................................1
  **B. Collaboration: A Team of Writers** ..............................2
  **C. Writing Independently of Prior Scripts** ......................2

**II. CREDIT DETERMINATION PROCEDURE** ........................ 4
  **A. Notice of Tentative Writing Credit** ............................ 4
  **B. What To Do Upon Receipt of Notice** ...........................5
  **C. Agreement Among Writers** ...................................... 6
  **D. Arbitration** ..............................................................7
    1. Selection of Arbiters .....................................................7
    2. Screen Credits Consultants .......................................... 8
    3. Anonymity of Arbiters and Consultants ......................... 8
    4. Rights and Responsibilities of Participants ................... 8
    5. Pre-Arbitration Hearing ................................................11
    6. Procedure of Arbitration Committee ..............................11
    7. Appeals Before a Policy Review Board ......................... 13
    8. Notification ................................................................ 14
    9. Guild Decision Final .................................................... 15

**III. GUILD POLICY ON CREDITS** ......................................16
  **A. Definitions** ............................................................16
    1. Writer ........................................................................ 16

2. Literary Material.................................................................16

3. Source Material ................................................................16

4. Story ..................................................................................17

5. Screen Story.....................................................................17

6. Screenplay ........................................................................17

7. "Written by" ......................................................................18

8. "Narration Written by" .....................................................18

9. "Based on Characters Created by"...............................18

10. "Adaptation by"...............................................................18

**B. Rules for Determining Credit ............................................18**

1. "Written by" ......................................................................19

2. "Story by" .........................................................................19

3. "Screen Story by" ............................................................19

4. "Screenplay by" ...............................................................19

5. "Adaptation by".................................................................22

6. Irreducible Story Minimum .............................................22

7. No Other Credits Approved............................................22

**C. Production Executives..........................................................23**

1. Automatic Arbitration Provisions ...................................23

2. Notice Requirements.......................................................23

3. Percentage Requirements to Receive Screenplay
Credit...............................................................................23

**D. Remakes.................................................................................24**

**E. Withdrawal From Credit .......................................................24**

**F. Guild's Right to Protest .......................................................25**

**G. Order of Names ....................................................................25**

**H. Pseudonyms ..........................................................................25**

**I. Written Material Prevails.......................................................26**

**J. Revision of Script After Final Credit Determination........26**

**K. Publicizing of Credits ..........................................................27**

**L. Conclusion.............................................................................27**

iii

# Preface

A writer's position in the motion picture or television industry is determined largely by his/her credits. His/her professional status depends on the quality and number of the screenplays, teleplays, or stories which bear his/her name. Writing credit is given for the act of creation in writing for the screen. This includes the creation of plot, characters, dialogue, scenes and all the other elements which comprise a screenplay.

The administration of an accurate and equitable system of determining credits is therefore one of the most important services the Guild performs for writers, and it is to a better understanding of this important responsibility that this Manual is dedicated.

The Guild is asked more than one hundred and fifty times a year to assist in the resolution of controversies between writers over their credits. Arduous and unpleasant as this chore sometimes is, the Guild undertakes it willingly, not only to protect writers from embarrassing personal conflicts but also to ensure the validity of credit records on which the professional status of writers depends.

The guiding principle of this system of credit determination is that the writing credits should be a true and accurate statement of authorship as determined by the rules of this Manual. Fortunately, the written material provides a definite basis for credit determination, and the willingness of experienced writers to read this material carefully and weigh the contributions of the participants ensures a fair and impartial decision arrived at by qualified persons.

The importance of credits demands that writers give the process for determining credits the closest scrutiny. The rules and procedures set down here are based on:

1. the Guild's contractual obligations under the Minimum Basic Agreements; and

2. the Guild's own rules and regulations adopted by the membership, which are put into practice by writers.

iv

# I. Working Procedures

## A. WRITER'S RESPONSIBILITIES WHEN ASSIGNED

### 1. Notify other writers on the same assignment.

The Company is obligated, under the Minimum Basic Agreement, to notify a writer of all writers currently or previously employed by the Company on the same material. At the request of any participating writer, the Company will notify the writer in writing of the name(s) of any writer(s) employed subsequent to such writer.

The writer's responsibility begins at the moment the writer starts an assignment. A Guild Working Rule requires that the writer ascertain from the proper authorities in the production company the names of any other writers currently assigned to the same material. The writer also must notify any such writers of the fact that the writer has been assigned to the material.

### 2. File contract at Guild office.

Each member must promptly file with the Guild office a copy of his/her contract of employment, in no case later than one week after receipt of the contract.

### 3. Keep a copy of all work done.

For fair credit determination it is vital that the writer keep copies of all work done. To be considered in a credit arbitration, literary material must have been submitted by the writer to the Company upon completion of the work or upon purchase. All material should be properly dated and labeled. Copies of story or script suggestions constituting literary material should be kept and must also have been submitted to the Company in writing if the writer wants to claim credit for these contributions. A dated memorandum to the Company can place these suggestions on the record. Literary material submitted to the Company includes submis-

**1**

sion to individuals authorized by the Company to accept such materials.

## B. COLLABORATION: A TEAM OF WRITERS

A "team" of writers is defined as follows: Two writers who have been assigned at about the same time to the same material and who work together for approximately the same length of time on the material.

The Guild does and must presume that when two writers comply with the definition of a team and their names appear jointly on the work that is produced, the whole will be judged as a joint contribution unless a specific objection to this assumption is made at the time of the writing. Such objections should be made in writing to the Screen Credits Administrator and concurrently to the other writer. It is the Guild's position that a writer who chooses to question the validity of a collaboration should do so openly and frankly at the time the work is done and not several months later in the course of a dispute as to credits.

If a writer is employed to work as part of a team in collaboration with a writer also employed in an additional capacity, a collaboration agreement is required in order for the writer also employed in an additional capacity to claim co-authorship of the team's material. (See "Section III.C., Production Executives.")

When credit is accorded to a team of writers, an ampersand (&) shall be used between the writers' names in the credit to denote a writing team. Use of the word "and" between writers' names in a credit indicates that the writers did their work separately, one usually rewriting the other. This distinction is well established in the industry through custom and practice.

## C. WRITING INDEPENDENTLY OF PRIOR SCRIPTS

It has been the practice and the policy of arbiters in credit arbitrations to assume that a writer has access to prior literary material, an assumption based on the custom of the industry.

2

Although a writer may claim in all honesty not to have seen any prior literary material, and/or that the producer had asked the writer not to read any prior literary material; and/or that all copies of prior literary material had been made unavailable for any reason whatsoever, nevertheless, the arbiters must act on the basis that there is presumptive evidence that a writer did, in fact, have access, in spite of a writer's claim of "writing independently of prior scripts," if a significant similarity exists between a prior piece of literary material and a writer's later literary material. The arbiters must proceed on the basis that the similarities in themselves constitute presumptive evidence that there must have been some sort of access even if the literary material of the prior writer was only orally transmitted, as, for example, from a production executive to a later writer. It is also presumptive evidence that a production executive would relate in some manner or form, directly or inadvertently, formally or informally, significant contents of a prior piece of literary material which may or may not be incorporated in later literary material.

Therefore, it is the policy of the Guild that the written material will prevail, making the lack of or the existence of a significant similarity between the prior or later literary material the deciding factor. Because this presumption is irrebuttable, the claim of writing independently of prior literary material may not be considered by a Policy Review Board.

This section relates only to the presumption that subsequent writers have access to prior writers' literary material. Please see "Section III. Guild Policy on Credits" for contribution necessary to receive credit.

3

# II. Credit Determination Procedure

## A. NOTICE OF TENTATIVE WRITING CREDIT

Schedule A of our Minimum Basic Agreement provides that the Company will send to each participant, or to the current agent of a participating writer if that participant so elects, and to the Guild concurrently a Notice of Tentative Writing Credits ("Notice"). The Company also is required to provide each participating writer (or designated agent) a copy of the final shooting script (or if such script is not available, the latest revised script).

A participant is defined as a writer who has participated in the writing of the screenplay, or a writer who has been employed by the Company on the story and/or screenplay, or a "professional writer"[1] who has sold or licensed literary material subject to the Minimum Basic Agreement. In addition, in the case of a remake, any writer who received writing credit under any WGA Basic Agreement in connection with a prior produced version shall also be a participant. If a participating writer is deceased or unavailable to participate in the credit determination process, such writer may participate through an appropriate representative. As a participant, the writer shall be entitled to participate in the procedure for determination of writing credits.

Although it is the Company's responsibility to send the Notice properly in accordance with the MBA provisions, it is in the best interest of each participating writer to make sure the Guild and the Company always

---

[1] The MBA generally defines a "professional writer" as a person who has received employment for a total of thirteen weeks as a television or theatrical motion picture writer; or received credit on the screen for a television or theatrical motion picture; or received credit for a professionally produced play or a published novel. A writer may also negotiate with a Company to be treated as a "professional writer" even if the writer would not otherwise qualify as a "professional writer" under the MBA.

4

have current address information to ensure proper and timely delivery. If a writer contractually designates an agent or other representative to receive Notices then the writer should periodically remind such representative to forward all Notices in a timely manner so important deadlines are not missed.

If a participating writer intends to be away from his/her residence, or for any other reason will not be able to receive materials at his/her customary mailing address, the writer should give prompt written notice to the Company to send the Notice of Tentative Writing Credits and the Final Shooting Script to a specified representative.

### B. WHAT TO DO UPON RECEIPT OF NOTICE

1. If the writer agrees with the tentative writing credits proposed by the Company, the writer does nothing, signifying acquiescence by failure to protest.

2. If after reading the final script, the writer wishes to discuss the credits with the other participating writers involved before deciding whether or not to protest the tentative writing credits, the writer may call the Guild and the Guild will make reasonable efforts to arrange for such discussion.

3. If after reading the final script the writer wishes to protest the tentative writing credits as proposed by the Company, the writer sends the following written protest both to the Company and to the Guild:

"HAVE READ FINAL SCRIPT AND HEREBY PROTEST TENTATIVE WRITING CREDITS ON (NAME OF PRODUCTION) AND CONSIDER CREDIT SHOULD BE _____."

Such written protest must be received by the Company and the Guild within the time specified at the bottom of the Notice of Tentative Writing Credits, but in no event shall this time be less than that specified in the Minimum Basic Agreement which states, "The Company will keep the final determination of screen credits open until a time specified in the notice by the Company, but such time will not be earlier than 6:00 p.m.

5

of the tenth business day following the next day after the dispatch of the notice above specified (12 business days); provided, however, that if in the good faith judgment of the Company there is an emergency requiring earlier determination and the Company so states in its notice, such time may be no earlier than 6:00 p.m. of the fifth business day following the next day after the dispatch of the notice above specified (7 business days)."

No writer should request credit or ask for an arbitration without first having read the final script.

4. In the case of an automatic arbitration, the Guild will be deemed to have made a written request for arbitration of credits at the time the Company submits the Notice of Tentative Writing Credits.

## C. AGREEMENT AMONG WRITERS

The Minimum Basic Agreement provides that, when more than one writer has participated in the writing of a motion picture, then all participants have the right to agree unanimously among themselves as to which of them shall receive writing credits on the screen and in what form, provided that the form agreed upon is in accordance with the terms of Theatrical Schedule A of the Minimum Basic Agreement, and provided the agreement is reached in advance of arbitration. The Minimum Basic Agreement also provides that the form of such credit shall not be suggested or directed by the Company.

Any participant may initiate a meeting or other discussion among all the writers who have contributed to try to reach such an agreement.

After a protest is received by the Guild, if there is an indication that agreement on the credits might be reached by the participants, the Screen Credits Administrator will make reasonable efforts to arrange a meeting or other discussion among the writers for this purpose. If no agreement is reached, credits shall be finally determined by arbitration.

6

## D. ARBITRATION

NOTE: The words "arbitration" and "arbiters" and their variants are used in this Manual in their broadest general, as opposed to technical, sense as implying an expeditious, fair and impartial means of resolving differences among writers as to their credits. There is no intended or implied connection with the more formalized arbitrations conducted in other forums, such as court-ordered arbitrations or union-management arbitrations. Use of the terms "arbitration" and its variants in this Manual does not contemplate that the credit determination procedures hereinafter set forth are to be construed as a form of statutory arbitration or as a grievance/arbitration mechanism such as the one contained in Articles 10 and 11 of the Minimum Basic Agreement.

No individual who serves as an arbiter, consultant, member of a Special Committee or Policy Review Board shall have an interest in the outcome of the credit determination.

### 1. Selection of Arbiters

Any controversy as to credits shall be determined by an Arbitration Committee consisting of three members of the Guild who shall be drawn from the Screen Arbiters List. The Screen Arbiters List includes writers who have been current members for at least five years or who have received three screen credits. At least two of the three arbiters on any Arbitration Committee shall have served on no less than two previous Arbitration Committees.

In setting up a Committee to serve in a particular arbitration, the Screen Credits Administrator shall submit to the participating writers a copy of the Screen Arbiters List. Each participating writer shall have the right to challenge peremptorily a reasonable number of the names on the Screen Arbiters List. The Screen Credits Administrator will select the Arbitration Committee from the names remaining on the list after all participating writers have had the opportunity to file a list of peremptory challenges.

7

Wherever possible, arbiters will be selected who are experienced in the type of writing involved in the particular arbitration. The members of the Committee so selected shall not be informed as to the name or identity of the other members of the Committee.

## 2. Screen Credits Consultants

One member of the Guild's Screen Credits Committee shall be designated by the Screen Credits Administrator to act as Consultant for each Arbitration Committee, and he/she shall be available to the members of that Arbitration Committee for information on policy, rules, precedent, and procedure during the arbitration period. It is his/her duty to aid the Committee toward a majority decision.

## 3. Anonymity of Arbiters and Consultants

As has always been Guild practice, the names of the arbiters and consultants selected remain anonymous and confidential. The Guild does not reveal the arbiters' or consultants' identities or any identifying information about them to the Company, the participating writers or anyone else outside the credit determination process. Arbiters and consultants volunteer their services in reliance upon the Guild's promise of anonymity.

## 4. Rights and Responsibilities of Participants

All participating writers are obligated to cooperate with the Guild, including the Screen Credits Administrator, Consultant, Arbitration Committee and Policy Review Board panel, in every way required to render a fair and timely decision.

### a. Verification of Materials

The Minimum Basic Agreement requires the Company to submit three copies of all available material written by the participating writers as well as the available source material. Inasmuch as the final determination of credits is based on an analysis of this written material, the writer owes it to himself/herself to examine all literary material and source mate-

rial submitted to the Guild by the Company and to make certain that all material written by him/her has been submitted and such material is accurately attributed and dated. This may necessitate a trip to the Guild office to examine material.

Under provisions of the Minimum Basic Agreement, the Guild has the right to ask for a cutting continuity which will be provided by the Company if it is available at the time of the arbitration. For this reason, if a writer believes that the "final shooting script" does not accurately reflect what was shot during principal photography, he/she should request the Screen Credits Administrator to ask the Company to submit a cutting continuity. If the cutting continuity is submitted to the Arbitration Committee, it is not credited to any participating writer.

### b. Statement to the Arbitration Committee

While the Arbitration Committee bases its decision on literary material, including scripts, stories, treatments, etc., and source material, each participating writer is strongly urged to submit a written statement of his/her position to the Screen Credits Administrator to forward to the arbiters. It is suggested that the statement address the requirements to receive credit as set forth in this Manual, "Section III. Guild Policy on Credits." The statement may include breakdowns and illustrative comparisons between the final shooting script and earlier work or any other information which would help the Arbitration Committee to evaluate the writer's contribution to the final shooting script. It is the Guild's policy to preclude references to a writer's entitlement to contingent compensation tied to the receipt of credit on the screen. Participants shall not include such references in their statements. Participating writers also shall not include as part of their statements to the Arbitration Committee any letters of support from other individuals.

Statements should not contain information pertaining to the development process that is not germane to the arbiters' analysis of the literary

material. For example, the fact that a project was "greenlit" after a certain draft is irrelevant in determining credits. The Arbitration Committee must base its decision on each writer's relative contribution to the final shooting script, and not on the perceived quality of work or other extraneous factors. In addition, statements may not contain information irrelevant to the written work which may prejudice any writer in the process.

As the written statement is the participant's only opportunity to communicate his/her position to the arbiters, it is advised that the writer take due care in its preparation. There is no set form or required length. Because of the limitation of 21 business days for the arbitration, this statement must be delivered to the Guild within 24 hours after the writer has notice that there has been a protest. At the request of a participating writer, additional time to submit a statement may be granted by the Screen Credits Administrator within the time constraints for determination of credits. Such requests will not be unreasonably denied. A participant's failure to submit a statement in a timely fashion shall not preclude the Guild from proceeding with an arbitration with the statements then available to the Guild. If a participating writer submits a statement after the materials have been submitted to the Arbitration Committee, the Screen Credits Administrator will forward such statement to the Arbitration Committee, provided such statement is received prior to a decision of the Arbitration Committee.

As a matter of Guild policy, in each arbitration the participants' statements are held confidential by the Guild. They are not provided to other participants, the Company or anyone else outside the credit determination process.

### c. Anonymity of Writers

The names of all participating writers on the production shall not be revealed to the Arbitration Committee. Writers will be identified to the Arbitration Committee only as "Writer A," "Writer B," etc., such designa-

tions to reflect the order in which the participating writers wrote.

### 5. Pre-Arbitration Hearing

In the event that a dispute exists as to the authenticity, identification, sequence, authorship or completeness of any literary material to be considered in a credit arbitration, a Special Committee consisting of three members of the Screen Credits Committee shall conduct a hearing at which all participating writers may present testimony and documentary evidence. Such Special Committee is empowered to make a binding determination for purposes of submission of material to the arbiters. Following a decision of a credit Arbitration Committee, findings and/or conclusions of a Special Committee may be reviewed by a Policy Review Board to determine if there has been a misinterpretation, misapplication or violation of Guild policy.

### 6. Procedure of Arbitration Committee

The following information and material is sent to each member of the Arbitration Committee by the Screen Credits Administrator:

a. Writing credits as tentatively determined by the Company.

b. Statements submitted by participating writers.

c. A statement of the issues to be determined by the Committee and any other relevant information as formulated by the Screen Credits Administrator.

d. Literary material, including scripts, stories, treatments, etc., verified for inclusion in the credit arbitration and source material submitted by the Company, together with a list of the dates of the material in chronological order.

Each participating writer may choose to have submitted those verified literary materials he/she deems relevant to demonstrate his/her writing contribution to the final shooting script. Every draft need not be submitted. Each writer should review his/her material in order to make this

11

determination.

As has been the practice, where appropriate, only the final shooting script and not prior drafts will be submitted to the Arbitration Committee on behalf of the last participating writer.

The literary material submitted to the Arbitration Committee includes material written by participating writers who are not seeking writing credit. This is necessary so that the Arbitration Committee can separate out the contribution of a subsequent writer from that of a prior writer who is not seeking credit.

e. A copy of this Credits Manual.

f. Request for telephonic communication to the Screen Credits Administrator by each member of the Arbitration Committee, indicating each arbiter's determination of writing credit, with confirmation of this decision to follow in writing.

Each member of the Arbitration Committee reads all the material submitted independent of the other two arbiters and makes a decision based on the guidelines for determining credits. In determining relative contributions, the Arbitration Committee bases its determination on what material was actually used, not the Committee's personal preference of one script over another.

Upon reaching a decision, each member of the Arbitration Committee shall telephone it to both the Credit Arbitration Consultant and Screen Credits Administrator.

In the event the members of the Arbitration Committee are not in unanimous agreement, the Arbitration Committee and the Credit Arbitration Consultant will participate in a teleconference administered by the Screen Credits Administrator. The members of the Arbitration Committee will discuss their decisions in an effort to achieve a unanimous decision. During the teleconference, the members of the Arbitration Committee shall not be informed as to the name or identity of the other

**12**

members of the Committee.

If the Arbitration Committee is unable to reach a unanimous decision during the teleconference, the majority decision shall be deemed the decision of the Arbitration Committee. When the Arbitration Committee reaches a decision, each member of the Committee shall confirm his/her individual decision in writing with a summation of the reason therefor. The decision of the Arbitration Committee shall be accepted as final and communicated by the Screen Credits Administrator to all interested parties.

### 7. Appeals Before a Policy Review Board

Within twenty-four hours of the initial notification of the Arbitration Committee's decision, any of the participating writers may request an internal Guild appeal to a Policy Review Board, consisting of the Chair or Vice-Chair and any other two members of the Screen Credits Committee except the Consultant in the case. If the Chair or Vice-Chair are unavailable or otherwise unable to serve on a Policy Review Board, the Policy Review Board shall consist of three members of the Screen Credits Committee. No member of the Policy Review Board shall have an interest in the outcome of the credit determination.

The function of the Policy Review Board is to determine whether or not, in the course of the credit determination, there has been any serious deviation from the policy of the Guild or the procedure as set forth in this Manual.

The members of a Policy Review Board are not permitted to read the material involved for purposes of independently judging writers' contributions to the final shooting script, and the Policy Review Board is not empowered to reverse an Arbitration Committee in matters of judgment as to the participating writers' relative contributions to the final script.

Only the following are grounds for a participant's appeal to a Policy Review Board:

13

a. Dereliction of duty on the part of the Arbitration Committee or any of its members;

b. The use of undue influence upon the Arbitration Committee or any of its members;

c. The misinterpretation, misapplication or violation of Guild policy; or

d. Availability of important literary or source material, for valid reasons not previously available to the Arbitration Committee.

If a writer is considering requesting a Policy Review Board, the writer may request copies of the arbiters' written summaries of their decisions, which will be provided by the Guild without any indication of the arbiters' identities.

Prior to the Policy Review Board hearing, writers requesting such Policy Review Board should submit a written statement to the Policy Review Board setting forth the grounds upon which the Policy Review Board is being requested (i.e., items a., b., c. and/or d. listed above) and the basis for such claims in reasonable detail. It is not necessary to bring an attorney to the Policy Review Board as the hearing is informal, although writers are free to do so if they so choose.

In those cases where it is empowered to act, the Policy Review Board shall have the authority to direct the original Arbitration Committee to reconsider the case or to direct the Screen Credits Administrator to form a new Arbitration Committee.

The Policy Review Board hearing must be held and its decision rendered within the 21 business days allowed for the arbitration under the provisions of the Minimum Basic Agreement.

**8. Notification**

The Screen Credits Administrator shall write a letter to the Company and the participating writers notifying them of the final decision of the Arbitration Committee.

### 9. Guild Decision Final

Theatrical Schedule A provides:

"The decision of the Guild Arbitration Committee, and any Policy Review Board established by the Guild in connection therewith, with respect to writing credits, insofar as it is rendered within the limitations of this Schedule A, shall be final, and the Company will accept and follow the designation of screen credits contained in such decision and all writers shall be bound thereby."

"The decision of the Guild Arbitration Committee may be published in such media as the Guild may determine. No writer or Company shall be entitled to collect damages or shall be entitled to injunctive relief as a result of any decision of the Committee with regard to credits. In signing any contract incorporating by reference or otherwise all or part of this Basic Agreement, any writer or Company specifically waives all rights or claims against the Guild and/or its arbiters or any of them under the laws of libel or slander or otherwise with regard to proceedings before the Guild Arbitration Committee and any full and fair publication of the findings and/or decisions of such Committee. The Guild and any writer signing any contract incorporating by reference or otherwise or referring to this Schedule A, and any writer consenting to the procedure set forth in this Schedule A, shall not have any rights or claims of any nature against any Company growing out of or concerning any action of the Guild or its arbiters or any of them, or any determination of credits in the manner provided in this Schedule A, and all such rights or claims are hereby specifically waived."

15

# III. Guild Policy on Credits

## A. DEFINITIONS

### 1. Writer

The term "writer" is defined in the Minimum Basic Agreement. In general, the term "writer" means a person employed by a Company to write literary material or a person from whom a Company purchased literary material who at the time of purchase was a "professional writer," as defined in the Minimum Basic Agreement.

For purposes of credit, a team of writers, as defined in the Screen Credits Manual Section I.B., is considered as one writer.

If literary material covered under the Minimum Basic Agreement is written by one member of a team, separate and apart from the work of the team, such literary material shall be considered separate from the literary material by the team for purposes of assessing contributions to the final shooting script. Therefore, such individual is eligible to receive writing credit as an individual writer and/or as a member of a team.

### 2. Literary Material

Literary material is written material and shall include stories, adaptations, treatments, original treatments, scenarios, continuities, teleplays, screenplays, dialogue, scripts, sketches, plots, outlines, narrative synopses, routines, and narrations, and, for use in the production of television film, formats.

### 3. Source Material

Source material is all material, other than story as hereinafter defined, upon which the story and/or screenplay is based.

This means that source material is material assigned to the writer which was previously published or exploited and upon which the writer's work is to be based (e.g., a novel, a produced play or series of published arti-

**16**

cles), or any other material written outside of the Guild's jurisdiction (e.g., literary material purchased from a non-professional writer). Illustrative examples of source material credits are: "From a Play by", "From a Novel by", "Based upon a Story by", "From a series of articles by", "Based upon a Screenplay by" or other appropriate wording indicating the form in which such source material is acquired. Research material is not considered source material.

**4. Story**

The term "story" means all writing covered by the provisions of the Minimum Basic Agreement representing a contribution "distinct from screenplay and consisting of basic narrative, idea, theme or outline indicating character development and action."

It is appropriate to award a "Story by" credit when: 1) the story was written under employment under Guild jurisdiction; 2) the story was purchased by a signatory company from a professional writer, as defined in the Minimum Basic Agreement; or 3) when the screenplay is based upon a sequel story written under the Guild's jurisdiction. If the story is based upon source material of a story nature, see "screen story" below.

**5. Screen Story**

Credit for story authorship in the form "Screen Story by" is appropriate when the screenplay is based upon source material and a story, as those terms are defined above, and the story is substantially new or different from the source material.

**6. Screenplay**

A screenplay consists of individual scenes and full dialogue, together with such prior treatment, basic adaptation, continuity, scenario and dialogue as shall be used in, and represent substantial contributions to the final script.

A "Screenplay by" credit is appropriate when there is source material

of a story nature (with or without a "Screen Story" credit) or when the writer(s) entitled to "Story by" credit is different than the writer(s) entitled to "Screenplay by" credit.

### 7. "Written by"

The term "Written by" is used when the writer(s) is entitled to both the "Story by" credit and the "Screenplay by" credit.

This credit shall not be granted where there is source material of a story nature. However, biographical, newspaper and other factual sources may not necessarily deprive the writer of such credit.

### 8. "Narration Written by"

"Narration Written by" credit is appropriate where the major writing contribution to a motion picture is in the form of narration. The term "narration" means material (typically off-camera) to explain or relate sequence or action (excluding promos or trailers).

### 9. "Based on Characters Created by"

"Based on Characters Created by" is a writing credit given to the writer(s) entitled to separated rights in a theatrical or television motion picture on each theatrical sequel to such theatrical or television motion picture.

Where there are no separated rights, "Based on Characters Created by" may be accorded to the author of source material upon which a sequel is based.

### 10. "Adaptation by"

This credit is appropriate in certain unusual cases where a writer shapes the direction of screenplay construction without qualifying for "Screenplay by" credit. In those special cases, and only as a result of arbitration, the "Adaptation by" credit may be used.

### B. RULES FOR DETERMINING CREDIT

In determining relative contribution, the relevant factors shall be what

material was actually used, not the Arbitration Committee's personal preference of one script over another.

A team of writers shall be treated in all respects as a single writer.

### 1. "Written by"

(See Section III.A.7.)

### 2. "Story by"

(See Section III. A.4)

Story credit may not be shared by more than two writers.

A story may be written in story form or may be contained within other literary material, such as a treatment or a screenplay, for purposes of receiving a "Story by" credit.

### 3. "Screen Story by"

(See Section III. A.5)

Screen Story credit may not be shared by more than two writers.

If the writer is furnished source material but takes from it only a spring-board, a characterization, an incident or some equally limited contribution, creating a substantially new and different story from the source material, he/she may receive "Screen Story by" credit but only as the result of arbitration. In such cases, the author of the source material may be given credit that specifies the form in which such material was acquired -- for instance, "From a Play by," "From a Novel by," "From a Saturday Evening Post Story by," "From a Series of Articles by," "Based on a Story by," etc.

### 4. "Screenplay by"

(See Section III. A.6)

Screen credit for screenplay will not be shared by more than two writers, except that in unusual cases, and solely as the result of arbitration, the

0063

names of three writers or the names of writers constituting two writing teams may be used. The limitation on the number of writers applies to all feature length photoplays except episodic pictures and revues.

### a. Percentage Requirements

Any writer whose work represents a contribution of more than 33% of a screenplay shall be entitled to screenplay credit, except where the screenplay is an original screenplay. In the case of an original screenplay, any subsequent writer or writing team must contribute 50% to the final screenplay.

### b. Original and Non-Original Screenplays

For purposes of determining "Screenplay by" credit only, two categories of screenplays are recognized:

(1) Original screenplays (i.e., those screenplays which are not based on source material and on which the first writer writes a screenplay without there being any other intervening literary material by another writer per-taining to the project).[2] If a writer is furnished or uses research material, the screenplay is still considered an original screenplay; and

(2) Non-original screenplays (i.e., screenplays based upon source mate-rial and all other screenplays not covered in (1) above, such as sequels).

### c. Additional Guidelines for the Arbiters in Determining Screenplay Credit

In each case, the arbiters read any source material and all literary mate-rial provided to them in connection with the development of the final screenplay in order to assess the contribution of each writer to the final shooting script.

---

2 In the case where a team writes a story, and there is no source material, and one member of the team goes on to write a screenplay without there being any other intervening literary material by any other writer, the screenplay shall still be considered an "original screenplay."

The percentage contribution made by writers to screenplay obviously cannot be determined by counting lines or even the number of pages to which a writer has contributed. Arbiters must take into consideration the following elements in determining whether a writer is entitled to screen-play credit:

■ dramatic construction;

■ original and different scenes;

■ characterization or character relationships; and

■ dialogue.

It is up to the arbiters to determine which of the above-listed elements are most important to the overall values of the final screenplay in each particular case. A writer may receive credit for a contribution to any or all of the above-listed elements. It is because of the need to understand contributions to the screenplay as a whole that professional expertise is required on the part of the arbiters. For example, there have been instances in which every line of dialogue has been changed and still the arbiters have found no significant change in the screenplay as a whole. On the other hand, there have been instances where far fewer changes in dialogue have made a significant contribution to the screenplay as a whole. In addition, a change in one portion of the script may be so signifi-cant that the entire screenplay is affected by it.

It is possible to consider the writer of a story or treatment as eligible for screenplay credit, but only in those cases where the story or treatment is written in great detail, to an extent far beyond the customary require-ments for a story or treatment.

### d. Selection from Source Material

As a guideline for arbiters in cases involving a non-original screenplay based upon source material, it is a fundamental principle that selection

21

of **screenplay elements**[3] from the source material is a part of the creative process of writing the screenplay. Arbiters should give weight to any writer's original and unique utilization, choice, or arrangement of source material when it is present in the final shooting script, but not the employment of basic **story elements**[4] which any other writer may have also selected. (See screenplay elements - Section III. B. 4.c. See story elements - Section III.A.4.)

### 5. "Adaptation by"

(See Section III. A.10)

Because of the strong feeling against a multiplicity of credits, the Guild is opposed to the general use of the "Adaptation by" credit. However, the Guild recognizes that there are certain unusual cases where credit is due a writer who shapes the direction of screenplay construction without qualifying for "Screenplay by" credit. In those special cases, and only as a result of arbitration, the "Adaptation by" credit may be used.

### 6. Irreducible Story Minimum

In the case of an original screenplay, the first writer shall be entitled to no less than a shared story credit.

### 7. No Other Credits Approved

Any form of credit not expressly described in this Manual shall be used only upon receipt of a waiver from the Guild. Fewer names and fewer types of credit enhance the value of all credits and the dignity of all writers.

---

*3 Section III.B.4.c. of the Screen Credits Manual refers to screenplay elements as follows: dramatic construction; original and different scenes; characterization or character relationships; and dialogue.*

---

*4 The term "story" means all writing covered by the provisions of the Minimum Basic Agreement representing a contribution "distinct from screenplay and consisting of basic narrative, idea, theme or outline indicating character development and action." (See Section III.A.4.)*

**22**

0066

## C. PRODUCTION EXECUTIVES

The term "production executives" includes individuals who receive credit as the director or in any producer capacity. The following rules govern writing credits of production executives who also perform writing services when there are other writers involved on the same project.

### 1. Automatic Arbitration Provisions

Schedule A of the Minimum Basic Agreement provides:

"Unless the story and/or screenplay writing is done entirely without any other writer, no designation of tentative story or screenplay credit to a production executive shall become final or effective unless approved by a credit arbitration as herein provided, in accordance with the Guild rules for determination of such credit."

### 2. Notice Requirements

If a production executive intends to claim credit as a team on any literary material with a writer(s) who is not a production executive, he/she must, at the time when such team writing begins, have signified such claim in writing to the Guild and to the writer(s) with whom he/she claims to have worked as a team. Failure to comply with the above will preclude such production executive from claiming co-authorship of the literary material in question, and such literary material shall be attributed to the other writer.

### 3. Percentage Requirements to Receive Screenplay Credit

At the time of the credit arbitration, the production executive or production executive team must assume the burden of proving that he/she/they had, in fact, worked on the script as a writer and had assumed full share of the writing. In the case of original screenplays, if the production executive or production executive team is the second writer he/she/they must have contributed more than 50% of the final script to receive screenplay credit. His/her/their contribution must consist of dramatic

23

construction; original and different scenes; characterization or character relationships; and dialogue.

As in all cases, decisions of Arbitration Committees are based upon literary material. Therefore, production executives, as well as other writers, should keep dated copies of all literary material written by them and submitted to the Company.

### D. REMAKES

In the case of remakes, any writer who has received writing credit under the Guild's jurisdiction in connection with a prior version of the motion picture is a participating writer on the remake. As such, those prior writers are entitled to participate in the credit determination process and are eligible to receive writing credit pursuant to the rules for determining writing credits. The final shooting script written by a prior writer(s) shall be considered literary material.

If under the "Rules for Determining Writing Credits" (Section III.B.) the Arbitration Committee determines that such prior writer(s) is not entitled to receive writing credit, the Arbitration Committee may, within its discretion, accord such prior writer(s) a credit in the nature of a source material credit, such as "Based on a Screenplay by...."

However, the rules do not preclude a prior writer(s) from receiving both writing credit and a credit in the nature of a source material credit at the discretion of the Arbitration Committee.

Remakes shall be considered non-original screenplays under Section III.B.4.b.(2) of this Manual.

### E. WITHDRAWAL FROM CREDIT

Prior to the time a credit question has been submitted to arbitration, a writer may withdraw from screen writing credit for personal cause, such as violation of his/her principles or mutilation of material he/she has written. If the other writer-contributors do not agree, the question shall be

**24**

referred to arbitration. The Arbitration Committee in such cases shall base its determination on whether there is such personal cause.

After screen credits have been determined by arbitration, a writer may not withdraw his/her name from screenplay credit. He/she may, however, by notification to the Guild, withdraw from any other form of credit.

Withdrawal from writing credit will result in loss of any and all rights accruing from receipt of writing credit. Use of a pseudonym rather than withdrawing from credit will not result in such a forfeiture. (See H. below.)

### F. GUILD'S RIGHT TO PROTEST

Pursuant to the provisions of the Minimum Basic Agreement the Guild has the right to protest credits proposed by the Company. The Guild may act irrespective of the wishes of any of the participating writers in order to ensure that the credit rules are properly applied.

### G. ORDER OF NAMES

The order of writers' names in a shared credit may be arbitrated. Generally, the most substantial contributor is entitled to first position credit. Where there is no agreement among the arbiters as to order of names, or where the Arbitration Committee determines that the credited writers' contribution is equal, then the Arbitration Committee shall order the writers' names chronologically.

### H. PSEUDONYMS

The Minimum Basic Agreement provides that any writer who is entitled to credit on the screen and who has been paid, or is guaranteed payment of, less than two hundred thousand dollars ($200,000) for writing services or literary materials relating to the particular motion picture shall have the right to be accorded credit on the screen, in advertising or otherwise, in a reasonable pseudonymous name. A writer must exercise this right within five (5) business days after final determination of writing credits. None of the writer's rights, including but not limited to compen-

sation of any kind, shall be affected by use of such pseudonym.

Before using a pseudonym a writer must register it with the Guild by sending a written notice to the Membership Department with the writer's Social Security number, if any. A pseudonym may not duplicate the name or pseudonym of another writer or the name of a public figure.

Subject to the terms of a fully-executed strike settlement agreement between a signatory company and the Guild, the Screen Credits Administrator shall be empowered to obtain the true name and identity of any writer listed by pseudonym on any Notice of Tentative Writing Credit submitted to the Guild. In the event that the Company or writer refuses to reveal the true identity of a writer listed by pseudonym on a Notice of Tentative Writing Credit on which the names of one or more other writers also appear, such writer listed by pseudonym shall not be entitled to receive writing credit, and credit shall be awarded to the other writers as the Arbitration Committee or the Screen Credits Administrator determines.

### I. WRITTEN MATERIAL PREVAILS

Decisions of Arbitration Committees are based upon literary material. Claims of authorship must be supported by literary material appropriate for submission to the Arbitration Committee. In the event of conflicting claims, literary material always prevails.

### J. REVISION OF SCRIPT AFTER FINAL CREDIT DETERMINATION

If, after screen credits are finally determined, material changes are made in the literary material, either the Company or a participant and the Guild jointly may reopen credit determination by making a claim within 48 hours after completion of the writing work claimed to justify the revision of credits; and in such case the procedure for the original determination of credits is followed.

26

## K. PUBLICIZING OF CREDITS

The Minimum Basic Agreement and Guild Working Rules provide that no writer shall claim credit for screen authorship on any motion picture prior to the time when the credits have been determined, and no writer shall claim credits contrary to such determination. In addition, the Guild believes that it is in the best interest of all writers that certain facts relating to any particular credit determination should remain confidential. For example, participating writers are asked to refrain from commenting in the press or media about issues related to pre-arbitration hearings, arbiters' written decisions or Policy Review Board hearings.

## L. CONCLUSION

These rules and procedures have been derived from the experience and practice of the past years. Although they remain the guiding policy by which credits are determined, they are not to be considered rigid or inflexible. The Guild has the discretion to depart from precedent when new conditions, new problems, or new methods of work may require an alteration of the rules or a new application of an existing rule to a unique set of facts and circumstances.

It is now accepted that administration of writers' credits belongs to the writers themselves. It is their responsibility to see to it that credits are administered wisely and well, that the written work product of participating writers is credited as accurately as possible, and that the overall result leads ultimately to a recognition of the importance of the writers' contribution to the screen.

| From: | Dave Callaham <Callaham@stingrza.com> |
|---|---|
| Sent: | Monday, August 17, 2009 3:44 PM |
| To: | Dave Kalstein <kalstein@mac.com>; Kyle Harimoto <kharimoto@sbcglobal.net> |
| Subject: | expendables |

HOLY SHIT THIS SCRIPT IS FUCKING AWFUL I feel really bad now for sending it to you guys. I am ASTOUNDED at how bad this is. I want you to know that it's nothing like what I wrote. Which I suppose at this point is both the good and bad news...

CONFIDENTIAL



EXHIBIT
D

DC00483_REV

0072

| | |
|---|---|
| **From:** | Dave Callaham <callaham@stingrza.com> |
| **Sent:** | Tuesday, August 18, 2009 2:11 PM |
| **To:** | Kyle Harimoto <kharimoto@sbcglobal.net> |
| **Cc:** | Dave Kalstein <kalstein@mac.com> |
| **Subject:** | Re: Expendables |

if i say that in an email I may be incriminating myself Kyle.

Put it this way: the idea and very loose structure is mine.

Everything else..:

I plead the fifth.

Or, to put it another way, if I get sole credit like I am asking for...

it would be A MIRACLE.

On Aug 18, 2009, at 11:06 AM, Kyle Harimoto wrote:

I read it last night. I have to know what in this script is yours and what is new?

CONFIDENTIAL



DC00497_REV

0073

1  | KATYA J. CULBERG
   | Associate Counsel
2  | WRITERS GUILD OF AMERICA, WEST, INC.
   | 7000 W. Third Street
3  | Los Angeles, California 90048
   | (323) 782-4521
4  | (323) 782-4806 (fax)
   | kculberg@wga.org
5  |
6  | Counsel for Complainants
7  |
8  |              BEFORE THE WRITERS GUILD OF AMERICA, WEST, INC. - PRODUCERS
9  |                                 ARBITRATION TRIBUNAL
10 | In the Matter of the Arbitration between
11 | WRITERS GUILD OF AMERICA, WEST, INC. and JITTERY
   | DOG PRODUCTIONS, INC. f/s/o DAVID CALLAHAM,
12 |
13 |                             Complainants,
14 | vs.
15 | WARNER BROS., DOUBLE LIFE PRODUCTIONS, INC.,
   | MILLENNIUM FILMS, INC., NU IMAGE, ALTA VISTA
16 | PRODUCTIONS, INC., ALTA VISTA FINANCING, LLC and
   | ALTA VISTA PRODUCTIONS, LLC,
17 |
   |                             Respondents,
18 |
   | Relating to sequel payments in connection with the theatrical
19 | motion picture entitled "THE EXPENDABLES."

NOTICE OF CLAIM
SUBMITTED TO
ARBITRATION AND
CLAIM

CASE NO. 12-SR-004

20  TO ALL PARTIES AND THEIR COUNSEL:

21      **PLEASE TAKE NOTICE** that Complainants WRITERS GUILD OF AMERICA, WEST,

22  INC. ("the Guild") and JITTERY DOG PRODUCTIONS, INC. f/s/o DAVID CALLAHAM

23  (collectively "Complainants") submit the above-captioned Claim to arbitration pursuant to Articles 10,

24  11 and 12 of the Writers Guild of America 2001-2011 Theatrical and Television Basic Agreements

25  (collectively "MBA"). Pursuant to Article 11.B.3. of the MBA, submission of this Claim to steps 1 and

26  2 of the grievance procedure is waived and/or not required.

27

28

EXHIBIT
E

0074

We have ten (10) days from your receipt of this Notice to mutually agree upon an arbitrator. If we are unable to reach such an agreement within that time period, an arbitrator will be selected in accord with the procedures of Article 11.C.2.

The WGAW requests production of the following information and documentation which is relevant and necessary to the WGAW's ability to enforce the MBA:

(a)   Copies of any and all agreements entered into by or on behalf of Respondents Warner Bros., Double Life Productions, Inc., Millennium Films, Inc., Nu Image, Alta Vista Productions, Inc., and Alta Vista Productions LLC (collectively "Respondents") for the acquisition, sale, purchase, licensing, assignment, quitclaim, and/or other transfer of any or all rights in and to the literary material written in connection with the theatrical motion picture entitled "The Expendables" ("Picture");

(b)   Copies of any and all documents, including but not limited to correspondence, memoranda and/or e-mails, referring to or otherwise evidencing the existence and/or terms of any agreements entered into by or on behalf Respondents for the sale, purchase, licensing, assignment, quitclaim, and/or other transfer of any or all rights in and to the literary material written in connection with the Picture;

(c)   An accounting of any and all gross and/or net receipts, costs, expenses and/or charges received or paid by Respondents in connection with the sale, licensing, assignment, quitclaim, assumption or transfer of rights in and to the literary material written in connection with the Picture; and

(d)   Copies of any and all checks, drafts, and/or bank transfers, issued by Respondents in payment for the sale, licensing, assignment, quitclaim, assumption or transfer of rights in and to the literary material written in connection with the Picture.

The nature of the Claim referred to herein is as follows:

<u>CLAIM</u>

[Pertaining to all Counts]

1.   Respondent Warner Bros. is signatory to or otherwise bound by the terms of the MBA.

2.   Respondent Double Life Productions, Inc., ("Double Life") is signatory to or otherwise bound by the terms of the MBA.

2

3.      At all times herein, Respondents Double Life Productions, Inc., Millennium Films, Inc., Nu Image and Alta Vista Productions, Inc. (collectively "the Double Life Companies"), were acting as the alter ego of one another and/or each was a joint employer of one another and/or assumed or were assigned the MBA obligations in connection with the Picture.

4.      During the term of the MBA, Respondent Warner Bros. entered into a Blind Commitment Agreement ("Agreement") with Jittery Dog Productions f/s/o David Callaham for Mr. Callaham to write an original screenplay in connection with the theatrical motion picture project "The Expendables." Mr. Callaham wrote and delivered an original screenplay (referred to in the Agreement as "Committed Material") and a rewrite (referred to in the Agreement as "First Optional Material") (collectively "Literary Material") and Respondent Warner Bros. paid Mr. Callaham initial compensation for these services in the amount of $250,000, all pursuant to the Agreement.

5.      During the term of the MBA, Alta Vista Productions, Inc., entered into a WGA Literary Material Assumption Agreement with Warner Bros. whereby the Alta Vista Productions, Inc., assumed all MBA obligations in connection with the Literary Material.

6.      During the term of the MBA, the Double Life Companies produced or caused to be produced the theatrical motion picture entitled "The Expendables" ("Picture").

7.      Respondents, and each of them, are therefore jointly and severally liable for any and all MBA obligations in connection with the Picture.

8.      The WGAW determined credits for the Picture. The final credit is:

Screenplay by David Callaham and Sylvester Stallone

Story by David Callaham

9.      David Callaham has separated rights in the Picture.

10.     Pursuant to the Agreement, Respondents Double Life paid Mr. Callaham a credit bonus in the amount of $100,000 because Mr. Callaham received a shared "Screenplay By" credit.

11.     During the term of the MBA, the Double Life Companies produced or caused to be produced a sequel to the Picture: the theatrical motion picture "The Expendables 2" ("the Sequel").

COUNT I

[Failure to Pay Theatrical Sequel Payment]

12.     Pursuant to the Agreement and the MBA, Mr. Callaham was to be paid "an Amount equal to 50% of the sums paid for the Committed Material, First Optional Material, Second Optional Material and either the sole or shared credit bonus, as applicable, payable upon commencement. . . ." if and when a theatrical motion picture sequel to the Picture was produced.

13.     Pursuant to Article 16.A.5.a. of the MBA and the Agreement, Respondents are required to pay Mr. Callaham compensation for the Sequel in the aggregate amount of $175,000.00, which is comprised of 50% of the sums paid for the Committed Material ($175,000), First Optional Material ($75,00) and the shared credit bonus ($100,000).

14.     The Guild is informed, believes and thereon alleges that no sequel payment was made to Mr. Callaham with respect to the Sequel.

15.     In breach of the MBA, Respondents have failed and continue to fail and refuse to pay Mr. Callaham the sequel payment due for the Sequel.

16.     Pursuant to Article 13.A.14. of the MBA, Respondents are required to pay interest on the payment owed for the Sequel at the rate of one and one-half percent (1.5%) per month, commencing to accrue when the payment was due, and continuing to accrue until paid in full.

COUNT II

[Failure to Deliver a Valid Written WGA Assumption Agreement]

17.     Pursuant to Articles 15, 51, 64 and 65 of the MBA, Respondents are required to obtain and deliver to the WGAW a valid written WGA assumption agreement in order to ensure a buyer's assumption of MBA obligations in connection with the Screenplay, Picture and Sequel, as applicable, including, but not limited to, the MBA obligations referenced in this Claim.

18.     In breach of the foregoing provisions of the MBA, Respondents have failed and refused, and continue to fail and refuse to deliver to the WGAW valid written assumption agreements in connection with the Screenplay, Picture and Sequel, as applicable.

19.     As a direct and proximate result of these substantial breaches of the MBA, Mr. Callaham has suffered, and unless Respondents are restrained, shall continue to suffer damage by the loss of

4

1  benefits conferred to him under the MBA in connection with Respondents' failure to obtain and file

2  assumption agreements.  The WGAW will present proof of the extent of damage at the hearing.

3      20.    As a further direct and proximate result of these breaches, the WGAW has suffered and,

4  unless Respondents are restrained, shall continue to suffer damage to its prestige and to the integrity of

5  the MBA.  The WGAW will present proof of the extent of damage at the hearing.

6                              PRAYER FOR RELIEF

7      WHEREFORE, Complainants pray for issuance of an award as follows:

8      a.    An order requiring Respondents to pay Mr. Callaham, pursuant to the MBA and the

9  Agreement, the unpaid sequel payment in connection with the Picture in an amount according to proof

10  at the hearing in this matter, and interest thereon;

11      b.    An order requiring Respondents to pay damages to the Guild and Mr. Callaham for

12  Respondents' failure to deliver to the WGAW a valid, written WGA Assumption Agreement for each

13  sale or transfer of rights in and to the Picture;

14      c.    An order requiring Respondents to deliver to the WGAW a valid, written WGA

15  Assumption Agreement for each sale or transfer of rights in and to the Picture; and

16      d.    Such other and further relief as the Arbitrator deems just and proper.

17

18                              WRITERS GUILD OF AMERICA, WEST, INC.

19

20  DATE: 5/19/13            BY: _____

21                              KATYA J. CULBERG
                                Counsel for Complainants

22

23

24

25

26

27

28

5

0078

CM-015

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):

Charles M. Coate (140404)
Costa Abrams & Coate LLP
1221 Second St, 3D FL, Santa Monica, CA 90401

TELEPHONE NO.: (310) 576-6161   FAX NO. (Optional): (310) 576-6160

E-MAIL ADDRESS (Optional):

ATTORNEY FOR (Name): Petitioner Double Life Productions, Inc.

FOR COURT USE ONLY

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County Of Los Angeles

DEC 24 2013

Sherri R. Carter, Executive Officer/Clerk
By: Judi Lara, Deputy

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 111 N. Hill St.
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles CA 90012
BRANCH NAME: Stanley Mosk Courthouse

PLAINTIFF/PETITIONER: Double Life Productions, Inc.

DEFENDANT/RESPONDENT: WRITERS Guild of America, West, Inc.

**NOTICE OF RELATED CASE**

CASE NUMBER: BS146511

JUDICIAL OFFICER:

DEPT.:

---

Identify, in chronological order according to date of filing, all cases related to the case referenced above.

1. a. Title: An Image, Inc. et al. v. David E. Callahan, et. al.
   b. Case number: BC 531496
   c. Court: ☒ same as above
      ☐ other state or federal court (name and address):
   d. Department: 72
   e. Case type: ☐ limited civil ☒ unlimited civil ☐ probate ☐ family law ☐ other (specify):
   f. Filing date: 12 | 23 | 13
   g. Has this case been designated or determined as "complex?" ☐ Yes ☒ No
   h. Relationship of this case to the case referenced above (check all that apply):
      ☒ involves the same parties and is based on the same or similar claims.
      ☒ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.
      ☒ involves claims against, title to, possession of, or damages to the same property.
      ☒ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.
      ☐ Additional explanation is attached in attachment 1h
   i. Status of case:
      ☒ pending
      ☐ dismissed ☐ with ☐ without prejudice
      ☐ disposed of by judgment

2. a. Title: Double Life Productions, Inc. vs. Writers Guild of America, West, Inc.
   b. Case number: BS146511
   c. Court: ☒ same as above
      ☐ other state or federal court (name and address):
   d. Department:

Page 1 of 3

Form Approved for Optional Use
Judicial Council of California
CM-015 [Rev. July 1, 2007]

**NOTICE OF RELATED CASE**

Cal. Rules of Court, rule 3.300
www.courtinfo.ca.gov

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

CASE NUMBER:

**CM-015**

**2.** *(continued)*

e. Case type: ☐ limited civil ☒ unlimited civil ☐ probate ☐ family law ☐ other *(specify):*

f. Filing date: 12 | 24 | 13

g. Has this case been designated or determined as "complex?" ☐ Yes ☒ No

h. Relationship of this case to the case referenced above *(check all that apply):*

☒ involves the same parties and is based on the same or similar claims.

☒ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

☒ involves claims against, title to, possession of, or damages to the same property.

☒ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

☐ Additional explanation is attached in attachment 2h

i. Status of case:

☒ pending

☐ dismissed ☐ with ☐ without prejudice

☐ disposed of by judgment

**3.** a. Title:

b. Case number:

c. Court: ☐ same as above

☐ other state or federal court *(name and address):*

d. Department:

e. Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☐ other *(specify):*

f. Filing date:

g. Has this case been designated or determined as "complex?" ☐ Yes ☐ No

h. Relationship of this case to the case referenced above *(check all that apply):*

☐ involves the same parties and is based on the same or similar claims.

☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

☐ involves claims against, title to, possession of, or damages to the same property.

☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

☐ Additional explanation is attached in attachment 3h

i. Status of case:

☐ pending

☐ dismissed ☐ with ☐ without prejudice

☐ disposed of by judgment

**4.** ☐ Additional related cases are described in Attachment 4. Number of pages attached: _____

Date: 12/24/13

CHARLES M. COATE

(TYPE OR PRINT NAME OF PARTY OR ATTORNEY)

▶

(SIGNATURE OF PARTY OR ATTORNEY)

CM-015 [Rev. July 1, 2007]

**NOTICE OF RELATED CASE**

Page 2 of 3

| | | CM-015 |
|---|---|---|
| PLAINTIFF/PETITIONER: | | CASE NUMBER: |
| DEFENDANT/RESPONDENT: | | |

## PROOF OF SERVICE BY FIRST-CLASS MAIL
### NOTICE OF RELATED CASE

*(NOTE: You cannot serve the Notice of Related Case if you are a party in the action. The person who served the notice must complete this proof of service. The notice must be served on all known parties in each related action or proceeding.)*

1. I am at least 18 years old and not a party to this action. I am a resident of or employed in the county where the mailing took place, and my residence or business address is *(specify):*

2. I served a copy of the *Notice of Related Case* by enclosing it in a sealed envelope with first-class postage fully prepaid and *(check one):*

   a. ☐ deposited the sealed envelope with the United States Postal Service.

   b. ☐ placed the sealed envelope for collection and processing for mailing, following this business's usual practices, with which I am readily familiar. On the same day correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service.

3. The *Notice of Related Case* was mailed:

   a. on *(date):*

   b. from *(city and state):*

4. The envelope was addressed and mailed as follows:

   a. Name of person served:

      Street address:
      City:
      State and zip code:

   c. Name of person served:

      Street address:
      City:
      State and zip code:

   b. Name of person served:

      Street address:
      City:
      State and zip code:

   d. Name of person served:

      Street address:
      City:
      State and zip code:

☐ Names and addresses of additional persons served are attached. *(You may use form POS-030(P).)*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

_____
(TYPE OR PRINT NAME OF DECLARANT)

▶

_____
(SIGNATURE OF DECLARANT)

0081