Charles M. Coate (SBN: 140404)
Darius Anthony Vosylius (SBN: 175030)
Theresa S. Johnson (SBN: 254123)
Costa Abrams & Coate LLP
1221 Second Street, Third Floor
Santa Monica, CA 90401
(310) 576-6161
E-Mail: ccoate@cacllp.com

*Attorneys for Petitioner Double Life Productions, Inc.*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOUBLE LIFE PRODUCTIONS, INC., a California corporation,<br><br>Petitioner,<br><br>vs.<br><br>WRITERS GUILD OF AMERICA, WEST, INC., a California corporation,<br><br>Respondent;<br><br>DAVID E. CALLAHAM, an individual; and JITTERY DOG PRODUCTIONS, INC., a California corporation,<br><br>Real Parties in Interest. | Case No. CV-14-00197-DMG (AJWx)<br>[Assigned to the Hon. Dolly M. Gee]<br><br>**NOTICE AND *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATIONS OF CHARLES M. COATE AND TREVOR SHORT**<br><br>**[PROPOSED] *EX PARTE* ORDER LODGED CONCURRENTLY HEREWITH**<br><br>Date:     Submitted On Papers<br>Time     Submitted On Papers<br>Place:    Courtroom 7<br><br>Action Filed In State Court: December 24, 2013<br><br>Action Removed To Federal Court: January 9, 2014 |

***EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER**

**AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION**

**TO:   THE HONORABLE DOLLY M. GEE, TO THE CLERK OF HER COURT, AND TO ALL INTERESTED PARTIES:**

Pursuant to Federal Rule of Civil Procedure ("F.R.C.P.") 65, Local Rules 7-11, 7-19, 7-20 and 65-1 et seq., and this Court's procedural rule 6,  Petitioner *Double Life Productions, Inc.* ("Petitioner") respectfully brings this *ex parte* application for a temporary restraining order and order to show cause regarding a preliminary injunction prohibiting respondent Writers Guild of America, West, Inc. ("WGA") and real parties in interest David E. Callaham ("Callaham") and his loan-out company Jittery Dog Productions, Inc. ("Jittery Dog") from prosecuting a WGA arbitration that is scheduled to take place on **January 31, 2014**.

This WGA arbitration concerns whether Mr. Callaham is entitled to certain "bonus" sequel writing payments with respect to the motion picture *Expendables 2*, even though Mr. Callaham did not provide any writing services whatsoever concerning *Expendables 2*.

As discussed below, Petitioner discovered Callaham's underlying fraud in 2013 and promptly notified the WGA shortly thereafter. The parties then engaged in substantive settlement discussions for several months. When the parties could not come to a resolution, Petitioner then filed this verified petition in the Los Angeles County Superior Court on December 24, 2013.  Petitioner is respectfully requesting three (3) types of relief: a writ of mandate, a writ of prohibition and a

writ of review against the WGA and Callaham/Jittery Dog. A hearing before the Los Angeles County Superior Court (Judge James Chalfant) was scheduled to take place on March 27, 2014, while the actual hearing regarding the merits of the petition to stay the WGA arbitration was scheduled to take place on May 9, 2014. However, the WGA removed this action on January 9, 2014, even though this is not a traditional labor dispute between a union and an employer.

Petitioner's request for a writ of mandate seeks an Order commanding the WGA to investigate its own member (real party in interest David Callaham) for his fraudulent conduct with respect to a 2009 WGA screen credit arbitration pertaining to the motion picture *The Expendables*.  Petitioner recently discovered this fraud and informed the WGA about it.  Yet, contrary to its own rules and regulations, Petitioner refuses to investigate its own member for the blatant fraud he committed and also refuses to review the 2009 WGA screen credit arbitration proceeding.

Mr. Callaham privately conceded the script for *The Expendables* was "nothing like what [Mr. Callaham] wrote" because it is "FUCKING AWFUL" and that "if [he] get[s] sole credit like I am asking for . . . it would be A MIRACLE." Yet, Mr. Callaham largely "prevailed" in the 2009 WGA screen credit arbitration and was granted separated rights. Petitioner was not a party to the 2009 WGA screen credit arbitration.  In any event, it is these separated rights which form the basis of the current pending WGA arbitration pertaining to *Expendables 2*. The

WGA and Callaham/Jittery Dog are contending that the *Expendables 2* is a sequel to *The Expendables* and accordingly, since Callaham/Jittery Dog have separated rights, they are entitled to a sizeable "bonus" sequel payment with respect to the motion picture *Expendables 2 (*even though Callaham/Jittery Dog did not provide any writing services whatsoever concerning *Expendables 2)*.

There is no doubt that Mr. Callaham's conduct violated numerous and explicit provisions of the WGA rules and procedures which clearly mandate that a writer cannot request credit for work that he or she has not done: No "member shall accept credit which misrepresents the member's contribution to a picture or program."  (WGA Working Rule ¶15).  WGA Working Rule ¶1 states that "A VIOLATION [BY A MEMBER] OF ANY WORKING RULE SHALL BE CONSIDERED GROUNDS FOR DISCIPLINARY ACTION."

Yet, the WGA is paying lip service to its own explicit rules and regulations and continues to refuse to investigate (let alone discipline) Callaham for his egregious and fraudulent conduct that was committed on the WGA itself. WGA even admits in the answer it filed on January 17, 2014 that it "has not initiated an investigation or disciplined Callaham." (See Docket #7 pg. 9 ¶49).

Because of Mr. Callaham's fraud, he was wrongfully given certain screen writing credits for *The Expendables* he knew he was not entitled to and which now forms the basis of the pending WGA arbitration, wherein the WGA and

Callaham/Jittery Dog are claiming that he is entitled to certain "bonus" sequel writing payments regarding *Expendables 2*.

Alternatively, Petitioner is seeking a writ of prohibition preventing the WGA and Callaham/Jittery Dog from prosecuting the pending WGA Arbitration regarding *Expendables 2*. Finally, Petitioner is seeking a writ of review or *certiorari* with respect to the 2009 WGA screen credit arbitration and to temporarily desist from prosecuting the pending WGA arbitration pertaining to *Expendables 2*. Petitioner cannot avail itself of the WGA's internal appeal rules since the time to file an appeal regarding the 2009 screen credit determination expired long ago (well before Mr. Callaham's fraud was discovered).

The pending arbitration is being conducted by Writers' Guild Arbitration Panel. The assigned arbitrator is Paul Crost, Esq. Mr. Crost recently denied Petitioner's request for a continuance of the January 31, 2014, arbitration, even for a few months. However, Mr. Crost acknowledged that if a Court were to issue an Order enjoining the prosecution of the arbitration, he would comply with such an Order.  Incidentally, the WGA as a matter of course does not chose an arbitrator that has ever ruled against it, and the WGA's selection of Arbitrator Crost follows that trend.

Good cause exists to grant this requested emergency *ex parte* relief based upon the verified petition, the attached memorandum of points and authorities as well as the Declarations of Charles M. Coate and Trevor Short.

In short, the pending WGA arbitration should be continued for several months until the serious issues of fraud raised in this action are resolved. Petitioner is only asking for a brief continuance of the January 31, 2014, arbitration **to maintain the status quo**. Otherwise, the arbitration before the WGA arbitrator will be held and an award will likely be issued against Petitioner based upon the fraudulently-obtained credit. Indeed, the WGA indicated that the "writing was on the wall" and that it will prevail before Arbitrator Crost. Such an award may then be confirmed by a court.

Injunctive relief is warranted here. Even if this Court finds that Mr. Callaham claimed and was accorded credit that he knew was false and until this substance of this petition is determine, it would amount to a Pyrrhic victory -- by then it is likely that an adverse arbitration award would likely be turned into a judgment against Petitioner. That would be patently unfair because Petitioner did not participate in the 2009 screen credit arbitration and yet if injunctive relief is not granted, it is likely that Petitioner will suffer the consequences of a fraudulently-obtained 2009 screen credit arbitration.

Under the circumstances, the "interests of justice" favor granting Petitioner's requested *ex parte* relief.  The requested application for a temporary restraining order enjoining the prosecution of the pending WGA arbitration would maintain the status quo until the merits of this petition are determined.

There should be no substantial prejudice to the WGA and Callaham/Jittery Dog if the requested relief were granted and the WGA arbitration enjoined from being prosecuted for a few months.  Any alleged "harm" suffered by Callaham/Jittery Dog by this brief delay would theoretically be addressed by a larger award of interest in favor of Callaham/Jittery Dog.  In other words, if Mr. Callaham is truly entitled to the credit that he himself believed he was not, then a brief delay in the pending arbitration will presumably be addressed by additional penalties and interest in favor of Mr. Callaham.  On the other hand, the denial of this application may sanction a fraud and insure that such fraud is compounded by subsequent proceedings premised upon the fraudulent award.

Furthermore, Petitioner is able to meet all of the requirements for the issuance of a preliminary injunction, as discussed herein.

This application and motion is made following the conference of counsel pursuant to L.R. 7-3 which took on January 8, 2014. Counsel for the WGA and Callaham/Jittery Dog oppose the requested relief and refuse to agree to continue

the January 31, 2014, arbitration pending resolution of this verified petition. Furthermore, Petitioner will provide further notice to opposing counsel of this Court's Initial Standing Order Rule 9, wherein opposing papers must be filed no than 3:00 p.m. on the first business day following service.

Dated: January 21, 2014                Respectfully submitted,

                                       COSTA ABRAMS & COATE LLP

                                       By:    /s/ Charles M. Coate
                                       _____
                                       Charles M. Coate
                                       Attorney for Petitioner

# **TABLE OF CONTENTS**

**I.**    **INTRODUCTION**………………………………………….... 9

**II.**   **NATURE OF ACTION**………………………………….... 10

**III.**  **COMPLIANCE WITH LOCAL RULE 7-19.** ………………… 12

**IV.**  **FACTUAL AND PROCEDURAL BACKGROUND**…………… 13

      **A.**   **The Parties**……………………………………… 13

      **B.**   **The WGA Rules & Its Credit Determination Process**………….. 14

      **C.**   **The August 2009 WGA Screen Credit Arbitration Re:** ***The Expendables* & Callaham's Misrepresentations**……………… 17

      **D.**   **The Sequels & The Pending 2013 WGA Arbitration**………….. 21

      **E.**   **Procedural Status**…………………………………… 22

**V.**   **PETITIONER IS ENTITLED TO AN IMMEDIATE INJUNCTION**. 23

      **A.**   **Applicable Law**……………………………………… 23

      **B.**   **Petitioner Is Likely To Succeed On The Merits Of This Action**.. 24

      **C.**   **Likelihood Of Irreparable Harm**……………………….... 27

      **D.**   **The Balance Of Hardships Favors Petitioner**………………... 30

      **E.**   **An Injunction Is In The Public Interest**……………………... 30

      **F.**   **The Court Should Require At Most A Minimal Bond** ………… 31

**VI.**  **CONCLUSION.** ……………………………………… 33

i

# TABLE OF AUTHORITIES

## STATUTES

28 U.S.C. § 1651(a)……………………………………………………………… 10

Central District Local Rule 7-3……………………………………………..….. 7

Central District Local Rule 7-11………………………………………….….. 2, 9

Central District Local Rule 7-19…....................................................... 2, 9, 12, 13

Central District Local Rule 7-20………………………………………….….. 2, 9

Central District Local Rules 65-1, *et seq*………………………………….….. 2, 9

Federal Rule of Civil Procedure 65……………………………………….. 2, 9, 31

## CASE LAW

*Amoco Prod. Co. v. Village of Gambell*,
   480 U.S. 531, 542, 107 S. Ct. 1396, 94 L. Ed. 2d 542 (1987)…………..…... 30

*Association of Irritated Residents v. Fred Schakel Dairy*,
   460 F.Supp.2d 1185, 1193 (E.D. Cal. 2006)……………………………... 27

*Bureerong v. Uvawas*, 167 F.R.D. 83, 87 (C.D. Cal. 1996)…………………..…… 27

*CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9thCir. 1962)……………………….…… 27

*Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2nd Cir. 1996)……………… 32

*FDIC v. Garner*, 125 F.3d 1272, 1279-80 (9th Cir. 1997)……………………… 28

*Foley v. Wells Fargo Bank*,
   2011 U.S. Dist. LEXIS 72212 *8-9 (D. Nevada 2011)............................... 25

*Gon v. First State Ins. Co., 871 F.2d 863* (9th Cir. 1989)………………….…… 10

ii

*Indep. Living Ctr. of S. Cal. v. Maxwell-Jolly*,
    572 F.3d 644, 659 (9th Cir. 2009).................................................................... 30

*Interlink Int'l Fin. Servs., Inc. v. Block*,
    145 F.Supp.2d 312, 315 (S.D.N.Y. 2001)....................................................... 32

*Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009)……………….....… 32

*Martin v. International Olympic Committee*, 740 F.2d 670, 675 (9th Cir. 1984).. 24

*Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010)………… 24

*Philips Elecs. N. Am. Corp. v. Hope*,
    631 F.Supp.2d 705, 724 n. 14 (MDNC 2009)............................................ 32

*Privitera v. Cal. Bd. of Med. Quality Assurance*,
    926 F.2d 890, 897 (9th Cir. 1991)……………………………..……… 28

*Rivers v. Walt Disney Co.*, 980 F.Supp. 1358, 1360 (C.D. Cal. 1997)………..… 27

*SEC v. Banc De Binary, Ltd.*,
    2013 U.S. Dist. LEXIS 111885 *6-7 (D. Nevada 2013)………..……. 24, 25

*Sierra On-Line, Inc. v. Phoenix Software, Inc.*,
    739 F.2d 1415, 1422 (9th Cir. 1984)…………………………….. 10, 24

*Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009)………………… 31

*Unite Here Health v. Parball Corp.*,
    2013 U.S. Dist. LEXIS 86904 *8 (D. Nevada 2013)………………..… 25

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981)……………. 24

*West v. Dizon*, 2014 U.S. Dist. LEXIS 3338 *5 (ED Cal. 2014)……………. 10, 28

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7, 20, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008)………… 24, 30

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    395 U.S. 100, 130-31, 89 S. Ct. 1562, 23 L. Ed. 2d 129 (1969)………….. 28

# **<u>OTHER AUTHORITIES</u>**

Black's Law Dictionary 1012 (9th ed. 2009)……………………………....….. 25

WGA Screen Credits Manual ¶7…………………………………………… 17

WGA Working Rule ¶1……………………………………………..... 11, 14

WGA Working Rule ¶2……………………………………………….. 14

WGA Working Rule ¶15……………………………..…. 11, 15, 17

WGA Working Rule ¶16…………………………………………… 15

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.      INTRODUCTION.

Petitioner  Double Life Productions, Inc. ("Petitioner") respectfully submits its memorandum of points and authorities in support of its *ex parte* application (with notice) for a temporary restraining order and order to show cause re: preliminary injunction against respondent Writers Guild of America, West, Inc. ("WGA") and real parties in interest David E. Callaham ("Callaham") and his loan-out company Jittery Dog Productions, Inc. ("Jittery Dog")  This application is brought pursuant to Federal Rule of Civil Procedure ("F.R.C.P.") 65, Central District of California Local Rules 7-11, 7-19, 7-20 and 65-1 *et seq.*, this Court's procedural rule number 6 and Initial Standing Order Rule 9.

Petitioner respectfully requests that the Court issue an emergency stay of a pending WGA arbitration pending before Paul Crost, which is scheduled to take place on **January 31, 2014**. Mr. Crost is an arbitrator that was selected by the WGA. The WGA as a matter of course does not pick any arbitrator that has ever ruled against it. (Declaration of Charles Coate ("Coate Dec.") ¶9)).  Mr. Crost recently denied Petitioner's request for a brief continuance of the arbitration. Coate Dec. ¶¶2 - 7; **Exhibits "G" – "L."** At the same hearing, the WGA indicated that the "writing was on the wall" and that the WGA will prevail at the January 31, 2014, arbitration. (Coate Dec. ¶7). In turn, Mr. Crost indicated that an award issued

against Petitioner will likely be confirmed into a judgment because an arbitrator's award generally cannot be vacated (even if an arbitrator makes a mistake as to the facts or the law).[1] (Coate Dec. ¶7).

Accordingly, "good cause" exists to grant Petitioner's requested relief. Petitioner has met its burden to clearly show that establish that it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction is in the public interest. Indeed, only a temporary restraining order and immediate injunction would preserve the status quo and prevent substantial and irreparable injury to Petitioner.

## II.    NATURE OF ACTION

In this action, Petitioner is seeking a writ of prohibition commanding the WGA to cease prosecuting a pending arbitration filed on behalf of Callaham/Jittery Dog against Petitioner and others, as more fully described herein. Petitioner is also seeking a writ of mandate commanding the WGA to discipline Callaham for his fraudulent conduct committed in a 2009 WGA screen credit arbitration proceeding,

---

[1] While a party, as a general matter, cannot obtain injunctive relief against non-parties, a federal court has the power to issue orders in aid of its own jurisdiction, 28 U.S.C. § 1651(a), and to prevent threatened injury that would impair the Court's ability to grant effective relief in a pending action. *West v. Dizon*, 2014 U.S. Dist. LEXIS 3338 *5 (ED Cal. 2014), citing to *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984); *Gon v. First State Ins. Co., 871 F.2d 863* (9th Cir. 1989).

as more fully described herein.[2] The WGA claims it is "responsible for determining writing credits for feature films . . . - a responsibility with far-reaching impact, financial and artistic."   WGA Working Rule ¶15 states that no "member shall accept credit which misrepresents the member's contribution to a picture or program." In turn, WGA Working Rule ¶1 states that "A VIOLATION [BY A MEMBER] OF ANY WORKING RULE SHALL BE CONSIDERED GROUNDS FOR DISCIPLINARY ACTION."

In this case, Callaham clearly violated these, as well as the other WGA rules described below, by falsely claiming that he is entitled to certain writing credit for *The Expendables* in a 2009 WGA screen credit arbitration panel. Despite his own stated belief that he was not entitled to the credit that he sought, Callaham nevertheless largely "prevailed" in that 2009 arbitration. Now, a few years later, Callaham is seeking an unwarranted windfall claiming that is entitled to certain "bonus" payments because a sequel to *The Expendables* was produced. Callaham did not work on the sequel at all, yet the WGA and Callaham/Jittery Dog claim they are entitled to more than **$234,800** with respect to *Expendables 2*.

Instead of prosecuting this current arbitration, what the WGA should have done instead was investigate its own member (*i.e.* Callaham) for the fraud that he

---

[2] There is an actual conflict of interest between the interests of the WGA, on the one hand, and Callaham/Jittery Dog, on the other.  Accordingly, Petitioner will file

committed back in 2009.  By refusing to do so, the WGA is simply paying lip service to its own explicit rules and regulations.  In order to fulfill its stated mission, the WGA claims that it is required to ensure that no "member shall accept credit which misrepresents the member's contribution to a picture or program" and that the WGA will discipline its own members for violating these rules.

However, the WGA is simply disregarding its own stated mandate. By turning a blind eye to Mr. Callaham's misconduct, the WGA is sending the wrong message to its own members who will be involved in future screen credit disputes. In essence, the WGA members now know that they can disregard the WGA's own rules and regulations and can instead advance whatever theory the member believes will lead to a positive result during a WGA screen credit arbitration panel.

The final type of relief that is sought in this petition is a writ of review or *certiorari* against the WGA and Callaham/Jittery Dog regarding the results of a 2009 WGA screen credit arbitration which Callaham/Jittery Dog largely prevailed on (based on Callaham's fraudulent conduct), as more fully described herein.

## III.    COMPLIANCE WITH LOCAL RULE 7-19.

Local Rule 7-19:  The name, address, telephone number and e-mail address of counsel for the opposing party:

a separate *ex parte* application seeking the disqualification of opposing counsel

Anthony R. Segall, Esq.
ROTHNER, SEGALL & GREENSTONE
510 South Marengo Avenue
Pasadena, California 91101-3115
Phone: (626) 796-7555; Fax: (626) 577-0124; E-mail: asegall@rsglabor.com

Katherine S. Christovich, Esq. & Leila B. Azari, Esq.
WRITERS GUILD OF AMERICA, WEST, INC.
7000 West Third Street
Los Angeles, California 90048
Phone: (323) 782-4521; Fax: (323) 782-4806; E-mail: lazari@wga.org

The reason for the seeking of the *ex parte* order is discussed herein, along with the points and authorities in support thereof.

Local Rule 7-19.1: Counsel for Petitioner discussed the substance of this *ex parte* application with opposing counsel in early January 2014. Indeed, counsel for Petitioner was involved with a teleconference with arbitrator Paul Crost on January 8, 2014, who denied Petitioner's request for a brief continuance of the arbitration. *See* Coate Dec. ¶¶2 - 7; **Exhibits "G" – "L."** Opposing counsel (Katherine Christovich, Esq.) indicated that the WGA and Callaham/Jittery Dog oppose the requested relief. *See* Coate Dec. ¶3, **Exhibit "H."**

## IV.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   The Parties

Petitioner is a motion picture production company located in Los Angeles. *See* Verified Petition ¶3.  In turn, the WGA is a labor union composed of writers

from representing both WGA and Callaham/Jittery Dog.

who write content for television shows and motion pictures. The WGA performs and functions as a "quasi-judicial" body and organization.   The WGA controls important economic interests and has attained a quasi-public stature in that it is a professional society of motion picture writers in the State of California. Verified Petition ¶8.

One of its members is David E. Callaham ("Callaham").  Mr. Callaham's loan-out company is Jittery Dog Productions, Inc. ("Jittery Dog). (Petition ¶6). Mr. Callaham is a writer with some experience in the motion picture industry and he primarily writes comic book and science fiction screenplays.  See Declaration of Trevor Short ("Short Dec.") ¶2 and Exhibit "A" attached to the Verified Petition).

Sylvester Stallone ("Stallone") is also a member of the WGA.  Besides being a world-famous actor, Stallone is also a well-regarded writer. Indeed, Stallone has approximately twenty-seven writing credits on various motion picture projects and has an Oscar nomination for "best writing and screenplay" for the motion picture *Rocky*. (Verified Petition ¶13).

**B.    The WGA Rules & Its Credit Determination Process**

WGA working rule ¶1 states, in part that "A VIOLATION [BY A MEMBER] OF ANY WORKING RULE SHALL BE CONSIDERED GROUNDS FOR DISCIPLINARY ACTION." WGA Working Rule ¶2 states that each "member shall comply with these Rules in spirit as well as in letter." WGA

Working Rule ¶15 states that no **"member shall accept credit which misrepresents the member's contribution to a picture or program."** WGA Working Rule ¶16 states, *inter alia*, that "members shall cooperate fully with the Guild Credits Committee **in order that all credits shall properly reflect the writer's contribution to the final script**."  (Verified Petition ¶16; *see also* Short Dec. ¶3 **Exhibit "B")**

The WGA's "primary duty is to represent our members in negotiations with film and television producers to ensure the rights of screen, television, and new media writers." Furthermore, according to its website, the WGA is "responsible for determining writing credits for feature films, television, and new media programs — a responsibility with far-reaching impact, financial and artistic. Writers' livelihoods often depend on the careful and objective determination of credits." (Verified Petition ¶17; *see also* Short Dec. ¶4).  According to the WGA's website, if an author writes "original material under Guild jurisdiction, the Guild's collective bargaining agreement provides you certain additional rights known as Separated Rights. The rights are quite important . . ." (Verified Petition ¶18).

According to the Preface for the WGA's "Screen Credits Manual," the "administration of an accurate and equitable system of determining credits is therefore one of the most important services the Guild performs for writers. . ." (Verified Petition ¶19; **Exhibit "C"**; *see also* Short Dec. ¶5).  The Preface to the

Screen Credits Manual further explains that the "Guild is asked more than one hundred and fifty times a year to assist in the resolution of controversies between writers over their credits. Arduous and unpleasant as this chore sometimes is, the Guild undertakes it willingly . . . **to ensure the validity of credit records** on which the professional status of writers depends." (Verified Petition ¶10).

The Preface then goes on to state that the "guiding principle of this system of credit determination is that the **writing credits should be a true and accurate** statement of authorship as determined by the rules of this Manual. . .   The importance of credits demands that writers give the process for determining credits **the closest scrutiny**." (Verified Petition ¶21; *see also* Short Dec. ¶5).  Paragraph 4 of the WGA's Screen Credits Manual states that all "participating writers are obligated to cooperate with the Guild . . . in every way required to render a fair and timely decision." (Verified Petition ¶22; *see also* Short Dec. ¶5).

The WGA provides for an appellate mechanism concerning credit determination arbitrations.   However, that mechanism contains very strict time limits and very limited grounds for an appeal.  In this case, the WGA's appellate mechanism does not provide a remedy in a situation such as the present one (*i.e.* where a prevailing writer such as Callaham/Jittery Dog later produces documents years later indicating that the prevailing writer actually committed fraud on the tribunal during the WGA credit determination arbitration). (Verified Petition ¶23).

More specifically, ¶7 of the WGA Screen Credits Manual states that within

> "twenty-four hours of the initial notification of the Arbitration Committee's decision, any of the participating writers may request an internal Guild appeal to a Policy Review Board. . . The function of the Policy Review Board is to determine whether or not, in the course of the credit determination, there has been any serious deviation from the policy of the Guild or the procedure as set forth in this Manual. . . Only the following are grounds for a participant's appeal to a Policy Review Board: (a) Dereliction of duty on the part of the Arbitration Committee or any of its members; (b)  The use of undue influence upon the Arbitration Committee or any of its members; (c) The misinterpretation, misapplication or **violation of Guild policy**; or (d) Availability of important literary or source material, for valid reasons not previously available to the Arbitration Committee. . ."

The Policy Review Board hearing must be held and its decision rendered within the 21 business days allowed for the arbitration under the provisions of the Minimum Basic Agreement." (Verified Petition ¶24l *see also* Short Dec. ¶5).

In this case, as alleged above, Callaham and/or Jittery Dog violated numerous WGA rules, including the WGA's Working Rule ¶15 which states that no "member shall accept credit which misrepresents the member's contribution to a picture or program." (Verified Petition ¶25; *see also* Short Dec. ¶6).  However, Petitioner only discovered Callaham and/or Jittery Dog's fraudulent conduct years later in 2013 long after the WGA's stated twenty-one day period to appeal referenced above expired. (Verified Petition ¶26; *see also* Short Dec. ¶7).

## C.     The August 2009 WGA Screen Credit Arbitration Re: *The Expendables* & Callaham's Misrepresentations

Petitioner was involved in the development and production of the motion

picture *The Expendables*, starring Stallone as well as other notable action stars including Jet Li, Jason Statham, Arnold Schwarzenegger and Bruce Willis. (Verified Petition ¶27; *see also* Short Dec. ¶8).

Petitioner is informed and believes that Stallone was primarily responsible for writing the script for *The Expendables*. Petitioner is informed and believes that while Stallone was writing the script, he reviewed Callaham's script entitled *Barrow* and based part of the story for *The Expendables* on *Barrow*. Petitioner is informed and believes that while he was writing *The Expendables*, Stallone believed that Callaham might receive a shared "Story By" credit for *The Expendables* along with Stallone, but that Stallone should be credited solely with a "Screenplay By" credit. (Verified Petition ¶28; *see also* Short Dec. ¶9).

Mr. Callaham was paid $250,000 for writing services concerning *Barrow* pursuant to a "Blind Commitment Agreement" originally signed with Warner Bros. (*see* Verified Petition ¶29; *see also* Short Dec. ¶10).

Stallone was not only a writer for *The Expendables* but also a production executive and a director of that motion picture.  Accordingly, because Stallone was also a production executive, the WGA rules provide for an automatic arbitration concerning screen writing credits under these circumstances. This screen writing credit arbitration took place in or about August-September 2009. (Verified Petition ¶30; *see also* Short Dec. ¶11). During that 2009 arbitration, Callaham represented

that he was entitled to sole "Written By" credit for *The Expendables*.  In other words, upon information and belief, Callaham contended that he alone wrote the screenplay for *The Expendables*. As set forth below, these representations and Callaham's position were patently false and confirmed by Callaham's own written words and disclosures that came to light years thereafter. (Verified Petition ¶31).

Nevertheless, on or about September 22, 2009, the WGA issued its screen writing credit determination. Callaham essentially prevailed and Callaham received a sole "Story By" credit and received the first position in a "Screenplay By" credit that he would share with Stallone with respect to *The Expendables*.  (Verified Petition ¶32; *see also* Short Dec. ¶13). However, long after Callaham "prevailed" with the WGA screen credit arbitration, several August 2009 emails written by Callaham surfaced. These emails (which Petitioner is informed and believes were not shared by Callaham with the 2009 WGA screen writing credit arbitration tribunal) reflect that Callaham in direct violation of WGA Rules accepted credits which misrepresented his contribution to *The Expendables,* and in effect committed fraud on the WGA tribunal.  (Verified Petition ¶33).

For example, in one August 17, 2009, email, Callaham claims that the script for *The Expendables* "IS FUCKING AWFUL. . . I am ASTOUNDED at how bad this is. **I want you to know that it's nothing like what I wrote.**" (emphasis added) (Verified Petition ¶34 **Exhibit "D"**; *see also* Short Dec. ¶15). On August

18, 2009, Callaham wrote another email to Kyle Harimoto and Dave Kalstein, stating the following: "Put it this way: the idea and very loose structure [of *The Expendables*] is mine. Everything else . . . I plead the fifth. Or, to put it another way, if I get sole credit like I am asking for . . . it would be A MIRACLE." This email certainly reflects Callaham's belief about the merits of the position he advanced before the WGA in 2009. (Verified Petition ¶35; **Exhibit "E"**; *see also* Short Dec. ¶16).

Petitioner believes that Callaham intentionally withheld these material emails, and concealed the limited extent of his contributions to *The Expendables* from the WGA screen writing credit arbitration panel in 2009 and instead continued to assert before the arbitral tribunal his patently false assertion that he was entitled to sole "Written By" credit for *The Expendables*. (Verified Petition ¶36; *see also* Short Dec. ¶17).

Callaham's false representations (*i.e.* that he wrote most of the shooting script for *The Expendables*) damaged Petitioner who justifiably were forced to rely upon on those false representations and pay Callaham/Jittery Dog a "writing credit bonus" of $102,250 as a result of the 2009 WGA screen credit arbitration based upon Callaham's falsehoods. If Petitioner had been aware of the falsity of the above misrepresentations of material fact, or omissions of material fact, then Petitioner would not have acted in the manner that it acted. (Verified Petition ¶37).

Callaham's withholding of material information from the 2009 WGA screen writing credit arbitration panel ultimately unjustly enriched Callaham/Jittery Dog: because Callaham (improperly) received a shared "Screenplay By" credit for *The Expendables*.  Furthermore, based on Callaham's false representations and material omissions, Petitioner paid Callaham a credit bonus of over $102,250.  This amount should be returned by Callaham/Jittery Dog to Petitioner. (Verified Petition ¶38).

### D.    The Sequels & The Pending 2013 WGA Arbitration

*The Expendables* was released in the United States on or about August 13, 2010, and was a popular motion picture with general public.   (Verified Petition ¶39; *see also* Short Dec. ¶20). Petitioner was then involved in developing and producing a sequel called *Expendables 2*, which was released in the United States on or about August 17, 2012.  *The Expendables 2* was also a popular motion picture with general public. (Verified Petition ¶40; *see also* Short Dec. ¶21). Because *Expendables 2* was produced and released, WGA and Callaham/Jittery Dog have now taken the position that they are entitled to receive a "sequel payment" even though Callaham/Jittery Dog did not contribute any writing service for *Expendables 2*. (Verified Petition ¶41; **Exhibit "F"**)

In this 2013 arbitration before the WGA Arbitration Panel, the WGA and Callaham/Jittery Dog have taken the position that Callaham/Jittery Dog have "separated rights" in *The Expendables*.  Accordingly, based on this theory, they

claim that Callaham/Jittery Dog is owed the principal amount of $175,000 as a "sequel payment" because of *Expendables 2*, along with substantial interest.[3] As of July 25, 2013, the WGA and Callaham/Jittery Dog contend they are owed in excess of $234,800 as a "sequel payment."  (Verified Petition ¶42).

### E.  Procedural Status

The WGA Arbitration is scheduled to take place on January 31, 2014. Coate Dec. ¶7; **Exhibit "L."**  Petitioner discovered Callaham's fraud in 2013 and promptly notified the WGA shortly thereafter. The parties then engaged in substantive settlement discussions for several months. When the parties could not come to a resolution, Petitioner then filed this verified petition in the Los Angeles County Superior Court on December 24, 2013. Coate Dec. ¶1.  Counsel for the Petitioner then requested that opposing counsel voluntarily stipulate to a stay of the January 31, 2014, WGA arbitration, which was denied.  Coate Dec. ¶2-3; **Exhibits "G" – "H."** Petitioner then promptly filed a letter brief before the assigned WGA arbitrator (Paul Crost, Esq.) requesting a brief continuance of the WGA arbitration, and informed the arbitrator that there would be a hearing before the Los Angeles County Superior Court in May 2014. Coate Dec. ¶4; **Exhibit "I."** Indeed, the Los Angeles County Superior Court promptly scheduled a hearing on March 27, 2014, and a hearing on the merits pertaining to the petition for writ of prohibition and/or

---

[3] *Expendables 3* is currently in production and is expected to be released in August

writ of review or certiorari for May 6, 2041. Coate Dec. ¶-6; **Exhibits "J" - "K."**

A teleconference was held with Mr. Crost on January 8, 2014.  Mr. Crost indicated that he would not continue the January 31, 2014, WGA arbitration and would only continue the hearing if a Court issued an order compelling him to do so.  Coate Dec. ¶7; **Exhibit "L."**  During the hearing, counsel for the WGA indicated that Petitioner would likely lose the WGA arbitration and said that the "writing was on the wall." Coate Dec. ¶7. In response, Mr. Crost indicated that his award was not likely to be overturned since federal and state case law upholds arbitrator awards even if the arbitrator makes a mistake as to the facts or the law. Coate Dec. ¶7. Thus, based on these comments, Mr. Crost will likely rule against Petitioner and that the WGA will then promptly try to confirm that award into a judgment against Petitioner. Coate Dec. ¶7.

Finally, Mr. Crost indicated that he would be on vacation from January 10 – 25, 2014, and would not respond to issues pertaining to this case until January 26, 2014.  Coate Dec. ¶8; **Exhibit "M."**

## V.       PETITIONER IS ENTITLED TO AN IMMEDIATE INJUNCTION

### A.      Applicable Law

The purpose of injunctive relief is to preserve the rights and relative positions of the parties, *i.e.,* the status quo, until a final judgment issues. *See U.S.*

2014. (Verified Petition ¶43;  *see also* Short Dec. ¶24).

*Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010) (*citing Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981)); *see also* F.R.C.P. 65.   In other words, a preliminary injunction is to preserve the status quo and prevent irreparable loss of rights prior to judgment. *Sierra On-Line v. Phoenix Software*, 739 F.2d 1415, 1422 (9th Cir. 1984).

A party seeking injunctive relief must show that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 20, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008).[4]

## B.    Petitioner Is Likely To Succeed On The Merits Of This Action.

Black's Law Dictionary defines the "likelihood-of-success-on-the-merits test" rather leniently as "[t]he rule that a litigant who seeks [preliminary relief] must show a reasonable probability of success . . ." *SEC v. Banc De Binary, Ltd.*,

---

[4] A more stringent standard is applied where mandatory, as opposed to prohibitory preliminary relief is sought. The Ninth Circuit has noted that although the same general principles inform the court's analysis, "[w]here a party seeks mandatory preliminary relief that goes well beyond maintaining the status quo pendente lite, courts should be extremely cautious about issuing a preliminary injunction." *Martin v. International Olympic Committee*, 740 F.2d 670, 675 (9th Cir. 1984). But that is not the situation here: in this case Petitioner is requesting narrow prohibitory injunctive relief.

2013 U.S. Dist. LEXIS 111885 *6-7 (D. Nevada 2013), *citing to* Black's Law Dictionary 1012 (9th ed. 2009).

In this case, it is likely that Petitioner will succeed on its requested relief. As discussed above, Petitioner seeks three (3) types of writs.  One of them is a writ of prohibition commanding the WGA to cease prosecuting the pending WGA arbitration filed on behalf of Callaham/Jittery Dog. This is intertwined with the other relief Petitioner is seeking: *i.e.* a writ of mandate commanding the WGA to discipline Callaham for his fraudulent conduct committed during the 2009 WGA screen credit arbitration proceeding, and for an alternate writ of review or *certiorari* against the WGA and Callaham/Jittery Dog regarding the results of a 2009 WGA screen credit arbitration.

To reiterate, Petitioner has to establish a "reasonable probability of success" in this action.[5] In this case, there is substantial likelihood and a "reasonable probability" that Petitioner will succeed on the merits of its claims against the WGA. The WGA will be hard-pressed to prevail on its apparent argument that it does not have to investigate misconduct that is committed by its own members during its own internal screen credit arbitration.

---

[5] *See  SEC v. Banc De Binary*  2013 U.S. Dist. LEXIS 111885  *6-7 (D. Nevada 2013); *see also Foley v. Wells Fargo Bank* 2011 U.S. Dist. LEXIS 72212 *8-9 (D. Nevada 2011); *Unite Here Health v. Parball Corp.*, 2013 U.S. Dist. LEXIS 86904 *8 (D. Nevada 2013).

Indeed, it is difficult to examine a clearer case of fraud on the screen credit arbitration tribunal based on Callaham's own written words. Again, in one August 17, 2009, email, Callaham claims that the script for *The Expendables* "IS FUCKING AWFUL. . . I am ASTOUNDED at how bad this is. **I want you to know that it's nothing like what I wrote."** (Verified Petition ¶34 **Exhibit "D"**; *see also* Short Dec. ¶15).   The next day, Callaham wrote another email stating the following:  "Put it this way: the idea and very loose structure [of *The Expendables*] is mine. Everything else . . . I plead the fifth.  Or, to put it another way, if I get sole credit like I am asking for . . . it would be A MIRACLE."

These emails are shocking. Now that the WGA is aware of these emails and the fraud that was committed by its own members, it should have immediately launched an investigation into the matter to determine if Mr. Callaham should have been disciplined. Yet, it failed to abide by its own clear rules and regulations that are identified above and attached to the verified petition. Indeed, in the answer that was filed on January 17, 2014, the WGA admits that "the Guild has not initiated an investigation or disciplined Callaham." (Answer, Docket #7, ¶49).

Accordingly, it certainly appears that Petitioner will prevail on some of the relief it is seeking herein.   Finally, it should be pointed out that the Petitioner is likely to prevail on at least some of the relief it is seeking because a district court has inherent power and discretion to control the cases on its docket in a manner

that will promote economy of time and effort for itself, for counsel, and for litigants. *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9thCir. 1962). As a general rule, this includes the inherent power to stay civil proceedings in the interests of justice. *Bureerong v. Uvawas*, 167 F.R.D. 83, 87 (C.D. Cal. 1996); *see also Rivers v. Walt Disney Co.*, 980 F.Supp. 1358, 1360 (C.D. Cal. 1997) [power to grant stay of pretrial proceedings is within court's discretion, and stay is appropriate when it serves interests of judicial economy and efficiency]; *Association of Irritated Residents v. Fred Schakel Dairy*, 460 F.Supp.2d 1185, 1193 (E.D. Cal. 2006) [a judge has wide discretion to use the inherent power of the federal court to promote judicial efficiency and prevent prejudice to the parties in granting or denying a motion to stay].

For this dispute to proceed in this fashion would be analogous to a court awarding punitive damages before liability had been determined. It is not only a waste of resources, but also fundamentally unfair. Therefore, this Court should exercise its inherent power to stay the pending WGA arbitration pending the threshold determinations raised by this action.

### C.  Likelihood Of Irreparable Harm

The second prong that this Court must considered before issuing a preliminary injunction is whether the Petitioner will suffer irreparable harm if the injunction is not granted.   "Courts generally look at the immediacy of the

threatened injury in determining whether to grant preliminary injunctions." *Privitera v. Cal. Bd. of Med. Quality Assurance*, 926 F.2d 890, 897 (9th Cir. 1991).

A "presently existing actual threat must be shown, although the injury need not be certain to occur." *West v. Dizon*, 2014 U.S. Dist. LEXIS 3338 *4 (ED Cal. 2014), *citing to Zenith Radio Corp. v. Hazeltine Research, Inc*., 395 U.S. 100, 130-31, 89 S. Ct. 1562, 23 L. Ed. 2d 129 (1969); *FDIC v. Garner*, 125 F.3d 1272, 1279-80 (9th Cir. 1997).

In this case, Petitioner is likely to suffer irreparable injury absent an injunction. As discussed above, the WGA and Callaham/Jittery Dog will likely prevail at the pending January 31, 2014, WGA arbitration before Arbitrator Paul Crost. (Coate Dec. ¶7). The WGA as a matter of course does not pick an arbitrator that has ever ruled against it and Mr. Crost's selection by the WGA is no surprise. (Coate Dec. ¶7). During the January 7, 2014, conference before Mr. Crost, the WGA indicated that the "writing was on the wall" and that the WGA will prevail at the January 31, 2014, arbitration. In turn, Mr. Crost indicated that an award issued against Petitioner will likely be confirmed into a judgment because an arbitrator's award generally cannot be vacated (even if an arbitrator makes a mistake as to the facts or the law). (Coate Dec. ¶7).

Therefore, Petitioner faces enormous, irreparable harm from proceeding in the pending WGA arbitration. This arbitration is on a fast track and will likely be

decided against Petitioner in less than two weeks – well before this Court would have a chance to decide the dispositive issues that could preclude or defeat arbitration.

Petitioner can not avail itself of the WGA's own internal appeal procedures since the time to appeal has expired long ago (well before Callaham's fraud was discovered). (*See* Verified Petition ¶24; Short Dec. ¶5). Indeed, Petitioner did not participate in the 2009 screen credit arbitration process and only discovered it in 2013. After it discovered the fraud, Petitioner promptly informed the WGA and then engaged in substantive settlement discussions. (See Coate Dec. ¶1).

To allow the WGA arbitration to go forward at this junction is tantamount to placing "the cart before the horse."  The entire predicate of this current WGA arbitration rests on the determination of the 2009 WGA screen credit arbitration that Callaham was entitled to certain writing credits with respect to *The Expendables*.  Thus, if this Court will agree with Petitioner and grant Petitioner some or all of the relief requested in this hearing, Petitioner will be forced to participate in a costly and time-consuming WGA arbitration spending thousands of dollars to defend itself, money which it likely will not recover from the WGA or Callaham/Jittery Dog.  More importantly, Petitioner will likely suffer an adverse arbitration award in excess of $230,000 (which will likely be confirmed). At that

point, whatever legal recourse Petitioner might have to undo the award based on the fundamental issues raised here would be illusory.

### D.     The Balance Of Hardships Favors Petitioner

In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. *Winter v. NRDC, Inc.*, 555 U.S. 7, 24, *quoting Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542, 107 S. Ct. 1396, 94 L. Ed. 2d 542 (1987). Here, there is a "likelihood of irreparable injury." *Winter* at 21.

In contrast to the likely substantial harm to Petitioner, the harm to the WGA and Callaham/Jittery Dog is minimal: they will just have to stop from prosecuting their WGA arbitration for a short period of time.   If injunctive relief were granted, there will only be a brief delay on having the merits of their claims resolved with respect to the *Expendables 2*. Issuance of any preliminary injunctive relief would not require this Court to significantly interfere with WGA arbitration process (rather, that process would simply be continued for a short while).

### E.     An Injunction Is In The Public Interest

The last element requires the Court to consider "whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Indep. Living Ctr. of S. Cal. v. Maxwell-Jolly*, 572 F.3d 644, 659 (9th Cir. 2009) (internal citation omitted).   "When the reach of an injunction is narrow, limited

only to the parties, and has no impact on non-parties, the public interest will be "at most a neutral factor in the analysis" of whether to grant a preliminary injunction. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009).

Here, the Petitioner seeks a narrow temporary restraining order and preliminary injunction that affects only the parties to this action. The impact of an injunction has little reach beyond the parties and there is little potential for public consequences.  If there is any "public interest," then an injunction would actually further it.  Here, the public, and more specifically the members of the WGA, would be served here.  The WGA members have a strong interest in accurate and fair determinations during the screen credit writing arbitration process.  By granting the requested relief, the Court could further this interest by compelling the WGA to revisit a particularly egregious example of fraud that was committed on the WGA itself.

### F.     The Court Should Require At Most A Minimal Bond

Under F.R.C.P. 65(c), a court may grant preliminary injunctive relief "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Nevertheless, district court are invested with discretion as to the amount of security required, if any, and may dispense with the filing of a bond if it

concludes that there is no realistic likelihood of harm to the defendant/respondent from the injunction. *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009). Defendants/Respondents bear the burden to establish any damages they are likely to suffer and the amount of bond necessary to secure against the wrongful issuance of an injunction. *Philips Elecs. N. Am. Corp. v. Hope*, 631 F.Supp.2d 705, 724 n. 14 (MDNC 2009) (*citing Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2nd Cir. 1996).

This is a case where there is no reasonable likelihood of harm to the Respondent (WGA) or real parties in interest (Callaham/Jittery Dog). Petitioner has shown a strong likelihood of success on the merits. Any harm to be suffered by them is purely speculative, especially since Callaham/Jittery Dog admitted in writing that he was not entitled to the credit he received for *The Expendables*.

Under these circumstances, a district court need not order security with respect to potential economic damages that are "speculative at best." *Interlink Int'l Fin. Servs., Inc. v. Block*, 145 F.Supp.2d 312, 315 (S.D.N.Y. 2001). There is no significant potential for harm to the WGA or Callaham/Jittery Dog arising from the issuance of the preliminary injunction. Consequently, the Court should not require a bond or at most require only a minimal amount of security.

## VI.    <u>CONCLUSION.</u>

Based on the foregoing, Petitioner respectfully requests that this Court grant its *ex parte* application and issue a Temporary Restraining Order preventing the Writers Guild of America, West, Inc. and real parties in interest David E. Callaham and Jittery Dog Productions, Inc. from prosecuting the January 31, 2014, WGA arbitration currently pending before Paul Crost, Esq. concerning the issue of "bonus" sequel payments relating to The Expendables and Expendables 2.

Furthermore, the Court should set a hearing on an Order to Show Case re: Issuance of a preliminary Injunction granting the following relief pending a final adjudication on the merits:

1.    An Order enjoining the WGA and Callaham/Jittery Dog from prosecuting the WGA arbitration currently pending before Paul Crost, Esq. concerning the issue of "bonus" sequel payments relating to *The Expendables* and *Expendables 2*.


Dated:  January 21, 2014                 Respectfully submitted,

                                         COSTA ABRAMS & COATE LLP

                                         By:    /s/ Charles M. Coate
                                         _____
                                         Charles M. Coate
                                         Attorney for Petitioner

### DECLARATION OF TREVOR SHORT

I, TREVOR SHORT, hereby declare as follows:

1.      I am an officer and authorized representative of Petitioner Double Life Productions, Inc. ("Petitioner"). The matters set forth herein are true and correct and of my own personal knowledge, and if called upon to testify to these matters, I could and would do so competently.

2.      I am informed and believe that David E. Callaham ("Callaham") is a writer with some minor experience in the motion picture industry and that he primarily writes comic book and science fiction screenplays. Attached hereto as **Exhibit "A"** is a printout from IMDB PRO listing Callaham's experience in the motion picture industry.  I am further informed and believe that Callaham's "loan out company" is Jittery Dog Productions, Inc. ("Jittery Dog").

3.      The Writers Guild of America, West, Inc. ("WGA") working rule ¶1 states, in part that "A VIOLATION [BY A MEMBER] OF ANY WORKING RULE SHALL BE CONSIDERED GROUNDS FOR DISCIPLINARY ACTION." WGA Working Rule ¶2 states that each "member shall comply with these Rules in spirit as well as in letter." WGA Working Rule ¶15 states that no "member shall accept credit which misrepresents the member's contribution to a picture or program." WGA Working Rule ¶16 states, *inter alia*, that "members shall cooperate fully with the Guild Credits Committee in order that all credits shall

properly reflect the writer's contribution to the final script."   Attached hereto as **Exhibit "B"** and incorporated herein is a copy of the WGA's "Code of Working Rules."

4.      According to its website, the WGA's "primary duty is to represent our members in negotiations with film and television producers to ensure the rights of screen, television, and new media writers." Furthermore, according to its website, the WGA is "responsible for determining writing credits for feature films, television, and new media programs — a responsibility with far-reaching impact, financial and artistic. Writers' livelihoods often depend on the careful and objective determination of credits."   According to the WGA's website, if an author writes "original material under Guild jurisdiction, the Guild's collective bargaining agreement provides you certain additional rights known as Separated Rights. The rights are quite important . . ."

5.      According to the Preface for the WGA's "Screen Credits Manual," the "administration of an accurate and equitable system of determining credits is therefore one of the most important services the Guild performs for writers. . ."  A copy of the WGA's "Screen Credits Manual" is attached hereto as **Exhibit "C."**

The WGA provides for an appellate mechanism concerning credit determination arbitrations.   However, that mechanism contains very strict time limits and very limited grounds for an appeal.   In this case, the WGA's appellate

mechanism does not provide a remedy in a situation such as the present one (*i.e.* where a prevailing writer such as Callaham/Jittery Dog later produces documents years later indicating that the prevailing writer actually committed fraud during the WGA credit determination arbitration).

6.      In this case, I am informed and believe that Callaham and/or Jittery Dog violated various WGA rules, including the WGA's Working Rule ¶15 which states that no "member shall accept credit which misrepresents the member's contribution to a picture or program."

7.      However, as discussed in greater detail herein, Petitioner only discovered Callaham and/or Jittery Dog's fraudulent conduct years later in 2013 after the WGA's stated twenty-one day period to appeal referenced above expired.

8.      Petitioner is one of the producers of the motion picture *The Expendables*, starring Sylvester Stallone ("Stallone") as well as other notable action stars including Jet Li, Jason Statham, Arnold Schwarzenegger and Bruce Willis.

9.      I am informed and believe that Stallone was primarily responsible for writing the script for *The Expendables*. I am further informed and believe that while Stallone was writing the script, he reviewed Callaham's script entitled *Barrow* and based part of the story for *The Expendables* on *Barrow*. I am informed and believe that while he was writing *The Expendables*, Stallone believed that

Callaham should receive a shared "Story By" credit for *The Expendables* along with Stallone, but that Stallone should be credited solely with a "Screenplay By" credit.

10. I am informed and believe that Callaham was paid $250,000 by Warner Bros. for his writing services concerning *Barrow*.

11. Stallone was not only a writer for *The Expendables* but also a production executive and a director of that motion picture. Accordingly, because Stallone was also a production executive, I am informed and believe that the WGA rules provide for an automatic arbitration concerning screen writing credits under these circumstances. I am informed that this screen writing credit arbitration took place in or about August-September 2009.

12. During that 2009 arbitration, I am informed and believe that Callaham contended that he was entitled to sole "Written By" credit for *The Expendables*. In other words, upon information and belief, Callaham contended that he alone wrote the screenplay for *The Expendables*. As set forth below, these allegations and Callaham's position appear to be patently false and confirmed by Callaham's own written words and disclosures that came to light years thereafter.

13. Nevertheless, on or about September 22, 2009, I am informed and believe that the WGA issued its screen writing credit determination. Callaham largely prevailed and Callaham received a sole "Story By" credit and received the

first position in a "Screenplay By" credit that he would share with Stallone with respect to *The Expendables*.

14.     However, after Callaham largely prevailed with the WGA screen credit arbitration, several August 2009 emails written by Callaham surfaced. These emails (which I am informed and believe was not shared by Callaham with the 2009 WGA screen writing credit arbitration tribunal) reflect that Callaham committed fraud on the WGA tribunal.

15.     For instance, in one August 17, 2009, email, Callaham claims that the script for *The Expendables* "IS FUCKING AWFUL. . . I am ASTOUNDED at how bad this is. **I want you to know that it's nothing like what I wrote.**" (emphasis added) Attached hereto as **Exhibit "D"** is a true and correct printout of Callaham's August 17, 2009, email that he wrote to Dave Kalstein and Kyle Harimoto confirming this.

16.     On August 18, 2009, Callaham wrote another email to Kyle Harimoto and Dave Kalstein, stating the following:  "Put it this way: the idea and very loose structure [of *The Expendables*] is mine. Everything else . . . I plead the fifth.  Or, to put it another way, if I get sole credit like I am asking for . . . it would be A MIRACLE." Attached hereto as **Exhibit "E"** is a true and correct printout of Callaham's August 18, 2009, email reflecting Callaham's belief about the merits of the position he advanced before the WGA.

17.    I am informed and believe that Callaham intentionally withheld these material emails from the WGA screen writing credit arbitration panel in 2009 and instead continued with his patently false assertion that he was entitled to sole "Written By" credit for *The Expendables*.

18.    Callaham's false representations (*i.e.* that he wrote most of the shooting script for *The Expendables*) damaged Petitioner who justifiably relied on those false representations and paid Callaham/Jittery Dog a "writing credit bonus" of over $102,250 after Callaham largely prevailed in the 2009 WGA screen credit arbitration. If Petitioner had been aware of the falsity of the above misrepresentations of material fact, or omissions of material fact, then Petitioner would not have acted in the manner that it acted.

19.    Callaham's withholding of material information from the 2009 WGA screen writing credit arbitration panel ultimately unjustly enriched Callaham/Jittery Dog: because Callaham (improperly) received a shared "Screenplay By" credit for *The Expendables*. Furthermore, based on Callaham's false representations and material omissions, Petitioner paid Callaham a credit bonus of over $102,250. This amount should be returned by Callaham/Jittery Dog to Petitioner.

20.    *The Expendables* was released in the United States on or about August 13, 2010, and I believe it was a popular motion picture with general public.

21.     Petitioner was then involved in producing a sequel called *Expendables 2*, which was released in the United States on or about August 17, 2012.  *The Expendables 2* was also apparently a popular motion picture with general public.

22.     Because *Expendables 2* was produced and released, WGA and Callaham/Jittery Dog have now taken the position that they are entitled to receive a "sequel payment" even though Callaham/Jittery Dog did not contribute any writing service for *Expendables 2*. A true and correct copy of the May 2013 "Notice of Claim" filed by the Respondent WGA against the Petitioner and others is attached hereto as **Exhibit "F."**

23.     In this 2013 arbitration, the WGA and Callaham/Jittery Dog have taken the position that Callaham/Jittery Dog have "separated rights" in *The Expendables*.  Accordingly, based on this theory, the WGA and Callaham/Jittery Dog have taken the position that Petitioner and others owe Callaham/Jittery Dog the principal amount of $175,000 as a "sequel payment" because of *Expendables 2*, along with interest.  As of July 25, 2013, the WGA and Callaham/Jittery Dog contend they are owed in excess of $234,800 as a "sequel payment."

24.     *Expendables 3* is currently in production and is expected to be released in August 2014.

25.     Petitioner has been damaged by the conduct of the WGA and Callaham/Jittery Dog in that Petitioner wrongfully paid over $102,250 to

Callaham/Jittery Dog with respect to *The Expendables*. Petitioner has been further damaged by being forced to incur attorney fees and costs in defending itself in the 2013 arbitration brought by the WGA on behalf of Callaham/Jittery Dog with respect to the *Expendables 2*.

26.     The WGA has been informed of Callaham/Jittery Dog's fraudulent conduct with respect to the 2009 screen credit writing arbitration; however, I do not believe that the WGA has initiated an investigation or disciplined Callaham.


I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and was executed on this $\underline{31}$ day of January __, 2014, at Los Angeles, California.

Trevor Short

37

## <u>DECLARATION OF CHARLES M. COATE</u>

I, Charles M. Coate, hereby declare as follows:

I am an attorney duly licensed to practice in the Courts of the State of California, the United States Supreme Court, the United States Court of Appeal for the Ninth Circuit, and the United States Central District of California. I am a member of Costa Abrams & Coate LLP, counsel of record for Petitioner Double Life Productions, Inc. ("Petitioner"). I have personal knowledge of the facts set forth herein, except as to those stated on information and belief and, as to those, I am informed and believe them to be true. If called as a witness, I could and would competently testify to the matters stated herein. I submit this declaration in support of Petitioner's request for a temporary restraining order and order to show cause re: preliminary injunction to stay or continue a pending WGA arbitration scheduled to take place before Paul Crost on January 31, 2013 (the "Pending WGA Arbitration").

1.      I am informed and believe that in 2013, Petitioner discovered Mr. David E. Callaham ("Callaham's) emails referenced in the verified petition in this action, and that Petitioner promptly notified the Writers Guild of America, West, Inc. ("WGA") shortly thereafter. I am further informed and believe that the WGA and Petitioner then engaged in substantive settlement discussions for several months. When the parties could not come to a resolution, my office was retained

and Petitioner then filed the underlying verified petition in the Los Angeles County Superior Court on December 24, 2013.

2.     After this verified petition was filed, I requested that counsel for the WGA (Katherine Christovich, Esq.) voluntarily stipulate to a stay of the Pending WGA Arbitration. Attached hereto as **Exhibit "G"** is a true and correct printout of an email I sent to Ms. Christovich, along with a draft letter to the assigned arbitrator (Paul Crost, Esq.)

3.     However, on Friday January 3, 2014, the WGA refused to stipulate to continue the pending January 31, 2014, arbitration. Attached hereto as **Exhibit "H"** is a true and correct copy of this letter I received from the WGA (from Ms. Christovich).

4.     After receiving written confirmation from the WGA that it will not stipulate to continue the arbitration, I sent a "letter brief" on Monday January 6, 2014,  to the assigned arbitrator (Paul Crost, Esq.). Attached hereto as **Exhibit "I"** is a true and correct copy of this letter (along with attachments) that was sent to Mr. Crost.

5.     During this period of time, the Los Angeles County Superior Court scheduled certain hearing dates in this verified petition. Attached hereto as **Exhibit "J"** is a true and correct copy of a "Notice of Trial Setting Conference" reflecting a

hearing scheduled for March 27, 2014, before the Honorable James Chalfant in Department 85.

6.     Furthermore, a hearing on the merits with respect to Petitioner's requested writ of prohibition and/or writ of review or certiorari was scheduled to be heard on May 6, 2014, before the Honorable James Chalfant in Department 85. Attached hereto as **Exhibit "K"** is a true and correct copy of that notice.

7.     On January 8, 2014, a hearing regarding Petitioner's request to stay or continue the Pending WGA Arbitration was held before Paul Crost.  During the hearing, counsel for the WGA (Katherine Christovich, Esq.) indicated that the "writing was on the wall" and that the WGA will prevail against the Petitioner because of the results of the 2009 screen credit arbitration regarding *The Expendables*. In turn, Mr. Crost indicated that any award that he would issue will likely be confirmed into a judgment because an arbitrator's award generally cannot be vacated (even if an arbitrator makes a mistake as to the facts or the law).  Mr. Crost also indicated that he would not continue the January 31, 2014, WGA arbitration and would only continue the hearing if a Court issued an Order compelling him to do so.  I also requested that Mr. Crost grant Petitioner a brief continuance to seek injunctive relief to do so; however, Mr. Crost denied this request as well. Thus, based on these comments, I am informed and believe that Mr. Crost will likely rule against Petitioner and the WGA will then likely try to

confirm that award into a judgment against Petitioner. Attached hereto as **Exhibit "L"** is a true and correct copy of Mr. Crost's order denying Petitioner's request to stay and/or continue the Pending WGA Arbitration, which remains scheduled for January 31, 2014. Mr. Crost signed this order (prepared by the WGA) approximately ten (10) minutes after receiving it from WGA's counsel by email, without giving Petitioner's counsel time to review or file objections thereto.

8.     Mr. Crost indicated that he would be on vacation from January 10 – 25, 2014, and would not respond to issues pertaining to this case until January 26, 2014.  Attached hereto as **Exhibit "M"** is a true and correct printout of an email that I received from Mr. Crost confirming this.

9.     I am informed and believe that Paul Crost was selected by the WGA to be the arbitrator in the Pending WGA Arbitration. I am further informed and believe that the WGA as a matter of course typically does not pick arbitrators that it believes may rule against it.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and was executed on this 21ST day of January, 2014, at Santa Monica, California.

/s/ Charles M. Coate

_____

CHARLES M. COATE

45



IMDb Pro : Dave Callaham. Main Details    Page 1 of 1

Case 2:14-cv-00197-DMG-AJW    Document 8    Filed 01/21/14    Page 50 of 180    Page ID #:177

# Dave Callaham

Main Details  Filmography  Personal Details  Media  Contact  Clients/Coworkers  ✎ Edit page

**Main Details**
STARmeter
**Filmography**
Summary
Year
Profession
Title Type
TV Series
Credited Name
Genre
Keyword
Budget
Box Office
Ratings
Votes
**Personal Details**
Biography
Quotes
Trivia
Other Works
Awards
Message Board
**Media**
Photo Gallery
Official Photos
Publicity
News Articles
Twitter
Blog
Web Sites
**Contact**
**Clients/Coworkers**
by STARmeter
by Company
by Relationship

| | |
|---|---|
| **Talent Agent:** | United Talent Agency (UTA) - Jason Burns  more » |
| | Beverly Hills, CA:<br>UTA Plaza<br>9336 Civic Center Drive<br>Beverly Hills, CA 90210<br>USA |
| **Profession:** | Writer / Producer |
| **Known for:** | The Expendables / Doom / The Expendables 2 |
| **Also Known As:** | Dave Callaham / David Callaham  more » |
| **Born:** | 24 October 1977, USA (age 35)  more » |
| **Height:** | 6' 7" (2.01 m) |
| **Industry News:** | 'Godzilla' Ready to Roar at Comic-Con as Legendary Promotes Its Next Creature Feature (From Variety - Film News, 15 July 2013, 12:43 PM, PDT)<br>Comic-Con 2013 schedule: All the best movie events (From EW.com - Inside Movies, 7 July 2013, 2:00 PM, PDT) |
| **News:**<br>(426 articles) | First Look @ New "Godzilla" (From SneakPeek, 8 October 2013, 11:47 PM, PDT)<br>2nd Godzilla Trailer Has Leaked! (From ComicBookMovie, 8 October 2013, 10:20 PM, PDT)<br>Watch the Godzilla Comic-Con trailer (From Flickeringmyth, 5 October 2013, 11:54 AM, PDT)<br>See the Godzilla Comic-Con Teaser Trailer While You Can! (From Dread Central, 4 October 2013, 12:00 PM, PDT) |

**STARmeter™**

Current rank:
**16,733**
Click graph for more detail

📷 **Photo Gallery**
🎬 **Official Photos**

---

## Filmography sorted by: Production Status ▾ [Go]

↳ Jump to: Future Films  Past Films & Videos  Add IMDb Resume

| Projects In Development (2 titles) | Year | MOVIE Meter | Status | |
|---|---|---|---|---|
| The Bulletcatchers - *Writer* | ???? | 445,739 | Unknown | |
| Untitled McG Sci-Fi/Adventure Project - *Writer (screenplay)* | ???? | 427,671 | Script | |

| Films In Production (2 titles) | Year | MOVIE Meter | Status | Budge |
|---|---|---|---|---|
| The Expendables 3 - *Writer (characters)* | 2014 | 189 | Filming | |
| Godzilla - *Writer (screenplay)* | 2014 | 74 | Post-production | |

| Past Films & Videos (6 titles) | Year | MOVIE Meter | Budget | Opening Weekend | US Bo: Office |
|---|---|---|---|---|---|
| The Expendables 2 - *Writer (characters) (as David Callaham)* | 2012 | 491 | $92M | $28.6M | $85I |
| The Expendables - *Writer (screenplay) (as David Callaham) (story) (as David Callaham)* | 2010 | 851 | $80M | $34.8M | $103I |
| Tell Tale - *Writer (screenplay) (as David Callaham), Executive Producer* | 2009 | 11,502 | $12M | | |
| Horsemen - *Writer (written by) (as David Callaham)* | 2009 | 6,106 | $20M | | |
| Doom - *Writer (screenplay) (as David Callaham) (story) (as David Callaham)* | 2005 | 3,174 | $60M | $15.5M | $28I |
| David Callaham: Writer Reel (short) - *Writer* | 2004 | 322,936 | $300 | | |

---

You may report errors and omissions on this page to the IMDb database managers. They will be examined and if approved will be included in a future update. Clicking the 'Edit page' button will take you through a step-by-step process.

**EXHIBIT**
A

(The following Code of Working Rules applies to Associate, Current and Post-Current members.)

# Code of Working Rules

## OPERATING

1. Under the Constitution, the Guild may, from time to time, adopt Working Rules, as set forth below, governing the working relationship of members with employers, agents and others with whom writers have professional dealings in connection with writing services and literary properties. Any proposed working rule must be approved by the Board of Directors before submission to the membership for approval but shall not be effective or operative if, in the discretion of the Board of Directors, it is contrary to the provisions of the Constitution or causes a breach of any contract entered into by the Guild. A VIOLATION OF ANY WORKING RULE SHALL BE CONSIDERED GROUNDS FOR DISCIPLINARY ACTION.

2. Each member shall comply with these Rules in spirit as well as in letter.

## EMPLOYMENT

3.

(a) All agreements and contracts between writers and producers must be in writing.

(b) Each member must promptly file with the Guild office a copy of his/her contract of employment (whether such agreement provides for leasing of material, participation in profits, residuals or otherwise) in no case later than one week after the receipt of the contract. *In addition to any other disciplinary action which may be deemed proper, an automatic fine shall be levied upon a member who fails to file his/her contract within two weeks after written notice that there is no contract on record.*

4. No member shall do any work, including reviewing stock film before the commencement of a definite assignment under contract.

5. Each member shall comply with the terms of the Minimum Basic Agreements in spirit as well as in letter, and shall not accept any employment, sign any contract or make any agreement for employment which violates such Minimum Basic Agreements.

6. No member shall contract for employment with any producer under terms less favorable than those set forth in the applicable Minimum Basic Agreements.

Violation of this rule shall subject the member to disciplinary action and a fine of up to $2,000, or on flat deals where the amount of money involved exceeds $2,000, a fine of not more than 100% of the amount received for such writing.



EXHIBIT
_B_

47

NOTE: If you are working at the minimum on any assignment, check with the Guild office for further particulars as to the applicable provisions of the Minimum Basic Agreements.

7. No member shall make or enter into any contract or participate in any venture requiring the writing of any literary material by such writer whereby writer's initial compensation for the writing of such material shall be less than the minimum set forth in the applicable MBAs except with the specific written approval of the Guild, which approval may be granted only under unusual circumstances. In the case of joint ventures or other similar engagements or deals involving participation in profits, a waiver may be granted only where the writer's participation is substantial.

8. No member shall accept employment with, nor option or sell literary material to, any person, firm or corporation who is not signatory to the applicable MBAs.

Violation of this Rule shall automatically subject the member to a fine, the maximum amount of which shall not exceed 100% of the remuneration received from such non-signatory.

9. It shall be the responsibility of every member to report, in confidence to the Guild office, for appropriate action, any violation or abuses of the terms and working standards established by the current Minimum Basic Agreements and Code of Working Rules, including any "offers" of employment which violate the current Minimum Basic Agreements.

10. No member may enter into a contract for the rendition of writing services with any producer whose name is contained in the then current Guild unfair list unless such producer shall have first posted a bond with the Guild guaranteeing the full amount of the writer's proposed compensation pursuant to such contract.

Violation of this Rule shall automatically subject the member to a fine, the maximum amount of which may not exceed 100% of his/her remuneration pursuant to such contract and the minimum amount of which shall be $250 or the applicable minimum, whichever is lower.

11. No member shall participate in any arrangement for ghost writing.

Violation of this Rule shall subject the member to disciplinary action and a fine of up to $2,000.

12. Each member upon being assigned under an employment contract is required to ascertain from the proper authorities in the production company the name or names of any other writers currently assigned to the same material. It will be the obligation of the member to notify the other writer or writers on the property of the fact that he/she has been assigned to it.

13. Each member shall report to the Guild any engagement as a producer, director or executive, or any activities which involve the hiring and firing of writers.

## SPECULATIVE WRITING

14. No member shall work for a producer on speculation or under any arrangement in which

payment is contingent on approval or ability to pay. Members may, however, discuss their thoughts and reactions regarding material owned by the producer; it is recommended, however, that in such cases the writer shall make a written memorandum of any suggestions made by him/her and register this material at the Guild office.

Violation of this Rule shall subject the member to disciplinary action and a fine of up to $2,000.

## CREDITS AND ARBITRATION

15. No member shall accept credit which misrepresents the member's contribution to a picture or program.

16. Members shall accept, abide by and contract for credit only in accordance with the terms and provisions of the applicable Minimum Basic Agreements; and members shall cooperate fully with the Guild Credits Committee in order that all credits shall properly reflect the writer's contribution to the final script.

17. Each member shall promptly report to the Guild all writing credits received on pictures or programs produced by non-signatory producers.

18. If a writer performing duties as a production executive intends to claim collaboration credit, he/she must, at the time he/she starts to work as a writer, signify such intention in writing to the Guild and to any other writer or writers assigned to the script. *Failure to comply will subject the member to disciplinary action.* In order to be entitled to credit, such production executive must be able to furnish the Guild with written material of his/her own, which can be identified as his/her contribution to the finished script.

## PSEUDONYM

19. A writer must use his/her own name in all writing credits unless he/she has already established a pseudonym or registers one at the Guild office *before commencement of employment* on a writing assignment, or *before disposition of any rights* to literary material on which he/she wishes to use such pseudonym.

## ORIGINAL STORIES, SERIES AND PROGRAM IDEAS, ORIGINAL RADIO, SCREEN AND TELEPLAYS

20. For the purposes only of these Rules, original stories, series and program ideas and original radio, screen and teleplays shall be defined as material which is the sole creation of the member or members and which is written by the member or members on his/her or their own time.

21. Each member shall promptly file with the Guild office a copy of his/her original story, series or program idea, and/or original radio, screen or teleplay sales or leasing contract, which filing shall in no event be later than one week after receipt of such contract.

NOTE: Members are strongly urged to register all literary material which they own with the Registration Service maintained at the Guild office prior to offering such material for sale or other exploitation. While such registration is not a substitute for the statutory copyright which must be obtained on publication of the work, it is extremely helpful if suit is brought for any copyright infringement or plagiarism of the material.

## ADVERTISING

22. The Writers Guild of America, West, Inc. has adopted and approved the agreement between the Screen Writers Guild and the consenting trade publications condemning the following practices as unfair:

1. Slanting reviews on account of advertising, or retaliating against a writer for failure to advertise.

2. Using pressure from a writer's employer to get advertising.

3. Engaging in any harassing practices, such as making repeated solicitation, asking for chain advertising, or soliciting an advertisement in connection with a particular picture before the picture has been previewed (or a particular show or series before the program has been broadcast).

The consenting trade publications have instructed their staffs to refrain from engaging in any of the above practices.

Members should immediately notify the Guild of any violation of the Code of Fair Practices.

## AGENTS

23. No writer shall enter into a representation agreement whether oral or written, with any agent who has not entered into an agreement with the Guild covering minimum terms and conditions between agents and their writer clients.

## ADDRESSES

24. Each member shall inform the Guild of his/her residence address and agent and will immediately advise the Guild of any changes thereof.

A member whose address is outside the United States shall inform the Guild immediately upon his entry into the United States.

The Guild must be able to contact a member whenever necessary.

Revised: 5/21/68; 7/24/74; 9/24/86.

Case 2:14-cv-00197-DMG-AJW   Document 8   Filed 01/21/14   Page 55 of 180   Page ID #:182

# Screen Credits Manual







WRITERS GUILD of AMERICA EAST

# Contents

*Effective for Notices of Tentative Writing Credits submitted on or after June 18, 2010.*

PREFACE ................................................................................iv

I. WORKING PROCEDURES ........................................................ 1
   A. Writer's Responsibility When Assigned ............................. 1
      1. Notify Other Writers on the Same Assignment ................... 1
      2. File Contract at Guild Office ................................. 1
      3. Keep a Copy of All Work Done .................................. 1
   B. Collaboration: A Team of Writers .................................. 2
   C. Writing Independently of Prior Scripts ............................ 2

II. CREDIT DETERMINATION PROCEDURE ......................................... 4
   A. Notice of Tentative Writing Credit ............................... 4
   B. What To Do Upon Receipt of Notice ................................ 5
   C. Agreement Among Writers .......................................... 6
   D. Arbitration ...................................................... 7
      1. Selection of Arbiters ........................................ 7
      2. Screen Credits Consultants ................................... 8
      3. Anonymity of Arbiters and Consultants ........................ 8
      4. Rights and Responsibilities of Participants .................. 8
      5. Pre-Arbitration Hearing ...................................... 11
      6. Procedure of Arbitration Committee ........................... 11
      7. Appeals Before a Policy Review Board ......................... 13
      8. Notification ................................................. 14
      9. Guild Decision Final ......................................... 15

III. GUILD POLICY ON CREDITS ............................................. 16
   A. Definitions ..................................................... 16
      1. Writer ...................................................... 16

2. Literary Material.............................................................. 16

3. Source Material ............................................................... 16

4. Story................................................................................ 17

5. Screen Story.................................................................... 17

6. Screenplay ...................................................................... 17

7. "Written by" .................................................................... 18

8. "Narration Written by" .................................................. 18

9. "Based on Characters Created by"............................... 18

10. "Adaptation by".......................................................... 18

**B. Rules for Determining Credit .......................................... 18**

1. "Written by" .................................................................... 19

2. "Story by" ....................................................................... 19

3. "Screen Story by" .......................................................... 19

4. "Screenplay by".............................................................. 19

5. "Adaptation by".............................................................. 22

6. Irreducible Story Minimum .......................................... 22

7. No Other Credits Approved.......................................... 22

**C. Production Executives.................................................... 23**

1. Automatic Arbitration Provisions............................... 23

2. Notice Requirements..................................................... 23

3. Percentage Requirements to Receive Screenplay
   Credit............................................................................. 23

**D. Remakes.......................................................................... 24**

**E. Withdrawal From Credit ................................................ 24**

**F. Guild's Right to Protest ................................................. 25**

**G. Order of Names .............................................................. 25**

**H. Pseudonyms ................................................................... 25**

**I. Written Material Prevails................................................ 26**

**J. Revision of Script After Final Credit Determination........ 26**

**K. Publicizing of Credits .................................................... 27**

**L. Conclusion...................................................................... 27**

III

# Preface

A writer's position in the motion picture or television industry is determined largely by his/her credits. His/her professional status depends on the quality and number of the screenplays, teleplays, or stories which bear his/her name. Writing credit is given for the act of creation in writing for the screen. This includes the creation of plot, characters, dialogue, scenes and all the other elements which comprise a screenplay.

The administration of an accurate and equitable system of determining credits is therefore one of the most important services the Guild performs for writers, and it is to a better understanding of this important responsibility that this Manual is dedicated.

The Guild is asked more than one hundred and fifty times a year to assist in the resolution of controversies between writers over their credits. Arduous and unpleasant as this chore sometimes is, the Guild undertakes it willingly, not only to protect writers from embarrassing personal conflicts but also to ensure the validity of credit records on which the professional status of writers depends.

The guiding principle of this system of credit determination is that the writing credits should be a true and accurate statement of authorship as determined by the rules of this Manual. Fortunately, the written material provides a definite basis for credit determination, and the willingness of experienced writers to read this material carefully and weigh the contributions of the participants ensures a fair and impartial decision arrived at by qualified persons.

The importance of credits demands that writers give the process for determining credits the closest scrutiny. The rules and procedures set down here are based on:

1. the Guild's contractual obligations under the Minimum Basic Agreements; and

2. the Guild's own rules and regulations adopted by the membership, which are put into practice by writers.

**iv**

# I. Working Procedures

## A. WRITER'S RESPONSIBILITIES WHEN ASSIGNED

### 1. Notify other writers on the same assignment.

The Company is obligated, under the Minimum Basic Agreement, to notify a writer of all writers currently or previously employed by the Company on the same material. At the request of any participating writer, the Company will notify the writer in writing of the name(s) of any writer(s) employed subsequent to such writer.

The writer's responsibility begins at the moment the writer starts an assignment. A Guild Working Rule requires that the writer ascertain from the proper authorities in the production company the names of any other writers currently assigned to the same material. The writer also must notify any such writers of the fact that the writer has been assigned to the material.

### 2. File contract at Guild office.

Each member must promptly file with the Guild office a copy of his/her contract of employment, in no case later than one week after receipt of the contract.

### 3. Keep a copy of all work done.

For fair credit determination it is vital that the writer keep copies of all work done. To be considered in a credit arbitration, literary material must have been submitted by the writer to the Company upon completion of the work or upon purchase. All material should be properly dated and labeled. Copies of story or script suggestions constituting literary material should be kept and must also have been submitted to the Company in writing if the writer wants to claim credit for these contributions. A dated memorandum to the Company can place these suggestions on the record. Literary material submitted to the Company includes submis-

**1**

sion to individuals authorized by the Company to accept such materials.

## B. COLLABORATION: A TEAM OF WRITERS

A "team" of writers is defined as follows: Two writers who have been assigned at about the same time to the same material and who work together for approximately the same length of time on the material.

The Guild does and must presume that when two writers comply with the definition of a team and their names appear jointly on the work that is produced, the whole will be judged as a joint contribution unless a specific objection to this assumption is made at the time of the writing. Such objections should be made in writing to the Screen Credits Administrator and concurrently to the other writer. It is the Guild's position that a writer who chooses to question the validity of a collaboration should do so openly and frankly at the time the work is done and not several months later in the course of a dispute as to credits.

If a writer is employed to work as part of a team in collaboration with a writer also employed in an additional capacity, a collaboration agreement is required in order for the writer also employed in an additional capacity to claim co-authorship of the team's material. (See "Section III.C., Production Executives.")

When credit is accorded to a team of writers, an ampersand (&) shall be used between the writers' names in the credit to denote a writing team. Use of the word "and" between writers' names in a credit indicates that the writers did their work separately, one usually rewriting the other. This distinction is well established in the industry through custom and practice.

## C. WRITING INDEPENDENTLY OF PRIOR SCRIPTS

It has been the practice and the policy of arbiters in credit arbitrations to assume that a writer has access to prior literary material, an assumption based on the custom of the industry.

2

Although a writer may claim in all honesty not to have seen any prior literary material, and/or that the producer had asked the writer not to read any prior literary material; and/or that all copies of prior literary material had been made unavailable for any reason whatsoever, nevertheless, the arbiters must act on the basis that there is presumptive evidence that a writer did, in fact, have access, in spite of a writer's claim of "writing independently of prior scripts," if a significant similarity exists between a prior piece of literary material and a writer's later literary material. The arbiters must proceed on the basis that the similarities in themselves constitute presumptive evidence that there must have been some sort of access even if the literary material of the prior writer was only orally transmitted, as, for example, from a production executive to a later writer. It is also presumptive evidence that a production executive would relate in some manner or form, directly or inadvertently, formally or informally, significant contents of a prior piece of literary material which may or may not be incorporated in later literary material.

Therefore, it is the policy of the Guild that the written material will prevail, making the lack of or the existence of a significant similarity between the prior or later literary material the deciding factor. Because this presumption is irrebuttable, the claim of writing independently of prior literary material may not be considered by a Policy Review Board.

This section relates only to the presumption that subsequent writers have access to prior writers' literary material. Please see "Section III, Guild Policy on Credits" for contribution necessary to receive credit.

3

# II. Credit Determination Procedure

## A. NOTICE OF TENTATIVE WRITING CREDIT

Schedule A of our Minimum Basic Agreement provides that the Company will send to each participant, or to the current agent of a participating writer if that participant so elects, and to the Guild concurrently a Notice of Tentative Writing Credits ("Notice"). The Company also is required to provide each participating writer (or designated agent) a copy of the final shooting script (or if such script is not available, the latest revised script).

A participant is defined as a writer who has participated in the writing of the screenplay, or a writer who has been employed by the Company on the story and/or screenplay, or a "professional writer"[1] who has sold or licensed literary material subject to the Minimum Basic Agreement. In addition, in the case of a remake, any writer who received writing credit under any WGA Basic Agreement in connection with a prior produced version shall also be a participant. If a participating writer is deceased or unavailable to participate in the credit determination process, such writer may participate through an appropriate representative. As a participant, the writer shall be entitled to participate in the procedure for determination of writing credits.

Although it is the Company's responsibility to send the Notice properly in accordance with the MBA provisions, it is in the best interest of each participating writer to make sure the Guild and the Company always

---

[1] The MBA generally defines a "professional writer" as a person who has received employment for a total of thirteen weeks as a television or theatrical motion picture writer; or received credit on the screen for a television or the-atrical motion picture; or received credit for a professionally produced play or a published novel. A writer may also negotiate with a Company to be treated as a "professional writer" even if the writer would not otherwise qualify as a "professional writer" under the MBA.

**4**

have current address information to ensure proper and timely delivery. If a writer contractually designates an agent or other representative to receive Notices then the writer should periodically remind such representative to forward all Notices in a timely manner so important deadlines are not missed.

If a participating writer intends to be away from his/her residence, or for any other reason will not be able to receive materials at his/her customary mailing address, the writer should give prompt written notice to the Company to send the Notice of Tentative Writing Credits and the Final Shooting Script to a specified representative.

## B. WHAT TO DO UPON RECEIPT OF NOTICE

1. If the writer agrees with the tentative writing credits proposed by the Company, the writer does nothing, signifying acquiescence by failure to protest.

2. If after reading the final script, the writer wishes to discuss the credits with the other participating writers involved before deciding whether or not to protest the tentative writing credits, the writer may call the Guild and the Guild will make reasonable efforts to arrange for such discussion.

3. If after reading the final script the writer wishes to protest the tentative writing credits as proposed by the Company, the writer sends the following written protest both to the Company and to the Guild:

"HAVE READ FINAL SCRIPT AND HEREBY PROTEST TENTATIVE WRITING CREDITS ON (NAME OF PRODUCTION) AND CONSIDER CREDIT SHOULD BE _____ ."

Such written protest must be received by the Company and the Guild within the time specified at the bottom of the Notice of Tentative Writing Credits, but in no event shall this time be less than that specified in the Minimum Basic Agreement which states, "The Company will keep the final determination of screen credits open until a time specified in the notice by the Company, but such time will not be earlier than 6:00 p.m.

**5**

of the tenth business day following the next day after the dispatch of the notice above specified (12 business days); provided, however, that if in the good faith judgment of the Company there is an emergency requiring earlier determination and the Company so states in its notice, such time may be no earlier than 6:00 p.m. of the fifth business day following the next day after the dispatch of the notice above specified (7 business days)."

No writer should request credit or ask for an arbitration without first having read the final script.

4. In the case of an automatic arbitration, the Guild will be deemed to have made a written request for arbitration of credits at the time the Company submits the Notice of Tentative Writing Credits.

## C. AGREEMENT AMONG WRITERS

The Minimum Basic Agreement provides that, when more than one writer has participated in the writing of a motion picture, then all participants have the right to agree unanimously among themselves as to which of them shall receive writing credits on the screen and in what form, provided that the form agreed upon is in accordance with the terms of Theatrical Schedule A of the Minimum Basic Agreement, and provided the agreement is reached in advance of arbitration. The Minimum Basic Agreement also provides that the form of such credit shall not be suggested or directed by the Company.

Any participant may initiate a meeting or other discussion among all the writers who have contributed to try to reach such an agreement.

After a protest is received by the Guild, if there is an indication that agreement on the credits might be reached by the participants, the Screen Credits Administrator will make reasonable efforts to arrange a meeting or other discussion among the writers for this purpose. If no agreement is reached, credits shall be finally determined by arbitration.

6

## D. ARBITRATION

NOTE: The words "arbitration" and "arbiters" and their variants are used in this Manual in their broadest general, as opposed to technical, sense as implying an expeditious, fair and impartial means of resolving differences among writers as to their credits. There is no intended or implied connection with the more formalized arbitrations conducted in other forums, such as court-ordered arbitrations or union-management arbitrations. Use of the terms "arbitration" and its variants in this Manual does not contemplate that the credit determination procedures hereinafter set forth are to be construed as a form of statutory arbitration or as a grievance/arbitration mechanism such as the one contained in Articles 10 and 11 of the Minimum Basic Agreement.

No individual who serves as an arbiter, consultant, member of a Special Committee or Policy Review Board shall have an interest in the outcome of the credit determination.

### 1. Selection of Arbiters

Any controversy as to credits shall be determined by an Arbitration Committee consisting of three members of the Guild who shall be drawn from the Screen Arbiters List. The Screen Arbiters List includes writers who have been current members for at least five years or who have received three screen credits. At least two of the three arbiters on any Arbitration Committee shall have served on no less than two previous Arbitration Committees.

In setting up a Committee to serve in a particular arbitration, the Screen Credits Administrator shall submit to the participating writers a copy of the Screen Arbiters List. Each participating writer shall have the right to challenge peremptorily a reasonable number of the names on the Screen Arbiters List. The Screen Credits Administrator will select the Arbitration Committee from the names remaining on the list after all participating writers have had the opportunity to file a list of peremptory challenges.

7

Wherever possible, arbiters will be selected who are experienced in the type of writing involved in the particular arbitration. The members of the Committee so selected shall not be informed as to the name or identity of the other members of the Committee.

## 2. Screen Credits Consultants

One member of the Guild's Screen Credits Committee shall be designated by the Screen Credits Administrator to act as Consultant for each Arbitration Committee, and he/she shall be available to the members of that Arbitration Committee for information on policy, rules, precedent, and procedure during the arbitration period. It is his/her duty to aid the Committee toward a majority decision.

## 3. Anonymity of Arbiters and Consultants

As has always been Guild practice, the names of the arbiters and consultants selected remain anonymous and confidential. The Guild does not reveal the arbiters' or consultants' identities or any identifying information about them to the Company, the participating writers or anyone else outside the credit determination process. Arbiters and consultants volunteer their services in reliance upon the Guild's promise of anonymity.

## 4. Rights and Responsibilities of Participants

All participating writers are obligated to cooperate with the Guild, including the Screen Credits Administrator, Consultant, Arbitration Committee and Policy Review Board panel, in every way required to render a fair and timely decision.

### a. Verification of Materials

The Minimum Basic Agreement requires the Company to submit three copies of all available material written by the participating writers as well as the available source material. Inasmuch as the final determination of credits is based on an analysis of this written material, the writer owes it to himself/herself to examine all literary material and source mate-

**8**

rial submitted to the Guild by the Company and to make certain that all material written by him/her has been submitted and such material is accurately attributed and dated. This may necessitate a trip to the Guild office to examine material.

Under provisions of the Minimum Basic Agreement, the Guild has the right to ask for a cutting continuity which will be provided by the Company if it is available at the time of the arbitration. For this reason, if a writer believes that the "final shooting script" does not accurately reflect what was shot during principal photography, he/she should request the Screen Credits Administrator to ask the Company to submit a cutting continuity. If the cutting continuity is submitted to the Arbitration Committee, it is not credited to any participating writer.

### b. Statement to the Arbitration Committee

While the Arbitration Committee bases its decision on literary material, including scripts, stories, treatments, etc., and source material, each participating writer is strongly urged to submit a written statement of his/her position to the Screen Credits Administrator to forward to the arbiters. It is suggested that the statement address the requirements to receive credit as set forth in this Manual, "Section III. Guild Policy on Credits." The statement may include breakdowns and illustrative comparisons between the final shooting script and earlier work or any other information which would help the Arbitration Committee to evaluate the writer's contribution to the final shooting script. It is the Guild's policy to preclude references to a writer's entitlement to contingent compensation tied to the receipt of credit on the screen. Participants shall not include such references in their statements. Participating writers also shall not include as part of their statements to the Arbitration Committee any letters of support from other individuals.

Statements should not contain information pertaining to the development process that is not germane to the arbiters' analysis of the literary

**9**

material. For example, the fact that a project was "greenlit" after a certain draft is irrelevant in determining credits. The Arbitration Committee must base its decision on each writer's relative contribution to the final shooting script, and not on the perceived quality of work or other extraneous factors. In addition, statements may not contain information irrelevant to the written work which may prejudice any writer in the process.

As the written statement is the participant's only opportunity to communicate his/her position to the arbiters, it is advised that the writer take due care in its preparation. There is no set form or required length. Because of the limitation of 21 business days for the arbitration, this statement must be delivered to the Guild within 24 hours after the writer has notice that there has been a protest. At the request of a participating writer, additional time to submit a statement may be granted by the Screen Credits Administrator within the time constraints for determination of credits. Such requests will not be unreasonably denied. A participant's failure to submit a statement in a timely fashion shall not preclude the Guild from proceeding with an arbitration with the statements then available to the Guild. If a participating writer submits a statement after the materials have been submitted to the Arbitration Committee, the Screen Credits Administrator will forward such statement to the Arbitration Committee, provided such statement is received prior to a decision of the Arbitration Committee.

As a matter of Guild policy, in each arbitration the participants' statements are held confidential by the Guild. They are not provided to other participants, the Company or anyone else outside the credit determination process.

### c. Anonymity of Writers

The names of all participating writers on the production shall not be revealed to the Arbitration Committee. Writers will be identified to the Arbitration Committee only as "Writer A," "Writer B," etc., such designa-

**10**

tions to reflect the order in which the participating writers wrote.

## 5. Pre-Arbitration Hearing

In the event that a dispute exists as to the authenticity, identification, sequence, authorship or completeness of any literary material to be considered in a credit arbitration, a Special Committee consisting of three members of the Screen Credits Committee shall conduct a hearing at which all participating writers may present testimony and documentary evidence. Such Special Committee is empowered to make a binding determination for purposes of submission of material to the arbiters. Following a decision of a credit Arbitration Committee, findings and/or conclusions of a Special Committee may be reviewed by a Policy Review Board to determine if there has been a misinterpretation, misapplication or violation of Guild policy.

## 6. Procedure of Arbitration Committee

The following information and material is sent to each member of the Arbitration Committee by the Screen Credits Administrator:

a. Writing credits as tentatively determined by the Company.

b. Statements submitted by participating writers.

c. A statement of the issues to be determined by the Committee and any other relevant information as formulated by the Screen Credits Administrator.

d. Literary material, including scripts, stories, treatments, etc., verified for inclusion in the credit arbitration and source material submitted by the Company, together with a list of the dates of the material in chronological order.

Each participating writer may choose to have submitted those verified literary materials he/she deems relevant to demonstrate his/her writing contribution to the final shooting script. Every draft need not be submitted. Each writer should review his/her material in order to make this

11

65

determination.

As has been the practice, where appropriate, only the final shooting script and not prior drafts will be submitted to the Arbitration Committee on behalf of the last participating writer.

The literary material submitted to the Arbitration Committee includes material written by participating writers who are not seeking writing credit. This is necessary so that the Arbitration Committee can separate out the contribution of a subsequent writer from that of a prior writer who is not seeking credit.

e. A copy of this Credits Manual.

f. Request for telephonic communication to the Screen Credits Administrator by each member of the Arbitration Committee, indicating each arbiter's determination of writing credit, with confirmation of this decision to follow in writing.

Each member of the Arbitration Committee reads all the material submitted independent of the other two arbiters and makes a decision based on the guidelines for determining credits. In determining relative contributions, the Arbitration Committee bases its determination on what material was actually used, not the Committee's personal preference of one script over another.

Upon reaching a decision, each member of the Arbitration Committee shall telephone it to both the Credit Arbitration Consultant and Screen Credits Administrator.

In the event the members of the Arbitration Committee are not in unanimous agreement, the Arbitration Committee and the Credit Arbitration Consultant will participate in a teleconference administered by the Screen Credits Administrator. The members of the Arbitration Committee will discuss their decisions in an effort to achieve a unanimous decision. During the teleconference, the members of the Arbitration Committee shall not be informed as to the name or identity of the other

12

members of the Committee.

If the Arbitration Committee is unable to reach a unanimous decision during the teleconference, the majority decision shall be deemed the decision of the Arbitration Committee. When the Arbitration Committee reaches a decision, each member of the Committee shall confirm his/her individual decision in writing with a summation of the reason therefor. The decision of the Arbitration Committee shall be accepted as final and communicated by the Screen Credits Administrator to all interested parties.

**7. Appeals Before a Policy Review Board**

Within twenty-four hours of the initial notification of the Arbitration Committee's decision, any of the participating writers may request an internal Guild appeal to a Policy Review Board, consisting of the Chair or Vice-Chair and any other two members of the Screen Credits Committee except the Consultant in the case. If the Chair or Vice-Chair are unavailable or otherwise unable to serve on a Policy Review Board, the Policy Review Board shall consist of three members of the Screen Credits Committee. No member of the Policy Review Board shall have an interest in the outcome of the credit determination.

The function of the Policy Review Board is to determine whether or not, in the course of the credit determination, there has been any serious deviation from the policy of the Guild or the procedure as set forth in this Manual.

The members of a Policy Review Board are not permitted to read the material involved for purposes of independently judging writers' contributions to the final shooting script, and the Policy Review Board is not empowered to reverse an Arbitration Committee in matters of judgment as to the participating writers' relative contributions to the final script.

Only the following are grounds for a participant's appeal to a Policy Review Board:

13

a. Dereliction of duty on the part of the Arbitration Committee or any of its members;

b. The use of undue influence upon the Arbitration Committee or any of its members;

c. The misinterpretation, misapplication or violation of Guild policy; or

d. Availability of important literary or source material, for valid reasons not previously available to the Arbitration Committee.

If a writer is considering requesting a Policy Review Board, the writer may request copies of the arbiters' written summaries of their decisions, which will be provided by the Guild without any indication of the arbiters' identities.

Prior to the Policy Review Board hearing, writers requesting such Policy Review Board should submit a written statement to the Policy Review Board setting forth the grounds upon which the Policy Review Board is being requested (i.e., items a., b., c. and/or d. listed above) and the basis for such claims in reasonable detail. It is not necessary to bring an attorney to the Policy Review Board as the hearing is informal, although writers are free to do so if they so choose.

In those cases where it is empowered to act, the Policy Review Board shall have the authority to direct the original Arbitration Committee to reconsider the case or to direct the Screen Credits Administrator to form a new Arbitration Committee.

The Policy Review Board hearing must be held and its decision rendered within the 21 business days allowed for the arbitration under the provisions of the Minimum Basic Agreement.

## 8. Notification

The Screen Credits Administrator shall write a letter to the Company and the participating writers notifying them of the final decision of the Arbitration Committee.

**14**

## 9. Guild Decision Final

Theatrical Schedule A provides:

"The decision of the Guild Arbitration Committee, and any Policy Review Board established by the Guild in connection therewith, with respect to writing credits, insofar as it is rendered within the limitations of this Schedule A, shall be final, and the Company will accept and follow the designation of screen credits contained in such decision and all writers shall be bound thereby."

"The decision of the Guild Arbitration Committee may be published in such media as the Guild may determine. No writer or Company shall be entitled to collect damages or shall be entitled to injunctive relief as a result of any decision of the Committee with regard to credits. In signing any contract incorporating by reference or otherwise all or part of this Basic Agreement, any writer or Company specifically waives all rights or claims against the Guild and/or its arbiters or any of them under the laws of libel or slander or otherwise with regard to proceedings before the Guild Arbitration Committee and any full and fair publication of the findings and/or decisions of such Committee. The Guild and any writer signing any contract incorporating by reference or otherwise or referring to this Schedule A, and any writer consenting to the procedure set forth in this Schedule A, shall not have any rights or claims of any nature against any Company growing out of or concerning any action of the Guild or its arbiters or any of them, or any determination of credits in the manner provided in this Schedule A, and all such rights or claims are hereby specifically waived."

**15**

# III. Guild Policy on Credits

## A. DEFINITIONS

### 1. Writer

The term "writer" is defined in the Minimum Basic Agreement. In general, the term "writer" means a person employed by a Company to write literary material or a person from whom a Company purchased literary material who at the time of purchase was a "professional writer," as defined in the Minimum Basic Agreement.

For purposes of credit, a team of writers, as defined in the Screen Credits Manual Section I.B., is considered as one writer.

If literary material covered under the Minimum Basic Agreement is written by one member of a team, separate and apart from the work of the team, such literary material shall be considered separate from the literary material by the team for purposes of assessing contributions to the final shooting script. Therefore, such individual is eligible to receive writing credit as an individual writer and/or as a member of a team.

### 2. Literary Material

Literary material is written material and shall include stories, adaptations, treatments, original treatments, scenarios, continuities, teleplays, screenplays, dialogue, scripts, sketches, plots, outlines, narrative synopses, routines, and narrations, and, for use in the production of television film, formats.

### 3. Source Material

Source material is all material, other than story as hereinafter defined, upon which the story and/or screenplay is based.

This means that source material is material assigned to the writer which was previously published or exploited and upon which the writer's work is to be based (e.g., a novel, a produced play or series of published arti-

**16**

cles), or any other material written outside of the Guild's jurisdiction (e.g., literary material purchased from a non-professional writer). Illustrative examples of source material credits are: "From a Play by", "From a Novel by", "Based upon a Story by", "From a series of articles by", "Based upon a Screenplay by" or other appropriate wording indicating the form in which such source material is acquired. Research material is not considered source material.

**4. Story**

The term "story" means all writing covered by the provisions of the Minimum Basic Agreement representing a contribution "distinct from screenplay and consisting of basic narrative, idea, theme or outline indicating character development and action."

It is appropriate to award a "Story by" credit when: 1) the story was written under employment under Guild jurisdiction; 2) the story was purchased by a signatory company from a professional writer, as defined in the Minimum Basic Agreement; or 3) when the screenplay is based upon a sequel story written under the Guild's jurisdiction. If the story is based upon source material of a story nature, see "screen story" below.

**5. Screen Story**

Credit for story authorship in the form "Screen Story by" is appropriate when the screenplay is based upon source material and a story, as those terms are defined above, and the story is substantially new or different from the source material.

**6. Screenplay**

A screenplay consists of individual scenes and full dialogue, together with such prior treatment, basic adaptation, continuity, scenario and dialogue as shall be used in, and represent substantial contributions to the final script.

A "Screenplay by" credit is appropriate when there is source material

17

of a story nature (with or without a "Screen Story" credit) or when the writer(s) entitled to "Story by" credit is different than the writer(s) entitled to "Screenplay by" credit.

### 7. "Written by"

The term "Written by" is used when the writer(s) is entitled to both the "Story by" credit and the "Screenplay by" credit.

This credit shall not be granted where there is source material of a story nature. However, biographical, newspaper and other factual sources may not necessarily deprive the writer of such credit.

### 8. "Narration Written by"

"Narration Written by" credit is appropriate where the major writing contribution to a motion picture is in the form of narration. The term "narration" means material (typically off-camera) to explain or relate sequence or action (excluding promos or trailers).

### 9. "Based on Characters Created by"

"Based on Characters Created by" is a writing credit given to the writer(s) entitled to separated rights in a theatrical or television motion picture on each theatrical sequel to such theatrical or television motion picture.

Where there are no separated rights, "Based on Characters Created by" may be accorded to the author of source material upon which a sequel is based.

### 10. "Adaptation by"

This credit is appropriate in certain unusual cases where a writer shapes the direction of screenplay construction without qualifying for "Screenplay by" credit. In those special cases, and only as a result of arbitration, the "Adaptation by" credit may be used.

### B. RULES FOR DETERMINING CREDIT

In determining relative contribution, the relevant factors shall be what

**18**

material was actually used, not the Arbitration Committee's personal preference of one script over another.

A team of writers shall be treated in all respects as a single writer.

### 1. "Written by"

(See Section III.A.7.)

### 2. "Story by"

(See Section III. A.4)

Story credit may not be shared by more than two writers.

A story may be written in story form or may be contained within other literary material, such as a treatment or a screenplay, for purposes of receiving a "Story by" credit.

### 3. "Screen Story by"

(See Section III. A.5)

Screen Story credit may not be shared by more than two writers.

If the writer is furnished source material but takes from it only a spring-board, a characterization, an incident or some equally limited contribution, creating a substantially new and different story from the source material, he/she may receive "Screen Story by" credit but only as the result of arbitration. In such cases, the author of the source material may be given credit that specifies the form in which such material was acquired -- for instance, "From a Play by," "From a Novel by," "From a Saturday Evening Post Story by," "From a Series of Articles by," "Based on a Story by," etc.

### 4. "Screenplay by"

(See Section III. A.6)

Screen credit for screenplay will not be shared by more than two writers, except that in unusual cases, and solely as the result of arbitration, the

**19**

names of three writers or the names of writers constituting two writing teams may be used. The limitation on the number of writers applies to all feature length photoplays except episodic pictures and revues.

### a. Percentage Requirements

Any writer whose work represents a contribution of more than 33% of a screenplay shall be entitled to screenplay credit, except where the screenplay is an original screenplay. In the case of an original screenplay, any subsequent writer or writing team must contribute 50% to the final screenplay.

### b. Original and Non-Original Screenplays

For purposes of determining "Screenplay by" credit only, two categories of screenplays are recognized:

(1) Original screenplays (i.e., those screenplays which are not based on source material and on which the first writer writes a screenplay without there being any other intervening literary material by another writer pertaining to the project).[2] If a writer is furnished or uses research material, the screenplay is still considered an original screenplay; and

(2) Non-original screenplays (i.e., screenplays based upon source material and all other screenplays not covered in (1) above, such as sequels).

### c. Additional Guidelines for the Arbiters in Determining Screenplay Credit

In each case, the arbiters read any source material and all literary material provided to them in connection with the development of the final screenplay in order to assess the contribution of each writer to the final shooting script.

---

2 In the case where a team writes a story, and there is no source material, and one member of the team goes on to write a screenplay without there being any other intervening literary material by any other writer, the screenplay shall still be considered an "original screenplay."

**20**

The percentage contribution made by writers to screenplay obviously cannot be determined by counting lines or even the number of pages to which a writer has contributed. Arbiters must take into consideration the following elements in determining whether a writer is entitled to screenplay credit:

■ dramatic construction;

■ original and different scenes;

■ characterization or character relationships; and

■ dialogue.

It is up to the arbiters to determine which of the above-listed elements are most important to the overall values of the final screenplay in each particular case. A writer may receive credit for a contribution to any or all of the above-listed elements. It is because of the need to understand contributions to the screenplay as a whole that professional expertise is required on the part of the arbiters. For example, there have been instances in which every line of dialogue has been changed and still the arbiters have found no significant change in the screenplay as a whole. On the other hand, there have been instances where far fewer changes in dialogue have made a significant contribution to the screenplay as a whole. In addition, a change in one portion of the script may be so significant that the entire screenplay is affected by it.

It is possible to consider the writer of a story or treatment as eligible for screenplay credit, but only in those cases where the story or treatment is written in great detail, to an extent far beyond the customary requirements for a story or treatment.

### d. Selection from Source Material

As a guideline for arbiters in cases involving a non-original screenplay based upon source material, it is a fundamental principle that selection

21

of **screenplay elements**[3] from the source material is a part of the creative process of writing the screenplay. Arbiters should give weight to any writer's original and unique utilization, choice, or arrangement of source material when it is present in the final shooting script, but not the employment of basic **story elements**[4] which any other writer may have also selected. (See screenplay elements - Section III. B. 4.c. See story elements - Section III.A.4.)

## 5. "Adaptation by"

(See Section III. A.10)

Because of the strong feeling against a multiplicity of credits, the Guild is opposed to the general use of the "Adaptation by" credit. However, the Guild recognizes that there are certain unusual cases where credit is due a writer who shapes the direction of screenplay construction without qualifying for "Screenplay by" credit. In those special cases, and only as a result of arbitration, the "Adaptation by" credit may be used.

## 6. Irreducible Story Minimum

In the case of an original screenplay, the first writer shall be entitled to no less than a shared story credit.

## 7. No Other Credits Approved

Any form of credit not expressly described in this Manual shall be used only upon receipt of a waiver from the Guild. Fewer names and fewer types of credit enhance the value of all credits and the dignity of all writers.

---

*3 Section III.B.4.c. of the Screen Credits Manual refers to screenplay elements as follows: dramatic construction; original and different scenes; characterization or character relationships; and dialogue.*

---

*4 The term "story" means all writing covered by the provisions of the Minimum Basic Agreement representing a contribution "distinct from screenplay and consisting of basic narrative, idea, theme or outline indicating character development and action." (See Section III.A.4.)*

**22**

## C. PRODUCTION EXECUTIVES

The term "production executives" includes individuals who receive credit as the director or in any producer capacity. The following rules govern writing credits of production executives who also perform writing services when there are other writers involved on the same project.

### 1. Automatic Arbitration Provisions

Schedule A of the Minimum Basic Agreement provides:

"Unless the story and/or screenplay writing is done entirely without any other writer, no designation of tentative story or screenplay credit to a production executive shall become final or effective unless approved by a credit arbitration as herein provided, in accordance with the Guild rules for determination of such credit."

### 2. Notice Requirements

If a production executive intends to claim credit as a team on any literary material with a writer(s) who is not a production executive, he/she must, at the time when such team writing begins, have signified such claim in writing to the Guild and to the writer(s) with whom he/she claims to have worked as a team. Failure to comply with the above will preclude such production executive from claiming co-authorship of the literary material in question, and such literary material shall be attributed to the other writer.

### 3. Percentage Requirements to Receive Screenplay Credit

At the time of the credit arbitration, the production executive or production executive team must assume the burden of proving that he/she/they had, in fact, worked on the script as a writer and had assumed full share of the writing. In the case of original screenplays, if the production executive or production executive team is the second writer he/she/they must have contributed more than 50% of the final script to receive screenplay credit. His/her/their contribution must consist of dramatic

**23**

construction; original and different scenes; characterization or character relationships; and dialogue.

As in all cases, decisions of Arbitration Committees are based upon literary material. Therefore, production executives, as well as other writers, should keep dated copies of all literary material written by them and submitted to the Company.

## D. REMAKES

In the case of remakes, any writer who has received writing credit under the Guild's jurisdiction in connection with a prior version of the motion picture is a participating writer on the remake. As such, those prior writers are entitled to participate in the credit determination process and are eligible to receive writing credit pursuant to the rules for determining writing credits. The final shooting script written by a prior writer(s) shall be considered literary material.

If under the "Rules for Determining Writing Credits" (Section III.B.) the Arbitration Committee determines that such prior writer(s) is not entitled to receive writing credit, the Arbitration Committee may, within its discretion, accord such prior writer(s) a credit in the nature of a source material credit, such as "Based on a Screenplay by...."

However, the rules do not preclude a prior writer(s) from receiving both writing credit and a credit in the nature of a source material credit at the discretion of the Arbitration Committee.

Remakes shall be considered non-original screenplays under Section III.B.4.b.(2) of this Manual.

## E. WITHDRAWAL FROM CREDIT

Prior to the time a credit question has been submitted to arbitration, a writer may withdraw from screen writing credit for personal cause, such as violation of his/her principles or mutilation of material he/she has written. If the other writer-contributors do not agree, the question shall be

**24**

referred to arbitration. The Arbitration Committee in such cases shall base its determination on whether there is such personal cause.

After screen credits have been determined by arbitration, a writer may not withdraw his/her name from screenplay credit. He/she may, however, by notification to the Guild, withdraw from any other form of credit.

Withdrawal from writing credit will result in loss of any and all rights accruing from receipt of writing credit. Use of a pseudonym rather than withdrawing from credit will not result in such a forfeiture. (See H. below.)

**F. GUILD'S RIGHT TO PROTEST**

Pursuant to the provisions of the Minimum Basic Agreement the Guild has the right to protest credits proposed by the Company. The Guild may act irrespective of the wishes of any of the participating writers in order to ensure that the credit rules are properly applied.

**G. ORDER OF NAMES**

The order of writers' names in a shared credit may be arbitrated. Generally, the most substantial contributor is entitled to first position credit. Where there is no agreement among the arbiters as to order of names, or where the Arbitration Committee determines that the credited writers' contribution is equal, then the Arbitration Committee shall order the writers' names chronologically.

**H. PSEUDONYMS**

The Minimum Basic Agreement provides that any writer who is entitled to credit on the screen and who has been paid, or is guaranteed payment of, less than two hundred thousand dollars ($200,000) for writing services or literary materials relating to the particular motion picture shall have the right to be accorded credit on the screen, in advertising or otherwise, in a reasonable pseudonymous name. A writer must exercise this right within five (5) business days after final determination of writing credits. None of the writer's rights, including but not limited to compen-

25

sation of any kind, shall be affected by use of such pseudonym.

Before using a pseudonym a writer must register it with the Guild by sending a written notice to the Membership Department with the writer's Social Security number, if any. A pseudonym may not duplicate the name or pseudonym of another writer or the name of a public figure.

Subject to the terms of a fully-executed strike settlement agreement between a signatory company and the Guild, the Screen Credits Administrator shall be empowered to obtain the true name and identity of any writer listed by pseudonym on any Notice of Tentative Writing Credit submitted to the Guild. In the event that the Company or writer refuses to reveal the true identity of a writer listed by pseudonym on a Notice of Tentative Writing Credit on which the names of one or more other writers also appear, such writer listed by pseudonym shall not be entitled to receive writing credit, and credit shall be awarded to the other writers as the Arbitration Committee or the Screen Credits Administrator determines.

## I. WRITTEN MATERIAL PREVAILS

Decisions of Arbitration Committees are based upon literary material. Claims of authorship must be supported by literary material appropriate for submission to the Arbitration Committee. In the event of conflicting claims, literary material always prevails.

## J. REVISION OF SCRIPT AFTER FINAL CREDIT DETERMINATION

If, after screen credits are finally determined, material changes are made in the literary material, either the Company or a participant and the Guild jointly may reopen credit determination by making a claim within 48 hours after completion of the writing work claimed to justify the revision of credits; and in such case the procedure for the original determination of credits is followed.

**26**

## K. PUBLICIZING OF CREDITS

The Minimum Basic Agreement and Guild Working Rules provide that no writer shall claim credit for screen authorship on any motion picture prior to the time when the credits have been determined, and no writer shall claim credits contrary to such determination. In addition, the Guild believes that it is in the best interest of all writers that certain facts relating to any particular credit determination should remain confidential. For example, participating writers are asked to refrain from commenting in the press or media about issues related to pre-arbitration hearings, arbiters' written decisions or Policy Review Board hearings.

## L. CONCLUSION

These rules and procedures have been derived from the experience and practice of the past years. Although they remain the guiding policy by which credits are determined, they are not to be considered rigid or inflexible. The Guild has the discretion to depart from precedent when new conditions, new problems, or new methods of work may require an alteration of the rules or a new application of an existing rule to a unique set of facts and circumstances.

It is now accepted that administration of writers' credits belongs to the writers themselves. It is their responsibility to see to it that credits are administered wisely and well, that the written work product of participating writers is credited as accurately as possible, and that the overall result leads ultimately to a recognition of the importance of the writers' contribution to the screen.

27

**From:** Dave Callaham <Callaham@stingrza.com>
**Sent:** Monday, August 17, 2009 3:44 PM
**To:** Dave Kalstein <kalstein@mac.com>; Kyle Harimoto <kharimoto@sbcglobal.net>
**Subject:** expendables

HOLY SHIT THIS SCRIPT IS FUCKING AWFUL I feel really bad now for sending it to you guys. I am ASTOUNDED at how bad this is. I want you to know that it's nothing like what I wrote. Which I suppose at this point is both the good and bad news...

CONFIDENTIAL



DC00483_REV

**From:**      Dave Callaham <callaham@stingrza.com>
**Sent:**      Tuesday, August 18, 2009 2:11 PM
**To:**        Kyle Harimoto <kharimoto@sbcglobal.net>
**Cc:**        Dave Kalstein <kalstein@mac.com>
**Subject:**   Re: Expendables

if i say that in an email I may be incriminating myself Kyle.

Put it this way: the idea and very loose structure is mine.

Everything else...

I plead the fifth.

Or, to put it another way, if I get sole credit like I am asking for...

it would be A MIRACLE.


On Aug 18, 2009, at 11:06 AM, Kyle Harimoto wrote:

I read it last night.  I have to know what in this script is yours and what is new?

CONFIDENTIAL



**EXHIBIT**
E
83

DC00497_REV

KATYA J. CULBERG
Associate Counsel
WRITERS GUILD OF AMERICA, WEST, INC.
7000 W. Third Street
Los Angeles, California 90048
(323) 782-4521
(323) 782-4806 (fax)
kculberg@wga.org

Counsel for Complainants

BEFORE THE WRITERS GUILD OF AMERICA, WEST, INC. - PRODUCERS

ARBITRATION TRIBUNAL

| In the Matter of the Arbitration between | NOTICE OF CLAIM SUBMITTED TO ARBITRATION AND CLAIM |
|---|---|
| WRITERS GUILD OF AMERICA, WEST, INC. and JITTERY DOG PRODUCTIONS, INC. f/s/o DAVID CALLAHAM, | |
| Complainants, | |
| vs. | CASE NO. 12-SR-004 |
| WARNER BROS., DOUBLE LIFE PRODUCTIONS, INC., MILLENNIUM FILMS, INC., NU IMAGE, ALTA VISTA PRODUCTIONS, INC., ALTA VISTA FINANCING, LLC and ALTA VISTA PRODUCTIONS, LLC, | |
| Respondents, | |
| Relating to sequel payments in connection with the theatrical motion picture entitled "THE EXPENDABLES." | |

TO ALL PARTIES AND THEIR COUNSEL:

**PLEASE TAKE NOTICE** that Complainants WRITERS GUILD OF AMERICA, WEST, INC. ("the Guild") and JITTERY DOG PRODUCTIONS, INC. f/s/o DAVID CALLAHAM (collectively "Complainants") submit the above-captioned Claim to arbitration pursuant to Articles 10, 11 and 12 of the Writers Guild of America 2001-2011 Theatrical and Television Basic Agreements (collectively "MBA"). Pursuant to Article 11.B.3. of the MBA, submission of this Claim to steps 1 and 2 of the grievance procedure is waived and/or not required.



EXHIBIT
F

84

5/1^|1?

1   We have ten (10) days from your receipt of this Notice to mutually agree upon an arbitrator.  If
2   we are unable to reach such an agreement within that time period, an arbitrator will be selected in
3   accord with the procedures of Article 11.C.2.

4   The WGAW requests production of the following information and documentation which is
5   relevant and necessary to the WGAW's ability to enforce the MBA:

6   (a)   Copies of any and all agreements entered into by or on behalf of Respondents Warner
7   Bros., Double Life Productions, Inc., Millennium Films, Inc., Nu Image, Alta Vista Productions, Inc.,
8   and Alta Vista Productions LLC (collectively "Respondents") for the acquisition, sale, purchase,
9   licensing, assignment, quitclaim, and/or other transfer of any or all rights in and to the literary material
10  written in connection with the theatrical motion picture entitled "The Expendables" ("Picture");

11  (b)   Copies of any and all documents, including but not limited to correspondence,
12  memoranda and/or e-mails, referring to or otherwise evidencing the existence and/or terms of any
13  agreements entered into by or on behalf Respondents for the sale, purchase, licensing, assignment,
14  quitclaim, and/or other transfer of any or all rights in and to the literary material written in connection
15  with the Picture;

16  (c)   An accounting of any and all gross and/or net receipts, costs, expenses and/or charges
17  received or paid by Respondents in connection with the sale, licensing, assignment, quitclaim,
18  assumption or transfer of rights in and to the literary material written in connection with the Picture;
19  and

20  (d)   Copies of any and all checks, drafts, and/or bank transfers, issued by Respondents in
21  payment for the sale, licensing, assignment, quitclaim, assumption or transfer of rights in and to the
22  literary material written in connection with the Picture.

23  The nature of the Claim referred to herein is as follows:

## CLAIM

### [Pertaining to all Counts]

26  1.   Respondent Warner Bros. is signatory to or otherwise bound by the terms of the MBA.
27  2.   Respondent Double Life Productions, Inc., ("Double Life") is signatory to or otherwise
28  bound by the terms of the MBA.

2

3.    At all times herein, Respondents Double Life Productions, Inc., Millennium Films, Inc., Nu Image and Alta Vista Productions, Inc. (collectively "the Double Life Companies"), were acting as the alter ego of one another and/or each was a joint employer of one another and/or assumed or were assigned the MBA obligations in connection with the Picture.

4.    During the term of the MBA, Respondent Warner Bros. entered into a Blind Commitment Agreement ("Agreement") with Jittery Dog Productions f/s/o David Callaham for Mr. Callaham to write an original screenplay in connection with the theatrical motion picture project "The Expendables." Mr. Callaham wrote and delivered an original screenplay (referred to in the Agreement as "Committed Material") and a rewrite (referred to in the Agreement as "First Optional Material") (collectively "Literary Material") and Respondent Warner Bros. paid Mr. Callaham initial compensation for these services in the amount of $250,000, all pursuant to the Agreement.

5.    During the term of the MBA, Alta Vista Productions, Inc., entered into a WGA Literary Material Assumption Agreement with Warner Bros. whereby the Alta Vista Productions, Inc., assumed all MBA obligations in connection with the Literary Material.

6.    During the term of the MBA, the Double Life Companies produced or caused to be produced the theatrical motion picture entitled "The Expendables" ("Picture").

7.    Respondents, and each of them, are therefore jointly and severally liable for any and all MBA obligations in connection with the Picture.

8.    The WGAW determined credits for the Picture. The final credit is:

    Screenplay by David Callaham and Sylvester Stallone

    Story by David Callaham

9.    David Callaham has separated rights in the Picture.

10.    Pursuant to the Agreement, Respondents Double Life paid Mr. Callaham a credit bonus in the amount of $100,000 because Mr. Callaham received a shared "Screenplay By" credit.

11.    During the term of the MBA, the Double Life Companies produced or caused to be produced a sequel to the Picture: the theatrical motion picture "The Expendables 2" ("the Sequel").

3

## COUNT I

### [Failure to Pay Theatrical Sequel Payment]

12.    Pursuant to the Agreement and the MBA, Mr. Callaham was to be paid "an Amount equal to 50% of the sums paid for the Committed Material, First Optional Material, Second Optional Material and either the sole or shared credit bonus, as applicable, payable upon commencement. . . ." if and when a theatrical motion picture sequel to the Picture was produced.

13.    Pursuant to Article 16.A.5.a. of the MBA and the Agreement, Respondents are required to pay Mr. Callaham compensation for the Sequel in the aggregate amount of $175,000.00, which is comprised of 50% of the sums paid for the Committed Material ($175,000), First Optional Material ($75,00) and the shared credit bonus ($100,000).

14.    The Guild is informed, believes and thereon alleges that no sequel payment was made to Mr. Callaham with respect to the Sequel.

15.    In breach of the MBA, Respondents have failed and continue to fail and refuse to pay Mr. Callaham the sequel payment due for the Sequel.

16.    Pursuant to Article 13.A.14. of the MBA, Respondents are required to pay interest on the payment owed for the Sequel at the rate of one and one-half percent (1.5%) per month, commencing to accrue when the payment was due, and continuing to accrue until paid in full.

## COUNT II

### [Failure to Deliver a Valid Written WGA Assumption Agreement]

17.    Pursuant to Articles 15, 51, 64 and 65 of the MBA, Respondents are required to obtain and deliver to the WGAW a valid written WGA assumption agreement in order to ensure a buyer's assumption of MBA obligations in connection with the Screenplay, Picture and Sequel, as applicable, including, but not limited to, the MBA obligations referenced in this Claim.

18.    In breach of the foregoing provisions of the MBA, Respondents have failed and refused, and continue to fail and refuse to deliver to the WGAW valid written assumption agreements in connection with the Screenplay, Picture and Sequel, as applicable.

19.    As a direct and proximate result of these substantial breaches of the MBA, Mr. Callaham has suffered, and unless Respondents are restrained, shall continue to suffer damage by the loss of

4

1   benefits conferred to him under the MBA in connection with Respondents' failure to obtain and file

2   assumption agreements. The WGAW will present proof of the extent of damage at the hearing.

3        20.     As a further direct and proximate result of these breaches, the WGAW has suffered and,

4   unless Respondents are restrained, shall continue to suffer damage to its prestige and to the integrity of

5   the MBA. The WGAW will present proof of the extent of damage at the hearing.

6                               <u>PRAYER FOR RELIEF</u>

7       WHEREFORE, Complainants pray for issuance of an award as follows:

8       a.      An order requiring Respondents to pay Mr. Callaham, pursuant to the MBA and the

9   Agreement, the unpaid sequel payment in connection with the Picture in an amount according to proof

10   at the hearing in this matter, and interest thereon;

11       b.      An order requiring Respondents to pay damages to the Guild and Mr. Callaham for

12   Respondents' failure to deliver to the WGAW a valid, written WGA Assumption Agreement for each

13   sale or transfer of rights in and to the Picture;

14       c.      An order requiring Respondents to deliver to the WGAW a valid, written WGA

15   Assumption Agreement for each sale or transfer of rights in and to the Picture; and

16       d.      Such other and further relief as the Arbitrator deems just and proper.

17

18                              WRITERS GUILD OF AMERICA, WEST, INC.

19

20   DATE: 5/17/13             BY: _____

21                                 KATYA J. CULBERG

                                  Counsel for Complainants

22

23

24

25

26

27

28

5

**Darius Vosylius**

| | |
|---|---|
| **From:** | Charles M. Coate [ccoate@cacllp.com] |
| **Sent:** | Thursday, January 02, 2014 3:58 PM |
| **To:** | 'Katherine Shannon Christovich' |
| **Subject:** | Double Life Prods adv. WGA/Callaham - Ltr to Arbitrator P Crost (Draft) 010214.pdf |
| **Attachments:** | Ltr to Arbitrator P Crost (Draft) 010214.pdf |

Hi Kathy:

I am not sure if you are in today; I called and left a message with an assistant -- I was calling to see if your office would be willing to stipulate to a stay or continuance of this arbitration hearing for reasons set forth in the draft attached -- Please let me know your thoughts and position regarding the same as I am confident that the arbitrator will want to know that we tried to resolve this request among counsel before burdening him with it.

Kind regards, Chuck

P.S. Happy New Year -

Charles M. Coate

ccoate@cacllp.com

**costa abrams & coate llp**
trial & transactional attorneys
**1221 2nd street**
**third floor**
**santa monica, california 90401**
**310 576-6161 (voice)**
**310 576-6160 (fax)**

**ALL CLIENT RIGHTS RESERVED.**
**CONFIDENTIALITY NOTICE:** This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is **STRICTLY PROHIBITED**. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you.



EXHIBIT *G* 1

89

**costa abrams & coate llp | trial & transactional attorneys**

1221 Second Street, Third Floor, Santa Monica, California 90401
tel 310.576.6161 fax 310.576.6160
A limited liability partnership including professional corporations

## REQUEST FOR STAY AND/OR CONTINUANCE OF ARBITRATION PROCEEDINGS

January __, 2014

### Via E-Mail @ PECrost@gmail.com, Facsimile @ (562) 245-3623 (without attachments) and First Class Mail

Paul Crost, Esq. (Arbitrator)
PAUL CROST MEDIATION
5318 East 2nd Street
Long Beach, CA. 90803
Phone: 562-608-8433

**DRAFT**

Re:   **In the Matter of the Arbitration between Writers Guild of America, West, Inc. and Jittery Dog Productions, Inc. f/s/o David Callaham v. Warner Bros., et al. (Relating to sequel payments in connection with "The Expendables") WGA Arbitration Tribunal Case No. 12-SR-004**

Dear Arbitrator Crost:

Our office has been recently retained by Double Life Productions, Inc., Millennium Films, Inc., Nu Image, Alta Vista Productions, Inc., Alta Vista Financing, LLC and Alta Vista Productions, LLC to represent their interests in the above-referenced arbitration. We understand that you have scheduled an arbitration hearing to take place on January 31, 2014. The subject of this arbitration is whether David Callaham (and his loan-out company) is entitled to certain sequel payments pertaining to the motion picture *The Expendables 2*.

However, please be advised that on behalf of our clients this office has recently filed a verified petition for writ of mandate, for a writ of prohibition and/or a writ of review against the Writers Guild of America, West, Inc. ("WGA") in Los Angeles County Superior Court. A copy of that pleading is enclosed and the case has been assigned to the Honorable James Chalfant at the Stanley Mosk Branch.

In the accompanying verified petition, (Double Life Productions, Inc.) the facts establish that Mr. Callaham engaged in wrongful and fraudulent conduct during a 2009 WGA screen credit arbitration pertaining to *The Expendables*. Mr. Callaham violated numerous WGA rules, including the WGA's Working Rule ¶15 which states that no "member shall accept credit which misrepresents the member's contribution to a picture or program."

90

During that 2009 screen credit arbitration, Mr. Callaham affirmatively claimed and misrepresented to the tribunal that he was entitled to sole "Written By" credit for *The Expendables*. Mr. Callaham represented that he alone wrote the screenplay for *The Expendables*. However, those representations were patently false and confirmed by Mr. Callaham's own written words and disclosures that came to light years later.

For example, in one August 17, 2009, email, Mr. Callaham claims that the script for *The Expendables* "IS F*#KING AWFUL. . . I am ASTOUNDED at how bad this is. I want you to know that it's nothing like what I wrote." On August 18, 2009, Mr. Callaham wrote another email stating the following: "Put it this way: the idea and very loose structure [of *The Expendables*] is mine. Everything else . . . I plead the fifth. Or, to put it another way, if I get sole credit like I am asking for . . . it would be A MIRACLE." Both of those emails are attached as exhibits to the verified petition.

Nevertheless, despite his own stated belief that he was not entitled to certain screen writing credits, Mr. Callaham largely "prevailed" in the 2009 WGA screen credit arbitration and is now asserting in this arbitration that he is correspondingly entitled to certain sequel payments for *The Expendables 2* based on the 2009 WGA screen credit arbitration.

Because Mr. Callaham intentionally withheld the aforementioned material emails from the arbitral tribunal, and concealed the limited extent of his contributions to *The Expendables* from the WGA screen writing credit arbitration panel in 2009 and instead continued to misrepresent before the arbitral tribunal that he was entitled to sole "Written By" credit for *The Expendables*, understandably our client does not believe that he should benefit by such conduct.

Our client only discovered Mr. Callaham's fraudulent conduct years later in early 2013 long after the WGA's stated twenty-one day period to appeal the credit determination expired. The pending writ of mandate seeks an order commanding the WGA to investigate Mr. Callaham for his fraudulent conduct and for his violations of the WGA rules and procedures. Alternatively, our client is seeking a writ of prohibition preventing the WGA from prosecuting this underlying arbitration. Finally, our client is seeking a writ of review or *certiorari* with respect to the 2009 WGA screen credit arbitration and to temporarily desist from prosecuting this underling arbitration.

Our client's verified petition was filed on December 24, 2013, and the WGA waived service of the summons on December 30, 2013, upon counsel's return to the office. Accordingly, the WGA's response to the verified petition is due on or about January 29, 2013. After receiving the WGA's response, our client intends to request that the Los Angeles County Superior Court hold a hearing on our client's requested relief. We anticipate that such a hearing will take place within four (4) months.

Accordingly, since the issues in the verified petition directly affect the issues in this arbitration, our client is respectfully requesting that this Tribunal stay and/or continue the pending January 2014 arbitration for a period of time until after the Los Angeles County Superior Court has had an opportunity to rule on our client's verified petition. A reasonable

request for a postponement of an arbitration hearing may provide grounds for a petition to vacate an arbitration award. California Code of Civil Procedure §1286.2(a)(5); *see also Humes v. MarGil Ventures, Inc.* (1985, 2nd District) 174 Cal.App.3d 486, 497.  Thank you for your prompt attention to this matter.  If necessary we will make ourselves available for, and will arrange a status conference call with you and opposing counsel to discuss the issues raised herein.

Respectfully,

# DRAFT

Charles M. Coate

CMC/bo
Enclosure

cc:    Katya J. Culberg, Esq. and Katherine Christovich, Esq. at WGA (via facsimile only at (323) 782-4806 (without enclosure))
Client



**WRITERS GUILD OF AMERICA**,WEST

LEGAL SERVICES
DEPARTMENT

PH 323.782.4521
FAX 323.782.4806

KATHERINE SHANNON
CHRISTOVICH
DIRECTOR OF LEGAL SERVICES

HEATHER L. PEARSON
SENIOR COUNSEL

DANIELLE M. FORBES
ASSOCIATE COUNSEL

SHANNON KEAST
ASSOCIATE COUNSEL

MELISSA A. JACKSON
ASSOCIATE COUNSEL

MELISSA S. GLOUKMAN
ASSOCIATE COUNSEL

LEELA R. AZARI
ASSOCIATE COUNSEL

MARY E. JERRICO
BUSINESS REPRESENTATIVE

SCOTT SAWYER
BUSINESS REPRESENTATIVE

LATIFAH BALOM
BUSINESS REPRESENTATIVE

January 3, 2014

Charles M. Coate, Esq.
Costa Abrams & Coate LLP
1221 Second Street, Third Floor
Santa Monica, CA 90401

Re:   *Jittery Dog Productions, Inc. f/s/o David Callaham v.
Double Life Productions, Inc., et al. ("The Expendables")*
WGAW Case No. 12-SR-004

Dear Mr. Coate:

We have reviewed your draft letter to Arbitrator Crost.  We oppose the
request for a continuance and object to you sending the draft letter to the
arbitrator.

There is no good cause to continue the hearing.  The claims raised in the
two state court proceedings are wholly without merit, and amount to an
untimely and procedurally defective collateral attack on a credit
determination that became final in 2009. The Guild and Mr. Callaham will
defend the actions in due course.

Even if there were any merit to the state court claims, moreover, the
Company waited too long to assert them as a basis for postponing the
arbitration.  The current hearing date was set in September, 2013.  Your
draft letter concedes that the Company discovered the alleged fraudulent
conduct on which the claims purport to be based in "early 2013."  There is no
excuse for the Company having waiting a year--until the eve of hearing--to
seek a continuance.

Finally, the Guild objects to the content of the letter, which contains
numerous unsupported and scurrilous allegations against Mr. Callaham.
Such *ex parte* communications of factual assertions to the arbitrator are
patently improper. While we hope it reconsiders its request, if the Company
insists on seeking a continuance, we suggest that you contact Arbitrator
Crost's office to set up a time for a conference call with counsel, so that all
parties may be heard on both the merits of the continuance request and the
procedure for hearing it.

> **EXHIBIT**
> **H**

7000 WEST THIRD STREET, LOS ANGELES, CA 90048   PH 323. 951. 4000   FAX 323. 782. 4800   www.wga.org

AFFILIATED WITH   WRITERS GUILD OF AMERICA, EAST, INC.   WRITERS GUILD OF CANADA   THE AUSTRALIAN WRITERS GUILD   NEW ZEALAND WRITERS' GUILD (INC)
SOCIÉTÉ DES AUTEURS DE RADIO, TÉLÉVISION ET CINEMA   THE WRITERS GUILD OF GREAT BRITIAN   THE IRISH PLAYWRIGHTS AND SCREENWRITERS GUILD

Charles M. Coate, Esq.
January 3, 2014
Page 2


This letter is not a comprehensive statement of the Guild's positions and
contentions concerning the continuance request or the state court litigation,
all of which are expressly reserved.

Very truly yours,

Katherine S. Christovich
Director of Legal Services

## costa abrams & coate llp | trial & transactional attorneys

1221 Second Street, Third Floor, Santa Monica, California 90401
tel 310.576.6161 fax 310.576.6160
A limited liability partnership including professional corporations

## REQUEST FOR STAY AND/OR CONTINUANCE OF ARBITRATION PROCEEDINGS

January 6, 2014

**Via E-Mail @ PECrost@gmail.com, Facsimile @ (562) 245-3623 (without attachments) and First Class Mail**

Paul Crost, Esq. (Arbitrator)
PAUL CROST MEDIATION
5318 East 2nd Street
Long Beach, CA. 90803
Phone: 562-608-8433

> Re:     **In the Matter of the Arbitration between Writers Guild of America, West, Inc. and Jittery Dog Productions, Inc. f/s/o David Callaham v. Warner Bros., et al. (Relating to sequel payments in connection with "The Expendables") WGA Arbitration Tribunal Case No. 12-SR-004**

Dear Arbitrator Crost:

Our office has been recently retained by Double Life Productions, Inc., Millennium Films, Inc., Nu Image, Alta Vista Productions, Inc., Alta Vista Financing, LLC and Alta Vista Productions, LLC to represent their interests in the above-referenced arbitration. We understand that you have scheduled an arbitration hearing to take place on January 31, 2014. The subject of this arbitration is whether David Callaham (and his loan-out company) is entitled to certain sequel payments pertaining to the motion picture *The Expendables 2*.

However, please be advised that on behalf of our clients this office has recently filed a verified petition for writ of mandate, for a writ of prohibition and/or a writ of review against the Writers Guild of America, West, Inc. ("WGA") in Los Angeles County Superior Court. A copy of that pleading is enclosed and the case has been assigned to the Honorable James Chalfant at the Stanley Mosk Branch.

In the accompanying verified petition, (Double Life Productions, Inc.) the facts establish that Mr. Callaham engaged in wrongful and fraudulent conduct during a 2009 WGA screen credit arbitration pertaining to *The Expendables*. Mr. Callaham violated numerous WGA rules, including the WGA's Working Rule ¶15 which states that no "member shall accept credit which misrepresents the member's contribution to a picture or program."



**EXHIBIT I**

95

During that 2009 screen credit arbitration, Mr. Callaham affirmatively claimed and misrepresented to the tribunal that he was entitled to sole "Written By" credit for *The Expendables*. Mr. Callaham represented that he alone wrote the screenplay for *The Expendables*. However, those representations were patently false and confirmed by Mr. Callaham's own written words and disclosures that came to light years later.

For example, in one August 17, 2009, email, Mr. Callaham claims that the script for *The Expendables* "IS F*#KING AWFUL. . . I am ASTOUNDED at how bad this is. I want you to know that it's nothing like what I wrote." On August 18, 2009, Mr. Callaham wrote another email stating the following:   "Put it this way: the idea and very loose structure [of *The Expendables*] is mine. Everything else . . . I plead the fifth. Or, to put it another way, if I get sole credit like I am asking for . . . it would be A MIRACLE." Both of those emails are attached as exhibits to the verified petition.

Nevertheless, despite his own stated belief that he was not entitled to certain screen writing credits, Mr. Callaham largely "prevailed" in the 2009 WGA screen credit arbitration and is now asserting in this arbitration that he is correspondingly entitled to certain sequel payments for *The Expendables 2* based on the 2009 WGA screen credit arbitration.

Because Mr. Callaham intentionally withheld the aforementioned material emails from the arbitral tribunal, and concealed the limited extent of his contributions to *The Expendables* from the WGA screen writing credit arbitration panel in 2009 and instead continued to misrepresent before the arbitral tribunal that he was entitled to sole "Written By" credit for *The Expendables*, understandably our client does not believe that he should benefit by such conduct.

Our client only discovered Mr. Callaham's fraudulent conduct years later in early 2013 long after the WGA's stated twenty-one day period to appeal the credit determination expired. The pending writ of mandate seeks an order commanding the WGA to investigate Mr. Callaham for his fraudulent conduct and for his violations of the WGA rules and procedures. Alternatively, our client is seeking a writ of prohibition preventing the WGA from prosecuting this underlying arbitration. Finally, our client is seeking a writ of review or *certiorari* with respect to the 2009 WGA screen credit arbitration and to temporarily desist from prosecuting this underling arbitration.

Our client's verified petition was filed on December 24, 2013, and the WGA waived service of the summons on December 30, 2013, upon counsel's return to the office. Accordingly, the WGA's response to the verified petition is due on or about January 29, 2013. After receiving the WGA's response, our client intends to request that the Los Angeles County Superior Court hold a hearing on our client's requested relief. The first available date provided by the Superior Court was not until May of this year.

Accordingly, since the issues in the verified petition directly affect the issues in this arbitration, our client is respectfully requesting that this Tribunal stay and/or continue the pending January 2014 arbitration for a period of time until after the Los Angeles County Superior Court has had an opportunity to rule on our client's verified petition.  A reasonable

request for a postponement of an arbitration hearing may provide grounds for a petition to vacate an arbitration award. California Code of Civil Procedure §1286.2(a)(5); *see also Humes v. MarGil Ventures, Inc.* (1985, 2nd District) 174 Cal.App.3d 486, 497.  We have attempted to discuss and resolve this scheduling matter with opposing counsel but they have not returned our call but instead have advised us by letter that they are opposed to such a continuance.

Thank you for your prompt attention to this matter.  If necessary we will make ourselves available for, and will arrange a status conference call with you and opposing counsel to discuss the issues raised herein.

Respectfully,

Charles M. Coate

CMC/bo
Enclosure

cc:   Katya J. Culberg, Esq. and Katherine Christovich, Esq. at WGA (via facsimile only at (323) 782-4806 (without enclosure))
Client

# costa abrams & coate llp | trial & transactional attorneys

1221 Second Street, Third Floor, Santa Monica, California 90401
tel 310.576.6161   fax 310.576.6160
A limited liability partnership including professional corporations

# FAX

| To: | Paul T. Crost, Esq. (Arbitrator) | From: | Charles M. Coate |
|---|---|---|---|
| Fax: | (562) 245-3623 | Pages: | 4 total (including cover sheet) |
| Phone: | | Date: | January 6, 2013 |
| Re: | **Writers Guild of America, West Inc. and Jittery Dog Productions Inc. f/s/o David Callaham v. Warner Bros., et al.** | Cc: | |

☐ **Urgent**      ☐ **For Review**      ☐ **Please Comment**      ☐ **Please Reply**      ☐ **Please Recycle**

MESSAGE:

**CONFIDENTIALITY NOTE**: *The information contained in this facsimile is confidential information intended only for the use of the individual or entity named above and may be legally privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this facsimile is strictly prohibited. If you have received this facsimile in error, your courtesy will be appreciated in telephoning us collect to inform us of the misdirection and returning the original facsimile to us at the address above by mail. Thank you for your cooperation.*

```
TRANSMISSION VERIFICATION REPORT
```

```
TIME : 01/06/2014 10:32
NAME : CAC
FAX  : 1
TEL  : 3105766160
SER.# : 000C2V538104
```

```
DATE,TIME          01/06  10:31
FAX NO./NAME       15622453623
DURATION           00:00:47
PAGE(S)            04
RESULT             OK
MODE               STANDARD
                   ECM
```

## costa abrams & coate llp | trial & transactional attorneys

1221 Second Street, Third Floor, Santa Monica, California 90401
tel 310.576.6161   fax 310.576.6160
A limited liability partnership including professional corporations

# FAX

To: Paul T. Crost, Esq. (Arbitrator)

From: Charles M. Coate

Fax: (562) 245-3623

Pages: 4 total
(including cover sheet)

Phone:

Date: January 6, 2013

Re: **Writers Guild of America, West Inc. and Jittery Dog Productions Inc. f/s/o David Callaham v. Warner Bros., et al.**

Cc:

☐ Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

MESSAGE:

DEPT. 85
JAMES C.
CHALFANT

CONFORMED COPY
ORIGINAL FILED
Superior Court Of California
County Of Los Angeles

DEC 2 4 2013

Sherri R. Carter, Executive Officer/Clerk
By: Judi Lara, Deputy

1  Charles M. Coate, Esq. (SBN: 140404)
2  Darius Anthony Vosylius, Esq. (SBN: 175030)
   COSTA, ABRAMS & COATE, LLP
3  1221 Second Street, Third Floor
   Santa Monica, California 90401
4  (310) 576-6161
5  fax (310) 576-6160
   Attorneys for Petitioner Double Life Productions, Inc.

6

7               SUPERIOR COURT OF THE STATE OF CALIFORNIA

8                        COUNTY OF LOS ANGELES

9
                                                    BS146511
10  DOUBLE LIFE PRODUCTIONS, INC., a        Case No.:
11  California corporation,
                                             VERIFIED PETITION FOR WRIT OF
12         Petitioner,                       MANDATE, FOR A WRIT OF
                                             PROHIBITION AND/OR A WRIT OF
13                                           REVIEW OR CERTIORARI
14         vs.
                                             MEMORANDUM OF POINTS AND
15  WRITERS GUILD OF AMERICA, WEST,          AUTHORITIES AND DECLARATION
    INC., a California corporation,          OF TREVOR SHORT
16
                                             [Cal. Const., art. VI § 10, Code Civil
17  Respondent;                              Procedure §§ 1063, 1064, 1084-1110b]

18  DAVID E. CALLAHAM, an individual; and    Date:  TBD
19  JITTERY DOG PRODUCTIONS, INC., a         Time:  TBD
    California corporation,                  Dept.: TBD
20
21         Real Parties in Interest.

22

23

24         Petitioner Double Life Productions, Inc. hereby petitions and alleges as follows:

25                        JURISDICTION AND VENUE

26         1.     This Court has jurisdiction over the subject matter of this action and venue

27  pursuant to the provisions of California Constitution Article VI § 10 and Code Civil

28

                                         CONFIRMATION COPY

                                         1

         VERIFIED PETITION FOR MANDAMUS, PROHIBITION OR CERTIORARI

Procedure §§ 1063, 1064, 1084-1110b, *et. seq.*

2.    This Court has personal jurisdiction over the Respondent and Real Parties in Interest named herein because they are based in this forum. Furthermore, venue is also proper in this forum.

## THE PARTIES

3.    Petitioner Double Life Productions, Inc. was and is now, and at all relevant times mentioned herein, a California corporation with its principal place of business located in Los Angeles, California.

4.    Petitioner is informed and believes that Respondent Writers Guild of America, West, Inc. ("WGA") is a California corporation as well as labor union composed of writers who write content for television shows and motion pictures.

5.    Petitioner is informed and believes that real party in interest David E. Callaham ("Callaham") is an individual residing in Los Angeles County, California.

6.    Petitioner is informed and believes that real party in interest Jittery Dog Productions, Inc. ("Jittery Dog) is a California corporation that functions as Callaham's "loan-out corporation." Petitioner is further informed and believes that Callaham is the president, officer and/or authorized representative of Jittery Dog and at all relevant times has the authority to bind Jittery Dog.

7.    Petitioner is informed and believes that Callaham and Jittery Dog have an interest that is directly affected by this proceeding in that Petitioner is seeking a writ of mandate commanding the WGA to discipline Callaham for his fraudulent conduct committed in a 2009 WGA screen credit arbitration proceeding, as more fully described herein.

Furthermore, Petitioner is seeking a writ of prohibition commanding the WGA to cease a pending arbitration filed on behalf of Callaham/Jittery Dog against Petitioner and others, as more fully described herein. Finally, Petitioner is seeking a writ of review or certiorari against the WGA and Callaham/Jittery Dog regarding the results of a 2009 WGA screen credit arbitration which Callaham/Jittery Dog largely prevailed on (based on Callaham's fraudulent conduct), as more fully described herein.

## NATURE OF ACTION

8.     The WGA performs and functions as a "quasi-judicial" body and organization. The WGA controls important economic interests and has attained a quasi-public stature in that it is a professional society of motion picture writers in the State of California.

9.     This petition respectfully requests that this Court issue three types of prerogative writs.   First, Petitioner respectfully requests that this Court issue a writ of mandate commanding the WGA to follow its procedures and to investigate its own member (*i.e.* Callaham/Jittery Dog) who apparently committed fraud upon the WGA and the Petitioner with respect to a 2009 WGA screen credit arbitration pertaining to the motion picture *The Expendables*. Second, Petitioner respectfully requests that this Court issue a writ of prohibition commanding the WGA to cease representing and arbitrating a 2013 pending arbitration on behalf of Callaham/Jittery Dog against Petitioner and others pertaining to the motion picture *Expendables 2*. Third, Petitioner respectfully requests a writ of review (or certiorari) concerning the results of the 2009 WGA screen credit arbitration.

VERIFIED PETITION FOR MANDAMUS, PROHIBITION OR CERTIORARI

10. Petitioner does not have a plain, speedy, and adequate remedy in the ordinary course of law.

## GENERAL ALLEGATIONS

11. Petitioner is informed and believes that Callaham is a writer with some experience in the motion picture industry and that he primarily writes comic book and science fiction screenplays. A copy of IMDB Pro's listing of Callaham's experience is attached hereto as **Exhibit "A."** See also Declaration of Trevor Short ("Short Dec.") ¶2).

12. Petitioner is informed and believes that Callaham and/or Jittery Dog are members of the WGA.

13. Petitioner is informed and believes that Sylvester Stallone ("Stallone") is also a member of the WGA. Besides being a world-famous actor, Stallone is also a well-regarded writer. Indeed, Stallone has approximately twenty-seven writing credits on various motion picture projects and has an Oscar nomination for "best writing and screenplay" for the motion picture *Rocky*.

14. This dispute results from Callaham's wrongful and fraudulent conduct during and after a 2009 WGA arbitration concerning the determination of screen writing credits for the motion picture *The Expendables*. As set forth below, Callaham engaged in fraudulent conduct during that 2009 arbitration and the subterfuge he committed back in 2009 continues to damage Petitioner to this day.

### The WGA Rules & Its Credit Determination Process

15. Because of the fraud committed by Callaham on the WGA tribunal during the 2009 screen writing credit arbitration as alleged below, the WGA should investigate and

4

discipline Callaham according to its own rules.

16.     WGA working rule ¶1 states, in part that "A VIOLATION [BY A MEMBER] OF ANY WORKING RULE SHALL BE CONSIDERED GROUNDS FOR DISCIPLINARY ACTION." WGA Working Rule ¶2 states that each "member shall comply with these Rules in spirit as well as in letter." WGA Working Rule ¶15 states that no "member shall accept credit which misrepresents the member's contribution to a picture or program." WGA Working Rule ¶16 states, *inter alia*, that "members shall cooperate fully with the Guild Credits Committee in order that all credits shall properly reflect the writer's contribution to the final script." Attached hereto as **Exhibit "B"** and incorporated herein is a copy of the WGA's "Code of Working Rules." (See also Short Dec. ¶3).

17.     According to its website, the WGA's "primary duty is to represent our members in negotiations with film and television producers to ensure the rights of screen, television, and new media writers." Furthermore, according to its website, the WGA is "responsible for determining writing credits for feature films, television, and new media programs — a responsibility with far-reaching impact, financial and artistic. Writers' livelihoods often depend on the careful and objective determination of credits." (See also Short Dec. ¶4).

18.     According to the WGA's website, if an author writes "original material under Guild jurisdiction, the Guild's collective bargaining agreement provides you certain additional rights known as Separated Rights. The rights are quite important . . ." (See also Short Dec. ¶4).

19.     According to the Preface for the WGA's "Screen Credits Manual" attached

hereto as **Exhibit "C,"** the "administration of an accurate and equitable system of determining credits is therefore one of the most important services the Guild performs for writers. . ." (See also Short Dec. ¶5).

20. The Preface to the Screen Credits Manual further explains that the "Guild is asked more than one hundred and fifty times a year to assist in the resolution of controversies between writers over their credits. Arduous and unpleasant as this chore sometimes is, the Guild undertakes it willingly . . . to ensure the validity of credit records on which the professional status of writers depends." (See also Short Dec. ¶5).

21. The Preface then goes on to state that the "guiding principle of this system of credit determination is that the writing credits should be a true and accurate statement of authorship as determined by the rules of this Manual. . . The importance of credits demands that writers give the process for determining credits the closest scrutiny." (See also Short Dec. ¶5).

22. Paragraph 4 of the WGA's Screen Credits Manual states that all "participating writers are obligated to cooperate with the Guild . . . in every way required to render a fair and timely decision." (See also Short Dec. ¶5).

23. The WGA provides for an appellate mechanism concerning credit determination arbitrations. However, that mechanism contains very strict time limits and very limited grounds for an appeal. In this case, the WGA's appellate mechanism does not provide a remedy in a situation such as the present one (*i.e.* where a prevailing writer such as Callaham/Jittery Dog later produces documents years later indicating that the prevailing writer actually committed fraud on the tribunal during the WGA credit determination

6

arbitration). (See also Short Dec. ¶5).

24. More specifically, ¶7 of the WGA Screen Credits Manual states that within "twenty-four hours of the initial notification of the Arbitration Committee's decision, any of the participating writers may request an internal Guild appeal to a Policy Review Board. . . The function of the Policy Review Board is to determine whether or not, in the course of the credit determination, there has been any serious deviation from the policy of the Guild or the procedure as set forth in this Manual. . . Only the following are grounds for a participant's appeal to a Policy Review Board:

a. Dereliction of duty on the part of the Arbitration Committee or any of its members;

b. The use of undue influence upon the Arbitration Committee or any of its members;

c. The misinterpretation, misapplication or **violation of Guild policy**; or

d. Availability of important literary or source material, for valid reasons not previously available to the Arbitration Committee. . .

The Policy Review Board hearing must be held and its decision rendered within the 21 business days allowed for the arbitration under the provisions of the Minimum Basic Agreement." (See also Short Dec. ¶5).

25. In this case, as alleged above, Callaham and/or Jittery Dog violated numerous WGA rules, including the WGA's Working Rule ¶15 which states that no "member shall accept credit which misrepresents the member's contribution to a picture or program." (See also Short Dec. ¶6).

7

26.     However, as discussed in greater detail herein, Petitioner only discovered Callaham and/or Jittery Dog's fraudulent conduct years later in early 2013 long after the WGA's stated twenty-one day period to appeal referenced above expired. (See also Short Dec. ¶7).

### The August 2009 WGA Screen Credit Arbitration Re: *The Expendables*

27.     Petitioner was involved in the development and production of the motion picture *The Expendables*, starring Stallone as well as other notable action stars including Jet Li, Jason Statham, Arnold Schwarzenegger and Bruce Willis. (See also Short Dec. ¶8).

28.     Petitioner is informed and believes that Stallone was primarily responsible for writing the script for *The Expendables*. Petitioner is informed and believes that while Stallone was writing the script, he reviewed Callaham's script entitled *Barrow* and based part of the story for *The Expendables* on *Barrow*. Petitioner is informed and believes that while he was writing *The Expendables*, Stallone believed that Callaham might receive a shared "Story By" credit for *The Expendables* along with Stallone, but that Stallone should be credited solely with a "Screenplay By" credit. (See also Short Dec. ¶9).

29.     Petitioner is informed and believes that Callaham was paid $250,000 for writing services concerning *Barrow* pursuant to a "Blind Commitment Agreement" originally signed with Warner Bros. (See also Short Dec. ¶10).

30.     Stallone was not only a writer for *The Expendables* but also a production executive and a director of that motion picture. Accordingly, because Stallone was also a production executive, the WGA rules provide for an automatic arbitration concerning screen writing credits under these circumstances. This screen writing credit arbitration took place in

or about August-September 2009. (See also Short Dec. ¶11).

31.     During that 2009 arbitration, Callaham represented that he was entitled to sole "Written By" credit for *The Expendables*.  In other words, upon information and belief, Callaham contended that he alone wrote the screenplay for *The Expendables*. As set forth below, these representations and Callaham's position were patently false and confirmed by Callaham's own written words and disclosures that came to light years thereafter. (See also Short Dec. ¶12).

32.     Nevertheless, on or about September 22, 2009, the WGA issued its screen writing credit determination. Callaham essentially prevailed and Callaham received a sole "Story By" credit and received the first position in a "Screenplay By" credit that he would share with Stallone with respect to *The Expendables*.  (See also Short Dec. ¶13).

33.     However, long after Callaham "prevailed" with the WGA screen credit arbitration, several August 2009 emails written by Callaham surfaced. These emails (which Petitioner is informed and believes were not shared by Callaham with the 2009 WGA screen writing credit arbitration tribunal) reflect that Callaham in direct violation of WGA Rules accepted credits which misrepresented his contribution to *The Expendables,* and in effect committed fraud on the WGA tribunal. (See also Short Dec. ¶14).

34.     For example, in one August 17, 2009, email, Callaham claims that the script for *The Expendables* "IS FUCKING AWFUL. . . I am ASTOUNDED at how bad this is. I **want you to know that it's nothing like what I wrote.**" (emphasis added) Attached hereto as **Exhibit "D"** is a true and correct printout of Callaham's August 17, 2009, email that he wrote to Dave Kalstein and Kyle Harimoto confirming this. (See also Short Dec. ¶15).

35.   On August 18, 2009, Callaham wrote another email to Kyle Harimoto and Dave Kalstein, stating the following: "Put it this way: the idea and very loose structure [of *The Expendables*] is mine. Everything else . . . I plead the fifth. Or, to put it another way, if I get sole credit like I am asking for . . . it would be A MIRACLE." Attached hereto as **Exhibit "E"** is a true and correct printout of Callaham's August 18, 2009, email reflecting Callaham's belief about the merits of the position he advanced before the WGA. (See also Short Dec. ¶16).

36.   Petitioner is informed and believes that Callaham intentionally withheld these material emails, and concealed the limited extent of his contributions to *The Expendables* from the WGA screen writing credit arbitration panel in 2009 and instead continued to assert before the arbitral tribunal his patently false assertion that he was entitled to sole "Written By" credit for *The Expendables*. (See also Short Dec. ¶17).

37.   Callaham's false representations (*i.e.* that he wrote most of the shooting script for *The Expendables*) damaged Petitioner who justifiably were forced to rely upon on those false representations and pay Callaham/Jittery Dog a "writing credit bonus" of $102,250 as a result of the 2009 WGA screen credit arbitration based upon Callaham's falsehoods. If Petitioner had been aware of the falsity of the above misrepresentations of material fact, or omissions of material fact, then Petitioner would not have acted in the manner that it acted. (See also Short Dec. ¶18).

38.   Callaham's withholding of material information from the 2009 WGA screen writing credit arbitration panel ultimately unjustly enriched Callaham/Jittery Dog: because Callaham (improperly) received a shared "Screenplay By" credit for *The Expendables*.

Furthermore, based on Callaham's false representations and material omissions, Petitioner paid Callaham a credit bonus of over $102,250. This amount should be returned by Callaham/Jittery Dog to Petitioner. (See also Short Dec. ¶19).

### *The Sequels* & **The Pending 2013 WGA Arbitration**

39. *The Expendables* was released in the United States on or about August 13, 2010, and was a popular motion picture with general public. (See also Short Dec. ¶20).

40. Petitioner was then involved in developing and producing a sequel called *Expendables 2*, which was released in the United States on or about August 17, 2012. *The Expendables 2* was also a popular motion picture with general public. (See also Short Dec. ¶21).

41. Because *Expendables 2* was produced and released, WGA and Callaham/Jittery Dog have now taken the position that they are entitled to receive a "sequel payment" even though Callaham/Jittery Dog did not contribute any writing service for *Expendables 2*. A true and correct copy of the May 2013 "Notice of Claim" filed by the Respondent WGA against the Petitioner and others is attached hereto as **Exhibit "F."** (See also Short Dec. ¶22).

42. In this 2013 arbitration, the WGA and Callaham/Jittery Dog have taken the position that Callaham/Jittery Dog have "separated rights" in *The Expendables.* Accordingly, based on this theory, the WGA and Callaham/Jittery Dog have taken the position that Petitioner and others owe Callaham/Jittery Dog the principal amount of $175,000 as a "sequel payment" because of *Expendables 2*, along with interest. As of July 25, 2013, the WGA and Callaham/Jittery Dog contend they are owed in excess of $234,800

as a "sequel payment." (See also Short Dec. ¶23).

43.     *Expendables 3* is currently in production and is expected to be released in August 2014. (See also Short Dec. ¶24).

### Petitioner's Damages and Ongoing Injuries

44.     Petitioner has performed all conditions precedent to the filing of this petition. Petitioner has exhausted any and all internal remedies provided by the WGA and the initiation of the 2013 arbitration on behalf of Callaham/Jittery Dog excuses Petitioner from exhausting those remedies further.  Further, Petitioner is informed and believes and on that basis alleges that the 2009 screen credit determination as well as the WGA's refusal to investigate and/or discipline Callaham/Jittery Dog for its fraudulent conduct back in 2009 is final.

45.     Petitioner has been damaged by the conduct of the WGA and Callaham/Jittery Dog in that Petitioner wrongfully paid over $102,250 to Callaham/Jittery Dog with respect to *The Expendables*. Petitioner has been further damaged by being forced to incur attorney fees and costs in defending itself in the 2013 arbitration brought by the WGA on behalf of Callaham/Jittery Dog with respect to the *Expendables 2*. (See also Short Dec. ¶25). Therefore, Petitioner will seek leave to amend this petition to show the true amount and nature of these damages when they are ascertained.

46.     Furthermore, Petitioner's injuries as a proximate result of the wrongful conduct by the WGA and Callaham/Jittery Dog are continuing injuries. Thus, Petitioner would be required to institute successive actions at law for damages, leading to a multiplicity of judicial proceedings.

VERIFIED PETITION FOR MANDAMUS, PROHIBITION OR CERTIORARI

## PETITION FOR WRIT OF MANDATE

47.   A writ of mandate may issue to compel performance of a ministerial act or mandatory duty if there is a legal right in the person seeking relief, a corresponding duty and a lack of any other adequate remedy.  See C.C.P. §§1085(a), 1086.

48.   In this case, as alleged above, WGA working rule ¶1 states, in part that "A VIOLATION [BY A MEMBER] OF ANY WORKING RULE SHALL BE CONSIDERED GROUNDS FOR DISCIPLINARY ACTION." (See also Short Dec. ¶3).

49.   However, despite being informed of Callaham/Jittery Dog's fraudulent conduct with respect to the 2009 screen credit writing arbitration, the WGA has not initiated an investigation or disciplined Callaham. (See Short Dec. ¶26).

50.   The investigation of one of its members for disciplinary action is, upon information and belief, a ministerial act. Accordingly, a writ of mandate should issue from this Court requiring the WGA to investigate Callaham for his fraudulent conduct and for his numerous violations of the WGA rules and procedures.

51.   Petitioner has a beneficial interest in the requested writ of mandate because, *inter alia*, if Callaham/Jittery Dog are investigated and disciplined by the WGA, then the pending arbitration brought by the WGA against Petitioner and other will likely cease.

52.   Petitioner has established the requirements for its requested relief for a writ of mandate, including:

(a)   its beneficial interest. *See California Association for Health Services at Home v. State Department of Health Services* (2007) 148 Cal.App.4th 696, 704-707;

(b)   its performance of all conditions precedent, if any. (*See Igna v. City of Baldwin Park* (1970) 9 Cal.App.3d 909, 914; (See Short Dec. ¶¶ 5, 26).

13

(c)    the making of a demand on WGA for the requested relief. *See Metropolitan Life Ins. Co. v. Rolph* (1920) 184 Cal. 557, 559. (See Short Dec. ¶26).

(d)    the ability of the Respondent to perform the duty or exercise the discretion when the writ seeks to compel performance of a duty or exercise of discretion. *See Treber v. Superior Court* (1968) 68 Cal.2d 128, 134. In this case, there can be no doubt that the WGA has the authority to investigate Callaham, yet it refuses to do so.

(e)    the lack of an adequate legal remedy. *See Phelan v. Superior Court* (1950) 35 Cal.2d 363, 366; and

(f)    damages. *See* C.C.P. §1095.

## PETITION FOR WRIT OF PROHIBITION

53.    A writ of prohibition may issue to prevent an inferior tribunal possessing quasi-judicial powers from exercising its jurisdiction in matters over which it lacks sufficient jurisdiction. See C.C.P. §§1102, 1103(a).

54.    As alleged above, in 2013, the WGA initiated an arbitration on behalf of Callaham/Jittery Dog with respect to the *Expendables 2*. (See Short Dec. ¶22; Exhibit "F").

55.    Because of Callaham/Jittery Dog's underlying fraudulent and wrongful conduct, there is no merit to this arbitration. Nevertheless, the WGA continues to prosecute the 2013 arbitration against the Petitioner and others. Accordingly, this Court should issue a writ of prohibition arresting and/or suspending the pending 2013 arbitration.

56.    Petitioner has established the requirements for its requested relief for a writ of prohibition, including:

(a)    the identity of respondent WGA as an inferior tribunal, corporation, board or person. *See* C.C.P. § 1103(a); *Haldane v. Superior Court (1963)* 221 Cal.App.2d 483, 485-

14

486;

(b)  the fact that respondent WGA is threatening to take judicial action without or in excess of its jurisdiction.  See C.C.P. §1102.  In this case, the WGA has initiated an arbitration and, if successful, will presumably seek to have such an arbitration award confirmed with this Court;

(c)  the fact that Petitioner objected to Respondent WGA's exercise of jurisdiction and/or that such an objection regarding Respondent's lack of jurisdiction would be useless. *See Rescue Army v. Municipal Court* (1946) 28 Cal.2d 460, 465; *Hanrahan v. Superior Court* (1947) 81 Cal.App.2d 432, 434-435.

(d)  the beneficial interest of Petitioner; C.C.P. §1103(a); *Seven Up Bottling Co. v. Superior Court* (1951) 107 Cal.App.2d 75, 76. In this case, the Petitioner has a beneficial interest in having the pending 2013 arbitration suspended and/or terminated in that it is a party to that arbitration.

(e)  the lack of an adequate legal remedy.  *See C.C.P. §1103(a); Peebler v. Superior Court (1944) 63 Cal.App.2d 651, 653;* and

(f)  damages. *See* C.C.P. §§1095, 1105; *McCarthy v. Superior Court* (1944) 65 Cal.App.2d 42, 43.


## PETITION FOR WRIT OF REVIEW OR CERTIORARI

57.  A writ of review or certiorari may issue to review miscellaneous actions of inferior tribunals, boards and officers exercising judicial functions if these bodies have exceeded their jurisdiction and there is neither any appeal nor any plain, speedy and adequate remedy.  See C.C.P. §§1068(a), 1074.

58.   A writ of review commands the respondent to certify to this Court the transcript of what has been done and may, in addition, require the respondent to temporarily desist from further proceedings in the matter to be reviewed. C.C.P. §1071.

59.   Accordingly, for the reasons set forth above, Petitioner respectfully requests that this Court issue a writ of review with respect to the 2009 WGA screen credit arbitration and command the WGA to certify to this Court what has been done and to temporarily desist from prosecuting the current 2013 arbitration on behalf of Callaham/Jittery Dog with respect to the *Expendables 2*.

## **PRAYER FOR RELIEF**

WHEREFORE, Petitioner prays judgment against Respondents and Real Parties in Interest, as follows:

1.   That the Court issue a peremptory writ of mandate in the first instance commanding respondent Writers Guild of America, West, Inc. to investigate David E. Callaham with respect to the alleged fraud committed by him during a 2009 WGA screen credit arbitration pertaining to *The Expendables*.

2.   That in the alternative, this Court first issue an alternative writ commanding respondent Writers Guild of America, West, Inc. to investigate David E. Callaham with respect to the alleged fraud committed by him during a 2009 WGA screen credit arbitration pertaining to *The Expendables* or, in the alternative, show cause why it should not do so and thereafter issue a peremptory writ commanding respondent to conduct this investigation.

3.   That the Court issue a peremptory writ of prohibition in the first instance commanding respondent Writers Guild of America, West, Inc. to immediately cease representing and arbitrating a 2013 pending arbitration on behalf of Callaham/Jittery Dog

against Petitioner and others pertaining to the motion picture *Expendables 2.*

4.    That in the alternative, this Court first issue an alternative writ commanding respondent Writers Guild of America, West, Inc. to immediately cease representing and arbitrating a 2013 pending arbitration on behalf of Callaham/Jittery Dog against Petitioner and others pertaining to the motion picture *Expendables 2* or in the alternative, show cause why it should not do so and thereafter issue a peremptory writ commanding respondent to conduct this investigation.

5.    That the Court issue a peremptory writ of review of certiorari in the first instance commanding respondent Writers Guild of America, West, Inc. concerning the results of the 2009 WGA screen credit arbitration pertaining to *The Expendables.*

6.    That in the alternative, this Court first issue an alternative writ of review of certiorari concerning the results of the 2009 WGA screen credit arbitration pertaining to *The Expendables* or in the alternative, show cause why such determination is not subject to review and thereafter issue a peremptory writ of review or certiorari pertaining to the 2009 WGA screen credit arbitration.

7.    For general damages according to proof.

8.    For costs of suit herein incurred;

9.    For such other and further relief as the Court may deem proper.

Dated: December 13, 2013

COSTA, ABRAMS & COATE, LLP

By: _____

Charles M. Coate
Attorneys for Petitioner Double Life Productions, Inc.

17

## **VERIFICATION**

I, Trevor Short, am an officer and authorized representative of the Petitioner Double Life Productions, Inc. in the above-entitled proceeding. I have read the foregoing petition and know its contents. The same is true of my own knowledge, except as to those matters that are therein alleged on information and belief, and as to those matters, I believe it to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and was executed in Los Angeles, California on December 13, 2013.

Trevor Short

VERIFIED PETITION FOR MANDAMUS, PROHIBITION OR CERTIORARI

## DECLARATION OF TREVOR SHORT

I, TREVOR SHORT, hereby declare as follows:

1.     I am an officer and authorized representative of Petitioner Double Life Productions, Inc. ("Petitioner"). The matters set forth herein are true and correct and of my own personal knowledge, and if called upon to testify to these matters, I could and would do so competently.

2.     I am informed and believe that David E. Callaham ("Callaham") is a writer with some experience in the motion picture industry and that he primarily writes comic book and science fiction screenplays. Attached hereto as **Exhibit "A"** is a printout from IMDB PRO listing Callaham's experience in the motion picture industry.  I am further informed and believe that Callaham's "loan out company" is Jittery Dog Productions, Inc. ("Jittery Dog").

3.     The Writers Guild of America, West, Inc. ("WGA") working rule ¶1 states, in part that "A VIOLATION [BY A MEMBER] OF ANY WORKING RULE SHALL BE CONSIDERED GROUNDS FOR DISCIPLINARY ACTION." WGA Working Rule ¶2 states that each "member shall comply with these Rules in spirit as well as in letter." WGA Working Rule ¶15 states that no "member shall accept credit which misrepresents the member's contribution to a picture or program." WGA Working Rule ¶16 states, *inter alia,* that "members shall cooperate fully with the Guild Credits Committee in order that all credits shall properly reflect the writer's contribution to the final script."  Attached hereto as **Exhibit "B"** and incorporated herein is a copy of the WGA's "Code of Working Rules."

4.     According to its website, the WGA's "primary duty is to represent our members in negotiations with film and television producers to ensure the rights of screen,

television, and new media writers." Furthermore, according to its website, the WGA is "responsible for determining writing credits for feature films, television, and new media programs — a responsibility with far-reaching impact, financial and artistic. Writers' livelihoods often depend on the careful and objective determination of credits."

According to the WGA's website, if an author writes "original material under Guild jurisdiction, the Guild's collective bargaining agreement provides you certain additional rights known as Separated Rights. The rights are quite important . . ."

5.    According to the Preface for the WGA's "Screen Credits Manual," the "administration of an accurate and equitable system of determining credits is therefore one of the most important services the Guild performs for writers. . ."  A copy of the WGA's "Screen Credits Manual" is attached hereto as **Exhibit "C."**

The WGA provides for an appellate mechanism concerning credit determination arbitrations.  However, that mechanism contains very strict time limits and very limited grounds for an appeal.  In this case, the WGA's appellate mechanism does not provide a remedy in a situation such as the present one (*i.e.* where a prevailing writer such as Callaham/Jittery Dog later produces documents years later indicating that the prevailing writer actually committed fraud during the WGA credit determination arbitration).

6.    In this case, I am informed and believe that Callaham and/or Jittery Dog violated various WGA rules, including the WGA's Working Rule ¶15 which states that no "member shall accept credit which misrepresents the member's contribution to a picture or program."

7.    However, as discussed in greater detail herein, Petitioner only discovered

20

Callaham and/or Jittery Dog's fraudulent conduct years later and long after the WGA's stated twenty-one day period to appeal referenced above expired.

8. Petitioner was involved in the development and production of the motion picture *The Expendables*, starring Sylvester Stallone ("Stallone") as well as other notable action stars including Jet Li, Jason Statham, Arnold Schwarzenegger and Bruce Willis.

9. I am informed and believe that Stallone was primarily responsible for writing the script for *The Expendables*. I am further informed and believe that while Stallone was writing the script, he reviewed Callaham's script entitled *Barrow* and based part of the story for *The Expendables* on *Barrow*. I am informed and believe that while he was writing *The Expendables*, Stallone believed that Callaham might receive a shared "Story By" credit for *The Expendables* along with Stallone, but that Stallone should be credited solely with a "Screenplay By" credit.

10. I am informed and believe that Callaham was paid $250,000 for his writing services concerning *Barrow* pursuant to a November 14, 2002 "Blind Commitment Agreement" originally signed with Warner Bros.

11. Stallone was not only a writer for *The Expendables* but also a production executive and a director of that motion picture. Accordingly, because Stallone was also a production executive, I am informed and believe that the WGA rules provide for an automatic arbitration concerning screen writing credits under these circumstances. I am informed that this screen writing credit arbitration took place in 2009.

12. During that 2009 arbitration, I am informed and believe that Callaham contended that he was entitled to sole "Written By" credit for *The Expendables*. I am further

informed and believe that Callaham contended that he alone wrote the screenplay for *The Expendables*. As set forth below, these allegations and Callaham's position appear to be patently false and confirmed by Callaham's own written words and disclosures that came to light years thereafter.

13.     Nevertheless, on or about September 22, 2009, I am informed and believe that the WGA issued its screen writing credit determination. Callaham essentially prevailed and Callaham received a sole "Story By" credit and received the first position in a "Screenplay By" credit that he would share with Stallone with respect to *The Expendables*.

14.     However, after Callaham "prevailed" with the WGA screen credit arbitration, several August 2009 emails written by Callaham surfaced years later. These emails (which I am informed and believe was not shared by Callaham with the 2009 WGA screen writing credit arbitration tribunal) reflect that Callaham in direct violation of WGA Rules accepted credits which misrepresented his contribution to *The Expendables*, and in effect, committed fraud on the WGA tribunal.

15.     For example, in one August 17, 2009, email, Callaham claims that the script for *The Expendables* "IS FUCKING AWFUL. . . I am ASTOUNDED at how bad this is. I **want you to know that it's nothing like what I wrote.**" (emphasis added) Attached hereto as **Exhibit "D"** is a true and correct printout of Callaham's August 17, 2009, email that he wrote to Dave Kalstein and Kyle Harimoto confirming this.

16.     On August 18, 2009, Callaham wrote another email to Kyle Harimoto and Dave Kalstein, stating the following: "Put it this way: the idea and very loose structure [of *The Expendables*] is mine. Everything else . . . I plead the fifth. Or, to put it another way, if I

get sole credit like I am asking for . . . it would be A MIRACLE." Attached hereto as **Exhibit "E"** is a true and correct printout of Callaham's August 18, 2009, email reflecting Callaham's belief about the merits of the position he advanced before the WGA.

17.     I am informed and believe that Callaham intentionally withheld these material emails, and concealed the limited extent of his contributions to *The Expendables* from the WGA screen writing credit arbitration panel in 2009 and instead continued to assert before the arbitral tribunal his patently false assertion that he was entitled to sole "Written By" credit for *The Expendables*.

18.     Callaham's false representations (*i.e.* that he wrote most of the shooting script for *The Expendables*) damaged Petitioner who justifiably were forced to rely upon on those false representations and paid Callaham/Jittery Dog a "writing credit bonus" of $102,250 as a result of the 2009 WGA screen credit arbitration based on Callaham's falsehoods. If Petitioner had been aware of the falsity of the above misrepresentations of material fact, or omissions of material fact, then Petitioner would not have acted in the manner that it acted.

19.     Callaham's withholding of material information from the 2009 WGA screen writing credit arbitration panel ultimately unjustly enriched Callaham/Jittery Dog: because Callaham received a shared "Screenplay By" credit for *The Expendables* from a tribunal upon which fraud had been committed. Furthermore, based on Callaham's false representations and material omissions, Petitioner paid Callaham a credit bonus of over $102,250. This amount should be returned by Callaham/Jittery Dog to Petitioner.

20.     *The Expendables* was released in the United States on or about August 13, 2010, and I believe it was a popular motion picture with the general public throughout the

world.

21.     Petitioner was then involved in developing and producing a sequel called *Expendables 2*, which was released in the United States on or about August 17, 2012. *The Expendables 2* was also a popular motion picture with the general public throughout the world.

22.     Because *Expendables 2* was produced and released, the WGA and Callaham/Jittery Dog have now taken the position that they are entitled to receive a "sequel payment" even though Callaham/Jittery Dog did not contribute any writing service for *Expendables 2*. A true and correct copy of the May 2013 "Notice of Claim" filed by the Respondent WGA against the Petitioner and others is attached hereto as **Exhibit "F."**

23.     In this 2013 arbitration, based on the results of the secret 2009 screen credit arbitration, the WGA and Callaham/Jittery Dog have taken the position that Callaham/Jittery Dog have "separated rights" in *The Expendables*.    Accordingly, the WGA and Callaham/Jittery Dog now claim that Petitioner and others owe Callaham/Jittery Dog the principal amount of $175,000 as a "sequel payment" because of *Expendables 2*, along with interest and penalties.  As of July 25, 2013, the WGA and Callaham/Jittery Dog contend they are owed in excess of $234,800 as a "sequel payment."

24.     *Expendables 3* is currently in production and is expected to be released in August 2014.

25.     Petitioner has been damaged by the conduct of the WGA and Callaham/Jittery Dog in that Petitioner wrongfully paid over $102,250 to Callaham/Jittery Dog with respect to *The Expendables*. Petitioner has been further damaged by being forced to incur attorney fees

24

VERIFIED PETITION FOR MANDAMUS, PROHIBITION OR CERTIORARI

and costs in defending itself in the 2013 arbitration brought by the WGA on behalf of Callaham/Jittery Dog with respect to the *Expendables 2*.

26.     The WGA has been informed of Callaham/Jittery Dog's fraudulent conduct with respect to the 2009 screen credit writing arbitration; however, I do not believe that the WGA has initiated an investigation or disciplined Callaham.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and was executed on this 13 day of December 2013, at Los Angeles, California.

Trevor Short

VERIFIED PETITION FOR MANDAMUS, PROHIBITION OR CERTIORARI

**Dave Callaham**

Main Details   Filmography   Personal Details   Media   Contact   Clients/Coworkers   Edit page

**Main Details**
STARmeter
**Filmography**
Summary
Year
Profession
Title Type
TV Series
Credited Name
Genre
Keyword
Budget
Box Office
Ratings
Votes
**Personal Details**
Biography
Quotes
Trivia
Other Works
Awards
Message Board
**Media**
Photo Gallery
Official Photos
Publicity
News Articles
Twitter
Blog
Web Sites
**Contact**
Clients/Coworkers
by STARmeter
by Category
by Relationship

| | |
|---|---|
| **Talent Agent:** | United Talent Agency (UTA) - Jason Burns  more » |
| | Beverly Hills, CA: |
| | UTA Plaza |
| | 9336 Civic Center Drive |
| | Beverly Hills, CA 90210 |
| | USA |
| **Profession:** | Writer / Producer |
| **Known for:** | The Expendables / Doom / The Expendables 2 |
| **Also Known As:** | Dave Callaham / David Callaham  more » |
| **Born:** | 24 October 1977, USA (age 35)  more » |
| **Height:** | 6' 7" (2.01 m) |
| **Industry News:** | 'Godzilla' Ready to Roar at Comic-Con as Legendary Promotes Its Next Creature Feature (From Variety - Film News, 15 July 2013, 12:43 PM, PDT) |
| | Comic-Con 2013 schedule: All the best movie events (From EW.com - Inside Movies, 7 July 2013, 2:00 PM, PDT) |
| **News:** | First Look @ New "Godzilla" (From SneakPeek, 8 October 2013, 11:47 PM, PDT) |
| (428 articles) | 2nd Godzilla Trailer Has Leaked! (From ComicBookMovie, 8 October 2013, 10:20 PM, PDT) |
| | Watch the Godzilla Comic-Con trailer (From Flickeringmyth, 8 October 2013, 11:34 AM, PDT) |
| | See the Godzilla Comic-Con Teaser Trailer While You Can! (From Dread Central, 4 October 2013, 12:00 PM, PDT) |

STARmeter™

Current rank:
**16,733**
Click graph for more detail

Photo Gallery
Official Photos

## Filmography sorted by: Production Status  ▾ (Go)

↳ Jump to: Future Films   Past Films & Videos   Add IMDb Resume

| Projects In Development (2 titles) | Year | MOVIE Meter | Status |
|---|---|---|---|
| The Bulletcatchers - *Writer* | ???? | 445,739 | Unknown |
| Untitled MrG Sci-Fi/Adventure Project - *Writer (screenplay)* | ???? | 427,671 | Scope |

| Films In Production (2 titles) | Year | MOVIE Meter | Status | Budge |
|---|---|---|---|---|
| The Expendables 3 - *Writer (characters)* | 2014 | 189 | Filming | |
| Godzilla - *Writer (screenplay)* | 2014 | 74 | Post-production | |

| Past Films & Videos (6 titles) | Year | MOVIE Meter | Budget | Opening Weekend | US Bo Office |
|---|---|---|---|---|---|
| The Expendables 2 - *Writer (characters) (as David Callaham)* | 2012 | 491 | $92M | $28.6M | $851 |
| The Expendables - *Writer (screenplay) (as David Callaham) (story) (as David Callaham)* | 2010 | 851 | $80M | $34.8M | $103I |
| Tell Tale - *Writer (screenplay) (as David Callaham), Executive Producer* | 2009 | 11,502 | $12M | | |
| Horseman - *Writer (written by) (as David Callaham)* | 2009 | 6,106 | $20M | | |
| Doom - *Writer (screenplay) (as David Callaham) (story) (as David Callaham)* | 2005 | 3,174 | $60M | $15.5M | $28I |
| David Callaham: Writer Reel (short) - *Writer* | 2004 | 322,936 | $300 | | |

**update**   You may report errors and omissions on this page to the IMDb database managers. They will be examined and if approved will be included in a future update. Clicking the 'Edit page' button will take you through a step-by-step process.



EXHIBIT
A

10/16/2013

(The following Code of Working Rules applies to Associate, Current and Post-Current members.)

# Code of Working Rules

## OPERATING

1. Under the Constitution, the Guild may, from time to time, adopt Working Rules, as set forth below, governing the working relationship of members with employers, agents and others with whom writers have professional dealings in connection with writing services and literary properties. Any proposed working rule must be approved by the Board of Directors before submission to the membership for approval but shall not be effective or operative if, in the discretion of the Board of Directors, it is contrary to the provisions of the Constitution or causes a breach of any contract entered into by the Guild. A VIOLATION OF ANY WORKING RULE SHALL BE CONSIDERED GROUNDS FOR DISCIPLINARY ACTION.

2. Each member shall comply with these Rules in spirit as well as in letter.

## EMPLOYMENT

3.

   (a) All agreements and contracts between writers and producers must be in writing.

   (b) Each member must promptly file with the Guild office a copy of his/her contract of employment (whether such agreement provides for leasing of material, participation in profits, residuals or otherwise) in no case later than one week after the receipt of the contract. *In addition to any other disciplinary action which may be deemed proper, an automatic fine shall be levied upon a member who fails to file his/her contract within two weeks after written notice that there is no contract on record.*

4. No member shall do any work, including reviewing stock film before the commencement of a definite assignment under contract.

5. Each member shall comply with the terms of the Minimum Basic Agreements in spirit as well as in letter, and shall not accept any employment, sign any contract or make any agreement for employment which violates such Minimum Basic Agreements.

6. No member shall contract for employment with any producer under terms less favorable than those set forth in the applicable Minimum Basic Agreements.

Violation of this rule shall subject the member to disciplinary action and a fine of up to $2,000, or on flat deals where the amount of money involved exceeds $2,000, a fine of not more than 100% of the amount received for such writing.



126

NOTE: If you are working at the minimum on any assignment, check with the Guild office for further particulars as to the applicable provisions of the Minimum Basic Agreements.

7. No member shall make or enter into any contract or participate in any venture requiring the writing of any literary material by such writer whereby writer's initial compensation for the writing of such material shall be less than the minimum set forth in the applicable MBAs except with the specific written approval of the Guild, which approval may be granted only under unusual circumstances. In the case of joint ventures or other similar engagements or deals involving participation in profits, a waiver may be granted only where the writer's participation is substantial.

8. No member shall accept employment with, nor option or sell literary material to, any person, firm or corporation who is not signatory to the applicable MBAs.

Violation of this Rule shall automatically subject the member to a fine, the maximum amount of which shall not exceed 100% of the remuneration received from such non-signatory.

9. It shall be the responsibility of every member to report, in confidence to the Guild office, for appropriate action, any violation or abuses of the terms and working standards established by the current Minimum Basic Agreements and Code of Working Rules, including any "offers" of employment which violate the current Minimum Basic Agreements.

10. No member may enter into a contract for the rendition of writing services with any producer whose name is contained in the then current Guild unfair list unless such producer shall have first posted a bond with the Guild guaranteeing the full amount of the writer's proposed compensation pursuant to such contract.

Violation of this Rule shall automatically subject the member to a fine, the maximum amount of which may not exceed 100% of his/her remuneration pursuant to such contract and the minimum amount of which shall be $250 or the applicable minimum, whichever is lower.

11. No member shall participate in any arrangement for ghost writing.

Violation of this Rule shall subject the member to disciplinary action and a fine of up to $2,000.

12. Each member upon being assigned under an employment contract is required to ascertain from the proper authorities in the production company the name or names of any other writers currently assigned to the same material. It will be the obligation of the member to notify the other writer or writers on the property of the fact that he/she has been assigned to it.

13. Each member shall report to the Guild any engagement as a producer, director or executive, or any activities which involve the hiring and firing of writers.

**SPECULATIVE WRITING**

14. No member shall work for a producer on speculation or under any arrangement in which

127

payment is contingent on approval or ability to pay. Members may, however, discuss their thoughts and reactions regarding material owned by the producer; it is recommended, however, that in such cases the writer shall make a written memorandum of any suggestions made by him/her and register this material at the Guild office.

Violation of this Rule shall subject the member to disciplinary action and a fine of up to $2,000.

## CREDITS AND ARBITRATION

15. No member shall accept credit which misrepresents the member's contribution to a picture or program.

16. Members shall accept, abide by and contract for credit only in accordance with the terms and provisions of the applicable Minimum Basic Agreements; and members shall cooperate fully with the Guild Credits Committee in order that all credits shall properly reflect the writer's contribution to the final script.

17. Each member shall promptly report to the Guild all writing credits received on pictures or programs produced by non-signatory producers.

18. If a writer performing duties as a production executive intends to claim collaboration credit, he/she must, at the time he/she starts to work as a writer, signify such intention in writing to the Guild and to any other writer or writers assigned to the script. *Failure to comply will subject the member to disciplinary action.* In order to be entitled to credit, such production executive must be able to furnish the Guild with written material of his/her own, which can be identified as his/her contribution to the finished script.

## PSEUDONYM

19. A writer must use his/her own name in all writing credits unless he/she has already established a pseudonym or registers one at the Guild office *before commencement of employment* on a writing assignment, or *before disposition of any rights* to literary material on which he/she wishes to use such pseudonym.

## ORIGINAL STORIES, SERIES AND PROGRAM IDEAS, ORIGINAL RADIO, SCREEN AND TELEPLAYS

20. For the purposes only of these Rules, original stories, series and program ideas and original radio, screen and teleplays shall be defined as material which is the sole creation of the member or members and which is written by the member or members on his/her or their own time.

21. Each member shall promptly file with the Guild office a copy of his/her original story, series or program idea, and/or original radio, screen or teleplay sales or leasing contract, which filing shall in no event be later than one week after receipt of such contract.

NOTE: Members are strongly urged to register all literary material which they own with the Registration Service maintained at the Guild office prior to offering such material for sale or other exploitation. While such registration is not a substitute for the statutory copyright which must be obtained on publication of the work, it is extremely helpful if suit is brought for any copyright infringement or plagiarism of the material.

## ADVERTISING

22. The Writers Guild of America, West, Inc. has adopted and approved the agreement between the Screen Writers Guild and the consenting trade publications condemning the following practices as unfair:

1. Slanting reviews on account of advertising, or retaliating against a writer for failure to advertise.

2. Using pressure from a writer's employer to get advertising.

3. Engaging in any harassing practices, such as making repeated solicitation, asking for chain advertising, or soliciting an advertisement in connection with a particular picture before the picture has been previewed (or a particular show or series before the program has been broadcast).

The consenting trade publications have instructed their staffs to refrain from engaging in any of the above practices.

Members should immediately notify the Guild of any violation of the Code of Fair Practices.

## AGENTS

23. No writer shall enter into a representation agreement whether oral or written, with any agent who has not entered into an agreement with the Guild covering minimum terms and conditions between agents and their writer clients.

## ADDRESSES

24. Each member shall inform the Guild of his/her residence address and agent and will immediately advise the Guild of any changes thereof.

A member whose address is outside the United States shall inform the Guild immediately upon his entry into the United States.

The Guild must be able to contact a member whenever necessary.

Revised: 5/21/68; 7/24/74; 9/24/86.

# Screen
# Credits Manual





**WGAW** WRITERS GUILD OF AMERICA



WRITERS GUILD of AMERICA EAST

# Contents

*Effective for Notices of Tentative Writing Credits submitted on or after June 18, 2010.*

PREFACE ..................................................................................iv

I. WORKING PROCEDURES ................................................ 1
  A. Writer's Responsibility When Assigned ....................... 1
    1. Notify Other Writers on the Same Assignment.................1
    2. File Contract at Guild Office...........................................1
    3. Keep a Copy of All Work Done.......................................1
  B. Collaboration: A Team of Writers................................2
  C. Writing Independently of Prior Scripts........................2

II. CREDIT DETERMINATION PROCEDURE................................. 4
  A. Notice of Tentative Writing Credit............................... 4
  B. What To Do Upon Receipt of Notice ............................5
  C. Agreement Among Writers......................................... 6
  D. Arbitration ................................................................7
    1. Selection of Arbiters......................................................7
    2. Screen Credits Consultants.............................................8
    3. Anonymity of Arbiters and Consultants............................8
    4. Rights and Responsibilities of Participants........................8
    5. Pre-Arbitration Hearing................................................11
    6. Procedure of Arbitration Committee...............................11
    7. Appeals Before a Policy Review Board ........................ 13
    8. Notification ..............................................................14
    9. Guild Decision Final ...................................................15

III. GUILD POLICY ON CREDITS..........................................16
  A. Definitions...............................................................16
    1. Writer .......................................................................16

2. Literary Material..............................................................16

3. Source Material ...............................................................16

4. Story ..............................................................................17

5. Screen Story....................................................................17

6. Screenplay ......................................................................17

7. "Written by" ....................................................................18

8. "Narration Written by" ....................................................18

9. "Based on Characters Created by"..................................18

10. "Adaptation by".............................................................18

**B. Rules for Determining Credit .........................................18**

1. "Written by" ....................................................................19

2. "Story by" .......................................................................19

3. "Screen Story by" ...........................................................19

4. "Screenplay by" ..............................................................19

5. "Adaptation by" ..............................................................22

6. Irreducible Story Minimum .............................................22

7. No Other Credits Approved.............................................22

**C. Production Executives.....................................................23**

1. Automatic Arbitration Provisions.....................................23

2. Notice Requirements.......................................................23

3. Percentage Requirements to Receive Screenplay
Credit................................................................................23

**D. Remakes..........................................................................24**

**E. Withdrawal From Credit ..................................................24**

**F. Guild's Right to Protest ...................................................25**

**G. Order of Names ...............................................................25**

**H. Pseudonyms ....................................................................25**

**I. Written Material Prevails...................................................26**

**J. Revision of Script After Final Credit Determination........26**

**K. Publicizing of Credits ......................................................27**

**L. Conclusion.......................................................................27**

iii

# Preface

A writer's position in the motion picture or television industry is determined largely by his/her credits. His/her professional status depends on the quality and number of the screenplays, teleplays, or stories which bear his/her name. Writing credit is given for the act of creation in writing for the screen. This includes the creation of plot, characters, dialogue, scenes and all the other elements which comprise a screenplay.

The administration of an accurate and equitable system of determining credits is therefore one of the most important services the Guild performs for writers, and it is to a better understanding of this important responsibility that this Manual is dedicated.

The Guild is asked more than one hundred and fifty times a year to assist in the resolution of controversies between writers over their credits. Arduous and unpleasant as this chore sometimes is, the Guild undertakes it willingly, not only to protect writers from embarrassing personal conflicts but also to ensure the validity of credit records on which the professional status of writers depends.

The guiding principle of this system of credit determination is that the writing credits should be a true and accurate statement of authorship as determined by the rules of this Manual. Fortunately, the written material provides a definite basis for credit determination, and the willingness of experienced writers to read this material carefully and weigh the contributions of the participants ensures a fair and impartial decision arrived at by qualified persons.

The importance of credits demands that writers give the process for determining credits the closest scrutiny. The rules and procedures set down here are based on:

1. the Guild's contractual obligations under the Minimum Basic Agreements; and

2. the Guild's own rules and regulations adopted by the membership, which are put into practice by writers.

iv

# I. Working Procedures

## A. WRITER'S RESPONSIBILITIES WHEN ASSIGNED

### 1. Notify other writers on the same assignment.

The Company is obligated, under the Minimum Basic Agreement, to notify a writer of all writers currently or previously employed by the Company on the same material. At the request of any participating writer, the Company will notify the writer in writing of the name(s) of any writer(s) employed subsequent to such writer.

The writer's responsibility begins at the moment the writer starts an assignment. A Guild Working Rule requires that the writer ascertain from the proper authorities in the production company the names of any other writers currently assigned to the same material. The writer also must notify any such writers of the fact that the writer has been assigned to the material.

### 2. File contract at Guild office.

Each member must promptly file with the Guild office a copy of his/her contract of employment, in no case later than one week after receipt of the contract.

### 3. Keep a copy of all work done.

For fair credit determination it is vital that the writer keep copies of all work done. To be considered in a credit arbitration, literary material must have been submitted by the writer to the Company upon completion of the work or upon purchase. All material should be properly dated and labeled. Copies of story or script suggestions constituting literary material should be kept and must also have been submitted to the Company in writing if the writer wants to claim credit for these contributions. A dated memorandum to the Company can place these suggestions on the record. Literary material submitted to the Company includes submis-

1

sion to individuals authorized by the Company to accept such materials.

## B. COLLABORATION: A TEAM OF WRITERS

A "team" of writers is defined as follows: Two writers who have been assigned at about the same time to the same material and who work together for approximately the same length of time on the material.

The Guild does and must presume that when two writers comply with the definition of a team and their names appear jointly on the work that is produced, the whole will be judged as a joint contribution unless a specific objection to this assumption is made at the time of the writing. Such objections should be made in writing to the Screen Credits Administrator and concurrently to the other writer. It is the Guild's position that a writer who chooses to question the validity of a collaboration should do so openly and frankly at the time the work is done and not several months later in the course of a dispute as to credits.

If a writer is employed to work as part of a team in collaboration with a writer also employed in an additional capacity, a collaboration agreement is required in order for the writer also employed in an additional capacity to claim co-authorship of the team's material. (See "Section III.C., Production Executives.")

When credit is accorded to a team of writers, an ampersand (&) shall be used between the writers' names in the credit to denote a writing team. Use of the word "and" between writers' names in a credit indicates that the writers did their work separately, one usually rewriting the other. This distinction is well established in the industry through custom and practice.

## C. WRITING INDEPENDENTLY OF PRIOR SCRIPTS

It has been the practice and the policy of arbiters in credit arbitrations to assume that a writer has access to prior literary material, an assumption based on the custom of the industry.

2

Although a writer may claim in all honesty not to have seen any prior literary material, and/or that the producer had asked the writer not to read any prior literary material; and/or that all copies of prior literary material had been made unavailable for any reason whatsoever, nevertheless, the arbiters must act on the basis that there is presumptive evidence that a writer did, in fact, have access, in spite of a writer's claim of "writing independently of prior scripts," if a significant similarity exists between a prior piece of literary material and a writer's later literary material. The arbiters must proceed on the basis that the similarities in themselves constitute presumptive evidence that there must have been some sort of access even if the literary material of the prior writer was only orally transmitted, as, for example, from a production executive to a later writer. It is also presumptive evidence that a production executive would relate in some manner or form, directly or inadvertently, formally or informally, significant contents of a prior piece of literary material which may or may not be incorporated in later literary material.

Therefore, it is the policy of the Guild that the written material will prevail, making the lack of or the existence of a significant similarity between the prior or later literary material the deciding factor. Because this presumption is irrebuttable, the claim of writing independently of prior literary material may not be considered by a Policy Review Board.

This section relates only to the presumption that subsequent writers have access to prior writers' literary material. Please see "Section III, Guild Policy on Credits" for contribution necessary to receive credit.

3

# II. Credit Determination Procedure

### A. NOTICE OF TENTATIVE WRITING CREDIT

Schedule A of our Minimum Basic Agreement provides that the Company will send to each participant, or to the current agent of a participating writer if that participant so elects, and to the Guild concurrently a Notice of Tentative Writing Credits ("Notice"). The Company also is required to provide each participating writer (or designated agent) a copy of the final shooting script (or if such script is not available, the latest revised script).

A participant is defined as a writer who has participated in the writing of the screenplay, or a writer who has been employed by the Company on the story and/or screenplay, or a "professional writer"[1] who has sold or licensed literary material subject to the Minimum Basic Agreement. In addition, in the case of a remake, any writer who received writing credit under any WGA Basic Agreement in connection with a prior produced version shall also be a participant. If a participating writer is deceased or unavailable to participate in the credit determination process, such writer may participate through an appropriate representative. As a participant, the writer shall be entitled to participate in the procedure for determination of writing credits.

Although it is the Company's responsibility to send the Notice properly in accordance with the MBA provisions, it is in the best interest of each participating writer to make sure the Guild and the Company always

---

1 The MBA generally defines a "professional writer" as a person who has received employment for a total of thirteen weeks as a television or theatrical motion picture writer; or received credit on the screen for a television or theatrical motion picture; or received credit for a professionally produced play or a published novel. A writer may also negotiate with a Company to be treated as a "professional writer" even if the writer would not otherwise qualify as a "professional writer" under the MBA.

**4**

have current address information to ensure proper and timely delivery. If a writer contractually designates an agent or other representative to receive Notices then the writer should periodically remind such representative to forward all Notices in a timely manner so important deadlines are not missed.

If a participating writer intends to be away from his/her residence, or for any other reason will not be able to receive materials at his/her customary mailing address, the writer should give prompt written notice to the Company to send the Notice of Tentative Writing Credits and the Final Shooting Script to a specified representative.

## B. WHAT TO DO UPON RECEIPT OF NOTICE

1. If the writer agrees with the tentative writing credits proposed by the Company, the writer does nothing, signifying acquiescence by failure to protest.

2. If after reading the final script, the writer wishes to discuss the credits with the other participating writers involved before deciding whether or not to protest the tentative writing credits, the writer may call the Guild and the Guild will make reasonable efforts to arrange for such discussion.

3. If after reading the final script the writer wishes to protest the tentative writing credits as proposed by the Company, the writer sends the following written protest both to the Company and to the Guild:

"HAVE READ FINAL SCRIPT AND HEREBY PROTEST TENTATIVE WRITING CREDITS ON (NAME OF PRODUCTION) AND CONSIDER CREDIT SHOULD BE _____."

Such written protest must be received by the Company and the Guild within the time specified at the bottom of the Notice of Tentative Writing Credits, but in no event shall this time be less than that specified in the Minimum Basic Agreement which states, "The Company will keep the final determination of screen credits open until a time specified in the notice by the Company, but such time will not be earlier than 6:00 p.m.

**5**

of the tenth business day following the next day after the dispatch of the notice above specified (12 business days); provided, however, that if in the good faith judgment of the Company there is an emergency requiring earlier determination and the Company so states in its notice, such time may be no earlier than 6:00 p.m. of the fifth business day following the next day after the dispatch of the notice above specified (7 business days)."

No writer should request credit or ask for an arbitration without first having read the final script.

4. In the case of an automatic arbitration, the Guild will be deemed to have made a written request for arbitration of credits at the time the Company submits the Notice of Tentative Writing Credits.

**C. AGREEMENT AMONG WRITERS**

The Minimum Basic Agreement provides that, when more than one writer has participated in the writing of a motion picture, then all participants have the right to agree unanimously among themselves as to which of them shall receive writing credits on the screen and in what form, provided that the form agreed upon is in accordance with the terms of Theatrical Schedule A of the Minimum Basic Agreement, and provided the agreement is reached in advance of arbitration. The Minimum Basic Agreement also provides that the form of such credit shall not be suggested or directed by the Company.

Any participant may initiate a meeting or other discussion among all the writers who have contributed to try to reach such an agreement.

After a protest is received by the Guild, if there is an indication that agreement on the credits might be reached by the participants, the Screen Credits Administrator will make reasonable efforts to arrange a meeting or other discussion among the writers for this purpose. If no agreement is reached, credits shall be finally determined by arbitration.

**6**

## D. ARBITRATION

NOTE: The words "arbitration" and "arbiters" and their variants are used in this Manual in their broadest general, as opposed to technical, sense as implying an expeditious, fair and impartial means of resolving differences among writers as to their credits. There is no intended or implied connection with the more formalized arbitrations conducted in other forums, such as court-ordered arbitrations or union-management arbitrations. Use of the terms "arbitration" and its variants in this Manual does not contemplate that the credit determination procedures hereinafter set forth are to be construed as a form of statutory arbitration or as a grievance/arbitration mechanism such as the one contained in Articles 10 and 11 of the Minimum Basic Agreement.

No individual who serves as an arbiter, consultant, member of a Special Committee or Policy Review Board shall have an interest in the outcome of the credit determination.

### 1. Selection of Arbiters

Any controversy as to credits shall be determined by an Arbitration Committee consisting of three members of the Guild who shall be drawn from the Screen Arbiters List. The Screen Arbiters List includes writers who have been current members for at least five years or who have received three screen credits. At least two of the three arbiters on any Arbitration Committee shall have served on no less than two previous Arbitration Committees.

In setting up a Committee to serve in a particular arbitration, the Screen Credits Administrator shall submit to the participating writers a copy of the Screen Arbiters List. Each participating writer shall have the right to challenge peremptorily a reasonable number of the names on the Screen Arbiters List. The Screen Credits Administrator will select the Arbitration Committee from the names remaining on the list after all participating writers have had the opportunity to file a list of peremptory challenges.

7

Wherever possible, arbiters will be selected who are experienced in the type of writing involved in the particular arbitration. The members of the Committee so selected shall not be informed as to the name or identity of the other members of the Committee.

**2. Screen Credits Consultants**

One member of the Guild's Screen Credits Committee shall be designated by the Screen Credits Administrator to act as Consultant for each Arbitration Committee, and he/she shall be available to the members of that Arbitration Committee for information on policy, rules, precedent, and procedure during the arbitration period. It is his/her duty to aid the Committee toward a majority decision.

**3. Anonymity of Arbiters and Consultants**

As has always been Guild practice, the names of the arbiters and consultants selected remain anonymous and confidential. The Guild does not reveal the arbiters' or consultants' identities or any identifying information about them to the Company, the participating writers or anyone else outside the credit determination process. Arbiters and consultants volunteer their services in reliance upon the Guild's promise of anonymity.

**4. Rights and Responsibilities of Participants**

All participating writers are obligated to cooperate with the Guild, including the Screen Credits Administrator, Consultant, Arbitration Committee and Policy Review Board panel, in every way required to render a fair and timely decision.

**a. Verification of Materials**

The Minimum Basic Agreement requires the Company to submit three copies of all available material written by the participating writers as well as the available source material. Inasmuch as the final determination of credits is based on an analysis of this written material, the writer owes it to himself/herself to examine all literary material and source mate-

**8**

rial submitted to the Guild by the Company and to make certain that
all material written by him/her has been submitted and such material is
accurately attributed and dated. This may necessitate a trip to the Guild
office to examine material.

Under provisions of the Minimum Basic Agreement, the Guild has the
right to ask for a cutting continuity which will be provided by the Com-
pany if it is available at the time of the arbitration. For this reason, if a
writer believes that the "final shooting script" does not accurately reflect
what was shot during principal photography, he/she should request the
Screen Credits Administrator to ask the Company to submit a cutting
continuity. If the cutting continuity is submitted to the Arbitration Com-
mittee, it is not credited to any participating writer.

### b. Statement to the Arbitration Committee

While the Arbitration Committee bases its decision on literary mate-
rial, including scripts, stories, treatments, etc., and source material, each
participating writer is strongly urged to submit a written statement of
his/her position to the Screen Credits Administrator to forward to the
arbiters. It is suggested that the statement address the requirements to
receive credit as set forth in this Manual, "Section III. Guild Policy on Cred-
its." The statement may include breakdowns and illustrative comparisons
between the final shooting script and earlier work or any other informa-
tion which would help the Arbitration Committee to evaluate the writer's
contribution to the final shooting script. It is the Guild's policy to preclude
references to a writer's entitlement to contingent compensation tied to
the receipt of credit on the screen. Participants shall not include such
references in their statements. Participating writers also shall not include
as part of their statements to the Arbitration Committee any letters of
support from other individuals.

Statements should not contain information pertaining to the develop-
ment process that is not germane to the arbiters' analysis of the literary

**9**

material. For example, the fact that a project was "greenlit" after a certain draft is irrelevant in determining credits. The Arbitration Committee must base its decision on each writer's relative contribution to the final shooting script, and not on the perceived quality of work or other extraneous factors. In addition, statements may not contain information irrelevant to the written work which may prejudice any writer in the process.

As the written statement is the participant's only opportunity to communicate his/her position to the arbiters, it is advised that the writer take due care in its preparation. There is no set form or required length. Because of the limitation of 21 business days for the arbitration, this statement must be delivered to the Guild within 24 hours after the writer has notice that there has been a protest. At the request of a participating writer, additional time to submit a statement may be granted by the Screen Credits Administrator within the time constraints for determination of credits. Such requests will not be unreasonably denied. A participant's failure to submit a statement in a timely fashion shall not preclude the Guild from proceeding with an arbitration with the statements then available to the Guild. If a participating writer submits a statement after the materials have been submitted to the Arbitration Committee, the Screen Credits Administrator will forward such statement to the Arbitration Committee, provided such statement is received prior to a decision of the Arbitration Committee.

As a matter of Guild policy, in each arbitration the participants' statements are held confidential by the Guild. They are not provided to other participants, the Company or anyone else outside the credit determination process.

### c. Anonymity of Writers

The names of all participating writers on the production shall not be revealed to the Arbitration Committee. Writers will be identified to the Arbitration Committee only as "Writer A," "Writer B," etc., such designa-

**10**

tions to reflect the order in which the participating writers wrote.

## 5. Pre-Arbitration Hearing

In the event that a dispute exists as to the authenticity, identification, sequence, authorship or completeness of any literary material to be considered in a credit arbitration, a Special Committee consisting of three members of the Screen Credits Committee shall conduct a hearing at which all participating writers may present testimony and documentary evidence. Such Special Committee is empowered to make a binding determination for purposes of submission of material to the arbiters. Following a decision of a credit Arbitration Committee, findings and/or conclusions of a Special Committee may be reviewed by a Policy Review Board to determine if there has been a misinterpretation, misapplication or violation of Guild policy.

## 6. Procedure of Arbitration Committee

The following information and material is sent to each member of the Arbitration Committee by the Screen Credits Administrator:

a. Writing credits as tentatively determined by the Company.

b. Statements submitted by participating writers.

c. A statement of the issues to be determined by the Committee and any other relevant information as formulated by the Screen Credits Administrator.

d. Literary material, including scripts, stories, treatments, etc., verified for inclusion in the credit arbitration and source material submitted by the Company, together with a list of the dates of the material in chronological order.

Each participating writer may choose to have submitted those verified literary materials he/she deems relevant to demonstrate his/her writing contribution to the final shooting script. Every draft need not be submitted. Each writer should review his/her material in order to make this

**11**

determination.

As has been the practice, where appropriate, only the final shooting script and not prior drafts will be submitted to the Arbitration Committee on behalf of the last participating writer.

The literary material submitted to the Arbitration Committee includes material written by participating writers who are not seeking writing credit. This is necessary so that the Arbitration Committee can separate out the contribution of a subsequent writer from that of a prior writer who is not seeking credit.

e. A copy of this Credits Manual.

f. Request for telephonic communication to the Screen Credits Administrator by each member of the Arbitration Committee, indicating each arbiter's determination of writing credit, with confirmation of this decision to follow in writing.

Each member of the Arbitration Committee reads all the material submitted independent of the other two arbiters and makes a decision based on the guidelines for determining credits. In determining relative contributions, the Arbitration Committee bases its determination on what material was actually used, not the Committee's personal preference of one script over another.

Upon reaching a decision, each member of the Arbitration Committee shall telephone it to both the Credit Arbitration Consultant and Screen Credits Administrator.

In the event the members of the Arbitration Committee are not in unanimous agreement, the Arbitration Committee and the Credit Arbitration Consultant will participate in a teleconference administered by the Screen Credits Administrator. The members of the Arbitration Committee will discuss their decisions in an effort to achieve a unanimous decision. During the teleconference, the members of the Arbitration Committee shall not be informed as to the name or identity of the other

**12**

members of the Committee.

If the Arbitration Committee is unable to reach a unanimous decision during the teleconference, the majority decision shall be deemed the decision of the Arbitration Committee. When the Arbitration Committee reaches a decision, each member of the Committee shall confirm his/her individual decision in writing with a summation of the reason therefor. The decision of the Arbitration Committee shall be accepted as final and communicated by the Screen Credits Administrator to all interested parties.

## 7. Appeals Before a Policy Review Board

Within twenty-four hours of the initial notification of the Arbitration Committee's decision, any of the participating writers may request an internal Guild appeal to a Policy Review Board, consisting of the Chair or Vice-Chair and any other two members of the Screen Credits Committee except the Consultant in the case. If the Chair or Vice-Chair are unavailable or otherwise unable to serve on a Policy Review Board, the Policy Review Board shall consist of three members of the Screen Credits Committee. No member of the Policy Review Board shall have an interest in the outcome of the credit determination.

The function of the Policy Review Board is to determine whether or not, in the course of the credit determination, there has been any serious deviation from the policy of the Guild or the procedure as set forth in this Manual.

The members of a Policy Review Board are not permitted to read the material involved for purposes of independently judging writers' contributions to the final shooting script, and the Policy Review Board is not empowered to reverse an Arbitration Committee in matters of judgment as to the participating writers' relative contributions to the final script.

Only the following are grounds for a participant's appeal to a Policy Review Board:

**13**

146

a. Dereliction of duty on the part of the Arbitration Committee or any of its members;

b. The use of undue influence upon the Arbitration Committee or any of its members;

c. The misinterpretation, misapplication or violation of Guild policy; or

d. Availability of important literary or source material, for valid reasons not previously available to the Arbitration Committee.

If a writer is considering requesting a Policy Review Board, the writer may request copies of the arbiters' written summaries of their decisions, which will be provided by the Guild without any indication of the arbiters' identities.

Prior to the Policy Review Board hearing, writers requesting such Policy Review Board should submit a written statement to the Policy Review Board setting forth the grounds upon which the Policy Review Board is being requested (i.e., items a., b., c. and/or d. listed above) and the basis for such claims in reasonable detail. It is not necessary to bring an attorney to the Policy Review Board as the hearing is informal, although writers are free to do so if they so choose.

In those cases where it is empowered to act, the Policy Review Board shall have the authority to direct the original Arbitration Committee to reconsider the case or to direct the Screen Credits Administrator to form a new Arbitration Committee.

The Policy Review Board hearing must be held and its decision rendered within the 21 business days allowed for the arbitration under the provisions of the Minimum Basic Agreement.

## 8. Notification

The Screen Credits Administrator shall write a letter to the Company and the participating writers notifying them of the final decision of the Arbitration Committee.

**14**

**9. Guild Decision Final**

Theatrical Schedule A provides:

"The decision of the Guild Arbitration Committee, and any Policy Review Board established by the Guild in connection therewith, with respect to writing credits, insofar as it is rendered within the limitations of this Schedule A, shall be final, and the Company will accept and follow the designation of screen credits contained in such decision and all writers shall be bound thereby."

"The decision of the Guild Arbitration Committee may be published in such media as the Guild may determine. No writer or Company shall be entitled to collect damages or shall be entitled to injunctive relief as a result of any decision of the Committee with regard to credits. In signing any contract incorporating by reference or otherwise all or part of this Basic Agreement, any writer or Company specifically waives all rights or claims against the Guild and/or its arbiters or any of them under the laws of libel or slander or otherwise with regard to proceedings before the Guild Arbitration Committee and any full and fair publication of the findings and/or decisions of such Committee. The Guild and any writer signing any contract incorporating by reference or otherwise or referring to this Schedule A, and any writer consenting to the procedure set forth in this Schedule A, shall not have any rights or claims of any nature against any Company growing out of or concerning any action of the Guild or its arbiters or any of them, or any determination of credits in the manner provided in this Schedule A, and all such rights or claims are hereby specifically waived."

15

148

# III. Guild Policy on Credits

## A. DEFINITIONS

### 1. Writer

The term "writer" is defined in the Minimum Basic Agreement. In general, the term "writer" means a person employed by a Company to write literary material or a person from whom a Company purchased literary material who at the time of purchase was a "professional writer," as defined in the Minimum Basic Agreement.

For purposes of credit, a team of writers, as defined in the Screen Credits Manual Section I.B., is considered as one writer.

If literary material covered under the Minimum Basic Agreement is written by one member of a team, separate and apart from the work of the team, such literary material shall be considered separate from the literary material by the team for purposes of assessing contributions to the final shooting script. Therefore, such individual is eligible to receive writing credit as an individual writer and/or as a member of a team.

### 2. Literary Material

Literary material is written material and shall include stories, adaptations, treatments, original treatments, scenarios, continuities, teleplays, screenplays, dialogue, scripts, sketches, plots, outlines, narrative synopses, routines, and narrations, and, for use in the production of television film, formats.

### 3. Source Material

Source material is all material, other than story as hereinafter defined, upon which the story and/or screenplay is based.

This means that source material is material assigned to the writer which was previously published or exploited and upon which the writer's work is to be based (e.g., a novel, a produced play or series of published arti-

16

cles), or any other material written outside of the Guild's jurisdiction (e.g., literary material purchased from a non-professional writer). Illustrative examples of source material credits are: "From a Play by", "From a Novel by", "Based upon a Story by", "From a series of articles by", "Based upon a Screenplay by" or other appropriate wording indicating the form in which such source material is acquired. Research material is not considered source material.

**4. Story**

The term "story" means all writing covered by the provisions of the Minimum Basic Agreement representing a contribution "distinct from screenplay and consisting of basic narrative, idea, theme or outline indicating character development and action."

It is appropriate to award a "Story by" credit when: 1) the story was written under employment under Guild jurisdiction; 2) the story was purchased by a signatory company from a professional writer, as defined in the Minimum Basic Agreement; or 3) when the screenplay is based upon a sequel story written under the Guild's jurisdiction. If the story is based upon source material of a story nature, see "screen story" below.

**5. Screen Story**

Credit for story authorship in the form "Screen Story by" is appropriate when the screenplay is based upon source material and a story, as those terms are defined above, and the story is substantially new or different from the source material.

**6. Screenplay**

A screenplay consists of individual scenes and full dialogue, together with such prior treatment, basic adaptation, continuity, scenario and dialogue as shall be used in, and represent substantial contributions to the final script.

A "Screenplay by" credit is appropriate when there is source material

**17**

of a story nature (with or without a "Screen Story" credit) or when the writer(s) entitled to "Story by" credit is different than the writer(s) entitled to "Screenplay by" credit.

### 7. "Written by"

The term "Written by" is used when the writer(s) is entitled to both the "Story by" credit and the "Screenplay by" credit.

This credit shall not be granted where there is source material of a story nature. However, biographical, newspaper and other factual sources may not necessarily deprive the writer of such credit.

### 8. "Narration Written by"

"Narration Written by" credit is appropriate where the major writing contribution to a motion picture is in the form of narration. The term "narration" means material (typically off-camera) to explain or relate sequence or action (excluding promos or trailers).

### 9. "Based on Characters Created by"

"Based on Characters Created by" is a writing credit given to the writer(s) entitled to separated rights in a theatrical or television motion picture on each theatrical sequel to such theatrical or television motion picture.

Where there are no separated rights, "Based on Characters Created by" may be accorded to the author of source material upon which a sequel is based.

### 10. "Adaptation by"

This credit is appropriate in certain unusual cases where a writer shapes the direction of screenplay construction without qualifying for "Screenplay by" credit. In those special cases, and only as a result of arbitration, the "Adaptation by" credit may be used.

### B. RULES FOR DETERMINING CREDIT

In determining relative contribution, the relevant factors shall be what

**18**

material was actually used, not the Arbitration Committee's personal preference of one script over another.

A team of writers shall be treated in all respects as a single writer.

**1. "Written by"**

(See Section III.A.7.)

**2. "Story by"**

(See Section III. A.4)

Story credit may not be shared by more than two writers.

A story may be written in story form or may be contained within other literary material, such as a treatment or a screenplay, for purposes of receiving a "Story by" credit.

**3. "Screen Story by"**

(See Section III. A.5)

Screen Story credit may not be shared by more than two writers.

If the writer is furnished source material but takes from it only a springboard, a characterization, an incident or some equally limited contribution, creating a substantially new and different story from the source material, he/she may receive "Screen Story by" credit but only as the result of arbitration. In such cases, the author of the source material may be given credit that specifies the form in which such material was acquired -- for instance, "From a Play by," "From a Novel by," "From a Saturday Evening Post Story by," "From a Series of Articles by," "Based on a Story by," etc.

**4. "Screenplay by"**

(See Section III. A.6)

Screen credit for screenplay will not be shared by more than two writers, except that in unusual cases, and solely as the result of arbitration, the

**19**

names of three writers or the names of writers constituting two writing teams may be used. The limitation on the number of writers applies to all feature length photoplays except episodic pictures and revues.

### a. Percentage Requirements

Any writer whose work represents a contribution of more than 33% of a screenplay shall be entitled to screenplay credit, except where the screenplay is an original screenplay. In the case of an original screenplay, any subsequent writer or writing team must contribute 50% to the final screenplay.

### b. Original and Non-Original Screenplays

For purposes of determining "Screenplay by" credit only, two categories of screenplays are recognized:

(1) Original screenplays (i.e., those screenplays which are not based on source material and on which the first writer writes a screenplay without there being any other intervening literary material by another writer pertaining to the project).[2] If a writer is furnished or uses research material, the screenplay is still considered an original screenplay; and

(2) Non-original screenplays (i.e., screenplays based upon source material and all other screenplays not covered in (1) above, such as sequels).

### c. Additional Guidelines for the Arbiters in Determining Screenplay Credit

In each case, the arbiters read any source material and all literary material provided to them in connection with the development of the final screenplay in order to assess the contribution of each writer to the final shooting script.

---

2 In the case where a team writes a story, and there is no source material, and one member of the team goes on to write a screenplay without there being any other intervening literary material by any other writer, the screenplay shall still be considered an "original screenplay."

**20**

The percentage contribution made by writers to screenplay obviously cannot be determined by counting lines or even the number of pages to which a writer has contributed. Arbiters must take into consideration the following elements in determining whether a writer is entitled to screen-play credit:

■ dramatic construction;

■ original and different scenes;

■ characterization or character relationships; and

■ dialogue.

It is up to the arbiters to determine which of the above-listed elements are most important to the overall values of the final screenplay in each particular case. A writer may receive credit for a contribution to any or all of the above-listed elements. It is because of the need to understand contributions to the screenplay as a whole that professional expertise is required on the part of the arbiters. For example, there have been instances in which every line of dialogue has been changed and still the arbiters have found no significant change in the screenplay as a whole. On the other hand, there have been instances where far fewer changes in dialogue have made a significant contribution to the screenplay as a whole. In addition, a change in one portion of the script may be so signifi-cant that the entire screenplay is affected by it.

It is possible to consider the writer of a story or treatment as eligible for screenplay credit, but only in those cases where the story or treatment is written in great detail, to an extent far beyond the customary require-ments for a story or treatment.

### d. Selection from Source Material

As a guideline for arbiters in cases involving a non-original screenplay based upon source material, it is a fundamental principle that selection

**21**

of **screenplay elements**[3] from the source material is a part of the creative process of writing the screenplay. Arbiters should give weight to any writer's original and unique utilization, choice, or arrangement of source material when it is present in the final shooting script, but not the employment of basic **story elements**[4] which any other writer may have also selected. (See screenplay elements - Section III. B. 4.c. See story elements - Section III.A.4.)

**5. "Adaptation by"**

(See Section III. A.10)

Because of the strong feeling against a multiplicity of credits, the Guild is opposed to the general use of the "Adaptation by" credit. However, the Guild recognizes that there are certain unusual cases where credit is due a writer who shapes the direction of screenplay construction without qualifying for "Screenplay by" credit. In those special cases, and only as a result of arbitration, the "Adaptation by" credit may be used.

**6. Irreducible Story Minimum**

In the case of an original screenplay, the first writer shall be entitled to no less than a shared story credit.

**7. No Other Credits Approved**

Any form of credit not expressly described in this Manual shall be used only upon receipt of a waiver from the Guild. Fewer names and fewer types of credit enhance the value of all credits and the dignity of all writers.

---

*3 Section III.B.4.c. of the Screen Credits Manual refers to screenplay elements as follows: dramatic construction; original and different scenes; characterization or character relationships; and dialogue.*

*4 The term "story" means all writing covered by the provisions of the Minimum Basic Agreement representing a contribution "distinct from screenplay and consisting of basic narrative, idea, theme or outline indicating character development and action." (See Section III.A.4.)*

**22**

## C. PRODUCTION EXECUTIVES

The term "production executives" includes individuals who receive credit as the director or in any producer capacity. The following rules govern writing credits of production executives who also perform writing services when there are other writers involved on the same project.

### 1. Automatic Arbitration Provisions

Schedule A of the Minimum Basic Agreement provides:

"Unless the story and/or screenplay writing is done entirely without any other writer, no designation of tentative story or screenplay credit to a production executive shall become final or effective unless approved by a credit arbitration as herein provided, in accordance with the Guild rules for determination of such credit."

### 2. Notice Requirements

If a production executive intends to claim credit as a team on any literary material with a writer(s) who is not a production executive, he/she must, at the time when such team writing begins, have signified such claim in writing to the Guild and to the writer(s) with whom he/she claims to have worked as a team. Failure to comply with the above will preclude such production executive from claiming co-authorship of the literary material in question, and such literary material shall be attributed to the other writer.

### 3. Percentage Requirements to Receive Screenplay Credit

At the time of the credit arbitration, the production executive or production executive team must assume the burden of proving that he/she/they had, in fact, worked on the script as a writer and had assumed full share of the writing. In the case of original screenplays, if the production executive or production executive team is the second writer he/she/they must have contributed more than 50% of the final script to receive screenplay credit. His/her/their contribution must consist of dramatic

**23**

construction; original and different scenes; characterization or character relationships; and dialogue.

As in all cases, decisions of Arbitration Committees are based upon literary material. Therefore, production executives, as well as other writers, should keep dated copies of all literary material written by them and submitted to the Company.

## D. REMAKES

In the case of remakes, any writer who has received writing credit under the Guild's jurisdiction in connection with a prior version of the motion picture is a participating writer on the remake. As such, those prior writers are entitled to participate in the credit determination process and are eligible to receive writing credit pursuant to the rules for determining writing credits. The final shooting script written by a prior writer(s) shall be considered literary material.

If under the "Rules for Determining Writing Credits" (Section III.B.) the Arbitration Committee determines that such prior writer(s) is not entitled to receive writing credit, the Arbitration Committee may, within its discretion, accord such prior writer(s) a credit in the nature of a source material credit, such as "Based on a Screenplay by...."

However, the rules do not preclude a prior writer(s) from receiving both writing credit and a credit in the nature of a source material credit at the discretion of the Arbitration Committee.

Remakes shall be considered non-original screenplays under Section III.B.4.b.(2) of this Manual.

## E. WITHDRAWAL FROM CREDIT

Prior to the time a credit question has been submitted to arbitration, a writer may withdraw from screen writing credit for personal cause, such as violation of his/her principles or mutilation of material he/she has written. If the other writer-contributors do not agree, the question shall be

**24**

referred to arbitration. The Arbitration Committee in such cases shall base its determination on whether there is such personal cause.

After screen credits have been determined by arbitration, a writer may not withdraw his/her name from screenplay credit. He/she may, however, by notification to the Guild, withdraw from any other form of credit.

Withdrawal from writing credit will result in loss of any and all rights accruing from receipt of writing credit. Use of a pseudonym rather than withdrawing from credit will not result in such a forfeiture. (See H. below.)

## F. GUILD'S RIGHT TO PROTEST

Pursuant to the provisions of the Minimum Basic Agreement the Guild has the right to protest credits proposed by the Company. The Guild may act irrespective of the wishes of any of the participating writers in order to ensure that the credit rules are properly applied.

## G. ORDER OF NAMES

The order of writers' names in a shared credit may be arbitrated. Generally, the most substantial contributor is entitled to first position credit. Where there is no agreement among the arbiters as to order of names, or where the Arbitration Committee determines that the credited writers' contribution is equal, then the Arbitration Committee shall order the writers' names chronologically.

## H. PSEUDONYMS

The Minimum Basic Agreement provides that any writer who is entitled to credit on the screen and who has been paid, or is guaranteed payment of, less than two hundred thousand dollars ($200,000) for writing services or literary materials relating to the particular motion picture shall have the right to be accorded credit on the screen, in advertising or otherwise, in a reasonable pseudonymous name. A writer must exercise this right within five (5) business days after final determination of writing credits. None of the writer's rights, including but not limited to compen-

**25**

sation of any kind, shall be affected by use of such pseudonym.

Before using a pseudonym a writer must register it with the Guild by sending a written notice to the Membership Department with the writer's Social Security number, if any. A pseudonym may not duplicate the name or pseudonym of another writer or the name of a public figure.

Subject to the terms of a fully-executed strike settlement agreement between a signatory company and the Guild, the Screen Credits Administrator shall be empowered to obtain the true name and identity of any writer listed by pseudonym on any Notice of Tentative Writing Credit submitted to the Guild. In the event that the Company or writer refuses to reveal the true identity of a writer listed by pseudonym on a Notice of Tentative Writing Credit on which the names of one or more other writers also appear, such writer listed by pseudonym shall not be entitled to receive writing credit, and credit shall be awarded to the other writers as the Arbitration Committee or the Screen Credits Administrator determines.

**I. WRITTEN MATERIAL PREVAILS**

Decisions of Arbitration Committees are based upon literary material. Claims of authorship must be supported by literary material appropriate for submission to the Arbitration Committee. In the event of conflicting claims, literary material always prevails.

**J. REVISION OF SCRIPT AFTER FINAL CREDIT DETERMINATION**

If, after screen credits are finally determined, material changes are made in the literary material, either the Company or a participant and the Guild jointly may reopen credit determination by making a claim within 48 hours after completion of the writing work claimed to justify the revision of credits; and in such case the procedure for the original determination of credits is followed.

**26**

## K. PUBLICIZING OF CREDITS

The Minimum Basic Agreement and Guild Working Rules provide that no writer shall claim credit for screen authorship on any motion picture prior to the time when the credits have been determined, and no writer shall claim credits contrary to such determination. In addition, the Guild believes that it is in the best interest of all writers that certain facts relating to any particular credit determination should remain confidential. For example, participating writers are asked to refrain from commenting in the press or media about issues related to pre-arbitration hearings, arbiters' written decisions or Policy Review Board hearings.

## L. CONCLUSION

These rules and procedures have been derived from the experience and practice of the past years. Although they remain the guiding policy by which credits are determined, they are not to be considered rigid or inflexible. The Guild has the discretion to depart from precedent when new conditions, new problems, or new methods of work may require an alteration of the rules or a new application of an existing rule to a unique set of facts and circumstances.

It is now accepted that administration of writers' credits belongs to the writers themselves. It is their responsibility to see to it that credits are administered wisely and well, that the written work product of participating writers is credited as accurately as possible, and that the overall result leads ultimately to a recognition of the importance of the writers' contribution to the screen.

**27**

| From: | Dave Callaham <Callaham@stingrza.com> |
| Sent: | Monday, August 17, 2009 3:44 PM |
| To: | Dave Kalstein <kalstein@mac.com>; Kyle Harimoto <kharimoto@sbcglobal.net> |
| Subject: | expendables |

HOLY SHIT THIS SCRIPT IS FUCKING AWFUL. I feel really bad now for sending it to you guys. I am ASTOUNDED at how bad this is. I want you to know that it's nothing like what I wrote. Which I suppose at this point is both the good and bad news...

CONFIDENTIAL



DC00483_REV

161

| From: | Dave Callaham <callaham@stingrza.com> |
| Sent: | Tuesday, August 18, 2009 2:11 PM |
| To: | Kyle Harimoto <kharimoto@sbcglobal.net> |
| Cc: | Dave Kalstein <kalstein@mac.com> |
| Subject: | Re: Expendables |

if i say that in an email I may be incriminating myself Kyle.

Put it this way: the idea and very loose structure is mine.

Everything else...

I plead the fifth.

Or, to put it another way, if I get sole credit like I am asking for...

it would be A MIRACLE.

On Aug 18, 2009, at 11:06 AM, Kyle Harimoto wrote:

I read it last night. I have to know what in this script is yours and what is new?

CONFIDENTIAL



DC00497_REV

KATYA J. CULBERG
Associate Counsel
WRITERS GUILD OF AMERICA, WEST, INC.
7000 W. Third Street
Los Angeles, California 90048
(323) 782-4521
(323) 782-4806 (fax)
kculberg@wga.org

Counsel for Complainants

BEFORE THE WRITERS GUILD OF AMERICA, WEST, INC. - PRODUCERS

ARBITRATION TRIBUNAL

| | |
|---|---|
| In the Matter of the Arbitration between | NOTICE OF CLAIM SUBMITTED TO ARBITRATION AND CLAIM |
| WRITERS GUILD OF AMERICA, WEST, INC. and JITTERY DOG PRODUCTIONS, INC. f/s/o DAVID CALLAHAM, | |
| Complainants, | |
| vs. | CASE NO. 12-SR-004 |
| WARNER BROS., DOUBLE LIFE PRODUCTIONS, INC., MILLENNIUM FILMS, INC., NU IMAGE, ALTA VISTA PRODUCTIONS, INC., ALTA VISTA FINANCING, LLC and ALTA VISTA PRODUCTIONS, LLC, | |
| Respondents, | |
| Relating to sequel payments in connection with the theatrical motion picture entitled "THE EXPENDABLES." | |

TO ALL PARTIES AND THEIR COUNSEL:

**PLEASE TAKE NOTICE** that Complainants WRITERS GUILD OF AMERICA, WEST,

INC. ("the Guild") and JITTERY DOG PRODUCTIONS, INC. f/s/o DAVID CALLAHAM

(collectively "Complainants") submit the above-captioned Claim to arbitration pursuant to Articles 10,

11 and 12 of the Writers Guild of America 2001-2011 Theatrical and Television Basic Agreements

(collectively "MBA"). Pursuant to Article 11.B.3. of the MBA, submission of this Claim to steps 1 and

2 of the grievance procedure is waived and/or not required.



EXHIBIT
F

163

5/ʳ|1?

We have ten (10) days from your receipt of this Notice to mutually agree upon an arbitrator. If we are unable to reach such an agreement within that time period, an arbitrator will be selected in accord with the procedures of Article 11.C.2.

The WGAW requests production of the following information and documentation which is relevant and necessary to the WGAW's ability to enforce the MBA:

(a)     Copies of any and all agreements entered into by or on behalf of Respondents Warner Bros., Double Life Productions, Inc., Millennium Films, Inc., Nu Image, Alta Vista Productions, Inc., and Alta Vista Productions LLC (collectively "Respondents") for the acquisition, sale, purchase, licensing, assignment, quitclaim, and/or other transfer of any or all rights in and to the literary material written in connection with the theatrical motion picture entitled "The Expendables" ("Picture");

(b)     Copies of any and all documents, including but not limited to correspondence, memoranda and/or e-mails, referring to or otherwise evidencing the existence and/or terms of any agreements entered into by or on behalf Respondents for the sale, purchase, licensing, assignment, quitclaim, and/or other transfer of any or all rights in and to the literary material written in connection with the Picture;

(c)     An accounting of any and all gross and/or net receipts, costs, expenses and/or charges received or paid by Respondents in connection with the sale, licensing, assignment, quitclaim, assumption or transfer of rights in and to the literary material written in connection with the Picture; and

(d)     Copies of any and all checks, drafts, and/or bank transfers, issued by Respondents in payment for the sale, licensing, assignment, quitclaim, assumption or transfer of rights in and to the literary material written in connection with the Picture.

The nature of the Claim referred to herein is as follows:

<u>CLAIM</u>

[Pertaining to all Counts]

1.     Respondent Warner Bros. is signatory to or otherwise bound by the terms of the MBA.

2.     Respondent Double Life Productions, Inc., ("Double Life") is signatory to or otherwise bound by the terms of the MBA.

2

3.      At all times herein, Respondents Double Life Productions, Inc., Millennium Films, Inc., Nu Image and Alta Vista Productions, Inc. (collectively "the Double Life Companies"), were acting as the alter ego of one another and/or each was a joint employer of one another and/or assumed or were assigned the MBA obligations in connection with the Picture.

4.      During the term of the MBA, Respondent Warner Bros. entered into a Blind Commitment Agreement ("Agreement") with Jittery Dog Productions f/s/o David Callaham for Mr. Callaham to write an original screenplay in connection with the theatrical motion picture project "The Expendables." Mr. Callaham wrote and delivered an original screenplay (referred to in the Agreement as "Committed Material") and a rewrite (referred to in the Agreement as "First Optional Material") (collectively "Literary Material") and Respondent Warner Bros. paid Mr. Callaham initial compensation for these services in the amount of $250,000, all pursuant to the Agreement.

5.      During the term of the MBA, Alta Vista Productions, Inc., entered into a WGA Literary Material Assumption Agreement with Warner Bros. whereby the Alta Vista Productions, Inc., assumed all MBA obligations in connection with the Literary Material.

6.      During the term of the MBA, the Double Life Companies produced or caused to be produced the theatrical motion picture entitled "The Expendables" ("Picture").

7.      Respondents, and each of them, are therefore jointly and severally liable for any and all MBA obligations in connection with the Picture.

8.      The WGAW determined credits for the Picture. The final credit is:

Screenplay by David Callaham and Sylvester Stallone

Story by David Callaham

9.      David Callaham has separated rights in the Picture.

10.     Pursuant to the Agreement, Respondents Double Life paid Mr. Callaham a credit bonus in the amount of $100,000 because Mr. Callaham received a shared "Screenplay By" credit.

11.     During the term of the MBA, the Double Life Companies produced or caused to be produced a sequel to the Picture: the theatrical motion picture "The Expendables 2" ("the Sequel").

3

## COUNT I

### [Failure to Pay Theatrical Sequel Payment]

12.    Pursuant to the Agreement and the MBA, Mr. Callaham was to be paid "an Amount equal to 50% of the sums paid for the Committed Material, First Optional Material, Second Optional Material and either the sole or shared credit bonus, as applicable, payable upon commencement. . . ." if and when a theatrical motion picture sequel to the Picture was produced.

13.    Pursuant to Article 16.A.5.a. of the MBA and the Agreement, Respondents are required to pay Mr. Callaham compensation for the Sequel in the aggregate amount of $175,000.00, which is comprised of 50% of the sums paid for the Committed Material ($175,000), First Optional Material ($75,00) and the shared credit bonus ($100,000).

14.    The Guild is informed, believes and thereon alleges that no sequel payment was made to Mr. Callaham with respect to the Sequel.

15.    In breach of the MBA, Respondents have failed and continue to fail and refuse to pay Mr. Callaham the sequel payment due for the Sequel.

16.    Pursuant to Article 13.A.14. of the MBA, Respondents are required to pay interest on the payment owed for the Sequel at the rate of one and one-half percent (1.5%) per month, commencing to accrue when the payment was due, and continuing to accrue until paid in full.

## COUNT II

### [Failure to Deliver a Valid Written WGA Assumption Agreement]

17.    Pursuant to Articles 15, 51, 64 and 65 of the MBA, Respondents are required to obtain and deliver to the WGAW a valid written WGA assumption agreement in order to ensure a buyer's assumption of MBA obligations in connection with the Screenplay, Picture and Sequel, as applicable, including, but not limited to, the MBA obligations referenced in this Claim.

18.    In breach of the foregoing provisions of the MBA, Respondents have failed and refused, and continue to fail and refuse to deliver to the WGAW valid written assumption agreements in connection with the Screenplay, Picture and Sequel, as applicable.

19.    As a direct and proximate result of these substantial breaches of the MBA, Mr. Callaham has suffered, and unless Respondents are restrained, shall continue to suffer damage by the loss of

4

1   benefits conferred to him under the MBA in connection with Respondents' failure to obtain and file

2   assumption agreements.  The WGAW will present proof of the extent of damage at the hearing.

3        20.      As a further direct and proximate result of these breaches, the WGAW has suffered and,

4   unless Respondents are restrained, shall continue to suffer damage to its prestige and to the integrity of

5   the MBA.  The WGAW will present proof of the extent of damage at the hearing.

6                                    PRAYER FOR RELIEF

7        WHEREFORE, Complainants pray for issuance of an award as follows:

8        a.       An order requiring Respondents to pay Mr. Callaham, pursuant to the MBA and the

9   Agreement, the unpaid sequel payment in connection with the Picture in an amount according to proof

10   at the hearing in this matter, and interest thereon;

11        b.       An order requiring Respondents to pay damages to the Guild and Mr. Callaham for

12   Respondents' failure to deliver to the WGAW a valid, written WGA Assumption Agreement for each

13   sale or transfer of rights in and to the Picture;

14        c.       An order requiring Respondents to deliver to the WGAW a valid, written WGA

15   Assumption Agreement for each sale or transfer of rights in and to the Picture; and

16        d.       Such other and further relief as the Arbitrator deems just and proper.

17

18                                         WRITERS GUILD OF AMERICA, WEST, INC.

19

20   DATE: 5/14/13                           BY:

21                                             KATYA J. CULBERG
                                              Counsel for Complainants

22

23

24

25

26

27

28

                                          5

1  Charles M. Coate, Esq. (SBN: 140404)
   Darius Anthony Vosylius, Esq. (SBN: 175030)
2  COSTA, ABRAMS & COATE, LLP
   1221 Second Street, Third Floor
3  Santa Monica, California 90401
   (310) 576-6161
4  fax (310) 576-6160
5  Attorneys for Petitioner Double Life Productions, Inc.

6

7

8               SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                        COUNTY OF LOS ANGELES

10
   DOUBLE LIFE PRODUCTIONS, INC., a          Case No.: BS146511
11 California corporation,

12          Petitioner,                       [Assigned to the Hon. James Chalfant]
                                             Dept 85
13
               vs.                           NOTICE OF TRIAL SETTING
14                                           CONFERENCE

15 WRITERS GUILD OF AMERICA, WEST,
   INC., a California corporation,
16
17 Respondent;

18 DAVID E. CALLAHAM, an individual; and
19 JITTERY DOG PRODUCTIONS, INC., a
   California corporation,
20
21          Real Parties in Interest.

22

23

24      To all parties and to their attorneys of record, please take notice of the following setting

25 of a trial setting conference in the above matter set for March 27, 2014 @ 9:30 am in Dept 85 of

26 the above entitled Court located at 111 N. Hill Street, Los Angeles, California 90012. Counsel

27
28 for Petitioner was ordered to give notice of the hearing. A true and correct copy of the Court's

**EXHIBIT**
**J**

NOTICE OF TRIAL SETTING CONFERENCE
168

1    notice is attached hereto.

2

3    DATED: January 8, 2014                         Respectfully submitted,

4                                                   COSTA ABRAMS & COATE LLP

5
                                                    By: _____
6                                                   Charles M. Coate
                                                    Attorney   for   Petitioner   Double   Life
7                                                   Productions, Inc.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE SENT TO:

Coate, Abrams & Coate, LLP
1221 Second Street, Third Floor
Santa Monica,       CA  90401

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

JAN 03 2014

Sherri R. Carter, Executive Officer/Clerk
By Araceli Rodriguez, Deputy

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | CASE NUMBER |
|---|---|
| DOUBLE LIFE PRODUCTIONS INC    Plaintiff(s), | BS146511 |
| VS. | |
| WRITERS GUILD OF AMERICA ET A    Defendant(s). | **NOTICE OF TRIAL SETTING CONFERENCE & ATTACHED ORDERS THEREON** |

**YOU ARE HEREBY NOTIFIED THAT THE ABOVE MATTER HAS BEEN SET FOR TRIAL SETTING CONFERENCE ON March 27, 2014 AT 9:30 am , IN DEPARTMENT Dept. 85 OF THE CENTRAL DISTRICT, 111 N. HILL ST., LOS ANGELES, CAL. 90012.**

**YOU ARE ORDERED TO GIVE NOTICE OF THIS HEARING AND SERVE A COPY OF THIS NOTICE TO ALL PARTIES TO THE ACTION WITHIN 10 DAYS OF SERVICE OF THIS NOTICE.**

### CERTIFICATE OF MAILING

I, the below named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Notice of Trial Setting Conference upon each party or counsel named above by depositing in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown above with the postage thereon fully prepaid.

Date: January 3, 2014                            Sherri R. Carter, EXECUTIVE OFFICER/CLERK

By_____,Deputy Clerk

170

## PROOF OF SERVICE

1

**STATE OF CALIFORNIA**  )

2                          )

**COUNTY OF LOS ANGELES**  )

3

4      I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 1221 Second Street, Third Floor, Santa Monica, California 90401.

5

6      On January 8, 2014, I served the foregoing document described as **NOTICE OF TRIAL SETTING CONFERENCE**

7      on the interested parties in this action by placing a copy thereof enclosed in a sealed envelope as follows:

8

Katherine Christovich, Esq.

9      WRITERS GUILD OF AMERICA, WEST
7000 West Third Street

10     Los Angeles, CA 90048

11     [ ]    **(BY HAND)** I caused the foregoing document to be delivered by hand in open court.

12     [ ]    **(BY EMAIL)** I caused the foregoing document to be delivered by email.

13     [X]    **(BY MAIL)** I deposited such envelope in the mail at Santa Monica, California.  The envelope was mailed with postage fully prepaid.  I am "readily familiar" with this firm's

14     practice of collection and processing correspondence for mailing.  It is deposited with the U.S. Postal Service on the same day with postage thereon fully prepaid at Santa Monica,

15     California in the ordinary course of business.  I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than

16     1 day after date of deposit for mailing in affidavit.

17     [X]    **(State)** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

18

19     Executed on January 8, 2014, at Santa Monica, California.

20

21                                          Charles M. Coate

22

23

24

25

26

27

28

1    Charles M. Coate, Esq. (SBN: 140404)
     Darius Anthony Vosylius, Esq. (SBN: 175030)
2    COSTA, ABRAMS & COATE, LLP
     1221 Second Street, Third Floor
3    Santa Monica, California 90401
     (310) 576-6161
4    fax (310) 576-6160
5    Attorneys for Petitioner Double Life Productions, Inc.

6

                **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
7
                        **COUNTY OF LOS ANGELES**
8

9
     DOUBLE LIFE PRODUCTIONS, INC., a          Case No.:  BS 146511
10   California corporation,
11                                             [Hon. James C. Chalfant]
12           Petitioner,                       **NOTICE OF HEARING RE: PETITION
                                               FOR WRIT OF PROHIBITION
13           vs.                               AND/OR WRIT OF REVIEW OR
                                               CERTIORARI**
14   WRITERS GUILD OF AMERICA, WEST,
15   INC., a California corporation,           **Date: May 6, 2014[1]
                                               Time: 1:30 p.m.
16                                             Place: Department 85**
     Respondent;
17

18
     DAVID E. CALLAHAM, an individual; and
19   JITTERY DOG PRODUCTIONS, INC., a
20   California corporation,

21
             Real Parties in Interest.
22

23

24

25

26

27
                              ┌─────────────────┐
28                            │    **EXHIBIT**    │
     ─────────────────         │        _K_        │
     [1] First available date per Court Clerk.  └─────────────────┘

─────────────────────────────────────────────────────────────────────
NOTICE OF HEARING DATE RE: PETITION FOR WRITE OF PROHIBITION AND/OR WRIT
                    OF REVIEW OR CERTIORARI

**TO ALL PARTIES AND TO THEIR ATTORNEY OF RECORD:**

**PLEASE TAKE NOTICE** that on May 6, 2014, at 1:30 p.m., or soon thereafter as this matter may be heard in Department "85" of the above-entitled Court, located at 111 N. Hill Street, Los Angeles, California 90012, before the Honorable James C. Chalfant, the petition for a writ of prohibition and/or a writ of review or certiorari by Petitioner Double Life Productions, Inc. will be heard, pursuant California Code of Civil Procedure ("C.C.P.") §§ 1102, 1103, 1068, 1074 *et seq.* and for the reasons and under the authorities set forth in the verified petition filed on December 24, 2013.

This hearing will be based upon this notice, the memorandum of points and authorities set forth in the verified petition filed on December 24, 2013, the declaration of Trevor Short filed with the verified petition on December 24, 2013, and all papers and pleadings on file in this action, and such other oral and documentary evidence as and may be presented at or before any hearing on this matter.

The hearing on the petition for writ of mandate sought by Double Life Productions, Inc. will be scheduled at a later date.

Dated: January 3, 2014

Respectfully submitted,

COSTA, ABRAMS & COATE, LLP

By:

Charles M. Coate, Esq.
Darius Anthony Vosylius, Esq.
Attorneys for Petitioner Double Life Productions, Inc.

2

NOTICE OF HEARING DATE RE: PETITION FOR WRITE OF PROHIBITION AND/OR WRIT OF REVIEW OR CERTIORARI

**PROOF OF SERVICE**

**STATE OF CALIFORNIA**          )
                                 )
**COUNTY OF LOS ANGELES**   )

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 1221 Second Street, Third Floor, Santa Monica, CA 90401. On January 3, 2014, I served the foregoing document described as **NOTICE OF HEARING RE: PETITION FOR WRIT OF PROHIBITION AND/OR WRIT OF REVIEW OR CERTIORARI** on the interested parties in this action by placing a copy thereof enclosed in a sealed envelope as follows:

Katherine Christovich, Esq.
WRITERS GUILD OF AMERICA, WEST
7000 West Third Street
Los Angeles, CA 90048
Attorneys for Respondent Writers Guild of America, West, Inc

[ X ]   **(BY MAIL)** I deposited such envelope in the mail at Santa Monica, California. The envelope was mailed with postage fully prepaid. I am "readily familiar" with this firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on the same day with postage thereon fully prepaid at Santa Monica, California in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than 1 day after date of deposit for mailing in affidavit.

[X]   **(State)** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on January 3, 2014, at Santa Monica, California.

Brendan O'Malley

3

Paul Crost
5318 East 2nd Street, Ste. 381
Long Beach, CA 90803
Tel:562 608 8433
Fax: 562 245 3623
Neutral Arbitrator

## BEFORE THE WRITERS GUILD OF AMERICA WEST, INC. – PRODUCERS ARBITRATION TRIBUNAL

| | |
|---|---|
| In the Matter of the Arbitration between<br><br>WRITERS GUILD OF AMERICA, WEST, INC. and JITTERY DOG PRODUCTIONS, INC. f/s/o DAVID CALLAHAM,<br><br>   Complainants,<br><br>vs.<br><br>DOUBLE LIFE PRODUCTIONS, INC., MILLENNIUM FILMS, INC., NU IMAGE, ALTA VISTA PRODUCTIONS, INC., ALTA VISTA FINANCING, LLC and ALTA VISTA PRODUCTIONS, LLC.<br><br>   Respondents.<br><br>Relating to sequel payments in connection with the theatrical motion picture entitled "THE EXPENDABLES." | [PROPOSED] ORDER DENYING RESPONDENTS' REQUEST FOR CONTINUANCE OF JANUARY 31, 2014 ARBITRATION HEARING |

The Arbitrator held a conference call on January 8, 2014 to address Respondents' request for a continuance of the arbitration hearing scheduled for January 31, 2014. During the call Respondents stated that the hearing should be continued until Respondents' two Los Angeles Superior Court actions filed on December 23, and 24, 2013, respectively, against Complainants had been adjudicated. Finding no good cause for the continuance, the Arbitrator denied the request. The January 31 hearing remains on calendar.

DATED: January 9, 2014

_____
Paul Crost, Arbitrator


**EXHIBIT**
175

Print  |  Close Window

Subject: **Out of Office Re: Double Life Productions, Inc. adv. WGA et. al. #12-SR-004**

From: **"Paul Crost" <pecrost@gmail.com>**

Date: **Wed, Jan 15, 2014 6:16 pm**

To: **ccoste@cacllp.com**

I will be on vacation between January 10 and January 25, and will not be able to respond to messages or inquiries until January 26.

—
Paul Crost Mediation
5318 East 2nd Street, Ste. 381
Long Beach, CA 90803
Tel:562 608 8433
Mobile: 213 392 0696
Fax: 562 245 3623

Copyright © 2003-2014. All rights reserved.

