1  Charles M. Coate (SBN: 140404)
2  ccoate@cacllp.com
   Darius Anthony Vosylius (SBN: 175030)
3  Theresa S. Johnson (SBN: 254123)
4  COSTA, ABRAMS & COATE, LLP
   1221 Second Street, Third Floor
5  Santa Monica, California 90401
6   (310) 576-6161; fax (310) 576-6160
7  *Attorneys for Petitioner Double Life Productions, Inc.*

8

9              **UNITED STATES DISTRICT COURT**

10      **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

11

12  DOUBLE LIFE PRODUCTIONS, INC., a    Case No. CV-14-00197-DMG (AJWx)
    California corporation,             [Assigned to the Hon. Dolly M. Gee]
13
14       Petitioner,                    **NOTICE AND *EX PARTE*
15                                       APPLICATION FOR AN ORDER
         vs.                            DISQUALIFYING OPPOSING
16                                       COUNSEL AND/OR FOR
                                         SHORTENED TIME TO HEAR
17  WRITERS GUILD OF AMERICA,           MOTION TO DISQUALIFY;
    WEST, INC., a California corporation, MEMORANDUM OF POINTS AND
18                                       AUTHORITIES; DECLARATIONS
19                                       OF TREVOR SHORT AND
    Respondent;                          CHARLES M. COATE**
20
21  DAVID E. CALLAHAM, an individual;   **[PROPOSED] *EX PARTE* ORDER
22  and JITTERY DOG PRODUCTIONS,        LODGED CONCURRENTLY**
    INC., a California corporation,          Date:    Submitted On Papers
23                                           Time     Submitted On Papers
24                                           Place:   Courtroom 7
    Real Parties in Interest.           Action Filed In State Court:
25                                       December 24, 2013
26
27                                       Action Removed To Federal Court:
28                                       January 9, 2014

*EX PARTE* APPLICATION FOR AN ORDER DISQUALIFYING OPPOSING COUNSEL OR, IN THE ALTERNATIVE, FOR SHORTENED TIME TO HAVE SAID MOTION HEARD

**TO:   THE HONORABLE DOLLY M. GEE, TO THE CLERK OF HER COURT, AND TO ALL INTERESTED PARTIES:**

Pursuant to Local Rules 7-19 and 7-20 and 65-1 *et seq.*, and this Court's procedural rule 6 and rule 9 of this Court's "Initial Standing Order," Petitioner Double Life Productions, Inc. ("Petitioner") respectfully brings this *ex parte* application[1] for an Order disqualifying and barring Kathy S. Christovich and Leila B. Azari as well as Anthony S. Segall of Rothner, Segall and Greenstone from representing the Writers Guild of America, West, Inc. ("WGA"), on the one hand, and David E. Callaham ("Callaham") and Jittery Dog Productions, Inc. ("Jittery Dog"), on the other hand.

As set forth below, the interests of the WGA, on the one hand, and Callaham/Jittery Dog, on the other hand, are directly adverse. In this action,

---

[1] Petitioner is also bringing a separate *ex parte* application for a temporary restraining order to prevent the WGA and Callaham/Jittery Dog from prosecuting a WGA arbitration that is scheduled to take place on **January 31, 2014**. Some of the issues raised in that application are also relevant here.  This pending WGA arbitration concerns whether Mr. Callaham is entitled to certain "bonus" sequel writing payments with respect to the motion picture *Expendables 2*, even though Mr. Callaham did not provide any writing services whatsoever concerning *Expendables 2*.

Petitioner is respectfully requesting that the Court issue a writ of mandate and/or writ of review commanding the WGA to investigate its own member (real party in interest David Callaham)  for his fraudulent conduct with respect to a 2009 WGA screen credit arbitration pertaining to the motion picture *The Expendables*.  Mr. Callaham's conduct clearly violated numerous and explicit provisions of the WGA rules and procedures; yet the WGA refused (and refuses) to investigate the fraud that was committed by Callaham on the WGA.

There is an actual conflict of interest between the interests of the WGA and those of Callaham/Jittery Dog.  Opposing counsel simply cannot represent the interests of the WGA, on the one hand, and the interests of Callaham/Jittery Dog, on the other hand.  Again, if Petitioner prevails with its requested relief, then the WGA will be compelled to investigate its own member (*i.e.* Callaham/Jittery Dog). That creates an actual conflict of interest.

California law and the California Rule of Professional Conduct 3-310 prohibits attorneys from representing adverse interests.   There are certain conflicts of interest that may not be waived and the situation here is one of those.

Good cause exists to grant this requested emergency *ex parte* relief based upon the attached memorandum of points and authorities as well as the Declarations of Trevor Short ("Short Dec.") and of Charles M. Coate ("Coate

Dec."). There is a pending January 31, 2014, arbitration that is being prosecuted by the WGA and Callaham/Jittery Dog against the Petitioner. That is set forth in great detail in the concurrently-filed *ex parte* application for a temporary restraining order to stay and/or continue that arbitration. Here the Petitioner is respectfully requesting that the Court issue the requested extraordinary relief and issue and Order disqualifying opposing counsel. In the alternative, Petitioner respectfully requests that the Court set a briefing schedule so that the resolution of these issues take place before January 31, 2014 (*i.e.* the date of the pending arbitration between the Petitioner, on the one hand, and the WGA and Callaham/Jittery Dog, on the other hand).

This application and motion is made following the conference of counsel pursuant to Local Rule 7-3 which took on January 13 -- 15, 2014. On January 15, 2014, opposing counsel informed Petitioner's counsel in writing that they will refuse to withdraw from representing the divergent interests of the WGA and Callaham/Jittery Dog. Thereafter, Petitioner acted diligently and promptly brought this matter to the Court's attention by way of this *ex parte* application.

Dated: January 21, 2014              Respectfully submitted,
                                     COSTA ABRAMS & COATE LLP

                                     By:   /s/ Charles M. Coate
                                     _____
                                     Charles M. Coate
                                     Attorney for Petitioner

# <u>TABLE OF CONTENTS</u>

**I.**   **<u>INTRODUCTION</u>**………………………………………………… 5

**II.**   **<u>NATURE OF ACTION</u>**……………………………………….…. 6

**III.**   **<u>COMPLIANCE WITH LOCAL RULE 7-19.</u>** ………………….… 7

**IV.**   **<u>FACTUAL AND PROCEDURAL BACKGROUND</u>**…………….…. 8

    **A.**   **The Parties**…………………………………………………… 8

    **B.**   **The WGA Rules & Its Credit Determination Process**…………… 9

    **C.**   **The August 2009 WGA Screen Credit Arbitration Re:** *The Expendables* **& Callaham's Misrepresentations**……………… 13

    **D.**   **The Sequels & The Pending 2013 WGA Arbitration**…………... 16

    **E.**   **Procedural Status**……………………………………………… 17

**V.**   **<u>OPPOSING COUNSEL SHOULD BE DISQUALIFIED FROM REPRESENTING BOTH THE WGA AND CALLAHAM/JITTERY DOG</u>** ……………………………………………………… 18

    **A.**   **California Law Governs**……………………………………….. 18

    **B.**   **Under California Law, An Attorney Cannot Represent Parties Whose Interests Are Adverse.** …………………………………… 19

    **C.**   **Application Of The Facts To This Case Prohibits Opposing Counsel From Representing Both The WGA and Callaham/Jittery Dog.** …………………………………….…… 23

        **Inability to provide competent representation.**…………... 24

        **Advancing adverse interests before a tribunal.**………….. 26

i

**Inability to provide adequate disclosure.**………………… 28

**VI.**   <u>**CONCLUSION**</u>………………………………………………... 29

# <u>TABLE OF AUTHORITIES</u>

## <u>STATUTES</u>

California Business & Professions Code § 6068(e)…………………………... 20

California Rule of Professional Conduct 3-100………………………………. 20

California Rule of Professional Conduct 3-110………………………………. 24

California Rule of Professional Conduct 3-300………………………………. 21

California Rule of Professional Conduct 3-310……………… 3, 20, 21, 22, 28, 29

California Rule of Professional Conduct 3-400……………………………... 24, 25

Central District Local Rule 7-19……………………………………… 2, 6, 7, 8

Central District Local Rule 7-20…………………………………………... 2, 6

Central District Local Rules 65-1, *et seq*…………………………………... 2

Central District Local Rule 83-3.1.2………………………………………… 18

## <u>CASE LAW</u>

*Brooklyn Navy Yard Cogeneration Partners v. Superior Court,*
    60 Cal.App. 4th 248 (1997)………………………………………….. 20

*Carper v. Adknowledge, Inc.,*
    2013 U.S. Dist. LEXIS 159211 *16 (N.D. Cal. 2013)……………...……… 6

*City and County of San Francisco v. Cobra Solutions, Inc.*
    (2006) 38 Cal.4th 839, 846………………………………………….. 21

*Dettamanti v. Lompoc Union School Dist.* 143 Cal App 2d 715, 723 (1956)…… 20

*Estate of Briggs*, 139 Cal App 2d 802, 806 (1956)……………………….…….. 20

*Flatt v. Superior Court* (1994) 9 Cal.4th 275, 284……………………………. 21

*Forrest v. Baeza*, 58 Cal. App. 4th 65 (1997)……………………………………. 27

*Gasperini v. Center for Humanities, Inc.*,
    518 U.S. 415, 426, 116 S. Ct. 2211, 135 L. Ed. 2d 659………………….. 18

*Gilbert v. National Corporation for Housing Partnerships*,
    71 Cal. App. 4th 1240, 1254 (1999)……………………………………………. 25

*Gregori v. Bank of America*, 207 Cal.App.3d 291, 308–30 (1989)………….... 19

*In re Charlisse C.*, 45 Cal. 4th 145, 159 (2008)………………………………… 21

*In re County of Los Angeles*, 223 F.3d 990, 995 (2000)…………………………. 18

*Ishmael v. Millington* 241 Cal.App.2d 520, 527-528  (1966)…………………… 22

*Kirk v. First American Title Ins. Co.*, 183 Cal. App. 4th 776, 815 (2010)………. 19

*Klemm v. Superior Court* (1977) 75 Cal.App.3d 893, 898………………. 23, 25, 26

*Lopez v. Banuelos*, 2013 U.S. Dist. LEXIS 127656 *20………………………… 19

*Neal v. Health Net, Inc.*, 100 Cal.App.4th 831, 840 (2002)…………………..… 19

*People v. Johnson* 105 Cal.App.3d 884 (1980)………………………………….. 20

*People ex rel. Dept. of Corporations v. SpeeDee Oil Change*,
    20 Cal. 4th 1135 (1999)…………………………………………… 19, 20, 21

*Responsible Citizens v. Superior Court*,
    16 Cal.App.4th 1717, 1723-1724 (1993)……………………………………. 19

*Spindle v. Chubb/Pacific Indemnity Group* 89 Cal.App.3d 706, 713 (1979)….… 21

*Woods v. Superior Court* 149 Cal.App.3d 931, 936 (1983)……………….... 22, 26

## **OTHER AUTHORITIES**

L.A. County Bar Assn. Ethics Op. 471 (12/21/92)…………………….....… 25, 28

WGA Screen Credits Manual ¶4………………………………………...…….. 11

WGA Screen Credits Manual ¶7………………………………………...…….. 12

WGA Working Rule ¶1…………………………………………………….….. 10

WGA Working Rule ¶15……………...………………………………10, 12

WGA Working Rule ¶16……………...……………………………....… 10, 12

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION.

Petitioner  Double Life Productions, Inc. ("Petitioner") respectfully submits its memorandum of points and authorities in support of its *ex parte* application (with notice) for an Order disqualifying and barring Kathy S. Christovich and Leila B. Azari as well as Anthony S. Segall of Rothner, Segall and Greenstone from representing respondent Writers Guild of America, West, Inc. ("WGA"), on the one hand, and real parties in interest David E. Callaham ("Callaham") and his loan out company Jittery Dog Productions, Inc. ("Jittery Dog"), on the other hand.

As set forth below, the interests of the WGA, on the one hand, and Callaham/Jittery Dog, on the other hand, are directly adverse and cannot be waived.  In this case, Petitioner is respectfully requesting that this Court issue a writ of mandate and/or a writ of review commanding the WGA to investigate its own member (real party in interest David Callaham)  for his fraudulent conduct with respect to a 2009 WGA screen credit arbitration pertaining to the motion picture *The Expendables*.  Mr. Callaham's conduct clearly violated numerous and explicit provisions of the WGA rules and procedures; yet the WGA refused (and refuses) to investigate the fraud that was committed by Mr. Callaham on the WGA and the 2009 screen credit arbitration panel.

This application is brought pursuant to the Central District of California Local Rules 7-19 and 7-20 and this Court's procedural rule number 6 and Rule 9 of the "Initial Standing Order."  "Good cause" exists to grant Petitioner's requested relief.

Federal courts take "attorney disqualification rules seriously" and recognize that if opposing counsel "is in fact prohibited from representing [defendants] in this action, [WGA and Callaham/Jittery Dog] will have improperly gained the assistance of a disqualified counsel. . ." *Carper v. Adknowledge, Inc.*, 2013 U.S. Dist. LEXIS 159211 *16 (N.D. Cal. 2013).

## II.   NATURE OF ACTION

In this action, Petitioner is seeking a writ of prohibition and/or writ of review or certiorari commanding the WGA to investigate (and discipline) Callaham for his fraudulent conduct committed in a 2009 WGA screen credit arbitration proceeding. As it stands, the WGA is simply paying lip service to its own explicit rules and regulations  which are in place to preserve the sanctity of its mission.  The WGA claims it is "responsible for determining writing credits for feature films . . . - a responsibility with far-reaching impact, financial and artistic." In order to fulfill its stated mission, the WGA claims that it is required to ensure that no "member shall accept credit which misrepresents the member's

contribution to a picture or program" and that the WGA will discipline its own members for violating these rules.

However, the WGA simply disregarded its own stated mandate and refuses to investigate and/or discipline Mr. Callaham for the blatant fraud he committed on the WGA's own internal screen credit arbitration tribunal.  By turning a blind eye to Mr. Callaham's misconduct, the WGA is sending the wrong message to its own members who will be involved in future screen credit disputes. In essence, the WGA members now know that they can disregard the WGA's own rules and regulations and can instead advance whatever theory the member believes will lead to a positive result during a WGA screen credit arbitration panel.

## III.    <u>COMPLIANCE WITH LOCAL RULE 7-19.</u>

<u>Local Rule 7-19</u>:  The name, address, telephone number and e-mail address of counsel for the opposing party:

Anthony R. Segall, Esq.
ROTHNER, SEGALL & GREENSTONE
510 South Marengo Avenue
Pasadena, California 91101-3115
Phone: (626) 796-7555
Facsimile: (626) 577-0124
E-mail: <u>asegall@rsglabor.com</u>


Katherine S. Christovich, Esq.
Leila B. Azari, Esq.
WRITERS GUILD OF AMERICA, WEST, INC.
7000 West Third Street
Los Angeles, California 90048
Phone: (323) 782-4521

Facsimile: (323) 782-4806
E-mail: lazari@wga.org

The reason for the seeking of the *ex parte* order is discussed below, along with the points and authorities in support thereof.

Local Rule 7-19.1: Counsel for Petitioner discussed the substance of this *ex parte* application with opposing counsel during a teleconference that took place on January 8, 2014 before the assigned arbitrator (Paul Crost, Esq.) in a pending January 31, 2014, WGA arbitration. Declaration of Charles M. Coate ("Coate Dec.") ¶1. Further, counsel for Petitioner made a written request on January 13, 2014, that opposing counsel immediately withdraw from the joint representation of the WGA and Callaham/Jittery Dog. (Coate Dec. ¶2; **Exhibit "H"**). However, on January 15, 2014, opposing counsel indicated that they will not voluntarily withdraw as counsel for WGA and Callaham/Jittery Dog. (Coate Dec. ¶3; **Exhibit "I"**).

## IV.  FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Parties

Petitioner is a motion picture production company located in Los Angeles. *See* Verified Petition ¶3. In turn, the WGA is a labor union composed of writers who write content for television shows and motion pictures. The WGA performs and functions as a "quasi-judicial" body and organization. The WGA controls

important economic interests and has attained a quasi-public stature in that it is a professional society of motion picture writers in the State of California. Verified Petition ¶8.

One of its members is David E. Callaham ("Callaham").  Mr. Callaham's loan-out company is Jittery Dog Productions, Inc. ("Jittery Dog). (Petition ¶6). Mr. Callaham is  a writer with some experience in the motion picture industry and he primarily writes comic book and science fiction screenplays.  See Declaration of Trevor Short ("Short Dec.") ¶2 and **Exhibit "A"** attached to the Verified Petition).

Sylvester Stallone ("Stallone") is also a member of the WGA.  Besides being a world-famous actor, Stallone is also a well-regarded writer. Indeed, Stallone has approximately twenty-seven writing credits on various motion picture projects and has an Oscar nomination for "best writing and screenplay" for the motion picture *Rocky*. (Verified Petition ¶13).

This dispute results from Callaham's wrongful and fraudulent conduct during and after a 2009 WGA arbitration concerning the determination of screen writing credits for the motion picture *The Expendables*. As set forth below, Callaham engaged in fraudulent conduct during that 2009 arbitration and the subterfuge he committed back in 2009 continues to damage Petitioner to this day.

**B.     The WGA Rules & Its Credit Determination Process**

Because of the fraud committed by Callaham on the WGA tribunal during

the 2009 screen writing credit arbitration as alleged below, the WGA should investigate and discipline Callaham according to its own rules.

WGA working rule ¶1 states, in part that "A VIOLATION [BY A MEMBER] OF ANY WORKING RULE SHALL BE CONSIDERED GROUNDS FOR DISCIPLINARY ACTION." WGA Working Rule ¶2 states that each "member shall comply with these Rules in spirit as well as in letter." WGA Working Rule ¶15 states that no **"member shall accept credit which misrepresents the member's contribution to a picture or program."** WGA Working Rule ¶16 states, *inter alia*, that "members shall cooperate fully with the Guild Credits Committee **in order that all credits shall properly reflect the writer's contribution to the final script**."  (Verified Petition ¶16; *see also* Short Dec. ¶3 **Exhibit "B"**)

The WGA's "primary duty is to represent our members in negotiations with film and television producers to ensure the rights of screen, television, and new media writers." Furthermore, according to its website, the WGA is "responsible for determining writing credits for feature films, television, and new media programs — a responsibility with far-reaching impact, financial and artistic. Writers' livelihoods often depend on the careful and objective determination of credits." (Verified Petition ¶17; see also Short Dec. ¶4).  According to the WGA's website, if an author writes "original material under Guild jurisdiction, the Guild's

collective bargaining agreement provides you certain additional rights known as Separated Rights. The rights are quite important . . ." (Verified Petition ¶18; *see also* Short Dec. ¶4).

According to the Preface for the WGA's "Screen Credits Manual," the "administration of an accurate and equitable system of determining credits is therefore one of the most important services the Guild performs for writers. . ." (Verified Petition ¶19; **Exhibit "C"**; *see also* Short Dec. ¶5).  The Preface to the Screen Credits Manual further explains that the "Guild is asked more than one hundred and fifty times a year to assist in the resolution of controversies between writers over their credits. Arduous and unpleasant as this chore sometimes is, the Guild undertakes it willingly . . . **to ensure the validity of credit records** on which the professional status of writers depends." (Verified Petition ¶10).

The Preface then goes on to state that the "guiding principle of this system of credit determination is that the **writing credits should be a true and accurate** statement of authorship as determined by the rules of this Manual. . .   The importance of credits demands that writers give the process for determining credits **the closest scrutiny**." (Verified Petition ¶21; *see also* Short Dec. ¶5).  Paragraph 4 of the WGA's Screen Credits Manual states that all "participating writers are obligated to cooperate with the Guild . . . in every way required to render a fair and timely decision." (Verified Petition ¶22; *see also* Short Dec. ¶5).

The WGA provides for an appellate mechanism concerning credit determination arbitrations.  However, that mechanism contains very strict time limits and very limited grounds for an appeal.  In this case, the WGA's appellate mechanism does not provide a remedy in a situation such as the present one (*i.e.* where a prevailing writer such as Callaham/Jittery Dog later produces documents years later indicating that the prevailing writer actually committed fraud on the tribunal during the WGA credit determination arbitration). (Verified Petition ¶23).

> More specifically, ¶7 of the WGA Screen Credits Manual states that within  "twenty-four hours of the initial notification of the Arbitration Committee's decision, any of the participating writers may request an internal Guild appeal to a Policy Review Board. . . The function of the Policy Review Board is to determine whether or not, in the course of the credit determination, there has been any serious deviation from the policy of the Guild or the procedure as set forth in this Manual. . . Only the following are grounds for a participant's appeal to a Policy Review Board: (a) Dereliction of duty on the part of the Arbitration Committee or any of its members; (b)  The use of undue influence upon the Arbitration Committee or any of its members; (c) The misinterpretation, misapplication or **violation of Guild policy**; or (d) Availability of important literary or source material, for valid reasons not previously available to the Arbitration Committee. . ."

The Policy Review Board hearing must be held and its decision rendered within the 21 business days allowed for the arbitration under the provisions of the Minimum Basic Agreement." (Verified Petition ¶24l *see also* Short Dec. ¶5).

In this case, as alleged above, Callaham and/or Jittery Dog violated numerous WGA rules, including the WGA's Working Rule ¶15 which states that no "member shall accept credit which misrepresents the member's contribution to

a picture or program." (Verified Petition ¶25; *see also* Short Dec. ¶6).  However, Petitioner only discovered Callaham and/or Jittery Dog's fraudulent conduct years later in 2013 long after the WGA's stated twenty-one day period to appeal referenced above expired. (Verified Petition ¶26; *see also* Short Dec. ¶7).

### C. The August 2009 WGA Screen Credit Arbitration Re: *The Expendables* & Callaham's Misrepresentations

Petitioner was involved in the development and production of the motion picture *The Expendables*, starring Stallone as well as other notable action stars including Jet Li, Jason Statham, Arnold Schwarzenegger and Bruce Willis. (Verified Petition ¶27; *see also* Short Dec. ¶8).

Petitioner is informed and believes that Stallone was primarily responsible for writing the script for *The Expendables*. Petitioner is informed and believes that while Stallone was writing the script, he reviewed Callaham's script entitled *Barrow* and based part of the story for *The Expendables* on *Barrow*. Petitioner is informed and believes that while he was writing *The Expendables*, Stallone believed that Callaham might receive a shared "Story By" credit for *The Expendables* along with Stallone, but that Stallone should be credited solely with a "Screenplay By" credit. (Verified Petition ¶28; *see also* Short Dec. ¶9).

Mr. Callaham was paid $250,000 for writing services concerning *Barrow* pursuant to a "Blind Commitment Agreement" originally signed with Warner Bros. (*see* Verified Petition ¶29; *see also* Short Dec. ¶10).

Stallone was not only a writer for *The Expendables* but also a production executive and a director of that motion picture. Accordingly, because Stallone was also a production executive, the WGA rules provide for an automatic arbitration concerning screen writing credits under these circumstances. This screen writing credit arbitration took place in or about August-September 2009. (Verified Petition ¶30; *see also* Short Dec. ¶11).

During that 2009 arbitration, Callaham represented that he was entitled to sole "Written By" credit for *The Expendables*. In other words, upon information and belief, Callaham contended that he alone wrote the screenplay for *The Expendables*. As set forth below, these representations and Callaham's position were patently false and confirmed by Callaham's own written words and disclosures that came to light years thereafter. (Verified Petition ¶31; *see also* Short Dec. ¶12).

Nevertheless, on or about September 22, 2009, the WGA issued its screen writing credit determination. Callaham essentially prevailed and Callaham received a sole "Story By" credit and received the first position in a "Screenplay By" credit that he would share with Stallone with respect to *The Expendables*. (Verified Petition ¶32; *see also* Short Dec. ¶13). However, long after Callaham "prevailed" with the WGA screen credit arbitration, several August 2009 emails written by Callaham surfaced. These emails (which Petitioner is informed and believes were

not shared by Callaham with the 2009 WGA screen writing credit arbitration tribunal) reflect that Callaham in direct violation of WGA Rules accepted credits which misrepresented his contribution to *The Expendables,* and in effect committed fraud on the WGA tribunal.  (Verified Petition ¶33).

For example, in one August 17, 2009, email, Callaham claims that the script for *The Expendables* "IS FUCKING AWFUL. . . I am ASTOUNDED at how bad this is. **I want you to know that it's nothing like what I wrote."** (emphasis added) (Verified Petition ¶34 **Exhibit "D"**; *see also* Short Dec. ¶15).

On August 18, 2009, Callaham wrote another email to Kyle Harimoto and Dave Kalstein, stating the following:  "Put it this way: the idea and very loose structure [of *The Expendables*] is mine. Everything else . . . I plead the fifth.  Or, to put it another way, if I get sole credit like I am asking for . . . it would be A MIRACLE."  This email certainly reflects Callaham's belief about the merits of the position he advanced before the WGA  in 2009. (Verified Petition ¶35; **Exhibit "E"**; *see also* Short Dec. ¶16).

Petitioner believes that Callaham intentionally withheld these material emails, and concealed the limited extent of his contributions to *The Expendables* from the WGA screen writing credit arbitration panel in 2009 and instead continued to assert before the arbitral tribunal his patently false assertion that he was entitled to sole "Written By" credit for *The Expendables*. (Verified Petition

¶36; *see also* Short Dec. ¶17).

Callaham's false representations (*i.e.* that he wrote most of the shooting script for *The Expendables*) damaged Petitioner who justifiably were forced to rely upon on those false representations and pay Callaham/Jittery Dog a "writing credit bonus" of $102,250 as a result of the 2009 WGA screen credit arbitration based upon Callaham's falsehoods. If Petitioner had been aware of the falsity of the above misrepresentations of material fact, or omissions of material fact, then Petitioner would not have acted in the manner that it acted. (Verified Petition ¶37; *see also* Short Dec. ¶18).

Callaham's withholding of material information from the 2009 WGA screen writing credit arbitration panel ultimately unjustly enriched Callaham/Jittery Dog: because Callaham (improperly) received a shared "Screenplay By" credit for *The Expendables*. Furthermore, based on Callaham's false representations and material omissions, Petitioner paid Callaham a credit bonus of over $102,250. This amount should be returned by Callaham/Jittery Dog to Petitioner. (Verified Petition ¶38; *see also* Short Dec. ¶19).

### D.     The Sequels & The Pending 2013 WGA Arbitration

*The Expendables* was released in the United States on or about August 13, 2010, and was a popular motion picture with general public.   (Verified Petition ¶39; *see also* Short Dec. ¶20).

Petitioner was then involved in developing and producing a sequel called *Expendables 2*, which was released in the United States on or about August 17, 2012. *The Expendables 2* was also a popular motion picture with general public. (Verified Petition ¶40; *see also* Short Dec. ¶21). Because *Expendables 2* was produced and released, WGA and Callaham/Jittery Dog have now taken the position that they are entitled to receive a "sequel payment" even though Callaham/Jittery Dog did not contribute any writing service for *Expendables 2*. (Verified Petition ¶41; **Exhibit "F"**)

In this 2013 arbitration before the WGA Arbitration Panel, the WGA and Callaham/Jittery Dog have taken the position that Callaham/Jittery Dog have "separated rights" in *The Expendables*. Accordingly, based on this theory, they claim that Callaham/Jittery Dog is owed the principal amount of $175,000 as a "sequel payment" because of *Expendables 2*, along with interest.[2] As of July 25, 2013, the WGA and Callaham/Jittery Dog contend they are owed in excess of $234,800 as a "sequel payment." (Verified Petition ¶42; *see also* Short Dec. ¶23).

**E.    Procedural Status**

Petitioner requested that the January 31, 2014, WGA Arbitration be continued and/or vacated. However, on January 8, 2014, the assigned arbitrator (Paul Crost, Esq.) denied this request, and the WGA Arbitration is scheduled to

take place on January 31, 2014. Coate Dec. ¶4; **Exhibit "G."**    Thereafter,
Petitioner requested that opposing counsel voluntarily withdraw from representing
both the WGA and Callaham/Jittery Dog. However, opposing counsel refused to
do so on January 15, 2014. (Coate Dec. ¶2-3; **Exhibits "H" – "I"**).

## V.    OPPOSING COUNSEL SHOULD BE DISQUALIFIED FROM REPRESENTING BOTH THE WGA AND CALLAHAM/JITTERY DOG

### A.    California Law Governs

Federal courts apply state law in determining matters of disqualification. *In re County of Los Angeles*, 223 F.3d 990, 995 (2000). "Under the Erie doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 426, 116 S. Ct. 2211, 135 L. Ed. 2d 659.

The Central District of California requires attorneys to "comply with the standards of professional conduct required of members of the State Bar of California and contained in the State Bar Act the rules of Professional Conduct of the State Bar of California, and the decisions of any court applicable thereto." Central District Local Rule 83-3.1.2. The Central District rule "adopt[s]" such California "statutes, rules and decisions." *Id*. California law, therefore, governs the issues raised in this application/motion.

---

[2] *Expendables 3* is currently in production and is expected to be released in August

Under California law, a "judge's authority to disqualify an attorney has its origins in the inherent power of every court in the furtherance of justice to control the conduct of ministerial officers and other persons in pending judicial proceedings." *Neal v. Health Net, Inc.*, 100 Cal.App.4th 831, 840 (2002). "The power is frequently exercised on a showing that disqualification is required under professional standards governing avoidance of conflicts of interest or potential adverse use of confidential information." *Responsible Citizens v. Superior Court*, 16 Cal.App.4th 1717, 1723-1724 (1993).

Motions to disqualify[3] are very fact and circumstance specific, and the "paramount concern" is the preservation of the public's trust in the scrupulous administration of justice and the integrity of the bar. *Lopez v. Banuelos*, 2013 U.S. Dist. LEXIS 127656 *20, c*iting to People ex rel. Dept. of Corporations v. SpeeDee Oil Change*, 20 Cal. 4th 1135,1144 (1999).

**B.     Under California Law, An Attorney Cannot Represent Parties Whose Interests Are Adverse.**

It is axiomatic that under California law, an attorney should not attempt to represent parties whose interests are adverse. *Estate of Briggs*, 139 Cal App 2d

---

2014. (Verified Petition ¶43; *see also* Short Dec. ¶24).

[3] Motions to disqualify are not about punishing guilty parties. *Kirk v. First American Title Ins. Co*., 183 Cal. App. 4th 776, 815 (2010). The purpose of a disqualification order is prophylactic, not punitive. *Id*., *citing to Gregori v. Bank of America*, 207 Cal.App.3d 291, 308–30 (1989) [the issue is whether there is a genuine likelihood that allowing the attorney to remain on the case will affect the outcome of the proceedings before the court.]

802, 806 (1956).  Where there is duty of loyalty to different clients, it is impossible for attorney to advise either one as to disputed claim against other. *Dettamanti v. Lompoc Union School Dist*. 143 Cal App 2d 715, 723 (1956).

Disqualification rules are primarily about "preserv[ing] public trust in the scrupulous administration of justice and the integrity of the bar." *People ex rel. Dept. of Corporations v. SpeeDee Oil Change*, 20 Cal.4th 1135, 1145 (1999). The duty of loyalty an attorney owes to a client is the principle underlying the rule that the attorney cannot undertake a representation that is directly adverse to an existing client (Prof Conduct Rule 3-310). Where an attorney's potentially conflicting representations are simultaneous, the primary value at stake is the attorney's duty, and the client's legitimate expectation, of loyalty. *Brooklyn Navy Yard Cogeneration Partners v. Superior Court*, 60 Cal.App. 4th 248 (1997); *see also People v. Johnson* 105 Cal.App.3d 884 (1980) [it undeniably would be improper for a district attorney to prosecute a client or a former client, without that client's consent, for a crime relating to a matter in reference to which he has obtained confidential information by reason of or in the course of his employment by such client or former client.]

Each attorney who is a member of the California State Bar has a duty to preserve client confidences (Business & Professions Code, § 6068(e); California

20

State Bar Rules of Prof. Conduct, rule 3-100) and to avoid interests that are adverse to the client's interests (Rules of Prof. Conduct, rules 3-300, 3-310).[4]

"The primary value at stake in cases of simultaneous or dual representation is the attorney's duty-and the client's legitimate expectation-of loyalty, rather than confidentiality." *Flatt v. Superior Court* (1994) 9 Cal.4th 275, 284. "The principle of loyalty is for the client's benefit . . . " *Id.* at 286, fn. 4.

A "[c]onflict of interest between jointly represented clients occurs whenever their common lawyer's representation of the one is rendered less effective by reason of his representation of the other." *Spindle v. Chubb/Pacific Indemnity Group* 89 Cal.App.3d 706, 713 (1979).

---

[4] "Conflicts of interest commonly arise in one of two factual contexts: (1) in cases of successive representation, where an attorney seeks to represent a client with interests that are potentially adverse to a former client of the attorney; and (2) in cases of simultaneous representation, where an attorney seeks to represent in a single action multiple parties with potentially adverse interests." *In re Charlisse C.*, supra, 45 Cal. 4th 145, 159 (2008). "Two ethical duties are entwined in any attorney-client relationship. First is the attorney's duty of confidentiality, which fosters full and open communication between client and counsel, based on the client's understanding that the attorney is statutorily obligated . . .  to maintain the client's confidences.  [*SpeeDee* 20 Cal.4th at p. 1146 . . . .] The second is the attorney's duty of undivided loyalty to the client. *Flatt v. Superior Court* (1994) 9 Cal.4th 275, 282 . . . . These ethical duties are mandated by the California Rules of Professional Conduct. (Rules Prof. Conduct, rule 3-310(C) & (E).)" *City and County of San Francisco v. Cobra Solutions, Inc.* (2006) 38 Cal.4th 839, 846.

Rule 3-310(C) of the Rules of Professional Conduct prohibits attorneys from accepting or continuing concurrent representation of clients whose interests actually conflict, absent the "informed written consent" of each client.[5]

"[T]he purpose of the rules against representing conflicting interests is not only to prevent dishonest conduct, but also to avoid placing the honest practitioner in a position where he may be required to choose between conflicting duties or attempt to reconcile conflicting interests. [Citations.]" *Woods v. Superior Court* 149 Cal.App.3d 931, 936 (1983))  The official discussion following Rule 3-310 of the Rules of Professional Conduct recognizes that "[t]here are some matters in which the conflicts are such that written consent may not suffice for non-disciplinary purposes." *See also Woods v. Superior Court* 149 Cal.App.3d 931, 936 (1983); *Klemm v. Superior Court* 75 Cal.App.3d 893, 898-899 (1977); *Ishmael v.*

---

[5] Rule 3-310(C) of the Rules of Professional Conduct states in pertinent part: "A member shall not, without the informed written consent of each client: [¶] (1) Accept representation of more than one client in a matter in which the interests of the clients potentially conflict; or [¶] (2) Accept or continue representation of more than one client in a matter in which the interests of the clients actually conflict . . . " (Italics added.) "Subparagraphs (C)(1) and (C)(2) [of Rule 3-310] are intended to apply to all types of legal employment, including the concurrent representation of multiple parties in litigation . . . In such situations, for the sake of convenience or economy, the parties may well prefer to employ a single counsel, but a member must disclose the potential adverse aspects of such multiple representation [citation] and must obtain the informed written consent of the clients thereto pursuant to subparagraph (C)(1). Moreover, if the potential adversity should become actual, the member must obtain the further informed written consent of the clients pursuant to subparagraph (C)(2)." (Discussion foll. Rules Prof. Conduct, rule 3-310.)

*Millington* 241 Cal.App.2d 520, 527-528 (1966).   A court observed in *Klemm v.*
*Superior Court* (1977) 75 Cal.App.3d 893, 898: "Though an informed consent be
obtained, no case we have been able to find sanctions dual representation of
conflicting interests if that representation is in conjunction with a trial or hearing
where there is an actual, present, existing conflict and the discharge of duty to one
client conflicts with the duty to another. [Citations.]"

### C.   Application Of The Facts To This Case Prohibits Opposing Counsel From Representing Both The WGA and Callaham/Jittery Dog.

The facts in this case establish that Mr. Callaham engaged in wrongful and
fraudulent conduct during a 2009 WGA screen credit arbitration pertaining to *The*
*Expendables*. Mr. Callaham violated numerous WGA rules, including the WGA's
Working Rule ¶15 which states that no "member shall accept credit which
misrepresents the member's contribution to a picture or program." During that
2009 screen credit arbitration, Mr. Callaham affirmatively claimed and
misrepresented to the tribunal that he was entitled to sole "Written By" credit for
*The Expendables*.  Mr. Callaham represented that he alone wrote the screenplay for
*The Expendables*.  However, those representations were patently false and
confirmed by Mr. Callaham's own written words and disclosures that came to light
years later. For example, in one August 17, 2009, email, Mr. Callaham claims that
the script for *The Expendables* "IS F*#KING AWFUL. . . I am ASTOUNDED at

how bad this is. I want you to know that it's nothing like what I wrote." On August 18, 2009, Mr. Callaham wrote another email stating the following:  "Put it this way: the idea and very loose structure [of *The Expendables*] is mine. Everything else . . . I plead the fifth.  Or, to put it another way, if I get sole credit like I am asking for . . . it would be A MIRACLE." Both of those emails are attached as exhibits to the verified petition.

Nevertheless, despite his own stated belief that he was not entitled to certain screen writing credits, Mr. Callaham largely "prevailed" in the 2009 WGA screen credit arbitration and is now asserting in a corresponding arbitration that he is now entitled to certain sequel payments for *The Expendables 2* based on the 2009 WGA screen credit arbitration.

There are certain conflicts of interest that may not be waived by counsel. These situation are   presented here by opposing counsel's improper dual representation are described below.

**Inability to provide competent representation.** This first category should not be surprising. Current Rule 3-110 of the Rules of Professional Conduct requires lawyers to deliver legal services competently. If a lawyer were unable to provide legal services competently to a client *as a result of* conflicting duties to another client, the lawyer should not be permitted even to seek consent from the former.  *Compare* Rule 3-400 ("Limiting Liability to a Client"), which provides in

part that a lawyer shall not "(A) Contract with a client prospectively limiting the member's liability to the client for the member's professional malpractice." A lawyer should not be able to circumvent the prohibitions in Rule 3-400 through a conflict waiver. *Klemm v. Superior Court,* 75 Cal. App. 3d 893 (1977) is the leading case for this proposition. The Court in *Klemm* noted "As a matter of law a purported consent to dual representation of litigants with adverse interests at a contested hearing would be neither intelligent nor informed. Such representation would be per se inconsistent with the adversary position of an attorney in litigation, and common sense dictates that it would be unthinkable to permit an attorney to assume a position at a trial or hearing where he could not advocate the interests of one client without adversely injuring those of the other." *Id.* at 899.

Although the *Klemm* Court's concern with the undivided loyalty owed each client is evident, the infirmity in representing adverse interests in such situations is best characterized as rendering the lawyer incapable of providing competent representation to both. *See also Gilbert v. National Corporation for Housing Partnerships*, 71 Cal. App. 4th 1240, 1254 (1999); L.A. County Bar Assn. Ethics Op. 471 (12/21/92). Such would be the case here. The duties of one joint defendant under the CBA, the WGA, of investigating whether one of its members has committed fraud on the WGA itself, cannot be reconciled with defending the

second joint defendant of the fraud in the first instance co-extensively. Accordingly, opposing counsel should withdraw from this joint representation.

**Advancing adverse interests before a tribunal.** This prohibited conflict concerns the representation of adverse interests in a matter before a tribunal. In an adversarial system whose integrity and effectiveness largely depends on parties being represented by loyal advocates similarly knowledgeable and skilled, permitting the same lawyer to advance directly adverse positions in a contested matter before a tribunal would be, in *Klemm*'s words, "unthinkable." *Klemm at* 899. For example, in *Woods v. Superior Court*, 149 Cal. App. 3d 931 (1983) a lawyer represented a corporation owned by a husband and wife that was the subject of dispute in their marital dissolution. The lawyer, however, also represented the husband in the marital dissolution. The court concluded that even if the wife had not disclosed confidential information to the lawyer material to the marital dissolution, by virtue of the lawyer representing the wife's interests in the family corporation, she continued to be the lawyer's client to whom the lawyer owed a duty of loyalty. The court noted conflict rules are intended "not only to prevent dishonest conduct, but also to avoid placing the honest practitioner in a position where he may be required to choose between conflicting duties or attempt to reconcile conflicting interests." *Id*. at 936.

Similarly, in *Forrest v. Baeza*, 58 Cal. App. 4th 65 (1997) the court held in a shareholder derivative suit a lawyer may not represent both a closely held corporation and the directors/shareholders accused of wrongdoing. It would not be possible for the lawyer to obtain informed consent to representing both interests. The court reasoned that "where the only shareholders of the corporations are also the directors involved in the controversy, to allow the shareholders to consent on behalf of the corporation would render [the rule] meaningless." *Id.* at 76.

Here, it is impossible for one jointly represented defendant, the WGA to simultaneously implement and carry out its mandatory obligations under the CBA to investigate whether its member (*i.e.* Callaham) defrauded the WGA and the other writer (*i.e.* Stallone) during the credit arbitration proceeding.  It is impossible for one jointly represented party (*i.e.* WGA) to discipline its jointly represented party (*i.e.* Callaham) if the other jointly represented party (*i.e.* WGA's) requisite investigation so warrants, and simultaneously defend Callaham of the fraud charges themselves coextensively. It is not only the first jointly represented party (i.e. WGA) who is harmed by this improper dual representation, but also the second jointly represented party (i.e. Callaham/Jittery Dog) who was a party to the credit proceeding as well as Petitioner, who as a producer is forced to rely upon WGA credit determinations and by responding to subsequent payment demands based on corresponding separated rights payment claims which follow as a result

of an arbitral hearing that was permeated by the fraud of one of the WGA's members.

**Inability to provide adequate disclosure.** Lastly, another ground of category of unwaivable conflict by opposing counsel goes to the very foundation underlying an effective conflict waiver - that a client who has received adequate disclosure concerning conflicts can make an informed decision whether to permit the conflicted representation. Under current Rule 3-310(A)(2), "informed written consent" means "the client's or former client's written agreement to the representation following written *disclosure*." Under 3-310(A)(1), "disclosure" means "informing the client or former client of the relevant circumstances and of the actual and reasonably foreseeable adverse consequences to the client or former client." Thus, whether a client's consent is "informed" depends on the quality of the disclosure. What constitutes adequate disclosure in turn depends on the specific facts and circumstances.   See e.g. L.A. County Bar Assn. Ethics Op. 471 (12/21/92), pp. 6-9.

It should be apparent that if a lawyer is precluded from providing a second client with sufficient disclosure because another client has prohibited the lawyer from disclosing to the first client information the first client needs to make an informed decision, the first client cannot give informed consent. Although we are not privy to what if any disclosure was provided to or obtained from Mr. Callaham

in connection with your respective offices' joint retention, we cannot fathom any circumstances under which it could possibly comply with Rule 3-310(A)(2).

## VI.    CONCLUSION

Based upon the foregoing, it is respectfully requested that the instant application and motion for an Order disqualifying and barring Kathy S. Christovich and Leila B. Azari as well as Anthony S. Segall of Rothner, Segall and Greenstone from representing the Writers Guild of America, West, Inc. ("WGA"), on the one hand, and David E. Callaham ("Callaham") and Jittery Dog Productions, Inc. ("Jittery Dog"), on the other hand should be granted in its entirety.

.

Dated:  January 21, 2014                     Respectfully submitted,

COSTA ABRAMS & COATE LLP

By:    /s/ Charles M. Coate
_____
Charles M. Coate
Attorney for Petitioner

29

## <u>DECLARATION OF TREVOR SHORT</u>

I, TREVOR SHORT, hereby declare as follows:

1.      I am an officer and authorized representative of Petitioner Double Life Productions, Inc. ("Petitioner"). The matters set forth herein are true and correct and of my own personal knowledge, and if called upon to testify to these matters, I could and would do so competently.

2.      I am informed and believe that David E. Callaham ("Callaham") is a writer with some minor experience in the motion picture industry and that he primarily writes comic book and science fiction screenplays. Attached hereto as **Exhibit "A"** is a printout from IMDB PRO listing Callaham's experience in the motion picture industry.  I am further informed and believe that Callaham's "loan out company" is Jittery Dog Productions, Inc. ("Jittery Dog").

3.      The Writers Guild of America, West, Inc. ("WGA") working rule ¶1 states, in part that "A VIOLATION [BY A MEMBER] OF ANY WORKING RULE SHALL BE CONSIDERED GROUNDS FOR DISCIPLINARY ACTION." WGA Working Rule ¶2 states that each "member shall comply with these Rules in spirit as well as in letter." WGA Working Rule ¶15 states that no "member shall accept credit which misrepresents the member's contribution to a picture or program." WGA Working Rule ¶16 states, *inter alia*, that "members shall cooperate fully with the Guild Credits Committee in order that all credits shall

properly reflect the writer's contribution to the final script."  Attached hereto as **Exhibit "B"** and incorporated herein is a copy of the WGA's "Code of Working Rules."

4.     According to its website, the WGA's "primary duty is to represent our members in negotiations with film and television producers to ensure the rights of screen, television, and new media writers." Furthermore, according to its website, the WGA is "responsible for determining writing credits for feature films, television, and new media programs — a responsibility with far-reaching impact, financial and artistic. Writers' livelihoods often depend on the careful and objective determination of credits."   According to the WGA's website, if an author writes "original material under Guild jurisdiction, the Guild's collective bargaining agreement provides you certain additional rights known as Separated Rights. The rights are quite important . . ."

5.     According to the Preface for the WGA's "Screen Credits Manual," the "administration of an accurate and equitable system of determining credits is therefore one of the most important services the Guild performs for writers. . ."  A copy of the WGA's "Screen Credits Manual" is attached hereto as **Exhibit "C."**

The WGA provides for an appellate mechanism concerning credit determination arbitrations.  However, that mechanism contains very strict time limits and very limited grounds for an appeal.  In this case, the WGA's appellate

mechanism does not provide a remedy in a situation such as the present one (*i.e.* where a prevailing writer such as Callaham/Jittery Dog later produces documents years later indicating that the prevailing writer actually committed fraud during the WGA credit determination arbitration).

6.    In this case, I am informed and believe that Callaham and/or Jittery Dog violated various WGA rules, including the WGA's Working Rule ¶15 which states that no "member shall accept credit which misrepresents the member's contribution to a picture or program."

7.    However, as discussed in greater detail herein, Petitioner only discovered Callaham and/or Jittery Dog's fraudulent conduct years later in 2013 after the WGA's stated twenty-one day period to appeal referenced above expired.

8.    Petitioner is one of the producers of the motion picture *The Expendables*, starring Sylvester Stallone ("Stallone") as well as other notable action stars including Jet Li, Jason Statham, Arnold Schwarzenegger and Bruce Willis.

9.    I am informed and believe that Stallone was primarily responsible for writing the script for *The Expendables*. I am further informed and believe that while Stallone was writing the script, he reviewed Callaham's script entitled *Barrow* and based part of the story for *The Expendables* on *Barrow*. I am informed and believe that while he was writing *The Expendables*, Stallone believed that

Callaham should receive a shared "Story By" credit for *The Expendables* along with Stallone, but that Stallone should be credited solely with a "Screenplay By" credit.

10.   I am informed and believe that Callaham was paid $250,000 by Warner Bros. for his writing services concerning *Barrow*.

11.   Stallone was not only a writer for *The Expendables* but also a production executive and a director of that motion picture.  Accordingly, because Stallone was also a production executive, I am informed and believe that the WGA rules provide for an automatic arbitration concerning screen writing credits under these circumstances. I am informed that this screen writing credit arbitration took place in or about August-September 2009.

12.   During that 2009 arbitration, I am informed and believe that Callaham contended that he was entitled to sole "Written By" credit for *The Expendables*.  In other words, upon information and belief, Callaham contended that he alone wrote the screenplay for *The Expendables*. As set forth below, these allegations and Callaham's position appear to be patently false and confirmed by Callaham's own written words and disclosures that came to light years thereafter.

13.   Nevertheless, on or about September 22, 2009, I am informed and believe that the WGA issued its screen writing credit determination. Callaham largely prevailed and Callaham received a sole "Story By" credit and received the

first position in a "Screenplay By" credit that he would share with Stallone with respect to *The Expendables*.

14.   However, after Callaham largely prevailed with the WGA screen credit arbitration, several August 2009 emails written by Callaham surfaced. These emails (which I am informed and believe was not shared by Callaham with the 2009 WGA screen writing credit arbitration tribunal) reflect that Callaham committed fraud on the WGA tribunal.

15.   For instance, in one August 17, 2009, email, Callaham claims that the script for *The Expendables* "IS FUCKING AWFUL. . . I am ASTOUNDED at how bad this is. **I want you to know that it's nothing like what I wrote.**" (emphasis added) Attached hereto as **Exhibit "D"** is a true and correct printout of Callaham's August 17, 2009, email that he wrote to Dave Kalstein and Kyle Harimoto confirming this.

16.   On August 18, 2009, Callaham wrote another email to Kyle Harimoto and Dave Kalstein, stating the following:  "Put it this way: the idea and very loose structure [of *The Expendables*] is mine. Everything else . . . I plead the fifth.  Or, to put it another way, if I get sole credit like I am asking for . . . it would be A MIRACLE." Attached hereto as **Exhibit "E"** is a true and correct printout of Callaham's August 18, 2009, email reflecting Callaham's belief about the merits of the position he advanced before the WGA.

17.    I am informed and believe that Callaham intentionally withheld these material emails from the WGA screen writing credit arbitration panel in 2009 and instead continued with his patently false assertion that he was entitled to sole "Written By" credit for *The Expendables*.

18.    Callaham's false representations (*i.e.* that he wrote most of the shooting script for *The Expendables*) damaged Petitioner who justifiably relied on those false representations and paid Callaham/Jittery Dog a "writing credit bonus" of over $102,250 after Callaham largely prevailed in the 2009 WGA screen credit arbitration. If Petitioner had been aware of the falsity of the above misrepresentations of material fact, or omissions of material fact, then Petitioner would not have acted in the manner that it acted.

19.    Callaham's withholding of material information from the 2009 WGA screen writing credit arbitration panel ultimately unjustly enriched Callaham/Jittery Dog: because Callaham (improperly) received a shared "Screenplay By" credit for *The Expendables*. Furthermore, based on Callaham's false representations and material omissions, Petitioner paid Callaham a credit bonus of over $102,250. This amount should be returned by Callaham/Jittery Dog to Petitioner.

20.    *The Expendables* was released in the United States on or about August 13, 2010, and I believe it was a popular motion picture with general public.

21.    Petitioner was then involved in producing a sequel called *Expendables 2*, which was released in the United States on or about August 17, 2012.  *The Expendables 2* was also apparently a popular motion picture with general public.

22.    Because *Expendables 2* was produced and released, WGA and Callaham/Jittery Dog have now taken the position that they are entitled to receive a "sequel payment" even though Callaham/Jittery Dog did not contribute any writing service for *Expendables 2*. A true and correct copy of the May 2013 "Notice of Claim" filed by the Respondent WGA against the Petitioner and others is attached hereto as **Exhibit "F."**

23.    In this 2013 arbitration, the WGA and Callaham/Jittery Dog have taken the position that Callaham/Jittery Dog have "separated rights" in *The Expendables*.  Accordingly, based on this theory, the WGA and Callaham/Jittery Dog have taken the position that Petitioner and others owe Callaham/Jittery Dog the principal amount of $175,000 as a "sequel payment" because of *Expendables 2*, along with interest.  As of July 25, 2013, the WGA and Callaham/Jittery Dog contend they are owed in excess of $234,800 as a "sequel payment."

24.    *Expendables 3* is currently in production and is expected to be released in August 2014.

25.    Petitioner has been damaged by the conduct of the WGA and Callaham/Jittery Dog in that Petitioner wrongfully paid over $102,250 to

Callaham/Jittery Dog with respect to *The Expendables*. Petitioner has been further damaged by being forced to incur attorney fees and costs in defending itself in the 2013 arbitration brought by the WGA on behalf of Callaham/Jittery Dog with respect to the *Expendables 2*.

26.    The WGA has been informed of Callaham/Jittery Dog's fraudulent conduct with respect to the 2009 screen credit writing arbitration; however, I do not believe that the WGA has initiated an investigation or disciplined Callaham.


I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and was executed on this ⅗( day of January __, 2014, at Los Angeles, California.

_____

Trevor Short

## DECLARATION OF CHARLES M. COATE

I, Charles M. Coate, hereby declare as follows:

I am an attorney duly licensed to practice in the Courts of the State of California, the United States Supreme Court, the United States Court of Appeals for the Ninth Circuit and the Central District of California. I am a member of Costa, Abrams & Coate, LLP, counsel of record for Petitioner Double Life Productions, Inc. ("Petitioner"). I have personal knowledge of the facts set forth herein, except as to those stated on information and belief and, as to those, I am informed and believe them to be true. If called as a witness, I could and would competently testify to the matters stated herein. I submit this declaration in support of Petitioner's ex parte application for an Order disqualifying opposing counsel from representing the interests of the respondent Writers Guild of America, West, Inc. ("WGA") and real parties in interest David E. Callaham ("Callaham") and Jittery Dog Productions, Inc. ("Jittery Dog").

1.      I discussed the substance of this *ex parte* application with opposing counsel during a teleconference that took place on January 8, 2014 before the assigned arbitrator (Paul Crost, Esq.) in a pending January 31, 2014, WGA arbitration.  Specifically I indicated to opposing counsel (Katherine S. Christovich, Esq.) that opposing counsel's joint representation of the WGA and Callaham/Jittery Dog presents an actual conflict of interest that cannot be waived. I

requested that opposing counsel immediately withdraw from such joint representation. Ms. Christovich indicated that they would not do so.

2.     After the arbitrator (Paul Crost, Esq.) denied Petitioner's request for a brief stay and/or continuance of the pending January 31, 2014, arbitration, I sent a letter to opposing counsel on January 13, 2014, requesting that they immediately withdraw from the joint representation of the WGA and Callaham/Jittery Dog. Attached hereto as **Exhibit "H"** is a true and correct copy of the letter that I sent to opposing counsel (Katherine S. Christovich, Esq. and Anthony R. Segall, Esq.)

3.     However, on January 15, 2014, opposing counsel (Anthony R. Segall, Esq.) wrote back and indicated that opposing counsel will not voluntarily withdraw from representing both the  WGA and Callaham/Jittery Dog. Attached hereto as **Exhibit "I"** is a true and correct copy of the letter that I received from Mr. Segall confirming this.

4.     Attached hereto as **Exhibit "G"** is a true and correct copy of an Order from Mr. Crost denying reflecting his denial of Petitioner's request to continue and/or stay the pending WGA Arbitration, which remains scheduled for January 31, 2014. Mr. Crost signed this order (prepared by the WGA) approximately ten (10) minutes after receiving it from WGA's counsel by email, without giving Petitioner's counsel time to review or file objections thereto.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and was executed on this 21ST day of January  2014, at Santa Monica, California.


/s/ Charles M. Coate

_____

CHARLES M. COATE

# Dave Callaham

Main Details  Filmography  Personal Details  Media  Contact  Clients/Coworkers  ✐ Edit Info

**Main Details**
STARmeter
**Filmography**
Summary
Year
Profession
Title Type
TV Series
Credited Name
Genre
Keyword
Budget
Box Office
Ratings
Votes
**Personal Details**
Biography
Quotes
Trivia
Other Works
Awards
Message Board
**Media**
Photo Gallery
Official Photos
Publicity
News Articles
Twitter
Blog
Web Sites
**Contact**
Clients/Coworkers
by STARmeter
by Company
by Relationship

| | |
|---|---|
| **Talent Agent:** | United Talent Agency (UTA) - Jason Burns  more » |
| | Beverly Hills, CA:<br>UTA Plaza<br>9336 Civic Center Drive<br>Beverly Hills, CA 90210<br>USA |
| **Profession:** | Writer / Producer |
| **Known for:** | The Expendables / Doom / The Expendables 2 |
| **Also Known As:** | Dave Callaham / David Callaham  more » |
| **Born:** | 24 October 1977, USA (age 35)  more » |
| **Height:** | 6' 7" (2.01 m) |
| **Industry News:** | 'Godzilla' Ready to Roar at Comic-Con as Legendary Promotes Its Next Creature Feature (From Variety - Film News. 15 July 2013, 12:43 PM, PDT)<br>Comic-Con 2013 schedule: All the best movie events (From EW.com - Inside Movies. 7 July 2013, 2:00 PM, PDT) |
| **News:**<br>(426 articles) | First Look @ New "Godzilla" (From SneakPeek. 8 October 2013, 11:47 PM, PDT)<br>2nd Godzilla Trailer Has Leaked! (From ComicBookMovie. 8 October 2013, 10:20 PM, PDT)<br>Watch the Godzilla Comic-Con trailer (From Flickeringmyth. 5 October 2013, 11:54 AM, PDT)<br>See the Godzilla Comic-Con Teaser Trailer While You Can! (From Dread Central. 4 October 2013, 12:00 PM, PDT) |

**STARmeter™**



Current rank:
**16,733**
Click graph for more detail

☐ Photo Gallery
☐ Official Photos

**Filmography** sorted by: [ Production Status ▾ ] [Go]

↳ Jump to: Future Films  Past Films & Videos  Add IMDb Resume

| Projects In Development (2 titles) | Year | MOVIE Meter | Status | | |
|---|---|---|---|---|---|
| The Bulletcatchers - *Writer* | ???? | 445,739 | Unknown | | |
| Untitled McG Sci-Fi/Adventure Project - *Writer* (screenplay) | ???? | 427,671 | Script | | |

| Films In Production (2 titles) | Year | MOVIE Meter | Status | Budge |
|---|---|---|---|---|
| The Expendables 3 - *Writer* (characters) | 2014 | 189 | Filming | |
| Godzilla - *Writer* (screenplay) | 2014 | 74 | Post-production | |

| Past Films & Videos (6 titles) | Year | MOVIE Meter | Budget | Opening Weekend | US Bo: Office |
|---|---|---|---|---|---|
| The Expendables 2 - *Writer* (characters) (as David Callaham) | 2012 | 491 | $92M | $28.6M | $85! |
| The Expendables - *Writer* (screenplay) (as David Callaham) (story) (as David Callaham) | 2010 | 851 | $80M | $34.8M | $103! |
| Tell Tale - *Writer* (screenplay) (as David Callaham), *Executive Producer* | 2009 | 11,502 | $12M | | |
| Horsemen - *Writer* (written by) (as David Callaham) | 2009 | 6,106 | $20M | | |
| Doom - *Writer* (screenplay) (as David Callaham) (story) (as David Callaham) | 2005 | 3,174 | $60M | $15.5M | $28! |
| David Callaham: Writer Reel (short) - *Writer* | 2004 | 322,936 | $300 | | |

[update]  You may report errors and omissions on this page to the IMDb database managers. They will be examined and if approved will be included in a future update. Clicking the 'Edit page' button will take you through a step-by-step process.



EXHIBIT
*A*

(The following Code of Working Rules applies to Associate, Current and Post-Current members.)

# Code of Working Rules

## OPERATING

1. Under the Constitution, the Guild may, from time to time, adopt Working Rules, as set forth below, governing the working relationship of members with employers, agents and others with whom writers have professional dealings in connection with writing services and literary properties. Any proposed working rule must be approved by the Board of Directors before submission to the membership for approval but shall not be effective or operative if, in the discretion of the Board of Directors, it is contrary to the provisions of the Constitution or causes a breach of any contract entered into by the Guild. A VIOLATION OF ANY WORKING RULE SHALL BE CONSIDERED GROUNDS FOR DISCIPLINARY ACTION.

2. Each member shall comply with these Rules in spirit as well as in letter.

## EMPLOYMENT

3.

   (a) All agreements and contracts between writers and producers must be in writing.

   (b) Each member must promptly file with the Guild office a copy of his/her contract of employment (whether such agreement provides for leasing of material, participation in profits, residuals or otherwise) in no case later than one week after the receipt of the contract. *In addition to any other disciplinary action which may be deemed proper, an automatic fine shall be levied upon a member who fails to file his/her contract within two weeks after written notice that there is no contract on record.*

4. No member shall do any work, including reviewing stock film before the commencement of a definite assignment under contract.

5. Each member shall comply with the terms of the Minimum Basic Agreements in spirit as well as in letter, and shall not accept any employment, sign any contract or make any agreement for employment which violates such Minimum Basic Agreements.

6. No member shall contract for employment with any producer under terms less favorable than those set forth in the applicable Minimum Basic Agreements.

Violation of this rule shall subject the member to disciplinary action and a fine of up to $2,000, or on flat deals where the amount of money involved exceeds $2,000, a fine of not more than 100% of the amount received for such writing.



NOTE: If you are working at the minimum on any assignment, check with the Guild office for further particulars as to the applicable provisions of the Minimum Basic Agreements.

7. No member shall make or enter into any contract or participate in any venture requiring the writing of any literary material by such writer whereby writer's initial compensation for the writing of such material shall be less than the minimum set forth in the applicable MBAs except with the specific written approval of the Guild, which approval may be granted only under unusual circumstances. In the case of joint ventures or other similar engagements or deals involving participation in profits, a waiver may be granted only where the writer's participation is substantial.

8. No member shall accept employment with, nor option or sell literary material to, any person, firm or corporation who is not signatory to the applicable MBAs.

Violation of this Rule shall automatically subject the member to a fine, the maximum amount of which shall not exceed 100% of the remuneration received from such non-signatory.

9. It shall be the responsibility of every member to report, in confidence to the Guild office, for appropriate action, any violation or abuses of the terms and working standards established by the current Minimum Basic Agreements and Code of Working Rules, including any "offers" of employment which violate the current Minimum Basic Agreements.

10. No member may enter into a contract for the rendition of writing services with any producer whose name is contained in the then current Guild unfair list unless such producer shall have first posted a bond with the Guild guaranteeing the full amount of the writer's proposed compensation pursuant to such contract.

Violation of this Rule shall automatically subject the member to a fine, the maximum amount of which may not exceed 100% of his/her remuneration pursuant to such contract and the minimum amount of which shall be $250 or the applicable minimum, whichever is lower.

11. No member shall participate in any arrangement for ghost writing.

Violation of this Rule shall subject the member to disciplinary action and a fine of up to $2,000.

12. Each member upon being assigned under an employment contract is required to ascertain from the proper authorities in the production company the name or names of any other writers currently assigned to the same material. It will be the obligation of the member to notify the other writer or writers on the property of the fact that he/she has been assigned to it.

13. Each member shall report to the Guild any engagement as a producer, director or executive, or any activities which involve the hiring and firing of writers.

## SPECULATIVE WRITING

14. No member shall work for a producer on speculation or under any arrangement in which

43

payment is contingent on approval or ability to pay. Members may, however, discuss their thoughts and reactions regarding material owned by the producer; it is recommended, however, that in such cases the writer shall make a written memorandum of any suggestions made by him/her and register this material at the Guild office.

Violation of this Rule shall subject the member to disciplinary action and a fine of up to $2,000.

## CREDITS AND ARBITRATION

15. No member shall accept credit which misrepresents the member's contribution to a picture or program.

16. Members shall accept, abide by and contract for credit only in accordance with the terms and provisions of the applicable Minimum Basic Agreements; and members shall cooperate fully with the Guild Credits Committee in order that all credits shall properly reflect the writer's contribution to the final script.

17. Each member shall promptly report to the Guild all writing credits received on pictures or programs produced by non-signatory producers.

18. If a writer performing duties as a production executive intends to claim collaboration credit, he/she must, at the time he/she starts to work as a writer, signify such intention in writing to the Guild and to any other writer or writers assigned to the script. *Failure to comply will subject the member to disciplinary action.* In order to be entitled to credit, such production executive must be able to furnish the Guild with written material of his/her own, which can be identified as his/her contribution to the finished script.

## PSEUDONYM

19. A writer must use his/her own name in all writing credits unless he/she has already established a pseudonym or registers one at the Guild office *before commencement of employment* on a writing assignment, or *before disposition of any rights* to literary material on which he/she wishes to use such pseudonym.

## ORIGINAL STORIES, SERIES AND PROGRAM IDEAS, ORIGINAL RADIO, SCREEN AND TELEPLAYS

20. For the purposes only of these Rules, original stories, series and program ideas and original radio, screen and teleplays shall be defined as material which is the sole creation of the member or members and which is written by the member or members on his/her or their own time.

21. Each member shall promptly file with the Guild office a copy of his/her original story, series or program idea, and/or original radio, screen or teleplay sales or leasing contract, which filing shall in no event be later than one week after receipt of such contract.

NOTE: Members are strongly urged to register all literary material which they own with the Registration Service maintained at the Guild office prior to offering such material for sale or other exploitation. While such registration is not a substitute for the statutory copyright which must be obtained on publication of the work, it is extremely helpful if suit is brought for any copyright infringement or plagiarism of the material.

## ADVERTISING

22. The Writers Guild of America, West, Inc. has adopted and approved the agreement between the Screen Writers Guild and the consenting trade publications condemning the following practices as unfair:

   1. Slanting reviews on account of advertising, or retaliating against a writer for failure to advertise.

   2. Using pressure from a writer's employer to get advertising.

   3. Engaging in any harassing practices, such as making repeated solicitation, asking for chain advertising, or soliciting an advertisement in connection with a particular picture before the picture has been previewed (or a particular show or series before the program has been broadcast).

The consenting trade publications have instructed their staffs to refrain from engaging in any of the above practices.

Members should immediately notify the Guild of any violation of the Code of Fair Practices.

## AGENTS

23. No writer shall enter into a representation agreement whether oral or written, with any agent who has not entered into an agreement with the Guild covering minimum terms and conditions between agents and their writer clients.

## ADDRESSES

24. Each member shall inform the Guild of his/her residence address and agent and will immediately advise the Guild of any changes thereof.

A member whose address is outside the United States shall inform the Guild immediately upon his entry into the United States.

The Guild must be able to contact a member whenever necessary.

Revised: 5/21/68; 7/24/74; 9/24/86.

# Screen Credits Manual





**WRITERS GUILD OF AMERICA WEST**



**WRITERS GUILD of AMERICA EAST**

# Contents

*Effective for Notices of Tentative Writing Credits submitted on or after June 18, 2010.*

**PREFACE** ..................................................................iv

**I. WORKING PROCEDURES** ........................................ 1
  **A. Writer's Responsibility When Assigned** .................. 1
    1. Notify Other Writers on the Same Assignment .............. 1
    2. File Contract at Guild Office ................................... 1
    3. Keep a Copy of All Work Done ................................ 1
  **B. Collaboration: A Team of Writers** .......................... 2
  **C. Writing Independently of Prior Scripts** .................. 2

**II. CREDIT DETERMINATION PROCEDURE** .................... 4
  **A. Notice of Tentative Writing Credit** ...................... 4
  **B. What To Do Upon Receipt of Notice** ..................... 5
  **C. Agreement Among Writers** ................................. 6
  **D. Arbitration** .................................................... 7
    1. Selection of Arbiters ........................................... 7
    2. Screen Credits Consultants .................................... 8
    3. Anonymity of Arbiters and Consultants ..................... 8
    4. Rights and Responsibilities of Participants ................. 8
    5. Pre-Arbitration Hearing ....................................... 11
    6. Procedure of Arbitration Committee .......................... 11
    7. Appeals Before a Policy Review Board ...................... 13
    8. Notification .................................................... 14
    9. Guild Decision Final .......................................... 15

**III. GUILD POLICY ON CREDITS** ............................... 16
  **A. Definitions** .................................................. 16
    1. Writer ......................................................... 16

2. Literary Material ................................................................ 16

3. Source Material ................................................................. 16

4. Story .................................................................................17

5. Screen Story .....................................................................17

6. Screenplay .......................................................................17

7. "Written by" ..................................................................... 18

8. "Narration Written by" ...................................................... 18

9. "Based on Characters Created by" .................................... 18

10. "Adaptation by" .............................................................. 18

**B. Rules for Determining Credit ..............................................18**

1. "Written by" ..................................................................... 19

2. "Story by" ........................................................................ 19

3. "Screen Story by" ............................................................ 19

4. "Screenplay by" ............................................................... 19

5. "Adaptation by" ...............................................................22

6. Irreducible Story Minimum ..............................................22

7. No Other Credits Approved ..............................................22

**C. Production Executives ........................................................23**

1. Automatic Arbitration Provisions ..................................... 23

2. Notice Requirements ....................................................... 23

3. Percentage Requirements to Receive Screenplay
   Credit ............................................................................ 23

**D. Remakes ...........................................................................24**

**E. Withdrawal From Credit ......................................................24**

**F. Guild's Right to Protest ......................................................25**

**G. Order of Names ................................................................25**

**H. Pseudonyms ......................................................................25**

**I. Written Material Prevails .....................................................26**

**J. Revision of Script After Final Credit Determination ........26**

**K. Publicizing of Credits ........................................................27**

**L. Conclusion ........................................................................27**

iii

# Preface

A writer's position in the motion picture or television industry is determined largely by his/her credits. His/her professional status depends on the quality and number of the screenplays, teleplays, or stories which bear his/her name. Writing credit is given for the act of creation in writing for the screen. This includes the creation of plot, characters, dialogue, scenes and all the other elements which comprise a screenplay.

The administration of an accurate and equitable system of determining credits is therefore one of the most important services the Guild performs for writers, and it is to a better understanding of this important responsibility that this Manual is dedicated.

The Guild is asked more than one hundred and fifty times a year to assist in the resolution of controversies between writers over their credits. Arduous and unpleasant as this chore sometimes is, the Guild undertakes it willingly, not only to protect writers from embarrassing personal conflicts but also to ensure the validity of credit records on which the professional status of writers depends.

The guiding principle of this system of credit determination is that the writing credits should be a true and accurate statement of authorship as determined by the rules of this Manual. Fortunately, the written material provides a definite basis for credit determination, and the willingness of experienced writers to read this material carefully and weigh the contributions of the participants ensures a fair and impartial decision arrived at by qualified persons.

The importance of credits demands that writers give the process for determining credits the closest scrutiny. The rules and procedures set down here are based on:

1. the Guild's contractual obligations under the Minimum Basic Agreements; and

2. the Guild's own rules and regulations adopted by the membership, which are put into practice by writers.

iv

# I. Working Procedures

## A. WRITER'S RESPONSIBILITIES WHEN ASSIGNED

### 1. Notify other writers on the same assignment.

The Company is obligated, under the Minimum Basic Agreement, to notify a writer of all writers currently or previously employed by the Company on the same material. At the request of any participating writer, the Company will notify the writer in writing of the name(s) of any writer(s) employed subsequent to such writer.

The writer's responsibility begins at the moment the writer starts an assignment. A Guild Working Rule requires that the writer ascertain from the proper authorities in the production company the names of any other writers currently assigned to the same material. The writer also must notify any such writers of the fact that the writer has been assigned to the material.

### 2. File contract at Guild office.

Each member must promptly file with the Guild office a copy of his/her contract of employment, in no case later than one week after receipt of the contract.

### 3. Keep a copy of all work done.

For fair credit determination it is vital that the writer keep copies of all work done. To be considered in a credit arbitration, literary material must have been submitted by the writer to the Company upon completion of the work or upon purchase. All material should be properly dated and labeled. Copies of story or script suggestions constituting literary material should be kept and must also have been submitted to the Company in writing if the writer wants to claim credit for these contributions. A dated memorandum to the Company can place these suggestions on the record. Literary material submitted to the Company includes submis-

**1**

sion to individuals authorized by the Company to accept such materials.

## B. COLLABORATION: A TEAM OF WRITERS

A "team" of writers is defined as follows: Two writers who have been assigned at about the same time to the same material and who work together for approximately the same length of time on the material.

The Guild does and must presume that when two writers comply with the definition of a team and their names appear jointly on the work that is produced, the whole will be judged as a joint contribution unless a specific objection to this assumption is made at the time of the writing. Such objections should be made in writing to the Screen Credits Administrator and concurrently to the other writer. It is the Guild's position that a writer who chooses to question the validity of a collaboration should do so openly and frankly at the time the work is done and not several months later in the course of a dispute as to credits.

If a writer is employed to work as part of a team in collaboration with a writer also employed in an additional capacity, a collaboration agreement is required in order for the writer also employed in an additional capacity to claim co-authorship of the team's material. (See "Section III.C., Production Executives.")

When credit is accorded to a team of writers, an ampersand (&) shall be used between the writers' names in the credit to denote a writing team. Use of the word "and" between writers' names in a credit indicates that the writers did their work separately, one usually rewriting the other. This distinction is well established in the industry through custom and practice.

## C. WRITING INDEPENDENTLY OF PRIOR SCRIPTS

It has been the practice and the policy of arbiters in credit arbitrations to assume that a writer has access to prior literary material, an assumption based on the custom of the industry.

2

Although a writer may claim in all honesty not to have seen any prior literary material, and/or that the producer had asked the writer not to read any prior literary material; and/or that all copies of prior literary material had been made unavailable for any reason whatsoever, nevertheless, the arbiters must act on the basis that there is presumptive evidence that a writer did, in fact, have access, in spite of a writer's claim of "writing independently of prior scripts," if a significant similarity exists between a prior piece of literary material and a writer's later literary material. The arbiters must proceed on the basis that the similarities in themselves constitute presumptive evidence that there must have been some sort of access even if the literary material of the prior writer was only orally transmitted, as, for example, from a production executive to a later writer. It is also presumptive evidence that a production executive would relate in some manner or form, directly or inadvertently, formally or informally, significant contents of a prior piece of literary material which may or may not be incorporated in later literary material.

Therefore, it is the policy of the Guild that the written material will prevail, making the lack of or the existence of a significant similarity between the prior or later literary material the deciding factor. Because this presumption is irrebuttable, the claim of writing independently of prior literary material may not be considered by a Policy Review Board.

This section relates only to the presumption that subsequent writers have access to prior writers' literary material. Please see "Section III. Guild Policy on Credits" for contribution necessary to receive credit.

3

# II. Credit Determination Procedure

## A. NOTICE OF TENTATIVE WRITING CREDIT

Schedule A of our Minimum Basic Agreement provides that the Company will send to each participant, or to the current agent of a participating writer if that participant so elects, and to the Guild concurrently a Notice of Tentative Writing Credits ("Notice"). The Company also is required to provide each participating writer (or designated agent) a copy of the final shooting script (or if such script is not available, the latest revised script).

A participant is defined as a writer who has participated in the writing of the screenplay, or a writer who has been employed by the Company on the story and/or screenplay, or a "professional writer"[1] who has sold or licensed literary material subject to the Minimum Basic Agreement. In addition, in the case of a remake, any writer who received writing credit under any WGA Basic Agreement in connection with a prior produced version shall also be a participant. If a participating writer is deceased or unavailable to participate in the credit determination process, such writer may participate through an appropriate representative. As a participant, the writer shall be entitled to participate in the procedure for determination of writing credits.

Although it is the Company's responsibility to send the Notice properly in accordance with the MBA provisions, it is in the best interest of each participating writer to make sure the Guild and the Company always

---

1 The MBA generally defines a "professional writer" as a person who has received employment for a total of thirteen weeks as a television or theatrical motion picture writer; or received credit on the screen for a television or theatrical motion picture; or received credit for a professionally produced play or a published novel. A writer may also negotiate with a Company to be treated as a "professional writer" even if the writer would not otherwise qualify as a "professional writer" under the MBA.

**4**

have current address information to ensure proper and timely delivery. If a writer contractually designates an agent or other representative to receive Notices then the writer should periodically remind such representative to forward all Notices in a timely manner so important deadlines are not missed.

If a participating writer intends to be away from his/her residence, or for any other reason will not be able to receive materials at his/her customary mailing address, the writer should give prompt written notice to the Company to send the Notice of Tentative Writing Credits and the Final Shooting Script to a specified representative.

### B. WHAT TO DO UPON RECEIPT OF NOTICE

1. If the writer agrees with the tentative writing credits proposed by the Company, the writer does nothing, signifying acquiescence by failure to protest.

2. If after reading the final script, the writer wishes to discuss the credits with the other participating writers involved before deciding whether or not to protest the tentative writing credits, the writer may call the Guild and the Guild will make reasonable efforts to arrange for such discussion.

3. If after reading the final script the writer wishes to protest the tentative writing credits as proposed by the Company, the writer sends the following written protest both to the Company and to the Guild:

"HAVE READ FINAL SCRIPT AND HEREBY PROTEST TENTATIVE WRITING CREDITS ON (NAME OF PRODUCTION) AND CONSIDER CREDIT SHOULD BE _____ ."

Such written protest must be received by the Company and the Guild within the time specified at the bottom of the Notice of Tentative Writing Credits, but in no event shall this time be less than that specified in the Minimum Basic Agreement which states, "The Company will keep the final determination of screen credits open until a time specified in the notice by the Company, but such time will not be earlier than 6:00 p.m.

**5**

of the tenth business day following the next day after the dispatch of the notice above specified (12 business days); provided, however, that if in the good faith judgment of the Company there is an emergency requiring earlier determination and the Company so states in its notice, such time may be no earlier than 6:00 p.m. of the fifth business day following the next day after the dispatch of the notice above specified (7 business days)."

No writer should request credit or ask for an arbitration without first having read the final script.

4. In the case of an automatic arbitration, the Guild will be deemed to have made a written request for arbitration of credits at the time the Company submits the Notice of Tentative Writing Credits.

## C. AGREEMENT AMONG WRITERS

The Minimum Basic Agreement provides that, when more than one writer has participated in the writing of a motion picture, then all participants have the right to agree unanimously among themselves as to which of them shall receive writing credits on the screen and in what form, provided that the form agreed upon is in accordance with the terms of Theatrical Schedule A of the Minimum Basic Agreement, and provided the agreement is reached in advance of arbitration. The Minimum Basic Agreement also provides that the form of such credit shall not be suggested or directed by the Company.

Any participant may initiate a meeting or other discussion among all the writers who have contributed to try to reach such an agreement.

After a protest is received by the Guild, if there is an indication that agreement on the credits might be reached by the participants, the Screen Credits Administrator will make reasonable efforts to arrange a meeting or other discussion among the writers for this purpose. If no agreement is reached, credits shall be finally determined by arbitration.

**6**

## D. ARBITRATION

NOTE: The words "arbitration" and "arbiters" and their variants are used in this Manual in their broadest general, as opposed to technical, sense as implying an expeditious, fair and impartial means of resolving differences among writers as to their credits. There is no intended or implied connection with the more formalized arbitrations conducted in other forums, such as court-ordered arbitrations or union-management arbitrations. Use of the terms "arbitration" and its variants in this Manual does not contemplate that the credit determination procedures hereinafter set forth are to be construed as a form of statutory arbitration or as a grievance/arbitration mechanism such as the one contained in Articles 10 and 11 of the Minimum Basic Agreement.

No individual who serves as an arbiter, consultant, member of a Special Committee or Policy Review Board shall have an interest in the outcome of the credit determination.

### 1. Selection of Arbiters

Any controversy as to credits shall be determined by an Arbitration Committee consisting of three members of the Guild who shall be drawn from the Screen Arbiters List. The Screen Arbiters List includes writers who have been current members for at least five years or who have received three screen credits. At least two of the three arbiters on any Arbitration Committee shall have served on no less than two previous Arbitration Committees.

In setting up a Committee to serve in a particular arbitration, the Screen Credits Administrator shall submit to the participating writers a copy of the Screen Arbiters List. Each participating writer shall have the right to challenge peremptorily a reasonable number of the names on the Screen Arbiters List. The Screen Credits Administrator will select the Arbitration Committee from the names remaining on the list after all participating writers have had the opportunity to file a list of peremptory challenges.

7

Wherever possible, arbiters will be selected who are experienced in the type of writing involved in the particular arbitration. The members of the Committee so selected shall not be informed as to the name or identity of the other members of the Committee.

**2. Screen Credits Consultants**

One member of the Guild's Screen Credits Committee shall be designated by the Screen Credits Administrator to act as Consultant for each Arbitration Committee, and he/she shall be available to the members of that Arbitration Committee for information on policy, rules, precedent, and procedure during the arbitration period. It is his/her duty to aid the Committee toward a majority decision.

**3. Anonymity of Arbiters and Consultants**

As has always been Guild practice, the names of the arbiters and consultants selected remain anonymous and confidential. The Guild does not reveal the arbiters' or consultants' identities or any identifying information about them to the Company, the participating writers or anyone else outside the credit determination process. Arbiters and consultants volunteer their services in reliance upon the Guild's promise of anonymity.

**4. Rights and Responsibilities of Participants**

All participating writers are obligated to cooperate with the Guild, including the Screen Credits Administrator, Consultant, Arbitration Committee and Policy Review Board panel, in every way required to render a fair and timely decision.

**a. Verification of Materials**

The Minimum Basic Agreement requires the Company to submit three copies of all available material written by the participating writers as well as the available source material. Inasmuch as the final determination of credits is based on an analysis of this written material, the writer owes it to himself/herself to examine all literary material and source mate-

8

rial submitted to the Guild by the Company and to make certain that all material written by him/her has been submitted and such material is accurately attributed and dated. This may necessitate a trip to the Guild office to examine material.

Under provisions of the Minimum Basic Agreement, the Guild has the right to ask for a cutting continuity which will be provided by the Company if it is available at the time of the arbitration. For this reason, if a writer believes that the "final shooting script" does not accurately reflect what was shot during principal photography, he/she should request the Screen Credits Administrator to ask the Company to submit a cutting continuity. If the cutting continuity is submitted to the Arbitration Committee, it is not credited to any participating writer.

### b. Statement to the Arbitration Committee

While the Arbitration Committee bases its decision on literary material, including scripts, stories, treatments, etc., and source material, each participating writer is strongly urged to submit a written statement of his/her position to the Screen Credits Administrator to forward to the arbiters. It is suggested that the statement address the requirements to receive credit as set forth in this Manual, "Section III. Guild Policy on Credits." The statement may include breakdowns and illustrative comparisons between the final shooting script and earlier work or any other information which would help the Arbitration Committee to evaluate the writer's contribution to the final shooting script. It is the Guild's policy to preclude references to a writer's entitlement to contingent compensation tied to the receipt of credit on the screen. Participants shall not include such references in their statements. Participating writers also shall not include as part of their statements to the Arbitration Committee any letters of support from other individuals.

Statements should not contain information pertaining to the development process that is not germane to the arbiters' analysis of the literary

**9**

material. For example, the fact that a project was "greenlit" after a certain draft is irrelevant in determining credits. The Arbitration Committee must base its decision on each writer's relative contribution to the final shooting script, and not on the perceived quality of work or other extraneous factors. In addition, statements may not contain information irrelevant to the written work which may prejudice any writer in the process.

As the written statement is the participant's only opportunity to communicate his/her position to the arbiters, it is advised that the writer take due care in its preparation. There is no set form or required length. Because of the limitation of 21 business days for the arbitration, this statement must be delivered to the Guild within 24 hours after the writer has notice that there has been a protest. At the request of a participating writer, additional time to submit a statement may be granted by the Screen Credits Administrator within the time constraints for determination of credits. Such requests will not be unreasonably denied. A participant's failure to submit a statement in a timely fashion shall not preclude the Guild from proceeding with an arbitration with the statements then available to the Guild. If a participating writer submits a statement after the materials have been submitted to the Arbitration Committee, the Screen Credits Administrator will forward such statement to the Arbitration Committee, provided such statement is received prior to a decision of the Arbitration Committee.

As a matter of Guild policy, in each arbitration the participants' statements are held confidential by the Guild. They are not provided to other participants, the Company or anyone else outside the credit determination process.

### c. Anonymity of Writers

The names of all participating writers on the production shall not be revealed to the Arbitration Committee. Writers will be identified to the Arbitration Committee only as "Writer A," "Writer B," etc., such designa-

**10**

tions to reflect the order in which the participating writers wrote.

### 5. Pre-Arbitration Hearing

In the event that a dispute exists as to the authenticity, identification, sequence, authorship or completeness of any literary material to be considered in a credit arbitration, a Special Committee consisting of three members of the Screen Credits Committee shall conduct a hearing at which all participating writers may present testimony and documentary evidence. Such Special Committee is empowered to make a binding determination for purposes of submission of material to the arbiters. Following a decision of a credit Arbitration Committee, findings and/or conclusions of a Special Committee may be reviewed by a Policy Review Board to determine if there has been a misinterpretation, misapplication or violation of Guild policy.

### 6. Procedure of Arbitration Committee

The following information and material is sent to each member of the Arbitration Committee by the Screen Credits Administrator:

a. Writing credits as tentatively determined by the Company.

b. Statements submitted by participating writers.

c. A statement of the issues to be determined by the Committee and any other relevant information as formulated by the Screen Credits Administrator.

d. Literary material, including scripts, stories, treatments, etc., verified for inclusion in the credit arbitration and source material submitted by the Company, together with a list of the dates of the material in chronological order.

Each participating writer may choose to have submitted those verified literary materials he/she deems relevant to demonstrate his/her writing contribution to the final shooting script. Every draft need not be submitted. Each writer should review his/her material in order to make this

11

determination.

As has been the practice, where appropriate, only the final shooting script and not prior drafts will be submitted to the Arbitration Committee on behalf of the last participating writer.

The literary material submitted to the Arbitration Committee includes material written by participating writers who are not seeking writing credit. This is necessary so that the Arbitration Committee can separate out the contribution of a subsequent writer from that of a prior writer who is not seeking credit.

e. A copy of this Credits Manual.

f. Request for telephonic communication to the Screen Credits Administrator by each member of the Arbitration Committee, indicating each arbiter's determination of writing credit, with confirmation of this decision to follow in writing.

Each member of the Arbitration Committee reads all the material submitted independent of the other two arbiters and makes a decision based on the guidelines for determining credits. In determining relative contributions, the Arbitration Committee bases its determination on what material was actually used, not the Committee's personal preference of one script over another.

Upon reaching a decision, each member of the Arbitration Committee shall telephone it to both the Credit Arbitration Consultant and Screen Credits Administrator.

In the event the members of the Arbitration Committee are not in unanimous agreement, the Arbitration Committee and the Credit Arbitration Consultant will participate in a teleconference administered by the Screen Credits Administrator. The members of the Arbitration Committee will discuss their decisions in an effort to achieve a unanimous decision. During the teleconference, the members of the Arbitration Committee shall not be informed as to the name or identity of the other

12

members of the Committee.

If the Arbitration Committee is unable to reach a unanimous decision during the teleconference, the majority decision shall be deemed the decision of the Arbitration Committee. When the Arbitration Committee reaches a decision, each member of the Committee shall confirm his/her individual decision in writing with a summation of the reason therefor. The decision of the Arbitration Committee shall be accepted as final and communicated by the Screen Credits Administrator to all interested parties.

### 7. Appeals Before a Policy Review Board

Within twenty-four hours of the initial notification of the Arbitration Committee's decision, any of the participating writers may request an internal Guild appeal to a Policy Review Board, consisting of the Chair or Vice-Chair and any other two members of the Screen Credits Committee except the Consultant in the case. If the Chair or Vice-Chair are unavailable or otherwise unable to serve on a Policy Review Board, the Policy Review Board shall consist of three members of the Screen Credits Committee. No member of the Policy Review Board shall have an interest in the outcome of the credit determination.

The function of the Policy Review Board is to determine whether or not, in the course of the credit determination, there has been any serious deviation from the policy of the Guild or the procedure as set forth in this Manual.

The members of a Policy Review Board are not permitted to read the material involved for purposes of independently judging writers' contributions to the final shooting script, and the Policy Review Board is not empowered to reverse an Arbitration Committee in matters of judgment as to the participating writers' relative contributions to the final script.

Only the following are grounds for a participant's appeal to a Policy Review Board:

**13**

a. Dereliction of duty on the part of the Arbitration Committee or any of its members;

b. The use of undue influence upon the Arbitration Committee or any of its members;

c. The misinterpretation, misapplication or violation of Guild policy; or

d. Availability of important literary or source material, for valid reasons not previously available to the Arbitration Committee.

If a writer is considering requesting a Policy Review Board, the writer may request copies of the arbiters' written summaries of their decisions, which will be provided by the Guild without any indication of the arbiters' identities.

Prior to the Policy Review Board hearing, writers requesting such Policy Review Board should submit a written statement to the Policy Review Board setting forth the grounds upon which the Policy Review Board is being requested (i.e., items a., b., c. and/or d. listed above) and the basis for such claims in reasonable detail. It is not necessary to bring an attorney to the Policy Review Board as the hearing is informal, although writers are free to do so if they so choose.

In those cases where it is empowered to act, the Policy Review Board shall have the authority to direct the original Arbitration Committee to reconsider the case or to direct the Screen Credits Administrator to form a new Arbitration Committee.

The Policy Review Board hearing must be held and its decision rendered within the 21 business days allowed for the arbitration under the provisions of the Minimum Basic Agreement.

### 8. Notification

The Screen Credits Administrator shall write a letter to the Company and the participating writers notifying them of the final decision of the Arbitration Committee.

**14**

**9. Guild Decision Final**

Theatrical Schedule A provides:

"The decision of the Guild Arbitration Committee, and any Policy Review Board established by the Guild in connection therewith, with respect to writing credits, insofar as it is rendered within the limitations of this Schedule A, shall be final, and the Company will accept and follow the designation of screen credits contained in such decision and all writers shall be bound thereby."

"The decision of the Guild Arbitration Committee may be published in such media as the Guild may determine. No writer or Company shall be entitled to collect damages or shall be entitled to injunctive relief as a result of any decision of the Committee with regard to credits. In signing any contract incorporating by reference or otherwise all or part of this Basic Agreement, any writer or Company specifically waives all rights or claims against the Guild and/or its arbiters or any of them under the laws of libel or slander or otherwise with regard to proceedings before the Guild Arbitration Committee and any full and fair publication of the findings and/or decisions of such Committee. The Guild and any writer signing any contract incorporating by reference or otherwise or referring to this Schedule A, and any writer consenting to the procedure set forth in this Schedule A, shall not have any rights or claims of any nature against any Company growing out of or concerning any action of the Guild or its arbiters or any of them, or any determination of credits in the manner provided in this Schedule A, and all such rights or claims are hereby specifically waived."

15

# III. Guild Policy on Credits

## A. DEFINITIONS

### 1. Writer

The term "writer" is defined in the Minimum Basic Agreement. In general, the term "writer" means a person employed by a Company to write literary material or a person from whom a Company purchased literary material who at the time of purchase was a "professional writer," as defined in the Minimum Basic Agreement.

For purposes of credit, a team of writers, as defined in the Screen Credits Manual Section I.B., is considered as one writer.

If literary material covered under the Minimum Basic Agreement is written by one member of a team, separate and apart from the work of the team, such literary material shall be considered separate from the literary material by the team for purposes of assessing contributions to the final shooting script. Therefore, such individual is eligible to receive writing credit as an individual writer and/or as a member of a team.

### 2. Literary Material

Literary material is written material and shall include stories, adaptations, treatments, original treatments, scenarios, continuities, teleplays, screenplays, dialogue, scripts, sketches, plots, outlines, narrative synopses, routines, and narrations, and, for use in the production of television film, formats.

### 3. Source Material

Source material is all material, other than story as hereinafter defined, upon which the story and/or screenplay is based.

This means that source material is material assigned to the writer which was previously published or exploited and upon which the writer's work is to be based (e.g., a novel, a produced play or series of published arti-

**16**

cles), or any other material written outside of the Guild's jurisdiction (e.g., literary material purchased from a non-professional writer). Illustrative examples of source material credits are: "From a Play by", "From a Novel by", "Based upon a Story by", "From a series of articles by", "Based upon a Screenplay by" or other appropriate wording indicating the form in which such source material is acquired. Research material is not considered source material.

### 4. Story

The term "story" means all writing covered by the provisions of the Minimum Basic Agreement representing a contribution "distinct from screenplay and consisting of basic narrative, idea, theme or outline indicating character development and action."

It is appropriate to award a "Story by" credit when: 1) the story was written under employment under Guild jurisdiction; 2) the story was purchased by a signatory company from a professional writer, as defined in the Minimum Basic Agreement; or 3) when the screenplay is based upon a sequel story written under the Guild's jurisdiction. If the story is based upon source material of a story nature, see "screen story" below.

### 5. Screen Story

Credit for story authorship in the form "Screen Story by" is appropriate when the screenplay is based upon source material and a story, as those terms are defined above, and the story is substantially new or different from the source material.

### 6. Screenplay

A screenplay consists of individual scenes and full dialogue, together with such prior treatment, basic adaptation, continuity, scenario and dialogue as shall be used in, and represent substantial contributions to the final script.

A "Screenplay by" credit is appropriate when there is source material

**17**

of a story nature (with or without a "Screen Story" credit) or when the writer(s) entitled to "Story by" credit is different than the writer(s) entitled to "Screenplay by" credit.

### 7. "Written by"

The term "Written by" is used when the writer(s) is entitled to both the "Story by" credit and the "Screenplay by" credit.

This credit shall not be granted where there is source material of a story nature. However, biographical, newspaper and other factual sources may not necessarily deprive the writer of such credit.

### 8. "Narration Written by"

"Narration Written by" credit is appropriate where the major writing contribution to a motion picture is in the form of narration. The term "narration" means material (typically off-camera) to explain or relate sequence or action (excluding promos or trailers).

### 9. "Based on Characters Created by"

"Based on Characters Created by" is a writing credit given to the writer(s) entitled to separated rights in a theatrical or television motion picture on each theatrical sequel to such theatrical or television motion picture.

Where there are no separated rights, "Based on Characters Created by" may be accorded to the author of source material upon which a sequel is based.

### 10. "Adaptation by"

This credit is appropriate in certain unusual cases where a writer shapes the direction of screenplay construction without qualifying for "Screenplay by" credit. In those special cases, and only as a result of arbitration, the "Adaptation by" credit may be used.

### B. RULES FOR DETERMINING CREDIT

In determining relative contribution, the relevant factors shall be what

**18**

material was actually used, not the Arbitration Committee's personal preference of one script over another.

A team of writers shall be treated in all respects as a single writer.

### 1. "Written by"

(See Section III.A.7.)

### 2. "Story by"

(See Section III. A.4)

Story credit may not be shared by more than two writers.

A story may be written in story form or may be contained within other literary material, such as a treatment or a screenplay, for purposes of receiving a "Story by" credit.

### 3. "Screen Story by"

(See Section III. A.5)

Screen Story credit may not be shared by more than two writers.

If the writer is furnished source material but takes from it only a spring-board, a characterization, an incident or some equally limited contribution, creating a substantially new and different story from the source material, he/she may receive "Screen Story by" credit but only as the result of arbitration. In such cases, the author of the source material may be given credit that specifies the form in which such material was acquired -- for instance, "From a Play by," "From a Novel by," "From a Saturday Evening Post Story by," "From a Series of Articles by," "Based on a Story by," etc.

### 4. "Screenplay by"

(See Section III. A.6)

Screen credit for screenplay will not be shared by more than two writers, except that in unusual cases, and solely as the result of arbitration, the

**19**

names of three writers or the names of writers constituting two writing teams may be used. The limitation on the number of writers applies to all feature length photoplays except episodic pictures and revues.

### a. Percentage Requirements

Any writer whose work represents a contribution of more than 33% of a screenplay shall be entitled to screenplay credit, except where the screenplay is an original screenplay. In the case of an original screenplay, any subsequent writer or writing team must contribute 50% to the final screenplay.

### b. Original and Non-Original Screenplays

For purposes of determining "Screenplay by" credit only, two categories of screenplays are recognized:

(1) Original screenplays (i.e., those screenplays which are not based on source material and on which the first writer writes a screenplay without there being any other intervening literary material by another writer pertaining to the project).[2] If a writer is furnished or uses research material, the screenplay is still considered an original screenplay; and

(2) Non-original screenplays (i.e., screenplays based upon source material and all other screenplays not covered in (1) above, such as sequels).

### c. Additional Guidelines for the Arbiters in Determining Screenplay Credit

In each case, the arbiters read any source material and all literary material provided to them in connection with the development of the final screenplay in order to assess the contribution of each writer to the final shooting script.

---

*2 In the case where a team writes a story, and there is no source material, and one member of the team goes on to write a screenplay without there being any other intervening literary material by any other writer, the screenplay shall still be considered an "original screenplay."*

**20**

The percentage contribution made by writers to screenplay obviously cannot be determined by counting lines or even the number of pages to which a writer has contributed. Arbiters must take into consideration the following elements in determining whether a writer is entitled to screenplay credit:

- dramatic construction;

- original and different scenes;

- characterization or character relationships; and

- dialogue.

It is up to the arbiters to determine which of the above-listed elements are most important to the overall values of the final screenplay in each particular case. A writer may receive credit for a contribution to any or all of the above-listed elements. It is because of the need to understand contributions to the screenplay as a whole that professional expertise is required on the part of the arbiters. For example, there have been instances in which every line of dialogue has been changed and still the arbiters have found no significant change in the screenplay as a whole. On the other hand, there have been instances where far fewer changes in dialogue have made a significant contribution to the screenplay as a whole. In addition, a change in one portion of the script may be so significant that the entire screenplay is affected by it.

It is possible to consider the writer of a story or treatment as eligible for screenplay credit, but only in those cases where the story or treatment is written in great detail, to an extent far beyond the customary requirements for a story or treatment.

### d. Selection from Source Material

As a guideline for arbiters in cases involving a non-original screenplay based upon source material, it is a fundamental principle that selection

21

of **screenplay elements**[3] from the source material is a part of the creative process of writing the screenplay. Arbiters should give weight to any writer's original and unique utilization, choice, or arrangement of source material when it is present in the final shooting script, but not the employment of basic **story elements**[4] which any other writer may have also selected. (See screenplay elements - Section III. B. 4.c. See story elements - Section III.A.4.)

### 5. "Adaptation by"

(See Section III. A.10)

Because of the strong feeling against a multiplicity of credits, the Guild is opposed to the general use of the "Adaptation by" credit. However, the Guild recognizes that there are certain unusual cases where credit is due a writer who shapes the direction of screenplay construction without qualifying for "Screenplay by" credit. In those special cases, and only as a result of arbitration, the "Adaptation by" credit may be used.

### 6. Irreducible Story Minimum

In the case of an original screenplay, the first writer shall be entitled to no less than a shared story credit.

### 7. No Other Credits Approved

Any form of credit not expressly described in this Manual shall be used only upon receipt of a waiver from the Guild. Fewer names and fewer types of credit enhance the value of all credits and the dignity of all writers.

---

*3 Section III.B.4.c. of the Screen Credits Manual refers to screenplay elements as follows: dramatic construction; original and different scenes; characterization or character relationships; and dialogue.*

---

*4 The term "story" means all writing covered by the provisions of the Minimum Basic Agreement representing a contribution "distinct from screenplay and consisting of basic narrative, idea, theme or outline indicating character development and action." (See Section III.A.4.)*

**22**

## C. PRODUCTION EXECUTIVES

The term "production executives" includes individuals who receive credit as the director or in any producer capacity. The following rules govern writing credits of production executives who also perform writing services when there are other writers involved on the same project.

### 1. Automatic Arbitration Provisions

Schedule A of the Minimum Basic Agreement provides:

"Unless the story and/or screenplay writing is done entirely without any other writer, no designation of tentative story or screenplay credit to a production executive shall become final or effective unless approved by a credit arbitration as herein provided, in accordance with the Guild rules for determination of such credit."

### 2. Notice Requirements

If a production executive intends to claim credit as a team on any literary material with a writer(s) who is not a production executive, he/she must, at the time when such team writing begins, have signified such claim in writing to the Guild and to the writer(s) with whom he/she claims to have worked as a team. Failure to comply with the above will preclude such production executive from claiming co-authorship of the literary material in question, and such literary material shall be attributed to the other writer.

### 3. Percentage Requirements to Receive Screenplay Credit

At the time of the credit arbitration, the production executive or production executive team must assume the burden of proving that he/she/they had, in fact, worked on the script as a writer and had assumed full share of the writing. In the case of original screenplays, if the production executive or production executive team is the second writer he/she/they must have contributed more than 50% of the final script to receive screenplay credit. His/her/their contribution must consist of dramatic

**23**

construction; original and different scenes; characterization or character relationships; and dialogue.

As in all cases, decisions of Arbitration Committees are based upon literary material. Therefore, production executives, as well as other writers, should keep dated copies of all literary material written by them and submitted to the Company.

### D. REMAKES

In the case of remakes, any writer who has received writing credit under the Guild's jurisdiction in connection with a prior version of the motion picture is a participating writer on the remake. As such, those prior writers are entitled to participate in the credit determination process and are eligible to receive writing credit pursuant to the rules for determining writing credits. The final shooting script written by a prior writer(s) shall be considered literary material.

If under the "Rules for Determining Writing Credits" (Section III.B.) the Arbitration Committee determines that such prior writer(s) is not entitled to receive writing credit, the Arbitration Committee may, within its discretion, accord such prior writer(s) a credit in the nature of a source material credit, such as "Based on a Screenplay by...."

However, the rules do not preclude a prior writer(s) from receiving both writing credit and a credit in the nature of a source material credit at the discretion of the Arbitration Committee.

Remakes shall be considered non-original screenplays under Section III.B.4.b.(2) of this Manual.

### E. WITHDRAWAL FROM CREDIT

Prior to the time a credit question has been submitted to arbitration, a writer may withdraw from screen writing credit for personal cause, such as violation of his/her principles or mutilation of material he/she has written. If the other writer-contributors do not agree, the question shall be

**24**

referred to arbitration. The Arbitration Committee in such cases shall base its determination on whether there is such personal cause.

After screen credits have been determined by arbitration, a writer may not withdraw his/her name from screenplay credit. He/she may, however, by notification to the Guild, withdraw from any other form of credit.

Withdrawal from writing credit will result in loss of any and all rights accruing from receipt of writing credit. Use of a pseudonym rather than withdrawing from credit will not result in such a forfeiture. (See H. below.)

### F. GUILD'S RIGHT TO PROTEST

Pursuant to the provisions of the Minimum Basic Agreement the Guild has the right to protest credits proposed by the Company. The Guild may act irrespective of the wishes of any of the participating writers in order to ensure that the credit rules are properly applied.

### G. ORDER OF NAMES

The order of writers' names in a shared credit may be arbitrated. Generally, the most substantial contributor is entitled to first position credit. Where there is no agreement among the arbiters as to order of names, or where the Arbitration Committee determines that the credited writers' contribution is equal, then the Arbitration Committee shall order the writers' names chronologically.

### H. PSEUDONYMS

The Minimum Basic Agreement provides that any writer who is entitled to credit on the screen and who has been paid, or is guaranteed payment of, less than two hundred thousand dollars ($200,000) for writing services or literary materials relating to the particular motion picture shall have the right to be accorded credit on the screen, in advertising or otherwise, in a reasonable pseudonymous name. A writer must exercise this right within five (5) business days after final determination of writing credits. None of the writer's rights, including but not limited to compen-

**25**

sation of any kind, shall be affected by use of such pseudonym.

Before using a pseudonym a writer must register it with the Guild by sending a written notice to the Membership Department with the writer's Social Security number, if any. A pseudonym may not duplicate the name or pseudonym of another writer or the name of a public figure.

Subject to the terms of a fully-executed strike settlement agreement between a signatory company and the Guild, the Screen Credits Administrator shall be empowered to obtain the true name and identity of any writer listed by pseudonym on any Notice of Tentative Writing Credit submitted to the Guild. In the event that the Company or writer refuses to reveal the true identity of a writer listed by pseudonym on a Notice of Tentative Writing Credit on which the names of one or more other writers also appear, such writer listed by pseudonym shall not be entitled to receive writing credit, and credit shall be awarded to the other writers as the Arbitration Committee or the Screen Credits Administrator determines.

## I. WRITTEN MATERIAL PREVAILS

Decisions of Arbitration Committees are based upon literary material. Claims of authorship must be supported by literary material appropriate for submission to the Arbitration Committee. In the event of conflicting claims, literary material always prevails.

## J. REVISION OF SCRIPT AFTER FINAL CREDIT DETERMINATION

If, after screen credits are finally determined, material changes are made in the literary material, either the Company or a participant and the Guild jointly may reopen credit determination by making a claim within 48 hours after completion of the writing work claimed to justify the revision of credits; and in such case the procedure for the original determination of credits is followed.

26

## K. PUBLICIZING OF CREDITS

The Minimum Basic Agreement and Guild Working Rules provide that no writer shall claim credit for screen authorship on any motion picture prior to the time when the credits have been determined, and no writer shall claim credits contrary to such determination. In addition, the Guild believes that it is in the best interest of all writers that certain facts relating to any particular credit determination should remain confidential. For example, participating writers are asked to refrain from commenting in the press or media about issues related to pre-arbitration hearings, arbiters' written decisions or Policy Review Board hearings.

## L. CONCLUSION

These rules and procedures have been derived from the experience and practice of the past years. Although they remain the guiding policy by which credits are determined, they are not to be considered rigid or inflexible. The Guild has the discretion to depart from precedent when new conditions, new problems, or new methods of work may require an alteration of the rules or a new application of an existing rule to a unique set of facts and circumstances.

It is now accepted that administration of writers' credits belongs to the writers themselves. It is their responsibility to see to it that credits are administered wisely and well, that the written work product of participating writers is credited as accurately as possible, and that the overall result leads ultimately to a recognition of the importance of the writers' contribution to the screen.

27

| From: | Dave Callaham <Callaham@stingrza.com> |
| Sent: | Monday, August 17, 2009 3:44 PM |
| To: | Dave Kalstein <kalstein@mac.com>; Kyle Harimoto <kharimoto@sbcglobal.net> |
| Subject: | expendables |

HOLY SHIT THIS SCRIPT IS FUCKING AWFUL I feel really bad now for sending it to you guys. I am ASTOUNDED at how bad this is. I want you to know that it's nothing like what I wrote. Which I suppose at this point is both the good and bad news...

CONFIDENTIAL



EXHIBIT
D

DC00483_REV

| | |
|---|---|
| **From:** | Dave Callaham <callaham@stingrza.com> |
| **Sent:** | Tuesday, August 18, 2009 2:11 PM |
| **To:** | Kyle Harimoto <kharimoto@sbcglobal.net> |
| **Cc:** | Dave Kalstein <kalstein@mac.com> |
| **Subject:** | Re: Expendables |

if i say that in an email I may be incriminating myself Kyle.

Put it this way: the idea and very loose structure is mine.

Everything else...

I plead the fifth.

Or, to put it another way, if I get sole credit like I am asking for...

it would be A MIRACLE.

On Aug 18, 2009, at 11:06 AM, Kyle Harimoto wrote:

I read it last night. I have to know what in this script is yours and what is new?

CONFIDENTIAL



EXHIBIT
E
78

DC00497_REV

1  KATYA J. CULBERG
Associate Counsel
2  WRITERS GUILD OF AMERICA, WEST, INC.
7000 W. Third Street
3  Los Angeles, California 90048
(323) 782-4521
4  (323) 782-4806 (fax)
kculberg@wga.org
5

6  Counsel for Complainants

7

8          BEFORE THE WRITERS GUILD OF AMERICA, WEST, INC. - PRODUCERS

9                   ARBITRATION TRIBUNAL

10  In the Matter of the Arbitration between      NOTICE OF CLAIM
SUBMITTED TO
11  WRITERS GUILD OF AMERICA, WEST, INC. and JITTERY  ARBITRATION AND
DOG PRODUCTIONS, INC. f/s/o DAVID CALLAHAM,  CLAIM
12
              Complainants,
13
                                           CASE NO. 12-SR-004
vs.
14
  WARNER BROS., DOUBLE LIFE PRODUCTIONS, INC.,
15  MILLENNIUM FILMS, INC., NU IMAGE, ALTA VISTA
PRODUCTIONS, INC., ALTA VISTA FINANCING, LLC and
16  ALTA VISTA PRODUCTIONS, LLC,

17              Respondents,

18  Relating to sequel payments in connection with the theatrical
motion picture entitled "THE EXPENDABLES."
19

20  TO ALL PARTIES AND THEIR COUNSEL:

21      **PLEASE TAKE NOTICE** that Complainants WRITERS GUILD OF AMERICA, WEST,

22  INC. ("the Guild") and JITTERY DOG PRODUCTIONS, INC. f/s/o DAVID CALLAHAM

23  (collectively "Complainants") submit the above-captioned Claim to arbitration pursuant to Articles 10,

24  11 and 12 of the Writers Guild of America 2001-2011 Theatrical and Television Basic Agreements

25  (collectively "MBA").  Pursuant to Article 11.B.3. of the MBA, submission of this Claim to steps 1 and

26  2 of the grievance procedure is waived and/or not required.

27

28



1    We have ten (10) days from your receipt of this Notice to mutually agree upon an arbitrator.  If

2    we are unable to reach such an agreement within that time period, an arbitrator will be selected in

3    accord with the procedures of Article 11.C.2.

4    The WGAW requests production of the following information and documentation which is

5    relevant and necessary to the WGAW's ability to enforce the MBA:

6    (a)    Copies of any and all agreements entered into by or on behalf of Respondents Warner

7    Bros., Double Life Productions, Inc., Millennium Films, Inc., Nu Image, Alta Vista Productions, Inc.,

8    and Alta Vista Productions LLC (collectively "Respondents") for the acquisition, sale, purchase,

9    licensing, assignment, quitclaim, and/or other transfer of any or all rights in and to the literary material

10   written in connection with the theatrical motion picture entitled "The Expendables" ("Picture");

11   (b)    Copies of any and all documents, including but not limited to correspondence,

12   memoranda and/or e-mails, referring to or otherwise evidencing the existence and/or terms of any

13   agreements entered into by or on behalf Respondents for the sale, purchase, licensing, assignment,

14   quitclaim, and/or other transfer of any or all rights in and to the literary material written in connection

15   with the Picture;

16   (c)    An accounting of any and all gross and/or net receipts, costs, expenses and/or charges

17   received or paid by Respondents in connection with the sale, licensing, assignment, quitclaim,

18   assumption or transfer of rights in and to the literary material written in connection with the Picture;

19   and

20   (d)    Copies of any and all checks, drafts, and/or bank transfers, issued by Respondents in

21   payment for the sale, licensing, assignment, quitclaim, assumption or transfer of rights in and to the

22   literary material written in connection with the Picture.

23   The nature of the Claim referred to herein is as follows:

24   <u>CLAIM</u>

25   [Pertaining to all Counts]

26   1.    Respondent Warner Bros. is signatory to or otherwise bound by the terms of the MBA.

27   2.    Respondent Double Life Productions, Inc., ("Double Life") is signatory to or otherwise

28   bound by the terms of the MBA.

2

3.      At all times herein, Respondents Double Life Productions, Inc., Millennium Films, Inc., Nu Image and Alta Vista Productions, Inc. (collectively "the Double Life Companies"), were acting as the alter ego of one another and/or each was a joint employer of one another and/or assumed or were assigned the MBA obligations in connection with the Picture.

4.      During the term of the MBA, Respondent Warner Bros. entered into a Blind Commitment Agreement ("Agreement") with Jittery Dog Productions f/s/o David Callaham for Mr. Callaham to write an original screenplay in connection with the theatrical motion picture project "The Expendables." Mr. Callaham wrote and delivered an original screenplay (referred to in the Agreement as "Committed Material") and a rewrite (referred to in the Agreement as "First Optional Material") (collectively "Literary Material") and Respondent Warner Bros. paid Mr. Callaham initial compensation for these services in the amount of $250,000, all pursuant to the Agreement.

5.      During the term of the MBA, Alta Vista Productions, Inc., entered into a WGA Literary Material Assumption Agreement with Warner Bros. whereby the Alta Vista Productions, Inc., assumed all MBA obligations in connection with the Literary Material.

6.      During the term of the MBA, the Double Life Companies produced or caused to be produced the theatrical motion picture entitled "The Expendables" ("Picture").

7.      Respondents, and each of them, are therefore jointly and severally liable for any and all MBA obligations in connection with the Picture.

8.      The WGAW determined credits for the Picture. The final credit is:

Screenplay by David Callaham and Sylvester Stallone

Story by David Callaham

9.      David Callaham has separated rights in the Picture.

10.     Pursuant to the Agreement, Respondents Double Life paid Mr. Callaham a credit bonus in the amount of $100,000 because Mr. Callaham received a shared "Screenplay By" credit.

11.     During the term of the MBA, the Double Life Companies produced or caused to be produced a sequel to the Picture: the theatrical motion picture "The Expendables 2" ("the Sequel").

3

COUNT I

[Failure to Pay Theatrical Sequel Payment]

12.     Pursuant to the Agreement and the MBA, Mr. Callaham was to be paid "an Amount equal to 50% of the sums paid for the Committed Material, First Optional Material, Second Optional Material and either the sole or shared credit bonus, as applicable, payable upon commencement. . . ." if and when a theatrical motion picture sequel to the Picture was produced.

13.     Pursuant to Article 16.A.5.a. of the MBA and the Agreement, Respondents are required to pay Mr. Callaham compensation for the Sequel in the aggregate amount of $175,000.00, which is comprised of 50% of the sums paid for the Committed Material ($175,000), First Optional Material ($75,00) and the shared credit bonus ($100,000).

14.     The Guild is informed, believes and thereon alleges that no sequel payment was made to Mr. Callaham with respect to the Sequel.

15.     In breach of the MBA, Respondents have failed and continue to fail and refuse to pay Mr. Callaham the sequel payment due for the Sequel.

16.     Pursuant to Article 13.A.14. of the MBA, Respondents are required to pay interest on the payment owed for the Sequel at the rate of one and one-half percent (1.5%) per month, commencing to accrue when the payment was due, and continuing to accrue until paid in full.

COUNT II

[Failure to Deliver a Valid Written WGA Assumption Agreement]

17.     Pursuant to Articles 15, 51, 64 and 65 of the MBA, Respondents are required to obtain and deliver to the WGAW a valid written WGA assumption agreement in order to ensure a buyer's assumption of MBA obligations in connection with the Screenplay, Picture and Sequel, as applicable, including, but not limited to, the MBA obligations referenced in this Claim.

18.     In breach of the foregoing provisions of the MBA, Respondents have failed and refused, and continue to fail and refuse to deliver to the WGAW valid written assumption agreements in connection with the Screenplay, Picture and Sequel, as applicable.

19.     As a direct and proximate result of these substantial breaches of the MBA, Mr. Callaham has suffered, and unless Respondents are restrained, shall continue to suffer damage by the loss of

4

1  benefits conferred to him under the MBA in connection with Respondents' failure to obtain and file

2  assumption agreements.  The WGAW will present proof of the extent of damage at the hearing.

3         20.       As a further direct and proximate result of these breaches, the WGAW has suffered and,

4  unless Respondents are restrained, shall continue to suffer damage to its prestige and to the integrity of

5  the MBA.  The WGAW will present proof of the extent of damage at the hearing.

6                                             PRAYER FOR RELIEF

7         WHEREFORE, Complainants pray for issuance of an award as follows:

8         a.        An order requiring Respondents to pay Mr. Callaham, pursuant to the MBA and the

9  Agreement, the unpaid sequel payment in connection with the Picture in an amount according to proof

10  at the hearing in this matter, and interest thereon;

11        b.        An order requiring Respondents to pay damages to the Guild and Mr. Callaham for

12  Respondents' failure to deliver to the WGAW a valid, written WGA Assumption Agreement for each

13  sale or transfer of rights in and to the Picture;

14        c.        An order requiring Respondents to deliver to the WGAW a valid, written WGA

15  Assumption Agreement for each sale or transfer of rights in and to the Picture; and

16        d.        Such other and further relief as the Arbitrator deems just and proper.

17

18                                             WRITERS GUILD OF AMERICA, WEST, INC.

19

20  DATE: 5/14/13                    BY:

21                                             KATYA J. CULBERG
                                               Counsel for Complainants
22

23

24

25

26

27

28

                                                  5

Paul Crost
5318 East 2nd Street, Ste. 381
Long Beach, CA 90803
Tel:562 608 8433
Fax: 562 245 3623
Neutral Arbitrator

# BEFORE THE WRITERS GUILD OF AMERICA WEST, INC. – PRODUCERS ARBITRATION TRIBUNAL

| | |
|---|---|
| In the Matter of the Arbitration between | [PROPOSED] ORDER DENYING RESPONDENTS' REQUEST FOR CONTINUANCE OF JANUARY 31, 2014 ARBITRATION HEARING |
| WRITERS GUILD OF AMERICA, WEST, INC. and JITTERY DOG PRODUCTIONS, INC. f/s/o DAVID CALLAHAM, | |
| Complainants, | |
| vs. | |
| DOUBLE LIFE PRODUCTIONS, INC., MILLENNIUM FILMS, INC., NU IMAGE, ALTA VISTA PRODUCTIONS, INC., ALTA VISTA FINANCING, LLC and ALTA VISTA PRODUCTIONS, LLC, | |
| Respondents. | |
| Relating to sequel payments in connection with the theatrical motion picture entitled "THE EXPENDABLES." | |

The Arbitrator held a conference call on January 8, 2014 to address Respondents' request for a continuance of the arbitration hearing scheduled for January 31, 2014. During the call Respondents stated that the hearing should be continued until Respondents' two Los Angeles Superior Court actions filed on December 23, and 24, 2013, respectively, against Complainants had been adjudicated. Finding no good cause for the continuance, the Arbitrator denied the request. The January 31 hearing remains on calendar.

DATED: January 9, 2014

Paul Crost, Arbitrator

**EXHIBIT**
G

84

**costa abrams & coate llp** | trial & transactional attorneys
1221 Second Street, Third Floor, Santa Monica, California 90401
tel 310.576.6161 fax 310.576.6160
A limited liability partnership including professional corporations

January 13, 2014

**Via Email: kchristovich@wga.org**
Katherine S. Christovich, Esq.
WRITERS GUILD OF AMERICA, WEST
7000 West Third Street
Los Angeles, CA 90048

**Via Email: asegall@wga.org; asegall@rgslabor.com**
Anthony R. Segall, Esq.
Rothner, Segall & Greenstone
510 S. Marengo Ave.
Pasadena, CA 91101-3115

    Re:    **Double Life Productions, Inc. v. Writers Guild of America West, Inc, et al.**
           LASC Case No. BC531490/U.S.D.C. CV 14-0197 DMG (AJWx)

    Re:    **Nu Image, Inc., et al. v. David E. Callaham, et al.**
           LASC Case No. BC531490/U.S.D.C. CV 14-0199 RGK (JCx)

Dear Counsel:

We are writing to you regarding Plaintiffs' request that your offices immediately notify us of your withdrawal as joint counsel for Defendants. Both of your respective offices have had an opportunity to review the verified petition and its contents. The petition, which is replete with exhibits that cannot and have not been refuted by Defendants (e.g. your joint clients), and speak for themselves, directly call into question whether one of your jointly represented clients David Callaham committed fraud on another of your jointly represented clients, the Writer's Guild of America, West, Inc. Indeed, your offices do not dispute the contents of the emails written by Mr. Callaham. Similarly, it is conceded that Mr. Callaham did not share these emails with the WGA arbitral tribunal while his credit was being determined by it and that he claimed writing credit from the WGA tribunal that he himself did not believe he was entitled to as confirmed by his emails.

The facts establish that Mr. Callaham engaged in wrongful and fraudulent conduct during a 2009 WGA screen credit arbitration pertaining to *The Expendables*. Mr. Callaham violated numerous WGA rules, including the WGA's Working Rule ¶15 which states that no "member shall accept credit which misrepresents the member's contribution to a picture or program."

During that 2009 screen credit arbitration, Mr. Callaham affirmatively claimed and misrepresented to the tribunal that he was entitled to sole "Written By" credit for *The Expendables*. Mr. Callaham represented that he alone wrote the screenplay for *The Expendables*.

**EXHIBIT**
*H*

However, those representations were patently false and confirmed by Mr. Callaham's own written words and disclosures that came to light years later.

For example, in one August 17, 2009, email, Mr. Callaham claims that the script for *The Expendables* "IS F*#KING AWFUL. . . I am ASTOUNDED at how bad this is. I want you to know that it's nothing like what I wrote." On August 18, 2009, Mr. Callaham wrote another email stating the following: "Put it this way: the idea and very loose structure [of *The Expendables*] is mine. Everything else . . . I plead the fifth. Or, to put it another way, if I get sole credit like I am asking for . . . it would be A MIRACLE." Both of those emails are attached as exhibits to the verified petition.

Nevertheless, despite his own stated belief that he was not entitled to certain screen writing credits, Mr. Callaham largely "prevailed" in the 2009 WGA screen credit arbitration and is now asserting in a corresponding arbitration that he is now entitled to certain sequel payments for *The Expendables 2* based on the 2009 WGA screen credit arbitration.

Because Mr. Callaham intentionally withheld the aforementioned material emails from the arbitral tribunal, and concealed the limited extent of his contributions to *The Expendables* from the WGA screen writing credit arbitration panel in 2009 and instead continued to misrepresent before the arbitral tribunal that he was entitled to sole "Written By" credit for *The Expendables*, understandably our client does not believe that he should benefit by such conduct.

Our clients only discovered Mr. Callaham's fraudulent conduct years later, long after the WGA's stated twenty-one day period to appeal the credit determination expired. The pending writ of mandate seeks an order commanding the WGA to investigate Mr. Callaham for his fraudulent conduct and for his violations of the WGA rules and procedures. Alternatively, our client is seeking a writ of prohibition preventing the WGA from prosecuting an underlying arbitration. Finally, our client is seeking a writ of review or *certiorari* with respect to the 2009 WGA screen credit arbitration and for the WGA to temporarily desist from prosecuting an underling arbitration.

There are certain conflicts of interest that may not be waived by counsel. Situations giving rise to conflicts that may not be waived include 1) the lawyer is unable to provide competent representation to each client; 2) the representation is prohibited by law; 3) the representation involves assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; 4) the lawyer is precluded by duties to one client from making sufficient disclosure to the other, rendering the latter's informed consent unobtainable; 5) the client lacks capacity to give informed consent.[5] Certain situations presented here by your improper dual representation are described below.

**Inability to provide competent representation.** This first category should not be surprising. Current Rule 3-110 of the Rules of Professional Conduct requires lawyers to deliver legal services competently. If a lawyer were unable to provide legal services competently to a client *as a result of* conflicting duties to another client, the lawyer should not be permitted even to seek consent from the former. *Compare* Rule 3-400 ("Limiting Liability to a Client"), which provides in part that a lawyer shall not "(A) Contract with a client prospectively limiting the

member's liability to the client for the member's professional malpractice." A lawyer should not be able to circumvent the prohibitions in Rule 3-400 through a conflict waiver.

*Klemm v. Superior Court,* 75 Cal. App. 3d 893 (1977) is the leading case for this proposition. The Court in *Klemm* noted "As a matter of law a purported consent to dual representation of litigants with adverse interests at a contested hearing would be neither intelligent nor informed. Such representation would be per se inconsistent with the adversary position of an attorney in litigation, and common sense dictates that it would be unthinkable to permit an attorney to assume a position at a trial or hearing where he could not advocate the interests of one client without adversely injuring those of the other." (Id. at 899.)

Although the *Klemm* court's concern with the undivided loyalty owed each client is evident, the infirmity in representing adverse interests in such situations is best characterized as rendering the lawyer incapable of providing competent representation to both. *See also Gilbert v. National Corporation for Housing Partnerships,* 71 Cal. App. 4th 1240, 1254 (1999); L.A. County Bar Assn. Ethics Op. 471 (12/21/92). Such would be the case here. The duties of one joint defendant under the CBA, the WGA, of investigating whether one of its members has committed fraud on the WGA itself, cannot be reconciled with defending the second joint defendant of the fraud in the first instance co-extensively. Accordingly, your offices must withdraw from joint representation of these joint defendants forthwith.

**Advancing adverse interests before a tribunal.** This prohibited conflict concerns the representation of adverse interests in a matter before a tribunal. In an adversarial system whose integrity and effectiveness largely depends on parties being represented by loyal advocates similarly knowledgeable and skilled, permitting the same lawyer to advance directly adverse positions in a contested matter before a tribunal would be, in *Klemm*'s words, "unthinkable." (*Klemm. supra.* at 899.)

For example, in *Woods v. Superior Court,* 149 Cal. App. 3d 931 (1983) a lawyer represented a corporation owned by a husband and wife that was the subject of dispute in their marital dissolution. The lawyer, however, also represented the husband in the marital dissolution. The court concluded that even if the wife had not disclosed confidential information to the lawyer material to the marital dissolution, by virtue of the lawyer representing the wife's interests in the family corporation, she continued to be the lawyer's client to whom the lawyer owed a duty of loyalty. The court noted conflict rules are intended "not only to prevent dishonest conduct, but also to avoid placing the honest practitioner in a position where he may be required to choose between conflicting duties or attempt to reconcile conflicting interests." *Id.* at 936.

Similarly, in *Forrest v. Baeza,* 58 Cal. App. 4th 65 (1997) the court held in a shareholder derivative suit a lawyer may not represent both a closely held corporation and the directors/shareholders accused of wrongdoing. It would not be possible for the lawyer to obtain informed consent to representing both interests. The court reasoned that "where the only shareholders of the corporations are also the directors involved in the controversy, to allow the shareholders to consent on behalf of the corporation would render [the rule] meaningless." *Id.* at 76.

Here, it is impossible for one jointly represented defendant, the WGA to simultaneously implement and carry out its mandatory obligations under the CBA to investigate whether its member and second jointly represented defendant Mr. Callaham defrauded the WGA and the other writer during the credit arbitration proceeding. It is impossible for one jointly represented defendant, the WGA, to discipline its jointly represented defendant Callaham if the other jointly represented defendant, (WGA's) requisite investigation so warrants, and simultaneously defend Callaham of the fraud charges themselves coextensively. It is not only the first jointly represented defendant WGA who is harmed by this improper dual representation, but also the second jointly represented defendant, Mr. Callaham, the other writer who was a party to the credit proceeding as well as our clients, who as producers are forced to rely upon WGA credit determinations and by responding to subsequent payment demands based on corresponding separated rights payment claims which follow as a result of an arbitral hearing that was permeated by the fraud of one of the WGA's members.

**Inability to provide adequate disclosure.** Lastly, another ground of category of unwaivable conflict by your offices goes to the very foundation underlying an effective conflict waiver—that a client who has received adequate disclosure concerning conflicts can make an informed decision whether to permit the conflicted representation. Under current Rule 3-310(A)(2), "informed written consent" means "the client's or former client's written agreement to the representation following written *disclosure*." Under 3-310(A)(1), "disclosure" means "informing the client or former client of the relevant circumstances and of the actual and reasonably foreseeable adverse consequences to the client or former client." Thus, whether a client's consent is "informed" depends on the quality of the disclosure. What constitutes adequate disclosure in turn depends on the specific facts and circumstances. See e.g. L.A. County Bar Assn. Ethics Op. 471 (12/21/92), pp. 6-9.

It should be apparent that if a lawyer is precluded from providing a second client with sufficient disclosure because another client has prohibited the lawyer from disclosing to the first client information the first client needs to make an informed decision, the first client cannot give informed consent. Although we are not privy to what if any disclosure was provided to or obtained from Mr. Callaham in connection with your respective offices' joint retention, we cannot fathom any circumstances under which it could possibly comply with Rule 3-310(A)(2). Accordingly, in the event that we do not receive forthwith written confirmation of your offices' withdrawal as counsel jointly representing the defendants in this matter, please consider this as our client's attempt to meet and confer with you before proceeding with the filing of a motion to disqualify your respective offices from joint representation of defendants in these matters. Please feel free to call or write us if you wish to meet and confer further over the next few days on this matter. However, please be advised that given the gravity of the conflict of interest, as well as the fact that your offices have compounded the conflict by vigorously opposing any effort to delay the corresponding arbitration hearing set for January 31, 2014, to avoid severe prejudice to our clients we must bring this matter to the attention of the Court forthwith.

Regards,

Charles M. Coate

**ROTHNER, SEGALL & GREENSTONE**
——————— ATTORNEYS ———————
510 SOUTH MARENGO AVENUE
PASADENA, CALIFORNIA 91101-3115

GLENN ROTHNER
ANTHONY R. SEGALL
ELLEN GREENSTONE
JONATHAN M. COHEN

MICHELE S. ANCHETA
JOSHUA ADAMS
MARIA KEEGAN MYERS
ELI NADURIS-WEISSMAN
ANTHONY P. RESNICK
CONSTANCE HSIAO

TELEPHONE:
(626) 796-7555

FACSIMILE:
(626) 577-0124

WEBSITE:
WWW.RSGLABOR.COM

January 15, 2014

**BY EMAIL AND FIRST CLASS MAIL**

Mr. Charles M. Coate
Costa Abrams & Coate LLP
1221 Second Street, Third Floor
Santa Monica, CA 90401

Re:  *Double Life Productions, Inc. v. Writers Guild of America West, Inc. et al.,*
      USDC CV 14-0197 DMG (AJWx); and *Nu Image, Inc., et al. v. David E.*
      *Callaham, et al.,* USDC CV 14-0199 RGK (JCx)

Dear Mr. Coate:

I received your January 13, 2014 letter addressed to Kathy Christovich and me, soliciting our withdrawal as counsel for the defendants/respondents in the two actions referenced above.

We have reviewed the legal citations contained in your letter and the pleadings on file in both actions, including the exhibits attached to both the fraud complaint and the writ petition. It is our conclusion that, even assuming the truth of all of the factual allegations contained in the two pleadings (and the authenticity of the appended exhibits), there is no actual or potential conflict of interest between the WGAW and Mr. Callaham (or his loan-out company) within the meaning of Rule 3-310. Indeed, the interest of all of the clients we represent in the litigation is the same: to uphold the finality of a procedurally regular and contractually compliant credit arbitration conducted and concluded in 2009. Nothing alleged in the pleadings on file in either action provides a basis for pursuing a different objective. If additional facts come to light, we will reassess our position consistent with our professional obligations.

We hope that the foregoing explanation dissuades you from seeking disqualification by motion. If not, we are available to meet and confer as required by the local rules.

Very truly yours,

Anthony R. Segall

ARS/jr

cc:   Katherine S. Christovich
       David E. Callaham

**EXHIBIT**
I

89